Stewart Gollan (Utah Bar No. 12524)
214 East Fifth South Street, Salt Lake City, UT 84103
(801) 328-9531; stewartgollan@utahlegalclinic.com

Justin Marceau (Calif. Bar No. 243479)
2255 E. Evans Avenue, Denver, CO 80208
(303) 871-6449; jmarceau@law.du.edu

Matthew Liebman (Calif. Bar No. 248861)
170 East Cotati Avenue, Cotati, CA 94931
(707) 795-2533, ext. 1028; mliebman@aldf.org

Matthew Strugar (Calif. Bar No. 232951)
2154 W. Sunset Blvd., Los Angeles, CA 90026
(323) 210-2263; matthew-s@petaf.org

(*Pro Hac Vice* applications pending)

Attorneys for Plaintiffs

_____

UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | | |
|---|---|---|
| **ANIMAL LEGAL DEFENSE FUND, PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, COUNTERPUNCH, AMY MEYER, WILL POTTER, DANIEL HAUFF, JAMES McWILLIAMS, JESSE FRUHWIRTH** | ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | **CIVIL RIGHTS COMPLAINT** |
| v. | ) ) | Judge: _____ |
| **GARY R. HERBERT**, in his official capacity as Governor of Utah; **JOHN SWALLOW**, in his official capacity as Attorney General of Utah, | ) ) ) ) ) | **CIVIL NO. _____** |
| Defendants. | ) ) | |

The non-profits Animal Legal Defense Fund and People for the Ethical Treatment of Animals, the news journal CounterPunch, local activist Amy Meyer, award-winning author and journalist Will Potter, animal investigation consultant and expert Daniel Hauff, animal agriculture scholar James McWilliams, and local freelance journalist and blogger Jesse Fruhwirth (hereinafter Plaintiffs), bring this Complaint and allege as follows:

<u>Introduction</u>

1.      This lawsuit challenges Utah's "ag gag" law, Utah Code Ann. § 76-6-112 (West 2012), as unconstitutional.  The law creates the crime of "agricultural operation interference" in an effort to impair the public debate about animal welfare, food safety, and labor issues on modern industrial farms.   In essence, the law criminalizes undercover investigations and videography at slaughterhouses, factory farms, and other agricultural operations, thus "gagging" speech that is critical of industrial animal agriculture.  In doing so, the statute violates the First Amendment, the Supremacy Clause, and the Fourteenth Amendment of the United States Constitution.

2.      Since the early twentieth century, some of America's most storied journalistic endeavors have exposed inhumane and unsafe meat production facilities.  Upton Sinclair became a household name for exposing the unfair labor practices, cruelty to animals, and unsanitary conditions of meat processing plants in the early 1900s, and his exposé led to the enactment of the Federal Meat Inspection Act and the Pure Food and Drug Act.

3.      There is a long and celebrated history of journalists and activists reporting on industrial agriculture conditions so as to spur enforcement, legislative reform, and debate.  The modern day accounts of the meat, dairy, and egg industries are no less compelling than those of a

century ago when Sinclair wrote *The Jungle*.[1] *See, e.g.*, Timothy Pachirat, *Every Twelve Seconds* (2011).

4.        In order to silence the undercover investigations and corresponding media coverage that contribute to public debate about animal treatment and food safety, industry executives have made the enactment of factory farm-secrecy statutes, commonly known as "ag gag" laws because they gag speech that is critical of industrial agriculture, a top legislative priority.

5.        Plaintiffs bring this action to prevent the enforcement of Utah's ag gag law, Utah Code Ann. § 76-6-112,[2] which has the effect of criminalizing this historically celebrated and important form of speech.

---

[1] The type of investigations criminalized by the Utah statute, as well as the subsequent media coverage of the investigation, have led to food safety recalls, citations for environmental and labor violations, evidence of health code violations, plant closures, criminal convictions, and civil litigation.  Such investigations have resulted in thousands of news stories in the past year alone.  Recent investigations have revealed numerous instances of cruelty to animals.  For example, one investigation by Plaintiff PETA that was widely covered in the media revealed workers slamming chickens against the wall, ripping their beaks off, twisting their heads off, spitting tobacco in their eyes and mouths, spray-painting their faces, and squeezing their bodies so hard that the birds expelled feces, all while the animals were still alive. People for the Ethical Treatment of Animals, *Thousands of Chickens Tortured by KFC Supplier*, Kentucky Fried Cruelty, http://www.kentuckyfriedcruelty.com/u-pilgrimspride.asp (last visited July 21, 2013). Another investigation by PETA revealed multiple beatings of pigs with metal rods and workers sticking clothespins into pigs' eyes and faces.  A supervisor was filmed kicking a young pig in the face, abdomen, and genitals to make her move and told the investigator, "You gotta beat on the bitch.  Make her cry."  People for the Ethical Treatment Animals, *Mother Pigs and Piglets Abused by Hormel Supplier*, https://secure.peta.org/site/Advocacy?cmd=display&page=UserAction&id=1131 (last visited July 21, 2013).  Other investigations have led to concerns about meat contamination and food safety issues more generally.

[2] The full text of the statute reads:  76-6-112. Agricultural operation interference -- Penalties.

6.      Notably, these laws criminalize efforts to document criminal behavior in a workplace.  There are federal crimes relating to food safety and animal handling, and the Utah statute unconstitutionally and unwisely prohibits efforts to bring violations of these laws to the attention of the public.

7.      Utah Code Ann. § 76-6-112 limits speech in the form of sound and image production, and it does so in a content-based manner.  The law drastically, if not entirely, limits the production and distribution of politically salient speech regarding industrial agriculture.  The practical effect of the law is to provide preferential treatment to industries at the expense of

---

(1)     As used in this section, "agricultural operation" means private property used for the production of livestock, poultry, livestock products, or poultry products.

(2)     A person is guilty of agricultural operation interference if the person:

    (a)     without consent from the owner of the agricultural operation, or the owner's agent, knowingly or intentionally records an image of, or sound from, the agricultural operation by leaving a recording device on the agricultural operation;

    (b)     obtains access to an agricultural operation under false pretenses;

    (c)

        (i)      applies for employment at an agricultural operation with the intent to record an image of, or sound from, the agricultural operation;

        (ii)     knows, at the time that the person accepts employment at the agricultural operation, that the owner of the agricultural operation prohibits the employee from recording an image of, or sound from, the agricultural operation; and

        (iii)    while employed at, and while present on, the agricultural operation, records an image of, or sound from, the agricultural operation; or

    (d)     without consent from the owner of the operation or the owner's agent, knowingly or intentionally records an image of, or sound from, an agricultural operation while the person is committing criminal trespass, as described in Section 76-6-206, on the agricultural operation.

(3)     A person who commits agricultural operation interference described in Subsection (2)(a) is guilty of a class A misdemeanor.

(4)     A person who commits agricultural operation interference described in Subsection (2)(b), (c), or (d) is guilty of a class B misdemeanor.

political speech.  Only one side of the debate regarding food safety, animal welfare, and labor practices is available after the enactment of the law in question in this case.

