Stewart Gollan (Utah Bar No. 12524)
214 E. Fifth South St., Salt Lake City, UT 84111
(801) 328-9531; stewartgollan@utahlegalclinic.com

Justin Marceau (California Bar No. 243479)
2255 E. Evans Ave., Denver, CO 80208, jmarceau@law.du.edu

Matthew Liebman (California Bar No. 248861)
170 E. Cotati Ave., Cotati, CA 94931, mliebman@aldf.org

Matthew Strugar (California Bar No. 232951)
2154 W. Sunset Blvd., Los Angeles, CA 90026, matthew-s@petaf.org

Alan Chen (Illinois Bar No. 6197902)
2255 E. Evans Avenue, Denver, CO 80208, achen@law.du.edu

Edward T. Ramey (Colorado Bar No. 6748)
Heizer Paul LLP, 2401 15th St., Suite 300, Denver, CO 80202, eramey@hpfirm.com

Attorneys for Plaintiffs

---

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

---

| | | |
|---|---|---|
| **ANIMAL LEGAL DEFENSE FUND, PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, COUNTERPUNCH, AMY MEYER, WILL POTTER, DANIEL HAUFF, JAMES McWILLIAMS, JESSE FRUHWIRTH** | ) ) ) ) ) ) ) ) | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |
| Plaintiffs, | ) ) | Case No. 2:13-cv-00679-RJS Judge: Robert J. Shelby |
| v. | ) ) | |
| **GARY R. HERBERT**, in his official capacity as Governor of Utah; **JOHN SWALLOW**, in his official capacity as Attorney General of Utah, | ) ) ) ) ) | |
| Defendants. | ) | |

---

**TABLE OF CONTENTS**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

LEGAL STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .iv

    1.  Undercover Investigations of Animal Agriculture Expose
        Inhumane and Unsafe Practices. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .iv

    2.  The Animal Agriculture Industry Responds by Pushing
        Legislation to Criminalize Investigations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .v

    3.  Utah Passes the Ag Gag Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

        a.  Legislators disparage Plaintiffs' speech as "just
            another version of domestic terrorism." . . . . . . . . . . . . . . . . . . . . . . . . . . .v

        b.  The law gags speech critical of industrial animal
            agriculture. . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . vii

    4.  The Ag Gag Law Silences Plaintiffs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

        a.  The ag gag law criminalizes Plaintiffs' investigations . . . . . . . . . . . . . .viii

        b.  Prosecutors charge Plaintiff Meyer under the ag gag law
            for protected speech and activity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .viii

        c.  The ag gag law blocks the newsgathering and academic
            Plaintiffs from accessing vital information. . . . . . . . . . . . . . . . . . . . . . . . ix

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

    I.     PLAINTIFFS HAVE STANDING TO CHALLENGE THE
          CONSTITUTIONALITY OF UTAH'S AG GAG LAW. . . . . . . . . . . . . 1

        A.  Plaintiffs ALDF, PETA, Hauff, and Meyer Have Standing
            Because Their Speech is Chilled By a Credible Threat
            of Prosecution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      1.  Plaintiffs are not required to risk arrest to challenge the constitutionality of a statute that chills their free speech, but need only demonstrate a credible threat of prosecution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      2.  The allegations in the complaint by ALDF, PETA, Hauff, and Meyer meet the Tenth Circuit test and establish a credible threat of prosecution that chills their speech. . . . . . . . . . 5

   B.  Plaintiffs CounterPunch, Potter, McWilliams, and Fruhwirth Have Standing in the Present Action Because the Ag Gag Law Unconstitutionally Restricts Their Right to Receive Information and Ideas. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

   C.  Hauff Has Standing Because the Ag Gag Law causes Him Economic Injuries In Fact. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

II.      PLAINTIFFS STATE AN EQUAL PROTECTION VIOLATION BECAUSE THE AG GAG LAW INTERFERES WITH THE EXERCISE OF A FUNDAMENTAL RIGHT AND IS MOTIVATED BY ANIMUS AGAINST ANIMAL PROTECTION ACTIVISTS. . . . . . 13

   A.  Laws Motivated by Animus Fail Rational Basis Review. . . . . . . . . . 15

   B.  Plaintiffs Allege Widespread Animus Against Animal Protection Groups in the Passage of the Ag Gag Law. . . . . . . . . . . . . . . . . . . . . 18

   C.  The State's Proffered Purposes for the Law are Not Well-Served By the Classification at Issue. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

III.     PLAINTIFFS STATE A CLAIM THAT THE AG GAG LAW IS PREEMPTED BY THE FALSE CLAIMS ACT. . . . . . . . . . . . . . . . . . . . 24

   A.  The Ag Gag Law Undermines the Objectives of the FCA. . . . . . . . . 25

   B.  Undercover Investigations Play a Pivotal Role in the Enforcement of the FCA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Plaintiffs, through undersigned counsel, oppose Defendants' Motion to Dismiss (Doc. 24) and request that the Motion be denied.

## INTRODUCTION

This case arises out of Utah's enactment and threatened enforcement of the ag gag law, Utah Code Ann. § 76-6-112. Plaintiffs, a group of journalists, academics, and activists, challenge the constitutionality of this statute under the First and Fourteenth Amendments as well as the Supremacy Clause of the U.S. Constitution. Defendants moved to dismiss the case, arguing that the law does not violate the Supremacy Clause or the Fourteenth Amendment and that the Plaintiffs lack standing. Notably, the Defendants have not moved to dismiss Plaintiffs' First Amendment claims.

## LEGAL STANDARD

In reviewing a motion to dismiss, the central question is whether, assuming the truth of the Plaintiffs' allegations, the claims stated are legally sufficient to state a claim. *See Archuleta v. Wagner*, 523 F.3d 1278, 1281 (10th Cir. 2008) ("[t]he court ... is 'limited to assessing the legal sufficiency of the allegations'") (quoting *Jojola v. Chavez*, 55 F.3d 488, 494 (10th Cir. 1995)). Taking Plaintiffs' allegations as true, the only question is whether they have stated a plausible claim of constitutional harm. *See Christensen v. Park City Mun. Corp.*, 554 F.3d 1271, 1276 (10th Cir. 2009). As a general matter, "[a] motion to dismiss for failure to state a claim is viewed with disfavor, and is rarely granted." *Lone Star Indus., Inc. v. Horman Family Trust*, 960 F.2d 917, 920 (10th Cir. 1992); *see also Lauer v. Thelin* , 433 Fed.Appx. 686, 687, 2011 WL 3667745 (10th Cir. 2011) (quoting *Lone Star Industries* and explaining that it is the "rare bare-bones filings that [are] properly subject to 12(b)(6) dismissal"). Even under *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009), the only question for this Court at this stage of the litigation is whether

Plaintiffs' factual allegations establish an entitlement to relief that is plausible—that is, more

than "conceivable." *See id*. at 683; *Bell Atlantic v. Twombly*, 550 U.S. 544, 556 (2007). For the

reasons stated below, Plaintiffs easily satisfy this standard as to both their standing and the merits

of their claims.

## STATEMENT OF FACTS

In 1904, author and investigative journalist Upton Sinclair obtained work at Chicago's

slaughterhouses with the purpose and intent of exposing the conditions within. *The Jungle*,

Sinclair's account of the six months he worked in those slaughterhouses, became a national

sensation, detailing rampant unfair labor practices, cruelty to animals, and unsanitary conditions.

Public pressure generated in response to *The Jungle* led to the enactment of the Federal Meat

Inspection Act and the Pure Food and Drug Act, as well as the establishment of the agency that

became the modern day Food and Drug Administration.

In the century since Sinclair published *The Jungle*, exposés of industrial animal

agriculture have continued to spur enforcement, legislative reform, and debate. In response, the

animal agriculture industry recently began to push legislative efforts to criminalize such

investigations. This suit challenges the most sweeping legislation that the industry has been able

to enact.

## 1. Undercover Investigations of Animal Agriculture Expose Inhumane and Unsafe Practices.

In recent years, undercover investigations of animal agriculture facilities have led to food

safety recalls, citations for environmental and labor violations, plant closures, and criminal

convictions. Compl. ¶ 3 n.1. They have also revealed systematic and horrific animal abuse. *Id*.

Plaintiff PETA exposed workers slamming chickens against a wall, ripping chickens' breaks off, twisting chickens' heads off, and squeezing chickens' bodies so hard the birds expelled feces, all while the birds were still alive. *Id*. Another PETA investigation revealed workers beating pigs with metal rods, sticking clothespins in pigs' eyes, and a supervisor kicking a young pig in the face, abdomen, and genitals in an attempt to make her move. *Id*. These and other investigations have led to thousands of news stories and the subsequent economic effects that follow such negative publicity. *Id*.