8.      Specifically, Utah Code Ann. § 76-6-112 is both facially content-based, and predicated on a viewpoint-based legislative purpose.  A law that prohibits the recording of images or sounds during certain activities—be it a political rally, or an unsafe or inhumane workplace—is content discriminatory.  Moreover, the legislative history, detailed below, leaves little doubt that the legislative purpose was to curtail a form of political speech of great public interest.

9.      The purpose and effect of the law, as set forth in detail below, are to (1) stifle political debate about modern animal agriculture by criminalizing the creation of videos or photos from within the industry made without the express consent of the industry, and (2) prevent the public and the government from learning about violations of laws and regulations designed to ensure a safe food supply and to minimize animal cruelty.

10.      Plaintiffs, as parties that conduct these investigations or rely on the investigations for their reporting and research, contribute to an important public debate about mass-produced meat, dairy, and eggs.  The rise of the internet and the increased public interest in safe and ethically produced food have fostered greater awareness of and concern with ongoing abuses by large agricultural enterprises.  The ag gag law has the effect of sheltering industries from scrutiny regarding food safety, animal welfare, and other related concerns.

11.      Moreover, the criminalization of this speech also creates significant obstacles to the enforcement and efficacy of federal laws and is therefore preempted under the Supremacy Clause.  Utah Code Ann. § 76-6-112 criminalizes whistle-blowing speech that is incentivized by

the False Claims Act and other statutory provisions protecting whistle-blowers and regulating the food industry.

12.    In addition, because the law is motivated by animus towards a politically unpopular group—animal protection advocates—it also violates the Fourteenth Amendment.

13.    In short, the Utah law infringes the rights of Plaintiffs and gives the animal agriculture industry a virtual monopoly on the most relevant and probative speech on a topic that is of vital importance to the public, thereby allowing the industry to provide a misleading account of activities in animal operations and hide violations of animal cruelty, labor, environmental, and food safety laws.  Such a sweeping prohibition on speech directly harms the Plaintiffs, both as investigators and conveyors of this information, and effectively removes an entire category of speech from the marketplace of ideas.

14.    Accordingly, Plaintiffs ask this Court for injunctive relief to preserve their right and the right of others to engage in expressive and communicative activity that is of the utmost public concern.

15.    Specifically, Plaintiffs bring this action seeking declaratory and injunctive relief to lift a chill that leads some Plaintiffs to refrain from engaging in protected speech and prevents other Plaintiffs from reporting on these events.  There is an imminent and credible threat of prosecution under statutory provisions that violate Plaintiffs' rights under the United States Constitution.   Utah Code Ann. § 76-6-112 is facially, and as applied to Plaintiffs, unconstitutional for several independent reasons:  (1) it is overbroad because it sweeps within its ambit a substantial amount of core First Amendment protected speech; (2) it discriminates on the basis of the content and viewpoint of particular speech and expressive conduct; (3) it is

preempted by federal laws; and (4) it violates the Equal Protection Clause of the Fourteenth Amendment because it lacks a rational basis and is predicated on animus.

## JURISDICTION AND VENUE

16.     This action arises under the United States Constitution and laws of the United States including 42 U.S.C. § 1983 and § 1988.  Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331 and § 1343.

17.     This Court has authority to grant the declaratory and injunctive relief herein requested pursuant to 28 U.S.C. §§ 2201, 2202, and Rules 57 and 65 of the Federal Rules of Civil Procedure.

18.     Venue is proper in the United States District Court for the District of Utah pursuant to 28 U.S.C. § 1391(b)(1) and (2).

## PARTIES

### PLAINTIFFS

19.     Plaintiff–ANIMAL LEGAL DEFENSE FUND (ALDF) is a national non-profit animal protection organization founded in 1979 that uses education, public outreach, investigations, legislation, and litigation to protect the lives and advance the interests of animals, including those raised for food.  ALDF's work is supported by more than 110,000 members across the country, including in Utah.  ALDF promotes the humane treatment of farmed animals. ALDF and its agents have conducted undercover investigations at animal facilities around the country.  ALDF has concrete plans to conduct an investigation at an animal agricultural operation in Utah but has refrained from doing so out of a reasonable fear of criminal prosecution.  ALDF has identified potential investigation sites, contracted with a private

investigation firm licensed in Utah, obtained employment applications from agricultural operations, and engaged an expert consultant – Plaintiff Daniel Hauff – to advise it on an undercover, employment-based investigation at a factory farm.  In short, ALDF has taken every step possible to prepare for an investigation, stopping just short of violating the statute.  If the ag gag law is declared unconstitutional, ALDF will follow through with its plans to conduct and publicize an undercover investigation at an agricultural operation.  ALDF also uses the results of undercover investigations by other organizations in its outreach and litigation projects; the ag gag law's stifling of that speech hinders ALDF's ability to pursue its organizational mission.

20.     Plaintiff PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS (PETA) is a Virginia non-stock corporation and animal protection charity exempt from taxation pursuant to Section 501(c)(3) of the Internal Revenue Code.  PETA is dedicated to protecting animals from abuse, neglect, and cruelty, and undertakes these efforts through public education, undercover investigations, research, animal rescue, legislation, special events, celebrity involvement, protest campaigns, and lawsuits to enforce laws enacted to protect animals.  A central tenet of PETA's mission is to expose cruelty to farmed animals, educate the public about such cruelty, and encourage people to choose a lifestyle that does not involve or support abuse, neglect, or exploitation of animals.   PETA's first undercover investigation—the 1981 investigation of Dr. Edward Taub's monkey testing laboratory in Silver Spring, Maryland— resulted in the nation's first arrest and criminal conviction of an animal experimenter for cruelty to animals.  PETA has conducted dozens of investigations in the United States over the past three decades, exposing illegal animal abuse and turning the results of each investigation over to appropriate law enforcement and/or regulatory authorities.   It continues to conduct these

investigations to expose further illegal conduct on the part of workers and management personnel.  PETA is also interested and willing to conduct an investigation in Utah but for the threat of criminal prosecution under Utah Code Ann. § 76-6-112.

21.     Plaintiff COUNTERPUNCH is a print and online journal of progressive politics, news, investigative reporting, civil liberties, art, and culture.  CounterPunch's readership is global, with over 5,000 paid subscribers and a web readership of over one million unique visitors per month.  CounterPunch and its writers have received numerous awards.  CounterPunch regularly reports on undercover investigations at factory farms; the following articles illustrate the extensive coverage CounterPunch gives to these investigations:  "Undercover at a Turkey Slaughtering Plant," "Hatchery Horrors," "The Price of Cheap Easter Eggs," "Life on HBO's Factory Hog Farm," "Is Your Child Eating Downer Cows?," "American Beef Supply at Risk," and "Pig Hell at Wal-Mart Supplier."  The ag gag law stifles undercover investigations in Utah and thus suppresses CounterPunch's free press rights and undermines its ability to report thoroughly and accurately on a matter of significant public concern: the ethical and public health implications of modern industrial animal agriculture.  If the ag gag law is declared unconstitutional, CounterPunch will report on the findings of undercover factory farm investigations conducted in Utah.