**2. The Animal Agriculture Industry Responds by Pushing Legislation to Criminalize Investigations.**

The animal agriculture's response to this negative publicity has been to push legislation that criminalizes the undercover investigations that generate criticism. *Id*. ¶ 4. Industry executives have made the enactment of farm-secrecy statutes a top legislative priority. *Id*. These statutes are commonly known as "ag gag" laws because they gag speech that is critical of industrial agriculture. *Id*. With model legislation drafted and lobbied for by the industry-backed American Legislative Exchange Council, ag gag legislation has been introduced in numerous state legislatures over the past three years. *Id*. ¶¶ 54-57.

**3. Utah Passes the Ag Gag Law.**

**a. Legislators disparage Plaintiffs' speech as "just another version of domestic terrorism."**

When state Representative John Mathis introduced the legislation that became the Utah ag gag law, he explained that his intent was to stop "national propaganda groups" from using footage of industrial animal agriculture to advance their political agendas, which he characterized as "undoing animal agriculture." *Id*. ¶ 42. Rep. Mathis elaborated on his motivation

by expressing his disdain for animal protection organizations, saying that recordings from undercover investigations of animal agriculture should be criminalized because such recordings are used "for the advancement of animal rights nationally, which, *in our industry*, we find egregious." *Id*. ¶ 43. Also speaking in favor of the House Bill, Rep. Daniel McCoy criticized undercover investigators who record behavior that "they interpret as abuse" by stating that "you have to look at [what someone] is trying to accomplish" by taking such a recording, a clear attack on the viewpoint of animal activists. *Id*. ¶ 45. Rep. Michael Noel was more straightforward, stating that he opposed letting "these groups like PETA and some of these organizations control what we do in this country, a country that feeds the world," and derisively calling anyone who would record inside an agricultural operation a "jack wagon." *Id*. ¶ 46. Rep. Lee Perry voiced support for the legislation by describing undercover investigations as "just another version of domestic terrorism." *Id*. ¶ 51 n.7.

The rhetoric was similar in the state Senate. Senate sponsor David Hinkins spoke in favor of the legislation by maligning Plaintiff PETA, saying, among other things, "I'd like to share some things with you on this PETA group and I'm not sure how many of you realize this but they are People for the Ethical Treatment of Animals, an organization known for uncompromising animal rights positions." *Id*. ¶ 47. Senator Hinkins made it clear that he viewed the legislation as a means of targeting "the vegetarian people" who "are trying to kill the animal industry." *Id*. ¶ 48. Echoing Rep. Perry, Senator Hinkins also expressed his view that the legislation was necessary because animal protection organizations are "terrorists" whose viewpoint is not entitled to protection. *Id*.

vi

### b.  The law gags speech critical of industrial animal agriculture.

The ag gag law, codified at Utah Code Ann. § 76-6-112, defines four ways that whistle-blowing activity is criminalized: 1) recording an image or sound by "leaving a recording device on the agricultural operation" without consent from the owner; 2) obtaining "access to an agricultural operation under false pretenses;" 3) applying for employment "with the intent to record an image of, or sound from, the agricultural operation" while knowing that the operation prohibits such recording and actually recording such an image or sound; and 4) recording an image or sound without the consent of the owner while committing criminal trespass. Utah Code Ann. § 76-6-112(2)(a)-(d).

The ag gag law has the effect of criminalizing undercover investigative activities targeting agricultural operations. Compl. ¶ 36. It criminalizes image capture from agricultural operations only if the owner of the facility does not approve of the recording in advance of its production, thus privileging speech that is favorable to the animal agriculture industry and criminalizing speech that is inconsistent with the goals and interest of the agriculture industry. *Id*. ¶ 37-39. By criminalizing speech that is critical of the agriculture industry, the ag gag law also creates significant obstacles to the efficacy of the federal False Claims Act and other statutory provisions protecting whistle-blowers and regulating the food industry. *Id*. ¶ 11.

### 4.  The Ag Gag Law Silences Plaintiffs.

The ag gag law silences Plaintiffs—organizations and individuals who conduct these investigation or rely on them for their reporting and research.

### a. The ag gag law criminalizes Plaintiffs' investigations.

The ag gag law effectively criminalizes any investigation strategy that would reveal the conditions inside an animal production facility. *Id*. ¶ 99. Both ALDF and PETA conduct investigations in furtherance of their missions. *Id*. ¶ 60. PETA regularly conducts these investigations at factory farming and slaughtering facilities and ALDF intends to pursue such investigations. *Id*. ¶¶ 60, 67-69. These investigations involve (or would involve) investigators obtaining employment at animal agriculture facilities and using recording equipment to document violations of applicable laws and regulations. *Id*. ¶¶ 62, 66. ALDF researched and identified animal agriculture facilities in Utah that it wants to investigate, allocated money for the investigations, hired a private investigation firm to conduct investigations, and had that firm gather applications from the identified Utah facilities. *Id*. ¶¶ 19, 85-91. ALDF also agreed to hire Plaintiff Hauff to coordinate the investigations. *Id*. ¶ 19, 92. PETA similarly seeks to conduct investigations of animal agriculture facilities in Utah. *Id*. ¶ 95. The investigations that ALDF and PETA wish to conduct in Utah would violate the ag gag law. *Id*. ¶¶ 35, 93, 95.

In addition, Plaintiff Hauff, an expert on conducting employment-based investigations and the former Director of Investigations for a national animal protection organization, lost an employment opportunity to consult with ALDF on an investigation at a Utah animal agriculture facility. *Id*. ¶ 19.

### b. Prosecutors charge Plaintiff Meyer under the ag gag law for protected speech and activity.

On February 8, 2013, Plaintiff Meyer stood on public property adjacent to a slaughterhouse in Draper City, Utah and filmed what appeared to be abusive activity, including a worker pushing a sick cow with a front-loader. *Id*. ¶ 22. Although Plaintiff Meyer never entered

private property, she was questioned by the Draper City Police and subsequently charged with violating the ag gag law, making her the first and only person in the country to be charged under an ag gag statute. *Id.* After being subject to court process and mandatory appearances, the case against her was dismissed without prejudice more than two months later. *Id.* While Plaintiff Meyer intends to continue her animal activism and engage in First Amendment activities related to that activism, her arrest has made her fearful of future arrest and prosecution. *Id.* ¶¶ 19, 105-09.

### c. The ag gag law blocks the newsgathering and academic Plaintiffs from accessing vital information.

The ag gag law also harms publishers, journalists, and scholars committed to addressing issues of food safety and animal welfare who rely on undercover investigations as a vital source of information. *Id.* ¶ 104. Plaintiff CounterPunch is a publisher that regularly reports on undercover investigations at factory farms and other issues involving the nation's food supply. *Id.* ¶ 21. Plaintiffs Potter and Fruwirth are journalists who regularly cover animal protection issues, including the results of undercover investigations. *Id.* ¶¶ 23, 26. Plaintiff McWilliams is an author and university professor who writes, publishes, and lectures nationally on food production, including factory farming, in which he relies on the results of undercover investigations. *Id.* ¶ 25. Each of these plaintiffs remains committed to covering the images and stories that emerge from undercover investigations of agricultural operations. *Id.* ¶¶ 21, 23, 25, 26, 100-04. The ag gag law directly impedes the ability of each of these plaintiffs to cover issues of industrial animal agriculture in Utah by stymieing undercover investigations in the state. *Id.* ¶ 104

## ARGUMENT

### I.   PLAINTIFFS HAVE STANDING TO CHALLENGE THE CONSTITUTIONALITY OF UTAH'S AG GAG LAW.

As discussed in detail below, each of the plaintiffs has standing: ALDF, PETA, Hauff, and Meyer have refrained from engaging in constitutionally-protected expressive activity because of a credible threat of prosecution under the statute; CounterPunch, McWilliams, Potter, and Fruhwirth have suffered informational injuries because the statute undermines their access to information crucial to their journalistic and academic endeavors; and Hauff has also suffered a financial injury from lost employment opportunities as an investigations consultant. Each of these injuries is directly caused by the ag gag statute, and were the law struck down, each of these injuries would be redressed.

### A. Plaintiffs ALDF, PETA, Hauff, and Meyer Have Standing Because Their Speech is Chilled By a Credible Threat of Prosecution.

#### 1. Plaintiffs are not required to risk arrest to challenge the constitutionality of a statute that chills their free speech, but need only demonstrate a credible threat of prosecution.