22.     Plaintiff AMY MEYER is a resident of Salt Lake County, Utah.  Meyer is an animal activist and has in the past engaged in protected First Amendment activities such as protests and demonstrations in an effort to bring public awareness to animal issues, including the treatment of farmed animals.  On February 8, 2013, Meyer was standing on public property adjacent to a slaughterhouse in Draper City, Utah.  While there, she witnessed practices that she

found troubling, including workers pushing what appeared to be a sick cow with a bulldozer. She recorded images of these practices from her vantage point on the adjacent public right-of-way. Although Meyer never entered private property and was simply exercising her rights as protected by the United States Constitution, she was questioned by the Draper City Police and subsequently charged with violating Utah Code Ann. § 76-6-112(4), Agricultural Operation Interference, making her the first and only person in the country to be charged under an ag gag statute. Meyer was criminally charged and retained private counsel. She was subject to court process and mandatory appearances until April 30, 2013, when her case was dismissed without prejudice. Meyer intends to continue her animal activism and has concrete plans to engage in First Amendment activities related to that activism generally and to animal agriculture specifically. Her prior arrest has made her fearful that if she does so, she may be arrested and again criminally charged if she records or is thought to have recorded images of animal agricultural activities—even if she does so while on generally accessible public property. This fear has a real and chilling effect on the exercise of her constitutionally protected rights. If the ag gag law is declared unconstitutional, these fears would be allayed and Meyer could again confidently engage in constitutionally protected free speech.

23. Plaintiff WILL POTTER is an award-winning journalist, author, and public speaker based in Washington, D.C. who is a leading authority on the animal rights and environmental movements. Potter's reporting and commentary have appeared in media outlets including *Rolling Stone*, *Mother Jones*, *The Los Angeles Times, The Vermont Law Review,* and *The Washington Post*. Potter has lectured at more than 100 universities and public forums internationally about his work, including Georgetown University, the New York City Bar

Association, and the House of Democracy and Human Rights in Berlin, and he has testified before the U.S. Congress about his reporting. Potter teaches investigative journalism at the University of Southern Maine. Potter is the author of *Green is the New Red: An Insider's Account of a Social Movement Under Siege*, which Kirkus Reviews named as one of the best books of 2011 and described as a "shocking exposé" of "remarkable merit." The book is regularly used in college and graduate school courses on political science, civil rights, and sociology. Potter also runs the popular website www.greenisthenewred.com, where he reports on issues concerning animals and the environment. Potter regularly reports on the results of undercover investigations, including the footage shot by Plaintiff Meyer, but the ag gag law limits his access to undercover investigations and hinders his coverage of industrial animal agriculture. Potter would report the findings of other investigations at animal agricultural operations in Utah, but for the ag gag statute.

24.    Plaintiff DANIEL HAUFF is an animal and human rights activist, consultant, and expert on employment-based undercover investigations at animal agricultural operations. He is the former Director of Investigations for a major national animal protection organization. In that capacity, he spent four years working with investigators, facilitating their employment, and overseeing more than a dozen high security undercover investigations across the country at a variety of animal agricultural operations—from pig breeding facilities to high-density egg farms to dairies to slaughterhouses to veal farms. Each investigation that Hauff oversaw revealed severe animal suffering, either through the gratuitous infliction of animal cruelty or through legal and routine industrial farming practices such as intensive confinement and unanaesthetized mutilations (e.g., beak-searing, horn removal, and castration). Hauff has facilitated every stage

of undercover investigations, including identifying and scouting locations, hiring investigators, advising investigators in-field on everything from the effective use of surveillance equipment to emergency decision-making, reviewing investigative footage, presenting findings to law enforcement, and serving as a media spokesperson to convey investigative findings to the public. Investigations overseen by Hauff gained national recognition and exposed institutionalized mistreatment of farmed animals, leading to raids on factory farms, rescue of abused and neglected animals, passage of landmark legislation, and major corporate policy changes affecting countless animals. Because of Hauff's extensive expertise in the field, Plaintiff ALDF has engaged him to coordinate an undercover, employment-based investigation in Utah. ALDF would pay Hauff to oversee such an investigation. The existence of the ag gag law, however, prevents Hauff from pursuing this consulting opportunity, for fear of being prosecuted as an accomplice or co-conspirator to "Agricultural Operation Interference." The ag gag statute has thus injured Hauff financially by depriving him of a consulting opportunity, and constitutionally by depriving him of the opportunity to serve as a media spokesperson about a Utah investigation at an agricultural operation. If the ag gag law is declared unconstitutional, Hauff will oversee an employment-based investigation of an agricultural operation in Utah on behalf of ALDF.

25.   Plaintiff JAMES MCWILLIAMS is an award-winning professor in the Department of History at Texas State University at San Marcos. McWilliams writes and publishes and lectures nationally at food and vegetarian conferences on the intersection of American history and diet, including the book *A Revolution in Eating: How the Quest for Food Shaped America*, published by Columbia University Press. McWilliams' writing on food, agriculture, and animals has appeared in the *New York Times, Harper's, The Washington Post,*

*The Atlantic, Slate, Forbes, Travel and Leisure, The Los Angeles Times, The International Herald Tribune, The Christian Science Monitor,* and *The Texas Observer.*  McWilliams also runs the popular *Eating Plants* blog, where he writes about factory farming, relying in part on undercover investigations.  His current projects include two books.  One, tentatively titled *A Glorious Distance: The Origins of Factory Farming in the United States*, is being published by the Cornell University Press.  The second, tentatively titled *The Modern Savage: Our Unthinking Decision to Eat Animals* (St. Martin's Press), investigates the hidden ethical, environmental, and economic problems with small-scale animal agriculture today.  As a scholar and historian, McWilliams places great importance on access to reliable, accurate, first-hand source materials.  The ag gag law inhibits this access, screening out important and relevant materials that are essential to McWilliams' scholarship, teaching, and national lectures, thus interfering with and undermining his profession.

26.    Plaintiff JESSE FRUHWIRTH is an activist and freelance journalist in Salt Lake City who covers environmental and animal rights topics on a variety of social media outlets.  For five years Fruhwirth was a professional newspaper writer, investigative journalist, and editor at several Utah newspapers, including *Salt Lake City Weekly*.  He was twice named as a finalist for Reporter of the Year by the Society of Professional Journalists Utah Headliner's Chapter.  He has investigated animal rights, repression of activist movements, oil refinery safety, police racial profiling, and local politics.  Fruhwirth's blogs and reporting have a large following and he would report the findings of investigations at animal agricultural operations in Utah, but for the ag gag statute.

**DEFENDANTS**

27.    Defendant GARY R. HERBERT is the Governor of Utah and as such, is the Chief

Executive for the state, responsible for ensuring the enforcement of the State's criminal statutes.

The Governor is sued in his official capacity.

28.    Defendant JOHN SWALLOW is the Attorney General of Utah and as such,

oversees the enforcement of the State's criminal statutes.  The Attorney General is sued in his

official capacity.