The Supreme Court has long held that "it is not necessary that [a plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974); *see also Bronson v. Swensen*, 500 F.3d 1099, 1107 (10th Cir. 2007). When a plaintiff refrains from exercising constitutional rights to avoid prosecution, such "threat-eliminating behavior [is] effectively coerced." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007). In the First Amendment context, this coercion is all the more significant, and the chilling effect of unconstitutional statutes all the more dangerous. *Virginia v. American Booksellers Ass'n*, 484

1

U.S. 383, 393 (1988) ("[T]he alleged danger of this statute is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution.").

Rather than require plaintiffs to risk arrest to challenge a statute that encumbers their constitutional rights, the Supreme Court has instead established a "credible threat of prosecution" standard. *Babbitt v. UFW Nat'l Union*, 442 U.S. 289, 298 (1979). Under this standard, a plaintiff has standing when she "has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Id*.; *see also Ward v. Utah*, 321 F.3d 1263, 1267 (10th Cir. 2003). One circuit court has referred to this as "a 'hold your tongue and challenge now' approach." *Ariz. Right to Life PAC v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003).

Sitting en banc in *Initiative and Referendum Institute v. Walker*, the Tenth Circuit "recognized that a chilling effect on the exercise of a plaintiff's First Amendment rights may amount to a judicially cognizable injury in fact, as long as it 'arise[s] from an objectively justified fear of real consequences' . . . [and] 'a credible threat of prosecution or other consequences flowing from the statute's enforcement.'" *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1088 (10th Cir. 2006) (en banc) (quoting *D.L.S. v. Utah*, 374 F.3d 971, 975 (10th Cir. 2004)). The court acknowledged that the injury in such cases is "[by] definition . . . inchoate: because speech is chilled, it has not yet occurred and might never occur, yet the government may have taken no formal enforcement action." *Id*. Nevertheless, the court held that it could not "ignore such harms just because there has been no need for the iron fist to slip its velvet glove." *Id*.

In determining whether a plaintiff faces a credible threat, courts presume that statutes will be enforced, and this presumption is even stronger for recently enacted statutes. *See, e.g.*, *American Booksellers Ass'n*, 484 U.S. at 393 ("The State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise."); *New Hampshire Right to Life PAC v. Gardner*, 99 F.3d 8, 15 (1st Cir. 1996) (in pre-enforcement challenges to recently enacted statutes, courts "assume a credible threat of prosecution in the absence of compelling contrary evidence"). Courts may find no standing where a statute is completely moribund, *Poe v. Ullman* 367 U.S. 497, 502 (1961) (statute languished unenforced for 81 years), or where there have been "affirmative assurances of non-prosecution from a governmental actor responsible for enforcing the challenged statute." *Bronson*, 500 F.3d at 1108. In *Bronson*, the Tenth Circuit held that a published policy statement by the Utah Attorney General that it would not enforce the state ban on consensual polygamy, in conjunction with the plaintiffs' own admission that the law was not enforced, rendered the plaintiffs' fear of prosecution under that statute unreasonable and not credible. *Id.* at 1109. *See also Winness v. Yocom*, 433 F.3d 727, 737 (10th Cir. 2006) (finding no standing in light of "authoritative disavowals of any intention to enforce the statute"); *D.L.S.*, 374 F.3d at 974 (finding no standing where the prosecutor submitted an affidavit disclaiming his intent to enforce the challenged statute). Where, as here, the state fails to disavow future prosecutions, a plaintiff's allegation that she desires to engage in expressive activity prohibited by the statute is sufficient to establish injury in fact. *Ward*, 321 F.3d 1268.

In *Walker*, the Tenth Circuit further clarified the contours of the credible threat test, establishing a three-part inquiry for whether plaintiffs have standing to seek prospective relief based on the chilling effect of a statute. To establish standing, the plaintiffs should present:

> (1) evidence that in the past they have engaged in the type of speech affected by the challenged government action; (2) affidavits or testimony stating a present desire, though no specific plans, to engage in such speech; and (3) a plausible claim that they presently have no intention to do so *because of* a credible threat that the statute will be enforced.

*Walker*, 450 F.3d at 1089. The court then applied this test to the plaintiffs, a coalition of advocates and organizations challenging a law that required wildlife initiatives to attain a supermajority in order to pass. *Id*. at 1090.

The court was quick to note that the first element—evidence of past speech—"obviously cannot be an indispensable element [because] people have a right to speak for the first time." *Id*. at 1089. But where past speech exists, it "lends concreteness and specificity to the plaintiffs' claims" of chilled speech. *Id*. Although the plaintiffs in *Walker* had never undertaken a wildlife initiative in Utah, the court was persuaded that initiative campaigns undertaken in other states were evidence of the plaintiffs' "present desire to bring similar initiatives in Utah." *Id*. at 1091, 1092 (observing that plaintiffs had prepared and supported wildlife initiatives in other states).

The court also found evidence to support the second element—a present desire to engage in prohibited speech—even though the plaintiffs did "not tell [the court] precisely what initiatives they would bring, or when; nor [did] they claim any certainty about their intentions." *Id*. at 1091. Nevertheless, it was sufficient that the plaintiffs were "*seriously considering* mounting a wildlife management initiative." *Id*. at 1092 (emphasis added).

4

Finally, the court found support for the third element—that the plaintiffs were refraining from expressive conduct because of the statute. Were it not for the supermajority requirement, they likely would have pursued a wildlife initiative, but in light of the heightened vote requirement, they "steer[ed] clear of wildlife advocacy . . . to avoid futile attempts and failed outcomes." *Id*.

2. **The allegations in the complaint by ALDF, PETA, Hauff, and Meyer meet the Tenth Circuit test and establish a credible threat of prosecution that chills their speech.**

Applying the *Walker* test to the present case leaves no doubt that Plaintiffs have standing: they have engaged in undercover investigations in the past and have a present desire to do so again in Utah, but they have refrained from doing so because of a credible threat of prosecution under ag gag law. *Id*. at 1089.

With regard to the first prong of the *Walker* test, ALDF, PETA, Hauff, and Meyer have "in the past . . . engaged in the type of speech affected by the challenged government action." *Id*. In the complaint, ALDF alleges that it has "conducted undercover investigations at animal facilities around the country." Compl. ¶¶ 19, 60. PETA alleges that it "has conducted dozens of investigations in the United States over the past three decades . . . [and] continues to conduct these investigations to expose further illegal conduct on the part of workers and management personnel." Compl. ¶¶ 20, 60; *see also* Compl. at 3 n.1 (describing PETA investigations at factory farms). Hauff alleges that he has engaged in this kind of speech in the past, having "spent four years working with investigators, facilitating their employment, and overseeing more than a dozen high security undercover investigations [at agricultural facilities] across the country." Compl. ¶ 24. Hauff has also engaged in core political speech related to these investigations, such

as "serving as a media spokesperson to convey investigative findings to the public." *Id*. Meyer alleges that she "has in the past engaged in protected First Amendment activities such as protests and demonstrations in an effort to bring public awareness to animal issues, including the treatment of farmed animals." Compl. ¶¶ 22, 106. Meyer has also used video to record the treatment of animals at a slaughterhouse. *Id*.

Nevertheless, Defendants argue that Plaintiffs fail the first prong of the *Walker* test. Defs' Br. at 4. Specifically, they argue that PETA's past investigations (and presumably ALDF's) are inadequate because they did not take place in Utah. *Id*. at 6. But the test is not so strict. In *Walker*, none of the plaintiffs had pursued a wildlife initiative in Utah in the past, but the fact that they had done so in other states was sufficient to establish the "concreteness and specificity" demanded for standing. *Walker*, 450 F.3d at 1089, 1091-92. Under Defendants' proposed standard, no one would ever have a right to speak for the first time in Utah, a view expressly discredited by the Tenth Circuit. *Id*. at 1089.

Moreover, just as in *Walker*, it would be "peculiar" to find no standing for "precisely the type of party . . . [the law] was avowedly designed to thwart." *Id*. at 1091. Given the fact that PETA, like the Humane Society of the United States in *Walker*, was explicitly and repeatedly disparaged during the legislative debate over the ag gag law, it would be absurd to hold that they lack a concrete interest in contesting the law. *Compare id*. ("[S]upporters of the supermajority requirement explicitly mentioned one Plaintiff, the Humane Society of the United States, as an organization whose planned initiative should be obstructed. It would be peculiar to hold, now, that such plaintiffs are not affected.") *with* Compl. ¶¶ 44, 46, 47, 48, 51 (describing disparaging comments made against PETA and other animal protection organizations).