## FACTUAL BACKGROUND

**Statutory Overview**

29.    In 2012, Utah adopted House Bill 187, codified at Utah Code Ann. § 76-6-112

(West 2012), which criminalizes "agricultural operation interference."[3]

---

[3] The full text of the statute reads:  76-6-112. Agricultural operation interference -- Penalties.

    (1)    As used in this section, "agricultural operation" means private property used for the production of livestock, poultry, livestock products, or poultry products.

    (2)    A person is guilty of agricultural operation interference if the person:

        (a)    without consent from the owner of the agricultural operation, or the owner's agent, knowingly or intentionally records an image of, or sound from, the agricultural operation by leaving a recording device on the agricultural operation;

        (b)    obtains access to an agricultural operation under false pretenses;

        (c)

            (i)    applies for employment at an agricultural operation with the intent to record an image of, or sound from, the agricultural operation;

            (ii)    knows, at the time that the person accepts employment at the agricultural operation, that the owner of the agricultural operation prohibits the employee from recording an image of, or sound from, the agricultural operation; and

30.     An agricultural operation is any "private property used for the production of livestock, poultry, livestock products, or poultry products."

31.     The statute defines four ways that whistle-blowing activity will be deemed criminal:

       a.     Recording an image or sound by "leaving a recording device on the agricultural operation" without consent from the owner, Utah Code Ann. § 76-6-112(2)(a);

       b.     Obtaining "access to an agricultural operation under false pretenses," Utah Code Ann. § 76-6-112(2)(b);

       c.     Applying for employment "with the intent to record an image of, or sound from, the agricultural operation" while knowing that the operation prohibits such recording and recording an "image of, or sound from, the agricultural operation" while employed, Utah Code Ann. § 76-6-112(c); or

       d.     Recording an image or sound without the consent of the owner of the operation while committing criminal trespass, Utah Code Ann. § 76-6-112(d).

32.     Persons violating Utah Code Ann. § 76-6-112(2)(a) face up to a year in jail and up

---

          (iii)     while employed at, and while present on, the agricultural operation, records an image of, or sound from, the agricultural operation; or

   (d)     without consent from the owner of the operation or the owner's agent, knowingly or intentionally records an image of, or sound from, an agricultural operation while the person is committing criminal trespass, as described in Section 76-6-206, on the agricultural operation.

   (3)     A person who commits agricultural operation interference described in Subsection (2)(a) is guilty of a class A misdemeanor.

   (4)     A person who commits agricultural operation interference described in Subsection (2)(b), (c), or (d) is guilty of a class B misdemeanor.

to $2,500 in fines, the same penalty as would attach to assaulting a police officer.  *See* Utah Code Ann. § 76-5-102.4 (West 2012).  Persons violating other subsections of section 76-6-112 face up to six months in jail and a $1,000 fine.[4]

33.     Under the plain terms of Utah Code Ann. § 76-6-112, no new investigations of the type contemplated by ALDF and PETA and reported on by several of the journalistic Plaintiffs may be conducted in the state of Utah.

34.     Although investigations and their corresponding media coverage are the primary source of whistleblowing activity in this industry, the Utah law makes all such speech effectively impossible.

35.     The threat of criminal liability extends beyond the individual who conducts the investigation and includes non-profit organizations such as PETA and ALDF who support and encourage whistleblowers and investigators who are shining a spotlight on practices in the belief that the public has a right to know what goes on in facilities that produce products for public consumption, as well as individuals such as Daniel Hauff, who support, encourage, and facilitate the recordings.   Indeed, even a journalist who contracted with an investigator to obtain undercover video or photographic images would be a criminal.   Utah Code Ann. § 76-2-202 (West 2012) (accomplice); Utah Code Ann. § 76-4-201 (West 2012) (conspiracy).

36.     These statutes have the effect of criminalizing undercover investigative activities targeting agricultural operations, as well as the planning and assistance of such activity, thereby making the investigations and the journalism surrounding such events virtually impossible.

---

[4] The legislative history suggests that *each* photograph could constitute a separate offense, such that offenders would, in the words of one House representative, "go away to jail for a very long time."

**Statutory Purpose**

37.     Utah Code Ann. § 76-6-112 criminalizes image capture from agricultural operations only if the owner of the facility does not approve of the recording in advance of its production.

38.     The statute does not target images and recordings produced by the owners or others who will portray the agricultural industry in a favorable light.  The purpose and effect of the statute is to prioritize and privilege speech that is favorable to the agricultural industry.

39.     The statute criminalizes the production of only speech that is inconsistent with the goals and economic interests of the agricultural industry.

40.     The statute criminalizes the production of speech that is a matter of considerable public concern.

41.     The statute's legislative history in Utah demonstrates that it was introduced with the explicit intent of silencing or impeding speech by animal protection organizations.

42.     Representative John Mathis, sponsor of the House bill, stated his intent was to stop "national propaganda groups" from using industrial agriculture footage to advance their political agendas, which he called "undoing animal agriculture."

43.     Rep. Mathis explained his motivation for introducing the legislation by expressing his disdain for animal protection organizations, saying that the recordings should be criminalized because they are used "for the advancement of animal rights nationally, which, *in our industry*, we find egregious."

44.     Rep. Mathis further stated that animal protection groups "should not be allowed to continue," and called for legislators to "stand[] up" to the national animal protection groups.

45.     Representative Daniel McCay spoke in support of the House Bill, taking note of "those who are fraudulently accepting employment" and then recording behavior that "they interpret as abuse." Rep. McCay explained that he supported the bill because "you have to look at [what someone] is trying to accomplish" by taking a recording.

46.     Representative Michael Noel was similarly emphatic in his animus towards Plaintiffs and other animal protection organizations, stating that he was opposed to letting "these groups like PETA and some of these organizations control what we do in this country, a country that feeds the world." Rep. Noel then referred to anyone who wanted to film an agricultural operation as a "jack wagon."[5] The legislative history is replete with references to animal protection organizations, which Representative King referred to as "very controversial groups." The legislative history demonstrates a desire to impede the legitimate and recognized mission of these organizations.

47.     Senator David Hinkins, the sponsor of the legislation in the Senate, discussed his support for the legislation by maligning one of the Plaintiffs, saying, among other things, "I'd like to share some things with you on this PETA group and I'm not sure how many of you realize this but they are the People for Ethical Treatment of Animals, an organization known for

---

[5] *Jack wagon* is a slang term for "loser" according to an online slang dictionary.
http://www.internetslang.com/JACK_20WAGON-meaning-definition.asp

uncompromising animal rights positions . . . ."   The senator provided a litany of personal, animus-based objections to PETA's lawful activity as a basis for supporting the legislation.[6]

48.     Senator Hinkins was also clear that he viewed the legislation as a means of targeting "the vegetarian people" who "are trying to kill the animal industry."  Senator Hinkins elaborated that in his view the law was necessary because the vegetarian groups are "terrorists" whose viewpoint is not entitled to protection.