Plaintiffs also meet the second prong of the *Walker* test, because the complaint alleges their present desire to conduct investigations that would violate the ag gag law. ALDF alleges that it "has concrete plans to conduct an investigation" and "has identified potential investigation sites, contracted with a private investigation firm licensed in Utah, obtained employment applications from agricultural operations, and engaged an expert consultant – Plaintiff Daniel Hauff – to advise it on an undercover, employment-based investigation at a factory farm." Compl. ¶¶ 19, 82, 85-92. Likewise, PETA "is also interested and willing to conduct an investigation in Utah but for the threat of criminal prosecution." Compl. ¶¶ 20, 95. These investigations would violate the ag gag law, as detailed in the complaint, because investigators would take unauthorized photos and videos and not disclose their affiliation with ALDF or PETA when applying. Compl. ¶¶ 62-68, 93-94. Hauff also alleges a present desire to engage in speech prohibited by the ag gag law, by consulting with ALDF on its contemplated investigations in Utah. Compl. ¶¶ 24, 92. Meyer alleges a desire "to continue her animal activism and has concrete plans to engage in First Amendment activities related . . . to animal agriculture"—the exact activity that precipitated her initial charges under the ag gag law. Compl. ¶ 22. Plaintiffs' present desire to engage in prohibited speech could not be any more manifest.

Yet Defendants argue that Plaintiffs have failed to allege "specific plans," "identify[] the specific operation they intend to investigate [and] the person they plan to use as an undercover operative," or "identif[y] exactly where [and] how they plan to conduct the investigation." Defs' Br. at 3-4, 6. Defendants insist that to prove the concreteness of their plans, Plaintiffs must "take an investigation all the way through the planning stage and even somewhat into the implementation stage . . . and go as far as the property line of the operation they have targeted."

Defs' Br. at 4. Such an exacting degree of specificity is nonsensical and out of step with Tenth

Circuit precedent.[1] In *Walker*, the court realized that "[i]t makes no sense to require plaintiffs

simultaneously to say 'this statute presently chills me from engaging in XYZ speech,' and 'I

have specific plans to engage in XYZ speech next Tuesday.'" 450 F.3d at 1089. It is enough that

plaintiffs express a "present desire," which "necessarily fall[s] short of specific plans." *Id*. at

1091. In *Walker*, it was sufficient that the plaintiffs were "seriously considering" an initiative

campaign and contemplated "the potential utilization" of their right to use the initiative process.

*Id*. at 1091-92. That they had no specific plans to do so was immaterial to their standing. *Id*. at

1092. ALDF, PETA, Hauff, and Meyer are not only "seriously considering" an investigation,

they have made concrete plans to do one, and have done far more to demonstrate their legitimate

desire to engage in the prohibited speech than the plaintiffs in *Walker*. *See* Compl. ¶¶ 19, 94.

Plaintiffs also meet the third element of the *Walker* test, because the complaint alleges

that they have refrained from engaging in speech "because of a credible threat that the statute

will be enforced." 450 F.3d at 1089. ALDF alleges that it "has refrained from [conducting an

undercover investigation] out of a reasonable fear of criminal prosecution." Compl. ¶¶ 19, 98.

PETA would also conduct an investigation, "but for the threat of criminal prosecution under

Utah Code Ann. § 76-7-112." Compl. ¶¶ 20, 98. Hauff has been similarly deterred: "The

existence of the ag gag law . . . prevents Hauff from pursuing [a] consulting opportunity [with

ALDF], for fear of being prosecuted as an accomplice or co-conspirator to 'Agricultural

---

[1] Such actions would almost certainly constitute "substantial steps" or "overt acts" sufficient to
expose Plaintiffs to criminal liability for attempting or conspiring to violate the ag gag law. *See*
Utah Code Ann. §§ 76-4-101, 76-4-201. The Supreme Court has long held that such risk is not
necessary to establish standing in chilled speech cases. *Steffel*, 415 U.S. at 459.

Operation Interference.'" Compl. ¶ 24. Meyer's "prior arrest [for violating the ag gag law] has made her fearful that . . . she may be arrested and again criminally charged if she records or is thought to have recorded images of animal agricultural activities . . . ." Compl. ¶ 22.

Each of the Plaintiffs "believe[s] that prosecutors in Utah intend to enforce" the ag gag law. Compl. ¶ 96. This threat is presumed to be credible, given the recency of the law's passage in 2012. *See, e.g.*, *American Booksellers Ass'n*, 484 U.S. at 393; *New Hampshire Right to Life PAC*, 99 F.3d at 15. Moreover, the fact that Meyer was prosecuted in 2013 under the law distinguishes this case from those cases in which the challenged law had laid dormant and unenforced for decades. *C.f. Poe*, 367 U.S. at 502 (no credible threat where statute had been effectively nullified since the 19th century). And unlike in *Winsness*, *D.L.S.*, and *Faustin*, the Attorney General and prosecutors have not sworn not to enforce the ag gag law. *Winsness*, 433 F.3d at 737; *D.L.S.*, 374 F.3d at 974; *Faustin*, 268 F.3d at 948. In fact, Defendants' brief does not even suggest that the law will not be actively enforced, and although the prosecutor dismissed Meyer's charges, he did so *without prejudice*. The threat of enforcement here is all the more credible because undercover investigations at factory farms typically result in high-profile media attention, public awareness campaigns, and other exposure, increasing the likelihood of a prosecutorial response and industry pressure to enforce the ag gag law. Compl. ¶¶ 70, 71, 72, 98.

Indistinguishably from the plaintiffs in *Walker*, ALDF, PETA, Hauff, and Meyer "have demonstrated that they have previously engaged in the type of speech allegedly chilled by the [challenged law], and that they desire to engage in such speech, but that they have no present intention to do so because of the certainty that the [challenged law] will be enforced." *Walker*, 450 F.3d at 1097. It follows that they have established an injury-in-fact sufficient for standing.

**B**.     **Plaintiffs CounterPunch, Potter, McWilliams, and Fruhwirth Have Standing in the Present Action Because the Ag Gag Law Unconstitutionally Restricts Their Right to Receive Information and Ideas.**

Plaintiffs CounterPunch, Potter, Fruhwirth, and McWilliams each have standing as listeners deprived of the right to receive and distribute information from a willing speaker on a matter that is vital to their own journalistic and academic endeavors and to the public interest generally.[2] When a Plaintiff raises a First Amendment challenge as a recipient of information from a willing speaker,[3] the recipient "need not be subject to a speech restriction in order to have standing to advance a challenge. First Amendment protections extend to both speakers and listeners, the latter having a right to receive information and ideas." *Kansas Judicial Review v. Stout*, 519 F.3d 1107, 1115 (10th Cir. 2008) (citing *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756-57 (1976)); *see also U.S. West, Inc. v. F.C.C.*, 182 F.3d 1224, 1232 (10th Cir. 1999) ("Effective speech has two components: a speaker and an audience [and a] restriction on either of these components is a restriction on speech.").

In *Kansas Judicial Review*, the court found that an organization, KJR, which sought information from judicial candidates, had standing to challenge a rule that limited those same candidates' ability to respond, even though KJR itself was not directly subject to the rule. *Kansas*

---

[2] In the event that this Court finds that one or more Plaintiffs have standing, it should not analyze the standing of the remaining Plaintiffs. *See Watt v. Energy Action Educational Foundation*, 454 U.S. 151, 160 (1981) ("Because we find [that one plaintiff] has standing, we do not consider the standing of the other plaintiffs."); *see also Am. Atheists, Inc. v. Davenport*, 637 F.3d 1095, 1114 (10th Cir. 2010); *State of Utah v. Babbitt*, 137 F.3d 1193, 1216 n. 36 (10th Cir. 1998).

[3] Plaintiffs ALDF and PETA have both averred that they are willing speakers, have conducted undercover investigations of agricultural facilities in the past, and would conduct such investigations in Utah agricultural facilities but for the ag gag law. Compl. ¶¶ 19, 20.

*Judicial Review*, 519 F.3d at 1115. The fact that the rule choked off the supply of information to KJR gave it a sufficient injury to raise a free speech challenge. *Id.*

Like the rule at issue in *Kansas Judicial Review*, the ag gag law eliminates Plaintiffs access to information that is vital to their academic and journalistic careers. Plaintiff CounterPunch is a news organization that regularly reports on the types of investigations criminalized by the ag gag law. Compl. ¶ 21. Similarly, Plaintiffs Potter and Fruhwirth are journalists who each allege a specific intent to report on and publish information obtained through undercover investigations criminalized by the ag gag law. *Id.* ¶¶ 23, 26. Plaintiff McWilliams is an academic and public speaker whose scholarship and speeches are undermined by the ag gag law's criminalization of certain methods of information-gathering. *Id.* ¶ 25. Each of these plaintiffs aver to the importance of the information to them professionally, and to the fact that their ability to receive this information is compromised by the statute. *Id.* ¶¶ 21, 23, 25-26.