49.     One of the primary public voices of support for the Utah statute was the Utah Farm Bureau.  Sterling Brown, from the Utah Farm Bureau, stated that farm investigations "have done more of a disservice than anything positive."

50.     In the House Law Enforcement Committee's review of HB 187, Rep. Mathis described his hope that the bill would undermine the "many groups around the country" that "use propaganda" to "change the way agriculture's done."

51.     The Committee's consideration of the bill also involved distinguishing between protecting the "innocent" people on the one hand, and Plaintiffs like PETA on the other, who legislators attempted to tar as "so-called animal rights terrorists."[7]

52.     During the committee hearings Rep. Mathis stated that the mission of the Plaintiffs was "very misguided" and that the purpose of the bill was to target those groups whose work he deems "egregious."

_____

[6] Senator Hinkins' comments were not directly relevant to the statutory language under review, but he repeatedly denounced People for the Ethical Treatment of Animals by accusing it of making "empty promises . . . to folks who generously offer their hard-earned money to help save animals."

[7] During the committee hearings Rep. Perry demonstrated that his support for the bill was also grounded in animus, explaining that he views undercover investigations as "just another version of domestic terrorism."

53.     Upon information and belief, certain legislators and legislative staff advocated for Utah Code Ann. § 76-6-112 specifically because it would silence animal protection organizations.  Mike Kohler, speaking on behalf of Utah dairy farmers, spoke in support of the bill, explaining that it "will be a good tool to . . . stop some of the conduct nationally that has been causing a problem" for the industry.

54.     On information and belief, Utah's law was based in substantial part on model language drafted and lobbied by the American Legislative Exchange Council (ALEC).

55.     On information and belief, many of the legislative votes in support of Utah's ag gag law came from ALEC members.

56.     Two of the representatives who supported the bill, Rep. Roger Barrus and House Speaker Rep. Rebecca Lockhart, are members of the ALEC Energy, Environment and Agriculture Task Force.

57.     On information and belief, the ALEC Energy, Environment and Agriculture Task Force has repeatedly discussed ways of silencing and diminishing the influence of Plaintiffs through legislation.

58.     The Utah law has the intent and effect of stopping future investigations by Plaintiffs ALDF and PETA into illegal acts by animal agricultural interests, as well as those conducted by investigative journalists.  The law also deprives journalists of footage and information that they would like to distribute to their readers.

59.     On information and belief, there are no other statutes in Utah that target a specific category whistle-blowing or investigative journalism activity.  Undercover investigations of, for example, childcare facilities, nursing homes, and banks are still permitted.

**Investigations and Reporting Generally**

60.    Plaintiff PETA regularly conducts investigations into industrial factory farming facilities and slaughtering operations in the United States.  These investigations are central to the organization's mission and related public interest campaigns.   ALDF has conducted investigations in the past at animal shelters, roadside zoos, and other animal facilities, and intends to pursue an agricultural investigation in Utah.

61.    Plaintiffs Will Potter, CounterPunch, James McWilliams, and Jesse Fruhwirth actively report on agricultural investigations.  Each engages in outreach and reporting that rely on the investigations either explicitly, or as part of their background research.

62.    In order to document actual conditions within agricultural operations, including egregious animal abuses and routine cruelties, PETA and ALDF have used or will use investigators to obtain employment at animal agriculture facilities.

63.    Investigators for PETA and ALDF would or have performed all the duties of a farm laborer while observing and recording any illegal conduct occurring at the facility.

64.    On information and belief, agricultural employers in Utah will inquire about whether a potential employee has any connections to an animal protection organization.

65.    Industry documents for the agricultural field routinely instruct agricultural employers to inquire about affiliations with animal protection organizations.

66.    During their employment, investigators use recording equipment to document violations of applicable laws and regulations, including unsanitary practices, cruelty to animals, pollution, sexual misconduct, labor law violations, and other matters of public importance.

67.     PETA's undercover investigations at factory farms have found workers kicking pigs in the head, spray painting them in the eyes, stomping and throwing chickens and turkeys like footballs, smashing piglets' heads against concrete floors, and beating and sexually assaulting pigs with steel gate rods and hard plastic herding canes.

68.     PETA has used, and ALDF plans to use, the videos and photos of illegal conduct to seek enforcement of civil and criminal laws and regulations, to encourage legislative and industry reform, and to effectuate changes in corporate policies and supply chains.

69.     PETA's 1998 investigation of Belcross Farm, a pig-breeding factory farm in North Carolina, resulted in felony indictments of workers after PETA released hours of video footage that revealed shocking, systematic cruelty from daily beatings of pregnant sows with a wrench and an iron pole to skinning pigs alive and sawing off a conscious animal's legs.  A 2001 PETA investigation of Seaboard Farms, an Oklahoma pig farm, resulted in the first conviction for felony animal cruelty to farmed animals after PETA's investigation showed employees routinely throwing, beating, kicking, and slamming animals against concrete floors and bludgeoning them with metal gate rods and hammers.  PETA's 2008 investigation of the factory farms of Aviagen Turkeys resulted in the first-ever felony indictments for farmed poultry, and first convictions of factory farmers for abusing turkeys.

70.     Undercover investigations have and will continue to result in positive legal outcomes, provide insights into modern factory farming, and contribute immensely to public discourse about the political and ethical dimensions of our food choices.

71.     These recordings are an important part of the marketplace of ideas because they influence public opinion and consumer demand.  A 2012 consumer survey conducted by Purdue

University's Department of Agricultural Economics and Department of Animal Sciences found that the public relies on the information gathered and presented by animal protection groups or investigative journalists, more than they rely on industry groups and the government combined.

72.    With the exception of material generated by or done on behalf of the animal agricultural industry, or pro-agriculture speech produced by the State, investigations by journalists or activists and their subsequent coverage in the media provide the primary lens through which the workings of agricultural operations can be seen.

**State Speech Regarding Animal Agriculture**

73.    The silencing of speech critical of factory farming is all the more dangerous in light of the state government's own one-sided, viewpoint-based speech on the issue.

74.    The Utah Department of Agriculture, through its website, speaks one-sidedly in support of industrial agriculture.

75.    The Department's website contains a series of videos produced by the Department entitled "Agriculture 101." The series is "intended to help consumers know more about where their food comes from." The videos cover the production of animal products, such as eggs, pork, beef, and dairy.

76.    One of the videos, "How Utah Eggs Are Produced," promotes the egg industry to consumers as safe and humane.

  a.    The video asserts that Utah eggs are "some of the safest in the country" and that egg-laying hens "are housed in clean, well-lighted, temperature-controlled buildings where their food, water, and comfort are monitored by employees and computers."