Defendants' argument that these plaintiffs lack standing because they have not pleaded a desire to themselves engage in the specific activities proscribed by the ag gag law, Defs' Br. at 3, 7-9, misses the mark. In *Kansas Judicial Review*, the Tenth Circuit found an injury to KJR even though the challenged rule did "not limit KJR's speech and the organization [could not] be disciplined under" it. *Kansas Judicial Review*, 519 F.3d at 1115. Similarly, in *Walker*, the Tenth Circuit held that even if a plaintiff does not face criminal prosecution under a statute, he may still have standing if he "face[s] a 'credible threat' of '*real consequences*' from enforcement." *Walker*, 450 F.3d at 1088 (quoting *D.L.S.*, 374 F.3d at 975) (emphasis added). These Plaintiffs need not allege an intent to violate the statute, but merely that their ability to obtain information

from a willing speaker is compromised by the statute. *Kansas Judicial Review*, 519 F.3d at 1115; *U.S. West*, 182 F.3d at 1232; *see also Essence, Inc. v. City of Fed. Heights*, 285 F.3d 1272, 1291 n.13 (10th Cir. 2002). Plaintiffs CounterPunch, Potter, McWilliams, and Fruhwirth have alleged that they would report on the Utah investigations of PETA or ALDF, or any other willing speakers, and thus they have sufficiently alleged standing to pursue their claims.

### C. Hauff Has standing Because the Ag-Gag Law Causes Him Economic Injuries in Fact.

Economic injuries qualify as Article III injuries in fact. *See, e.g.*, *Clinton v. City of New York*, 524 U.S. 417, 432-33 (1998). Indeed, "economic injury is one of [standing's] paradigmatic forms." *Danvers Motor Co., Inc. v. Ford Motor Co.*, 432 F.3d 286, 291 (3rd Cir. 2005). A plaintiff's loss of present and future employment opportunities "directly affect[s] [the plaintiff's] economic interests." *Nyberg v. City of Virginia*, 495 F.2d 1342, 1344 (8th Cir. 1974); *see also Association of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 154 (1970) ("[H]e who is likely to be financially injured may be a reliable private attorney general to litigate the issues of the public interest.") (citation and punctuation omitted). In *Nyberg*, the court held that physicians had standing to challenge state action that limited their ability to provide abortions, in part because "the practical effect of the stringent limitation on the use of hospital facilities for performing abortions is to arbitrarily bar the physicians from activities that directly affect their economic interests." *Nyberg*, 495 F.2d at 1344. Similarly, in *Taven Talent v. Charnes*, the court held that the owners of exotic dance clubs had standing to challenge an anti-nude dancing ordinance, even though they themselves were not dancers, because they were "deprived of revenue which would otherwise be theirs if live, nude dancing were permitted in licensed premises." *Tavern Talent v. Charnes*, 607 F. Supp. 1415, 1416 (D. Colo. 1985).

Here, Hauff has standing to challenge the ag gag law because the law "directly affects [his] economic interests," *Nyberg*, 495 F.2d at 1344, and "deprive[s] [him] of revenue," *Tavern Talent*, 607 F. Supp. at 1416, by preventing ALDF from paying Hauff to oversee an investigation of an agricultural operation in Utah. Compl. ¶¶19, 24, 92. Hauff alleges that the ag gag law injures him economically by forcing him to decline a specific consulting opportunity, for which ALDF would compensate him financially. *Id.* Because the ag gag law denies Hauff the benefit of this specific employment opportunity, Hauff has suffered economic injury and therefore has standing.

## II.   PLAINTIFFS STATE AN EQUAL PROTECTION VIOLATION BECAUSE THE AG GAG LAW INTERFERES WITH THE EXERCISE OF A FUNDAMENTAL RIGHT AND IS MOTIVATED BY ANIMUS AGAINST ANIMAL PROTECTION ACTIVISTS.

Plaintiffs have pled a claim under the Equal Protection clause challenging a facial classification that differentiates between whistleblowers generally, and whistleblowers in the agricultural industry. Plaintiffs have adequately pleaded an equal protection violation for two independent reasons.[4]

First, the Equal Protection Clause requires strict scrutiny of a legislative act, like the one in question, that "interferes with the exercise of a fundamental right." *Mass. Bd. of Ret. v.*

---

[4] Plaintiffs have pre-enforcement standing to raise their equal protection claim, just as they do for their free speech claims. *NRA of Am. v. Magaw*, 132 F.3d 272, 291 (6th Cir. 1997) ("[L]egal issues presented by an equal protection challenge may be conclusively resolved before enforcement of a statute.") (citing *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 210-12, 132 L. Ed. 2d 158, 115 S. Ct. 2097 (1995)); *see also Beacon Hill Farm Associates II Ltd. Partnership v. Loudoun County Bd. of Supervisors*, 875 F.2d 1081, 1084 (4th Cir. 1989) ("a plaintiff may make a pre-enforcement challenge to an ordinance as being arbitrary and discriminatory on its face in violation of the due process and equal protection clauses of the constitution"). Defendants do not argue otherwise.

*Murgia*, 427 U.S. 307, 312 (1976); *San Antonio Ind. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 40

(1973). There is no question that the right to free speech is a fundamental right. *See, e.g., Gitlow*

*v. New York,* 268 U.S. 652, 666 (1925); *McDonald v. City of Chicago*, 130 S.Ct. 3020, 3061

(2010) (Thomas J., concurring) (citing the First Amendment as emblematic of the sort of right

recognized as fundamental). Accordingly, without a showing that strict scrutiny is satisfied, the

motion to dismiss must be denied. To be sure, in a case raising an Equal Protection claim based

on a fundamental right to speech, ordinarily, the Equal Protection and the First Amendment

inquiries would yield the same result: If the First Amendment claim lacked merit, then framing it

as a fundamental right for Equal Protection purposes would not alter the conclusion. Here,

because Defendants declined to address the merits of the First Amendment analysis, a dismissal

of the Equal Protection (or the First Amendment) claim on the merits is not appropriate at this

stage of litigation. *See* FED. R. CIV. P. 12(g)(2) (barring successive motions to dismiss except in

certain enumerated circumstances). Stated differently, this Court need not address the animus

theory of Equal Protection raised in the Defendant's motion at this time because the Equal

Protection claim survives a motion to dismiss on independent grounds: free speech rights

violations are alleged in the complaint, thus implicating both the First Amendment and the Equal

Protection Clause. *See Police Dept. of City of Chicago v. Mosley*, 408 U.S. 92, 101 (1972)

(applying strict scrutiny under the Equal Protection clause when a statute affected First

Amendment interests and finding that the law in question was not "narrowly tailored to their

legitimate objectives").

  Second, and alternatively, Plaintiffs adequately allege that the Utah legislators acted with

animus in passing the ag gag law, in violation of the Equal Protection Clause. *See* Compl. ¶¶ 12,

15, 41-57, 149-50. At this stage of the litigation, Plaintiffs' allegations of animus must be taken as true and such allegations, for the reasons set forth below, require that the motion to dismiss be denied as to this claim.

### A.  Laws Motivated By Animus Fail Rational Basis Review.

Rational basis review requires that a challenged law "bear a rational relationship to an independent and legitimate legislative end . . . [and not be] drawn for the purpose of disadvantaging the group burdened by the law." *Romer v. Evans*, 517 U.S. 620, 633 (1996). It is the minimal level of scrutiny given to government actions challenged under Equal Protection, and such review is ordinarily characterized by deference to state actions. However, where animus is present, the presumption in favor of a law is lessened, and rational basis takes a more rigorous form – that is, the proverbial rational basis with "bite."[5] The Supreme Court has held that legislation driven by "a bare . . . desire to harm a politically unpopular group" lacks a legitimate purpose and will not survive even rational basis review. *United States Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973); *see also City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985); *see generally* Susannah W. Pollvogt, *Unconstitutional Animus*, 81 FORDHAM L. REV. 887, 926 (2012).

---

[5] *See United States v. Windsor*, S. Ct., No.12-307, Oral Arg. Transcript at 72 (Justice Kagan) ("[W]hen Congress targets a group that is not everybody's favorite group in the world . . . we look at those cases with some -- even if they're not suspect -- with some rigor. . . [We ask whether] Congress's judgment was infected by dislike, by fear, by animus, and so forth."); *See also City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 458 (1985) (Marshall, J., concurring in the judgment) (observing that although the majority did "not label its handiwork heightened scrutiny . . . the rational basis test invoked today is most assuredly not" traditional rational basis).