23

b.   The video provides a forum for the industry to tout the safety and humaneness of battery cage egg farms, stating that "growers . . . want the public to know that modern egg laying chickens are far healthier and more productive than hens of the past."

c.   One industry representative featured in the video states, "Our care for the birds [is] of the utmost and we do care about taking care of the production birds the best we know how."

d.   The video features footage of egg farms provided by the Utah Egg Marketing Board and the American Egg Board, organizations whose mission is to promote the egg industry.   The video shows pristine white hens in a clean, sterile environment.

e.   The environment depicted and the claims made in the video are a far cry from the inhumane and unhealthy conditions repeatedly exposed by undercover investigations at battery cage facilities throughout the country.

f.   In fact, two states have banned the confinement of hens in battery cages out of concern for the animals' welfare, including California, which is home to nearly 20 million egg-laying hens.

g.   On information and belief, the video inaccurately depicts the reality at many Utah egg farms, and Plaintiffs would engage in protected speech to counter these representations but for the existence of the ag gag law.

77.   Another video in the Department's Agriculture 101 series, entitled "Animal Care in the Hog Industry," promotes the pig industry as safe and humane.

a.   The video features Dr. Bruce King, the Utah State Veterinarian, who asserts that the pig industry "meet[s] the needs of you, the consumer, while at the same time focusing upon animal welfare."

b.   Dr. King further notes that "the Department and industry have a close partnership that assures a safe, wholesome food product with respect for the environment and [that] protects the well-being of animals."  Dr. King asserts that "the vast majority of producers . . . make[] sure [their] hogs are well taken care of."

c.   The video provides a forum for industry representatives, who claim that they "take care of [pigs] just as you would a family member."

d.   The video promotes the confinement of pregnant pigs in gestation crates, which are typically so small that they prevent the animal from even turning around.  Nine states have banned the confinement of pregnant pigs in gestation crates out of concern for the animals' welfare.   Yet the video claims this extreme confinement provides pigs "greater protection."

e.   The video misleadingly claims that "sometimes animals get sick, so farmers use antibiotics to treat the individual sick pigs," when in fact antibiotics are typically used indiscriminately for nontherapeutic purposes on factory farms, which poses significant public health concerns.

f.   The environment depicted and the claims made in the video are a far cry from the inhumane and unhealthy conditions repeatedly exposed by undercover investigations at pig breeding facilities throughout the country.

25

g.  These investigations are discounted and Plaintiffs' viewpoint is implicitly maligned by the video, which states that "producers believe consumers may have their own impression of the industry because of negative images distributed by some groups."

h.  On information and belief, the video inaccurately depicts the reality at many Utah pig farms, and Plaintiffs would engage in protected speech to counter these representations but for the existence of the ag gag law.

78.  Another video on the Department's website, entitled "Dairy Animal Care in Utah," promotes the dairy industry as safe and humane.

a.  Like the pro-pig industry video, this pro-dairy industry video features Dr. Bruce King and provides the State's imprimatur on controversial practices that are at the center of debates about cruelty in the animal agriculture industry.

b.  In the video, Dr. King states that "the dairy industry in Utah is run by people who . . . love livestock and they want to do anything in their power to become good stewards—and they are good stewards—of what they oversee."

c.  Dr. King further asserts that "it's of ultimate importance to the dairyman that he produce a high-quality product, and in order to do that, he has to take exceptional care of the production unit—the cow.  She has to be fed properly, she has to be clean and dry and comfortable.  She can be under no stress at all if he wants the ultimate production out of that particular animal."

d.  The video defends the industry practice of tail docking for cows, in which most of a cow's tail is amputated by placing an elastic band on the tail until it simply

falls off.   Alternatively, some facilities use a pliers-like device called an "emasculator," which crushes the tail.   The American Veterinary Medical Association discourages the practice, and some states have criminalized it as animal cruelty.   Nevertheless, Dr. King defends the practice, claiming it is "done to guarantee a good wholesome product to you and me and the consumer."

e.      The video also defends the dehorning of cows, which is typically done without anesthesia, claiming it is done for the protection of animals.

f.       Dr. King also asserts that those in the industry "don't do things to cause any unnecessary stress or any unnecessary pain in reference to these cows."

g.      The claims made in the video are a far cry from the illegal, inhumane, and unhealthy conditions repeatedly exposed by undercover investigations at dairy facilities throughout the country.

h.      On information and belief, the video inaccurately depicts the reality at many Utah dairy farms, and Plaintiffs would engage in protected speech to counter these representations but for the existence of the ag gag law.

79.     The Department's website has a section entitled "Links of Interest" that purports to "facilitate a flow of information to help Utah consumers understand the broad issues surrounding agriculture."   *Learn About Agriculture*, Utah Dep't Agric. & Food (2013), http://ag.utah.gov/learn/index.html.   Yet the links are clearly biased in favor of industrial animal agriculture.   Among the "links of interest" are the following:

a.      A link to the website of the Animal Agriculture Alliance, an industry-

27

supported organization that vociferously opposes Plaintiffs and their campaigns, claims factory farming is a "myth," and aggressively promotes ag gag legislation nationwide.  The Animal Agriculture Alliance is described on the Department's website as "a positive and informed voice communicating reliable, science-based information on key agricultural topics ranging from animal welfare to biotechnology to environmental impacts."

b.    A link to a misleading and inaccurate story in Beef Magazine that maligns Plaintiff PETA;

c.    An egg industry rebuttal to a Salt Lake Tribune article about animal welfare concerns in egg-production methods;

d.    A link to a third-party site called "I Love Farmers," which features articles endorsing industrial animal agriculture and disparaging animal protection organizations as "extremists" and peddlers of "propaganda."  One posting on I Love Farmers, entitled "Onward to Official Beefiness," claims that opponents of animal agriculture believe meat is "unjust, for reasons they think they believe to be true but in reality have made up to challenge authority and feel good about their lack of conviction in their personal lives."  The posting further asserts that "those who don't eat beef [are] part of a religion and, yes, their ideology could even be labeled a cult.  They believe in their crusade to end animal production for food just as Muslims in Jihad [sic] believe America is Satan."

e.      In short, the State's own website provides information and links to information that can fairly be characterized as a hyperbolic attack on animal protection organizations and advocates.

80.      Certainly the Department of Agriculture is free to promote agriculture; indeed, that is part of its purpose.  But for the government to speak in favor of one side of an issue of significant public concern, while at the same time passing legislation to silence the other side of the debate, violates the core principles that animate the First Amendment.

**Investigative Interests**

81.      Plaintiffs ALDF and PETA have the goal and organizational purpose of producing speech that shows the other side of industrial agriculture.

82.      PETA and ALDF have a specific interest in agricultural investigations in Utah.

83.      Plaintiffs' missions are best served by demonstrating that meat, dairy, eggs, and related products are produced in a similar manner industry-wide, across the United States, which requires the ability to access a diverse array of states and not just a select few.

84.      The inability to conduct undercover investigations in Utah allows agricultural enterprises in Utah to claim that they are treating their animals in a way that is different than what is shown in the videos obtained by Plaintiffs from other states.  Food safety, labor, and animal welfare issues are uniquely hidden from public scrutiny because of the Utah ag gag law.