The Supreme Court's cases addressing animus-motivated laws evince a clear distinction between conventional rational basis review and rational basis review with bite. In *Moreno*, the plaintiffs challenged a law that made anyone living in a household with an unrelated person ineligible for food stamps. 413 U.S 528 at 529. The stated goal of the law—"to safeguard the health and well-being of the Nation's population and raise levels of nutrition among low-income households"—was a legitimate government interest. *Id*. at 533-34. However, because the law was motivated by animus against "hippies" and "hippie communes," the Supreme Court held that it violated Equal Protection, notwithstanding the fact that "hippie-ness" is not a suspect classification. *Id*.

Likewise, in *City of Cleburne*, the state proffered a variety of *post hoc* interests that were facially legitimate to justify its requirement for a special permit for the operation of a group home for people with mental disabilities. 473 U.S. at 448-50. However, the Court rejected each of these rationales, finding that the law "rest[ed] on an irrational prejudice" towards the mentally disabled, notwithstanding the fact that it found that mental disability was not a suspect classification. *Id*. at 450. Moreover, the Court recognized that the over- and under-inclusive fit between the law and the purported government interest was further evidence of this animus. *Id*. at 450; *see also Romer*, 517 U.S. at 634 (finding that the challenged law "raise[d] the inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected").[6]

---

[6] Similarly, where there are questions about the logic of a law's means, the Tenth Circuit recognizes that it is appropriate to doubt the legitimacy of its ends and apply a searching rational basis review. *See, e.g.*, *Christian Heritage Acad. v. Oklahoma Secondary Sch. Activities Ass'n*, 483 F.3d 1025, 1035 (10th Cir. 2007).

Just last term, the Supreme Court reaffirmed and enhanced the role of animus in rational basis analysis in *United States v. Windsor*, 133 S.Ct. 2675 (2013), a successful challenge to the federal Defense of Marriage Act. Indeed, *Windsor* stands for the proposition that any concrete showing of animus warrants relief under the Equal Protection Clause. Stated more directly, when there is a strong showing of animus the law in question should be held unconstitutional. Animus towards a particular group or set of groups, without more, is a basis for invalidating a law. In *Windsor*, for example, the Supreme Court held that where interfering with a particular group is more than an "incidental effect of the" challenged statute, rational basis will typically require invalidating the law in question. *Windsor*, 133 S.Ct. at 2693. Justice Scalia emphasized with regard to the federal statute at issue in *Windsor* that there were "many perfectly valid—indeed, downright boring—justifying rationales for this legislation," any one of which, in his view, meant that the law satisfied rational basis review. *Id* at 2707 (Scalia, J., dissenting). Nonetheless, the majority responded by explaining that, "[t]he federal statute is invalid, for no legitimate purpose *overcomes* the purpose and effect to disparage and to injure." *Id* at 2696 (emphasis added). *See also,* Susannah W. Pollvogt, *Windsor, Animus, and the Future of Marriage Equality*, COLUMBIA L. REV. SIDEBAR __ (2013, Forthcoming), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2221999 (citing evidence that under *Windsor*, animus is a "doctrinal silver bullet" in Equal Protection analysis).

Moreover, even if animus is not treated as dispositive as to the constitutionality of a statute, at the very least its presence mandates a more careful tailoring of the law's legitimate purpose and the means used to achieve that purpose. *See, e.g., Lawrence v. Texas*, 538 U.S. 558, 580 (2003) (O'Connor, J., concurring) (recognizing that statutes predicated on animus are

17

subject to "a more searching form of rational basis review"). At the very least, then, the presence

of animus is a heavy thumb on the scale against constitutional validity. In *Windsor* even

assuming the purported government interests might have, as an abstract matter, "overcome" the

existence of legislative animus, as a practical matter, the Court did *not even consider* and balance

the State's proffered, non-animus explanations for the law. The refusal to so much as consider

the proffered purposes of the law represents an extension of animus-based Equal Protection

insofar as the Court did undertake such a review in *Romer* and *Cleburne*, among other cases.

*Windsor*, 133 S.Ct. at 2696.

 Underlying the decisions in *Moreno*, *Cleburne*, *Romer*, and *Windsor* is an awareness that

"nothing opens the door to arbitrary action so effectively as to allow those officials to *pick and*

*choose* only a few to whom they will apply legislation and thus to escape the political retribution

that might be visited upon them if larger numbers were affected." *Ry. Express Agency, Inc. v.*

*New York*, 336 U.S. 106, 112 (1949) (Jackson, J., concurring) (emphasis added). If the law in

question was one that applied even-handedly, across all commercial contexts, there would be no

viable Equal Protection claim. However, the unpopularity of animal protection groups cannot

serve as a legitimate government interest in support of singling out one type of whistle-blowing

as criminal. Accordingly, whether this Court treats animus as a dispositive showing, or merely a

factual predicate to a heightened requirement of tailoring, the Utah statute does not survive Equal

Protection review.

 **B.  Plaintiffs Allege Widespread Animus Against Animal Protection Groups in the
Passage of the Ag Gag Law.**

 In reviewing a motion to dismiss, the central question for the court is whether, assuming

the truth of the Plaintiffs' allegations, the claims stated are legally sufficient to state a claim. *See*

*Archuleta v. Wagner*, 523 F.3d 1278, 1281 (10th Cir. 2008). Plaintiffs clearly state a claim under the Equal Protection Clause, because animus against animal protection groups pervades the legislative history of the ag gag law, Compl. ¶¶ 37-59, and is considerably stronger than the record of animus against hippies in *Moreno*.

Plaintiffs plead that "the law is motivated by animus towards a politically unpopular group—animal protection advocates," Compl. ¶ 12, and that the law "was introduced with the explicit intent of silencing or impeding speech by animal protection organizations." *Id*. ¶ 41. Plaintiffs cite to a wealth of evidence of legislative animus against animal protection organizations generally, *id*. ¶¶ 37-59, including that animal protection organizations "should not be allowed to continue," *id*. ¶ 44, and that they are "terrorists," *id*. ¶48, 51, and "jack wagon[s]." *Id*. ¶ 46. Legislators also identified Plaintiff PETA specifically, with one legislator "provid[ing] a litany of personal, animus-based objections to PETA's lawful activity as a basis for supporting the legislation," *id*. ¶ 48, and another stating that he was opposed to "these groups like PETA and some of these organizations control[ling] what we do in this country, a country that feeds the world." *Id*. ¶ 46.The record of animus in this case could not be clearer, and is far greater than in previous cases. *See, e.g., Moreno*, 413 U.S. at 534 (citing only two examples of animus towards "hippies" and "hippie communes" in the legislative record). The unpopularity of animal protection groups among Utah legislators was a motivating force in enacting legislation that singles out one type of whistle-blowing as criminal. *See Planned Parenthood of Minn. v. Minnesota*, 612 F.2d 359, 361 (8th Cir. 1980).

Defendants argue that animus plays a very trivial role in the Equal Protection analysis. Defs' Br., at 14-15. For example, the Defendants quote prior Supreme Court dicta stating that

animus-based motives are generally irrelevant to the Equal Protection inquiry. *Id*. at 14. The ongoing persuasiveness of these citations, however, is nullified after *Windsor*. Indeed, the very language quoted in the Defendants' motion regarding the irrelevance of illicit motive is quoted by Justice Scalia in his *Windsor* dissent. Justice Scalia criticized the *Windsor* majority for adopting the view that laws based in animus fail rational basis review by explaining that "[i]t is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive. . . Or at least it *was* a familiar principle." *Windsor*, 133 S.Ct. at 2707 (emphasis added). Without noting the contrary authority, defendants rely on the dated "familiar principle" dicta to argue that this claim should be dismissed. Defs' Br. at 14.

### C.  The State's Proffered Purposes for the Law are Not Well-Served By the Classification at Issue.

Under even the most minimal form of rational basis review there has to be an ascertainable link between the stated government interest and the means chosen. *See, e.g., Moreno*, 413 U.S. at 534-35. At the very least, a law must "bear[] a rational relation to some legitimate end." *Romer*, 517 U.S. at 631; R. Randall Kelso, *Standards of Review Under the Equal Protection Clause and Related Constitutional Doctrines Protecting Individual Rights: The "Base Plus Six" Model and Modern Supreme Court Practice*, 4 U. Pa. J. Const. L. 225, 231 (2002) (identifying the range of rational basis analyses that exist and defining the minimum form of such review). The State's proffered interests—articulated alternatively as "protecting private property rights" and preventing "trespass and fraud," Defs' Br. at 12-13—are insufficient to overcome the animus motivating the law. Instead, the proffered reasons for secreting "agricultural operations" from scrutiny lack a concrete relationship to the chosen means, and thus

20

betray the animus against animal protection groups that so clearly motivated the ag gag law. *See City of Cleburne*, 473 U.S. at 448-50 (concluding the challenged ordinance was based on prejudice after considering the poor fit between the law and the purported government interests).