85.      ALDF has been researching potential targets for an undercover investigation in Utah.

86.      ALDF has concrete plans to conduct one or more investigations in Utah.

87.     Specifically, ALDF has conducted research and identified facilities that warrant an investigation.

88.     ALDF specifically allocated money from their budget to fund investigations, including in Utah.

89.     ALDF obtained conditional approval for an investigation in Utah from its executive director.  Once they are assured that the investigations will not result in criminal prosecutions, ALDF is ready to undertake investigations in Utah.

90.     ALDF has hired one or more private investigators to conduct investigations in Utah.

91.     ALDF has had an investigator gather applications from potential employers in Utah that ALDF has determined would be suitable subjects of an investigation.

92.     ALDF agreed to hire Daniel Hauff, a national expert in obtaining access to agricultural operations for undercover investigations.  Hauff will coordinate ALDF's Utah investigation.

93.     The investigations planned by ALDF would violate the ag gag statute, Utah Code Ann. § 76-6-112 (West 2012).  ALDF would instruct its investigator to take photos and videos to document the conditions inside the facility, without the permission or consent of the owner, in violation of § 76-6-112(c).  ALDF would instruct its investigator not to disclose their affiliation with animal protection organizations, in violation of § 76-6-112(b).

94.     ALDF has done everything required to conduct an investigation in Utah short of violating the statute.

95.     PETA similarly has a strong interest and desire in an agricultural investigation in Utah.  PETA is committed to doing an investigation in Utah and has the resources, capability, and experience to successfully conduct such an investigation.  PETA would instruct their investigators to take photos and videos to document illegal conduct inside the facility, without the permission or consent of the owner, and their investigators would not to disclose their affiliation with animal protection organizations.  As such, PETA and their investigators would face the threat of prosecution under Utah Code Ann. § 76-6-112(b) and (c).

96.     Plaintiffs believe that prosecutors in Utah intend to enforce Utah Code Ann. § 76-6-112, as evidenced by Plaintiff Meyer's prosecution under the statute.

97.     The more successful the undercover investigations by Plaintiffs, the more likely the animal welfare and food safety issues are to achieve substantial media attention, and the more likely it is that they will be prosecuted under Utah Code Ann. § 76-6-112.

98.     Despite the existence of a concrete plan to investigate one or more facilities in Utah by ALDF and PETA, because of the high likelihood of prosecution under Utah Code Ann. § 76-6-112, they cannot engage in their investigative activities without fear of prosecution.

99.     Realistically, there is no investigation strategy that would meaningfully reveal the conditions inside animal production facilities without violating the statute.

**Reporter and Scholarly Interests**

100.    Plaintiffs CounterPunch, Will Potter, and Jesse Fruhwirth are publishers or journalists committed to covering the images and stories that emerge from undercover investigations of agricultural operations.

101.    Plaintiff James McWilliams is a historian and scholar who lectures across the country, blogs, and teaches courses on the ethics of food.  He relies on undercover investigations for his research, teaching, and presentations.

102.    Each of the above mentioned media and scholarly plaintiffs have covered issues relating to labor, the environment, food safety, or animal welfare.

103.    Each such Plaintiff is concerned with animal welfare and food safety across the entire nation and will attest that they would report on any investigations done in Utah.  Local journalist Jesse Fruhwirth is uniquely interested in issues surrounding animal welfare and environmental impact in his state and would cover any investigations conducted in Utah.

104.    The harm to the media and academic plaintiffs is no less than the harm to the animal protection plaintiffs.  The media and academic plaintiffs are committed to a transparent and free-flowing exchange of ideas regarding issues of food safety and animal welfare, and the ag gag law directly impedes their ability to report on these stories by stymieing undercover investigations in the state.

**Fear of Arrest or Prosecution for Lawful Conduct**

105.    Plaintiff Amy Meyer has a well-founded fear that she will be arrested and prosecuted for lawful conduct based on an overzealous enforcement of the ag gag law.

106.    Plaintiff Amy Meyer has regularly participated in protest and free speech activities related to animal welfare, including activities conducted at or near animal agriculture operations.

107.    Meyer was charged with violating the ag gag law for filming an agricultural operation from a public easement.

108.   Although the charges were dismissed, albeit without prejudice, she missed work, suffered considerable stress, and is fearful to engage in constitutionally protected speech activities.

109.   Meyer's lawful speech activities have been chilled as a result of the ag gag law.

## CLAIMS FOR RELIEF

### Declaratory Relief

110.   An actual and immediate controversy exists between Plaintiffs and Defendants. Plaintiffs contend that the challenged statute is unconstitutional.  Defendants believe the statute is constitutional.

111.   Plaintiffs are therefore entitled to a declaration of rights with respect to this controversy.   Without such a declaration, Plaintiffs will be uncertain of their rights and responsibilities under the law.

### Injunctive Relief

112.   Plaintiffs are entitled to an injunction.  Defendants are acting and threatening to act under color of state law to deprive Plaintiffs of their constitutional rights.  Plaintiffs will suffer irreparable injury and will continue to suffer real and immediate threat of irreparable injury as a result of the existence, operation, enforcement, and threat of enforcement of the challenged statute.  Plaintiffs have no plain, adequate, or speedy remedy at law.  Plaintiffs are refraining from constitutionally protected activities solely for fear of prosecution under the statute.

## FIRST CAUSE OF ACTION

### (First Amendment: Overbreadth)

113.    Plaintiffs incorporate by reference all allegations contained in the above paragraphs.

114.    The act of image capture—the recording of images or sound—is not only a necessary predicate to certain speech, it is speech itself.

115.    A statute that prohibits substantially more speech than the First Amendment permits is unconstitutionally overbroad even though the State could lawfully punish some of the conduct targeted by the statute.  *See United States v. Stevens*, 130 S. Ct. 1577, 1587 (2010).

116.    Even if the State may be able to lawfully limit the creation of certain recordings on an agricultural operation, Utah Code Ann. § 76-6-112 (West 2012) regulates substantially more speech than the First Amendment permits.

117.    Specifically, the ag gag law targets a wide range of politically salient speech, including speech regarding animal welfare, worker safety, and food safety, and speech exposing illegal conduct on the part of industrial agriculture operations.

118.    The ag gag law criminalizes not just the protected speech of Plaintiffs, but of any person or group that would seek to investigate an "agricultural operation" in a similar manner, including employees, local journalists, or any person merely concerned about the conditions under which food is processed.

119.    The law also sweeps within its reach activities by labor organizations who seek to investigate labor conditions and conduct organizing activities.

120.    The law would also criminalize undercover investigations by federal officers, or those acting on behalf of federal authorities, for the purpose of enforcing federal food safety laws.

121.    Because the ag gag law categorizes so much protected speech as "criminal," it is unconstitutionally overbroad.

122.    Plaintiffs are entitled to prospective relief enjoining Defendants from enforcing the ag gag law.

123.    Plaintiffs are entitled to declaratory relief in the form of this Court ruling that the ag gag law is unconstitutionally overbroad and unenforceable in any situation.

## SECOND CAUSE OF ACTION

### (First Amendment: Content & Viewpoint Based Discrimination)

124.    Plaintiffs incorporate herein by reference all other paragraphs of this complaint as if those allegations were set out explicitly herein.