First, Defendants' assertion that the law is a "protection of property rights"[7] misses the mark, because the ag gag law provides no additional protections of private property – it merely punishes people who criticize the use of that property. Landowners can refuse to invite or terminate the invitation of anyone they want at any time, for any reason, or even for no reason at all. Likewise, a landowner can invite and employ anyone he or she chooses, and the right to terminate this invitation is similarly absolute. Accordingly, this law does not further protect the ability of landowners to control what persons do on their property; it simply codifies the animus of the landowners by making criminal the actions of certain invitees. *See id*. at 448 (the government "may not avoid the strictures of [the Equal Protection] Clause by deferring to the wishes or objections of some fraction of the body politic. 'Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect.'") (quoting *Palmore v. Sidoti,* 466 U.S. 429, 433 (1984)). If the state legislature truly intended to protect property rights and not to restrict speech of a particular type—audio and video recording and surveillance of agricultural operations—then it would not enact a law that criminalizes actions only in a single industry. The law creates a distinction between those who seek to expose corruption or crimes in meat or dairy industries, and those who seek to do the same in any other industry, for

---

[7] The interest in protecting property rights is articulated variously as "protecting private property rights," "protecting property owners," and allowing property owners to control "what [people] do while on their property." Defs' Br. at 12-13.

example, restaurants or childcare facilities.[8] This radical under-inclusivity in protecting property

rights exposes the law's true motive: to silence critics of animal agriculture. *Moreno*, 413 U.S. at

536.

Moreover, the goal of protecting private property is not at all served by this legislation.

Undercover investigations, ranging from national network news programs such as *Dateline* to

those planned by Plaintiffs, need not and will not result in any tangible harm to property – no

theft, no defacement, no contamination, and no damage. Property owners may not like having

animal activists or journalists employed undercover at their facility, but they cannot point to any

tangible property harm caused by investigators. Even if an investigation were to cause damage to

property, the persons responsible could be prosecuted for crimes or sued in tort. Plaintiffs are not

claiming a right to infringe on *any tangible property right*. The property-owners in question

retain the absolute right to exclude persons from their property and to control their property. The

notion that there is a property right that insulates an industry from whistle-blowing regarding

criminal conduct or other wrongdoing is a notion unknown in the law of property or whistle-

blowing.[9] No tangible or legitimate property interest is protected by the law in question.

---

[8] Undercover investigations are not uncommon and serve important functions. *See, e.g., United States v. Wahchumwah*, 710 F.3d 862, 868 (9th Cir. 2013) (approving "undercover agent's warrantless use of a concealed audio-video device in a home"); *Hoffa v. United States*, 385 U.S. 293 (1966). Private party media investigations, including investigative features such as the infamous "To Catch a Predator" are a common form of politically salient speech. In Utah, a review of media reports in recent years reveals a range of undercover investigations from restaurant safety, to firearm and alcohol sales, to animal abuse in research facilities, to fraudulent or criminal business activities, among other things. Investigations into private matters, both by government and private actors, are routinely reported and celebrated in Utah.
[9] There is also no legitimate state interest in insulating an industry of considerable political, ethical, and public health significance from whistle-blowing.

As for the Defendants' alternative explanation, that these laws are designed to "punish trespass and fraud," this too is inadequate. Utah already criminalizes trespass and certain kinds of fraud, such that anyone who commits these offenses at an agricultural facility is, even without the ag gag law, guilty of one or more crimes. *See, e.g.*, Utah Code Ann. §§ 76-6-206, 76-6-501, 76-6-1102; *see also Moreno*, 413 U.S. at 536 (explaining that it was "important to note" that fraud was already illegal, thus undermining the claim that fraud was a legitimate government interest served by the challenged statute). The proffered interest in punishing trespass and fraud is also significantly under-inclusive, because the law limits its scope to animal operations, leaving trespass and fraud at other facilities uncovered.

But even more fatally, the law is significantly over-inclusive because it prohibits conduct that is neither trespass nor fraud, sweeping up conduct that does not even implicate the purported state interest. Only one of the four prongs of the ag gag law requires trespass as a predicate for liability, Utah Code Ann. § 76-6-112(2)(d), and the statute does not require one of the essential elements of fraud: injury or damage resulting from a misstatement of fact. *See, e.g.*, *Armed Forces Ins. Exch. v. Harrison*, 70 P.3d 35, 40 (Utah 2003).[10] Thus the statute criminalizes conduct that is neither trespass nor fraud – gaining access to a farm by false pretenses to

---

[10] Economic losses stemming from the bad publicity that follows undercover exposés do not establish the injury element of fraud, because the proximate cause of the lost profits is not the exposé, but rather the bad conduct that it exposes. *See Food Lion v. Capital Cities/ABC, Inc.*, 964 F. Supp. 956, 962-63 (M.D.N.C. 1997) ("[T]ortious activities may have enabled access to store areas in which the public was not allowed and the consequent opportunity to film people, equipment and events from a perspective not available to the ordinary shopper, but it was the food handling practices themselves -- not the method by which they were recorded or published -- which caused the loss of consumer confidence."). Furthermore, neither the administrative costs of unwittingly hiring an undercover investigator as an employee nor the wages paid to him or her is sufficient to establish the injury element necessary for fraud. *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 512-14 (4th Cir. 1999).

document inhumane and potentially illegal conduct. The very gap between what the law criminalizes and the State's justification for the law is, perhaps, the most critical shortcoming of the law. It is through this provision that the law renders illegal the investigations of Plaintiffs, though such actions are not trespass or fraud. The absence of a good fit between the law's stated purpose and its actual classification reinforces that the law is grounded primarily in animus and an attempt to suppress Plaintiffs' viewpoint. Given the prior existence of trespass and other property protection laws in Utah, the ag gag law could have no other purpose.

In sum, the ag gag law is not rationally related to any legitimate government interests. The law, instead, is motivated by the legislature's animus towards animal protection groups. When the interest and intent is to marginalize, stigmatize, and criminalize a particular group, even a law perfectly tailored to that interest, fails rational basis review. *See Moreno*, 413 U.S. at 535 ("desire to harm a politically unpopular group cannot constitute a legitimate governmental interest"). Moreover, at this stage of the litigation, it suffices that Plaintiffs allege that the ag gag law had *no other purpose* than to harm a politically unpopular group and shelter a single industry from political discourse and criticism—an allegation that must be accepted as true for the purposes of the motion to dismiss. This allegation alone requires that the motion to dismiss be denied as to this claim.

## III.   PLAINTIFFS STATE A CLAIM THAT THE AG GAG LAW IS PREEMPTED BY THE FALSE CLAIMS ACT.

Utah's ag gag law is preempted because it conflicts with federal law. The ag gag law seriously undermines the substantive goals of the federal False Claims Act (FCA) and impedes its enforcement mechanism. More precisely, by forbidding undercover audio and video recordings of agricultural operations (and access to the same), the ag gag law impedes the federal

24

objective of facilitating the discovery of fraud by government contractors and undermines the achievement of that objective through the methods chosen by Congress.

**A.  The Ag Gag Law Undermines the Objectives of the FCA.**

Under preemption doctrine, "[w]hat is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000). Congress updated and modernized the FCA in 1986 specifically in response to "the growing pervasiveness of fraud" by government contractors. *See* S. Rep. No. 99-345 (1986) at 1, *reprinted in* 1986 U.S.C.A.A.N. 5266. Because the federal government's own investigators cannot possibly keep careful watch over all contractors, the FCA permits citizens who discover evidence of fraud against the federal government to bring an action on behalf of the United States against the party committing the fraud. 31 U.S.C. § 3730(b). These "*qui tam*" provisions provide important incentives and protections for private citizens who discover fraud against the government to assert FCA claims. State laws that interfere with citizens' undercover collection of evidence of fraud against the federal government undermine these important government interests.