125.    The most important function of the First Amendment is to protect against laws that target certain messages or speech because of their "ideas, subject matter, or content." *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95–96 (1972).

126.    "As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content-based." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 643 (1994).

127.    Even if the speech in question is not generally protected speech—for example, if the speech in question is merely cast as trespassing—the State still may not make a content based

distinction.  *R.A.V. v. City of St. Paul*, 505 U.S. 377, 380 (1992).  That is to say, content-based distinctions are impermissible even for speech that is generally unprotected.

128.    By its plain text, the ag gag statute is an explicit content-based regulation.  It singles out recording the activities of agricultural operations for special, discriminatory treatment.

129.    In addition, the legislative history of the statute, including statements made by the law's sponsors, make clear that the purpose of the ag gag statute was and is to interfere with and suppress the message of national animal protection groups.  Legislators were targeting the speech activities of certain individuals for discriminatory treatment.

130.    The law singles out speech about agricultural activities and limits the ability of activists and journalists to engage in the political speech that is of the utmost public concern.

131.    The State has not limited the ability to engage in whistleblowing activity in other highly regulated or important industries, including medical providers, defense contractors, banks, or childcare providers.

132.    By singling out the agricultural industry for protection against political speech that may be harmful to its profits, the ag gag law must be treated as a content- and viewpoint-based regulation.  In practice, the law ensures that only one side of the debate on food safety and animal welfare is raised.

133.    The ag gag statute, as a content- and viewpoint-based regulation that is neither justified by a compelling interest nor narrowly tailored, violates Plaintiffs' First Amendment rights.

134.     Plaintiffs are entitled to prospective relief from the Defendants to remedy the deprivations suffered as a result of the violations of their First Amendment rights.

135.     Plaintiffs are entitled to declaratory relief in the form of this Court ruling that the ag gag law is unconstitutional and unenforceable in any situation.

### THIRD CAUSE OF ACTION

### (Article VI, § 2: Supremacy Clause: Preemption)

136.     Plaintiffs incorporate herein by reference all other paragraphs of this complaint as if those allegations were set out explicitly herein.

137.     Article VI, paragraph 2, of the United States Constitution provides, "the Laws of the United States . . . shall be the supreme Law of the Land . . . , any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

138.     State laws that conflict with or frustrate the purposes of federal laws are preempted.

139.     A state law is preempted when it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 204 (1983).

140.     The operation, existence, and enforcement of the ag gag law, Utah Code Ann. § 76-6-112, violates the Supremacy Clause because it conflicts with federal law by undermining the objectives of a federal statute.

141.    Because one of the core purposes of the False Claims Act, 31 U.S.C. §§ 3729, 3730 (2006), is to provide incentives and protections for private persons to surreptitiously uncover fraud against the federal government, Utah Code Ann. § 76-6-112 is preempted.[8]

142.    In Utah there is at least one slaughterhouse that has a contract with the federal government to provide meat for the National School Lunch Program and other food assistance programs.

143.    On information and belief, some of the agricultural operations in Utah are subject to federal inspection.

144.    Utah Code Ann. § 76-6-112 drastically undermines the federal goal of discovering fraud against the federal government by criminalizing the very conduct that has produced at least one False Claims Act case in the agricultural industry.[9]

145.    Plaintiffs are entitled to a judgment declaring that Utah Code Ann. § 76-6-112 is preempted.  Such a declaration is appropriate and necessary in order to determine the rights and obligations of the parties.

---

[8]The Utah legislature considered and explicitly rejected an amendment to the bill that would have avoided preemption concerns.  Specifically, Senator Hinkins proposed an amendment specifying that one is not guilty of the offense "if the person is authorized by law to record an image of, or sound from the ag operation."

[9] For example, in 2008 an undercover investigation of a California slaughterhouse resulted in gruesome images of inhumane treatment of cows.  The investigation resulted in the president of the slaughterhouse admitting that his company had produced hamburger from sick cows and sold the product to the federal government for the National School Lunch Program.  The case spurred a False Claims Act prosecution resulting in a $497 million judgment.  *See* Linda Chiem, *Slaughterhouse Owners Hit With $500M Judgment In FCA Case*, Law360 (Nov. 16, 2012), http://www.law360.com/articles/394827/slaughterhouse-owners-hit-with-500m-judgment-in-fca-case.

146.    Plaintiffs are entitled to declaratory relief in the form of this Court ruling that the ag gag law is unconstitutional.

## FOURTH CAUSE OF ACTION

### (Fourteenth Amendment:  Equal Protection & Due Process)

147.    Plaintiffs incorporate herein by reference all other paragraphs of this complaint as if those allegations were set out explicitly herein.

148.    The Equal Protection Clause of the Fourteenth Amendment provides, "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

149.    When a statue is enacted based on improper motives, including animus towards a particular group of people, the equal protection and due process clauses of the Fourteenth Amendment are violated.  *See, e.g.*, *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973) ("If the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare . . . desire to harm a politically unpopular group cannot constitute a legitimate governmental interest.").

150.    Utah Code Ann. § 76-6-112 targets animal protection groups and serves no rational, non-animus based purpose.  The legislative history is replete with derogatory statements about Plaintiffs and their political beliefs.

151.    Plaintiffs are entitled to prospective relief from the Defendants to remedy the Equal Protection and Due Process violations.

152.    Plaintiffs are entitled to declaratory relief in the form of this Court ruling that the ag gag law is unconstitutional.

## **PRAYER FOR RELIEF**

Plaintiffs respectfully request an order and judgment:

153.    Declaring that the challenged statute violates the United States Constitution on its

face and as applied to Plaintiffs;

154.    Permanently enjoining Defendants from enforcing the challenged statute;

155.    Striking down the challenged statute in its entirety;

156.    Awarding the Plaintiffs reasonable attorneys' fees and costs; and

157.    Awarding any such relief as the Court may deem just and proper.


Dated this 22nd Day of July, 2013

                                        */S/ Stewart Gollan*
                                        _____
                                        Stewart Gollan
                                        Utah Legal Clinic
                                        214 East Fifth South Street
                                        Salt Lake City, Utah 84103
                                        (801) 328-9531
                                        stewartgollan@utahlegalclinic.com

                                        Professor Justin Marceau, (*Pro Hac Vice*
                                        *application pending*)
                                        Of Counsel, Animal Legal Defense Fund
                                        University of Denver
                                        Sturm College of Law
                                        2255 E. Evans Avenue
                                        Denver, CO 80208
                                        (303) 871-6449
                                        jmarceau@law.du.edu

Matthew Liebman, (*Pro Hac Vice application pending*)
Animal Legal Defense Fund
170 East Cotati Avenue
Cotati, CA 94931
(707) 795-2533, ext. 1028
mliebman@aldf.org

Matthew Strugar (*Pro Hac Vice application pending)*
PETA Foundation
2154 W. Sunset Blvd.
Los Angeles, CA 90026
(323) 210-2263
matthew-s@petaf.org

Attorneys for Plaintiffs