Conflict preemption is not limited to circumstances when there is an actual conflict (i.e., the regulated party cannot simultaneously comply with federal and state law requirements), but applies equally when state laws undermine the advancement of important federal policies. The Court infers that Congress would not tolerate state laws that interfere with the operation of federal laws. *See generally Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 873 (2000). For example, the Supreme Court has recognized preemption even when the federal and state laws have similar objectives, but the state law attempts to advance that objective in a way that appears

to be inconsistent with Congress's chosen mechanism of enforcement. *Arizona v. United States*, 132 S. Ct. 2492, 2505 (2012). What is more, "[a] state law also is pre-empted if it interferes *with the methods by which the federal statute was designed to reach* [its] *goal.*" *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987) (emphasis added); *see also Michigan Canners & Freezers Ass'n. v. Agricultural Marketing & Bargaining Bd.,* 467 U.S. 461, 477 (1984).

As alleged in the Complaint, the ag gag law criminalizes a wide range of undercover investigative conduct that would typically be undertaken by a whistleblower to reveal fraud. Complt. ¶ 31. By criminalizing such conduct, Utah enables private businesses to obscure their unlawful behavior from the public eye. Furthermore, as Plaintiffs have alleged, one or more slaughterhouses in Utah have a contract with the federal government to provide meat for the National School Lunch Program and other food assistance programs. Compl. ¶ 142. Slaughterhouses with these federal contracts typically pledge to abide by slaughter regulations and other applicable laws. Undercover investigations that reveal animal cruelty and unsafe food safety practices may demonstrate that a slaughterhouse is making fraudulent promises to the federal government. Indeed, as discussed in more detail *infra*, these are exactly the circumstances that led to the largest beef recall—and one of the biggest FCA settlements—in the country's history.

Because the Utah law criminalizes various methods of obtaining evidence of fraud to expose government contractors, it directly interferes with the federal government's efforts "to enhance [its] ability to recover losses sustained as a result of fraud against the Government." *See* S. Rep. No. 99-345 (1986) at 1, *reprinted in* 1986 U.S.C.A.A.N. 5266. While recognizing that the ag gag law does not ban all conduct through which the FCA could be enforced, the

criminalization of undercover audio and video recordings and gaining access to facilities through deception substantially interferes with the fraud detection and prevention that is contemplated by the FCA. If restrictions such as the ag gag law are upheld, nothing would prevent states from extending the reach of these restrictive statutes to other industries, or other methods of gathering evidence of fraud, further undermining the FCA's anti-fraud measures.

**B.  Undercover Investigations Play a Pivotal Role in the Enforcement of the FCA.**

The notion that suppressing video recordings of animal abuse would undermine False Claims Act actions is well supported.[11] Surreptitious video recordings made by undercover activists employed at a California slaughterhouse precipitated an FCA action and led to the largest federal recall of beef in United States history. Victoria Kim, *Slaughterhouse in Chino agrees to settlement; The owners will pay $300,000 in a suit stemming from secretly shot footage*, L.A. Times, Nov. 17, 2012, at 1. In 2008, the Humane Society of the United States brought a *qui tam* action under the FCA against multiple defendants involved in a California agricultural operation. *United States ex rel. Humane Society of the U.S. v. Hallmark Meat Packing Co.*, No. EDCV 08-00221-VAP (OPx), 2013 WL 4713557 (C.D. Cal. Apr. 30, 2013). The suit alleged that the defendants "falsely certified and represented in their technical proposals and bids to the United States Department of Agriculture [USDA] that cattle processed at the facility in question were handled humanely and in accordance with federal rules and regulations." *Id*. at *1.

---

[11] Federal courts have found that the FCA preempts other state laws when the FCA's goals would be disturbed or impeded. *See, e.g., Mortgages, Inc. v. United States District Court*, 934 F.2d 209 (9th Cir. 1991); *Israel Discount Bank Ltd. v. Entin*, 951 F.2d 311 (11th Cir. 1992).

If the State of California had in place a statute identical to the Utah ag gag law, the actions of the whistleblowers at the center of that FCA case would have been illegal. Without the discovery of the fraud, the resulting nationwide recall of beef for schoolchildren's lunches might never have occurred. Moreover, while Defendants argue that the FCA may still be enforced because the ag gag law does not proscribe "all recording" and that "a legitimate employee" might still record and report violations of federal law (Defs' Br. at 17), even with the FCA's whistleblower protection provisions these employees may be less likely than a third party to come forward. Even an employee who is brave enough to disclose fraud by his or her employer might be in a position where corroboration from a recording made by a third party is essential to backing his or her story. Indeed, in *Humane Society*, the activists' video recordings were used to help confirm a whistleblowing employee's account of animal abuse, to show that there was sufficient record evidence to defeat a summary judgment motion brought by some of the defendant agricultural operators. *Humane Society*, 2013 WL 4713557 at *13.

Moreover, the plain text and stated goals of the FCA belie the notion that the law is designed primarily to facilitate what the State calls "legitimate employee" whistle-blowers. On the contrary, there is no clean hands requirement for FCA enforcement; instead "the framers of the Act recognized that wrongdoers might be rewarded under the Act, acknowledging the qui tam provisions are based upon the idea of '*setting a rogue to catch a rogue.*'" *Mortgages, Inc. v. U.S. Dist. Court for Dist. of Nev.*, 934 F.2d 209, 213 (9th Cir 1991) (quoting Cong. Globe, 37th Cong. 3d Sess. 955-56 (1863) (remarks of Sen. Howard)) (emphasis added). Empirical evidence confirms that the use of paid relators whose job is to investigate fraud is a crucial rather than peripheral aspect of FCA enforcement. David Freeman Engstrom, *Harnessing the Private*

*Attorney General*, 112 Colum. L. Rev. 1244, 1278-80 (2012) (studying the role of specialized, repeat professional relators in whistle-blowing under the FCA); *id.* (finding that "repeat relators—who are almost by definition outsiders—are no less and perhaps more effective"). Contrary to the assertions of the State, the sort of investigations contemplated by plaintiffs are not a lesser form of whistle-blowing under the FCA simply because it is an "outsider" paid to investigate. *Id.*

To put the matter as plainly as possible, the ag gag law impedes a clear federal policy of encouraging whistle-blowing. The law need not make all whistle-blowing impossible; obstacle preemption exists when a state law interferes with conduct that is encouraged by federal law. *See, e.g., South Dakota Mining Association Inc. v. Lawrence County*, 155 F.3d 1005, 1011 (8th Cir. 1998). It is indisputable that one of the FCA's objectives is "encouraging 'whistleblowers.'" *United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*, 41 F.3d 1032, 1041-42 (6th Cir. 1994); *U.S. ex rel. Milam v. Univ. of Texas M.D. Anderson Cancer Ctr.*, 961 F.2d 46, 49 (4th Cir. 1992). Accordingly, by criminalizing animal activist strategies to go undercover and reveal illegal and inhumane treatment of animals, and potentially act as relators under the FCA, the Utah law criminalizes conduct encouraged by the federal government in the effort to prevent fraud. The sort of undercover work criminalized by the ag gag statute is not the only way that evidence of fraud can be reported, but such actions do serve a as a critically important vehicle for fraud detection and reporting and, thus, their impingement amounts to an interference with federal objectives. Plaintiffs have pled facts sufficient for their preemption claim to proceed.

29

## CONCLUSION

For the foregoing reasons, Plaintiffs request that the Motion to Dismiss be denied.

DATED this 10th Day of December, 2013.

        _/s/ Stewart Gollan_____
        Utah Legal Clinic
            Cooperating Attorneys for Utah Civil
            Rights & Liberties Foundation, Inc.
        214 East Fifth South Street
        Salt Lake City, Utah 84111-3204
        stewartgollan@utahlegalclinic.com

Alan Chen, *pro hac vice*                      Justin Marceau, *pro hac vice*
University of Denver, Sturm College of Law     University of Denver, Sturm College of Law
2255 E. Evans Avenue                           2255 E. Evans Avenue
Denver, CO 80208                               Denver, CO 80208
 (303) 871-6283                                (303) 871-6449
achen@law.du.edu                               jmarceau@law.du.edu

Edward T. Ramey, *pro hac vice*                Matthew Liebman, *pro hac vice*
Heizer Paul LLP                                Animal Legal Defense Fund
2401 15th Street, Suite 300                  170 East Cotati Avenue
Denver, CO 80202                               Cotati, CA 94931
(303) 376-3712                                 (707) 795-2533, ext. 1028
eramey@hpfirm.com                              mliebman@aldf.org

Matthew Strugar, *pro hac vice*
PETA Foundation
2154 W. Sunset Blvd.                           ATTORNEYS FOR PLAINTIFFS
Los Angeles, CA 90026
(323) 210-2263
matthew-s@petaf.org