Jeffrey J. Hunt (5855)
Bryan S. Johansen (9912)
PARR BROWN GEE & LOVELESS
185 South State Street Suite 800
Salt Lake City, UT 84111
801-532-7840
jhunt@parrbrown.com
bjohansen@parrbrown.com

Bruce D. Brown (*admitted pro hac vice*)
Gregg P. Leslie (*admitted pro hac vice*)
THE REPORTERS COMMITTEE
   FOR FREEDOM OF THE PRESS
1101 Wilson Blvd., Suite 1100
Arlington, VA 22209
Telephone: (703) 807-2100
bbrown@rcfp.org
gleslie@rcfp.org

*Counsel for Amicus Curiae*

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ANIMAL LEGAL DEFENSE FUND, PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, COUNTERPUNCH, AMY MEYER, WILL POTTER, DANIEL HAUFF, JAMES McWILLIAMS, and JESSE FRUHWIRTH,<br><br>        Plaintiffs,<br><br>    v.<br><br>GARY R. HERBERT, in his official capacity as Governor of Utah; JOHN SWALLOW, in his official capacity as Attorney General of Utah,<br><br>        Defendants. | **MOTION OF THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS AND 16 OTHERS FOR LEAVE TO FILE MEMORANDUM AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS**<br><br>Case No. 2:13-cv-00679-RJS<br>Judge Robert J. Shelby |

The Reporters Committee for Freedom of the Press and 16 additional *amici* identified herein respectfully seek leave of the Court to file the attached memorandum in support of Plaintiffs' response to Defendants' motion to dismiss.  Plaintiffs have consented to the filing of this memorandum; Defendants do not oppose it.

"District courts have long been permitted to allow *amicus* appearances at their discretion."  *Vigil v. Am. Tel. & Tel. Co*., Civil No. C-1476, 1969 U.S. Dist. LEXIS 9584, at *1 - 2 (D. Colo. Sept. 9, 1969).  "Because an *amicus curiae* participates only for the benefit of the court, and is not a party to the litigation, the court has the sole discretion to determine the fact, extent, and manner of participation by the amicus."  *Kane County, Utah. v. United State*s, 934 F. Supp. 2d 1344, 1347 (D. Utah 2013) (internal quotation marks omitted).  "District courts frequently welcome amicus briefs from non-parties concerning legal issues that have potential ramifications beyond the parties directly involved or if the amicus has unique information or perspective than can help the court beyond the help that lawyers for the parties are able to provide."  *NGV Gaming, Ltd. v. Upstream Point Molate, LLC*, 355 F. Supp. 2d 1061, 1067 (N.C. Cal. 2005) (internal quotations omitted).

The judges of this Court have frequently exercised their discretion to allow *amicu*s participation to provide additional perspective and proper ventilation of legal issues, particularly in cases raising broader public policy concerns or constitutional issues.  *See, e.g.*, *Utah v. United States*, No. 2:05-CV0-540, 2012 U.S. Dist. LEXIS 63545 *1 (D. Utah May 4, 2012); *United States v. Moesser*, No. 2:09-CR-842 TS, 2010 U.S. Dist. LEXIS 123271, at *18-20 (D. Utah

Nov. 19, 2010); *United States v. Angelos*, 345 F. Supp. 2d 1227, 1256 (D. Utah 2004); *Kennard v. Leavitt*, 246 F. Supp. 2d 1177, 1182 (D. Utah 2002).

*Amicus* The Reporters Committee for Freedom of the Press is a voluntary, unincorporated association of reporters and editors that works to defend the First Amendment rights and freedom-of-information interests of the news media.  The Reporters Committee has provided representation, guidance, and research in First Amendment and Freedom of Information Act litigation since 1970.

Additional *amici* are The Salt Lake Tribune, Deseret News Publishing Company, KSL Broadcast Group, KSTU Fox 13, Spectrum, and the Utah Headliners Chapter of the Society of Professional Journalists ("SPJ") (collectively, the "Utah News Media Amici"), as well as the Association of American Publishers, Inc., California Newspaper Publishers Association, First Amendment Coalition, the Investigative Reporting Workshop,  National Press Photographers Association, National Public Radio, Inc., The Newspaper Guild – CWA, North Jersey Media Group Inc., Stephens Media LLC, and Student Press Law Center.  The Utah News Media Amici include Utah-based news organizations that gather and report news and information to the general public, including on issues related to agricultural operations and food safety.  SPJ is a voluntary, not-for-profit professional association of news reporters, editors, photographers, publishers, and owners of various news organizations throughout the State of Utah.  SPJ works to protect the constitutional rights of freedom of the press, to preserve the public's right to know, and to require that the public's business be conducted in public.

*Amici* respectfully suggest that the attached memorandum may be of assistance to the Court in considering the significant First Amendment, newsgathering, and standing issues raised

by Defendants' motion to dismiss. *Amici's* memorandum provides a broader historical and legal context to explain why the Utah "ag-gag" statute infringes on constitutionally protected newsgathering rights and why the plaintiffs in this case have standing to challenge the law.

WHEREFORE, *Amici* respectfully request that the Court grant their motion for leave to file the *amicus curiae* memorandum submitted herewith.

RESPECTFULLY SUBMITTED this 10th day of December 2013,

/s/ Bruce D. Brown
Bruce D. Brown
Gregg P. Leslie
THE REPORTERS COMMITTEE
   FOR FREEDOM OF THE PRESS

      and

Jeffrey J. Hunt
Bryan S. Johansen
PARR BROWN GEE & LOVELESS

*Attorneys for Amicus Curiae*

iv

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 10th day of December 2013, I filed the foregoing motion via

the CM/ECF system, which electronically served the following:

STUART GOLLAN
Utah Legal Clinic
214 East Fifth South Street
Salt Lake City, Utah 84103
(801) 328-9531
stewartgollan@utahlegalclinic.com

JUSTIN MARCEAU
(*Pro Hac Vice application pending*)
Of Counsel, Animal Legal Defense Fund
University of Denver
Sturm College of Law
2255 E. Evans Avenue
Denver, CO 80208
(303) 871-6449
jmarceau@law.du.edu

MATTHEW LIEBMAN
(*Pro Hac Vice application pending*)
Animal Legal Defense Fund
170 East Cotati Avenue Cotati, CA 94931
(707) 795-2533, ext. 1028
mliebman@aldf.org

MATTHEW STRUGAR
(*Pro Hac Vice application pending*)
PETA Foundation
2154 W. Sunset Blvd.
Los Angeles, CA 90026
(323) 210-2263
matthew-s@petaf.org

*Attorneys for Plaintiffs*

KYLE J. KAISER (13924)
DANIEL R. WIDDISON (11979)
Assistant Utah Attorneys General
160 East 300 South, Sixth Floor
P.O. Box 140856
Salt Lake City, Utah 84114-0856
Telephone: (801) 366-0100
Facsimile: (801) 366-0101
E-mail: kkaiser@utah.gov
E-mail: dwiddison@utah.gov
*Attorneys for Defendants*

/s/ Bruce D. Brown

Bruce D. Brown

v

Jeffrey J. Hunt (5855)
Bryan S. Johansen (9912)
PARR BROWN GEE & LOVELESS
185 South State Street Suite 800
Salt Lake City, UT 84111
801-532-7840
jhunt@parrbrown.com
bjohansen@parrbrown.com

Bruce D. Brown (*admitted pro hac vice*)
Gregg P. Leslie (*admitted pro hac vice*)
THE REPORTERS COMMITTEE
   FOR FREEDOM OF THE PRESS
1101 Wilson Blvd., Suite 1100
Arlington, VA 22209
Telephone: (703) 807-2100
bbrown@rcfp.org
gleslie@rcfp.org

*Counsel for Amicus Curiae*

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ANIMAL LEGAL DEFENSE FUND, PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, COUNTERPUNCH, AMY MEYER, WILL POTTER, DANIEL HAUFF, JAMES McWILLIAMS, and JESSE FRUHWIRTH,    ) ) ) ) ) ) ) | **MEMORANDUM OF THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS AND 16 OTHERS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS** |
| Plaintiffs,    ) ) ) | Case No. 2:13-cv-00679-RJS |
| v.    ) ) | Judge Robert J. Shelby |
| GARY R. HERBERT, in his official capacity as Governor of Utah; JOHN SWALLOW, in his official capacity as Attorney General of Utah,    ) ) ) ) ) | . |
| Defendants.    ) | |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ iii

STATEMENT OF INTEREST .......................................................................... v

DISCLOSURE STATEMENT ......................................................................... vi

SUMMARY OF THE ARGUMENT ................................................................ 1

ARGUMENT .................................................................................................... 1

I.  THE UTAH "AG GAG" STATUTE INFRINGES ON THE FIRST AMENDMENT
    RIGHTS OF THOSE WHO WANT TO INFORM THE PUBLIC ABOUT
    IMPORTANT MATTERS SUCH AS FOOD SAFETY .................................................. 1

    A.  Investigations by journalists and other organizations into meat-processing
        facilities have long played a vital role in ensuring food safety ...................................... 2

    B.  The Utah "ag gag" statute creates a significant conflict with the government's
        interest in protecting the health of its citizens against the harms of
        contaminated meat. ......................................................................................... 5

II.  PLAINTIFFS HAVE STANDING TO CHALLENGE THE CONSTITUTIONALITY
     OF THE UTAH STATUTE ON FIRST AMENDMENT GROUNDS ............................ 7

CONCLUSION ................................................................................................. 10

APPENDIX A: DESCRIPTION OF AMICI ............................................................. 12

APPENDIX B: ADDITIONAL COUNSEL ............................................................... 17

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Babbitt v. UFW Nat'l Union*, 442 U.S. 289 (1979) ...................................................... 8

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973) ........................................................ 7, 8

*Gannett Co., Inc. v. DePasquale*, 443 U.S. 368 (1979)............................................... 9

*Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082 (10th Cir. 2006) ................... 7

*Nixon v. Warner Communications, Inc.*, 435 U.S. 589 (1978) ..................................... 9

*Press-Enterprise Co. v. Superior Court of California, Riverside* ("*Press-Enterprise I*"),
   464 U.S. 501 (1984)............................................................................................ 9

*Press-Enterprise Co. v. Superior Court of California, Riverside* ("*Press-Enterprise II*"),
   478 U.S. 1 (1986)................................................................................................ 9

*Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980)..................................... 9

*Secretary of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947 (1984) ....................... 8

**Statutes**

Utah Code Ann. § 76-6-112 (West 2012)................................................................ 1, 9

**Other Authorities**

113 Cong. Rec. 21283–86 (1967) ............................................................................ 3

*2001 – Investigative Reporting,* The Pulitzer Prizes, www.pulitzer.org/archives/6487 ............... 3

*2010 – Explanatory Reporting,* The Pulitzer Prizes, http://www.pulitzer.org/
   archives/8819 .................................................................................................... 3

*Continuing Problems in USDA's Enforcement of the Humane Methods of Slaughter Act:
   Hearing Before the Subcomm. on Domestic Policy of the H. Comm. on Oversight &
   Gov't Reform*, 111th Cong. (2010) ................................................................. 4, 5, 7

David Brown, *USDA Orders Largest Meat Recall in U.S. History*, Wash. Post, Feb. 18,
   2008, *available at* http://wapo.st/182ZgvW ......................................................... 5

*Food Safety*, in *Agriculture Fact Book*, USDA (2001–2002),
   http://www.usda.gov/factbook/chapter9.htm...................................................... 6

*Hearing on H.B. 187 Before the H. Law Enforcement & Criminal Justice Standing Comm.*,
   at 0:44:15, 1:04:12 (Feb. 14, 2012), *audio available at* http://bit.ly/1hgtHHk ......................... 6

James Diedrick, *The Jungle*, Encyclopedia of Chicago (Janice L. Reiff, Ann Durkin
   Keating, & James R. Grossman, eds. 2005), *available at*
   http://www.encyclopedia.chicagohistory.org/pages/679.html...................................... 2

James O'Shea, *Raking the Muck*, Chi. Trib., May 21, 2006, *available at*
   http://bit.ly/18TwTjR ............................................................................ 2, 7

Nicolas Cornell, Note, *Overbreadth and Listeners' Rights*, 123 Harv. L. Rev. 1749 (2010) ........ 8

Press Release, *Statement by Secretary of Agriculture Ed Schafer Regarding Animal
   Cruelty Charges Filed Against Employees at Hallmark/Westland Meat Packing
   Company* (Feb. 15, 2008), http://1.usa.gov/1832lft ........................................... 5

Press Release, *Statement by Secretary of Agriculture Ed Schafer Regarding Hallmark/
   Westland Meat Packing Company Two Year Product Recall*, USDA (Feb. 17, 2008),
   http://1.usa.gov/1830APr ...................................................................... 5

*The 2008 Pulitzer Prize Winners: Investigative Reporting*, The Pulitzer Prizes,
   http://www.pulitzer.org/citation/2008-Investigative-Reporting ................................ 4

Wallace F. Janssen, *The Story of the Laws Behind the Labels*, Food and Drug Admin.,
   http://www.fda.gov/AboutFDA/WhatWeDo/History/Overviews/ucm056044.htm
   (last updated Dec. 14, 2011) (originally published in *FDA Consumer*, June 1981).................. 3

## STATEMENT OF INTEREST

The Reporters Committee for Freedom of the Press and 16 additional *amici* listed below, through undersigned counsel, respectfully submit this memorandum as *amici curiae* in support of Plaintiffs.  Plaintiffs have consented to the filing of this memorandum; Defendants do not oppose it.

Media organizations have an interest in ensuring that reliable resources are available to them so that they may gather the news in a way that benefits the public and serves as a watchdog on the meat-processing industry.

In addition to the Reporters Committee, the *amicus* parties are: the Association of American Publishers, Inc., California Newspaper Publishers Association, Deseret News, First Amendment Coalition, the Investigative Reporting Workshop, KSL Broadcast Group, KSTU Fox 13, National Press Photographers Association, National Public Radio, Inc., The Newspaper Guild – CWA, North Jersey Media Group Inc., the Salt Lake Tribune, The Spectrum, Stephens Media LLC, Student Press Law Center, and Utah Headliners Chapter of the Society of Professional Journalists.  Each is described more fully in Appendix A.

### DISCLOSURE STATEMENT

The Association of American Publishers, Inc. is a nonprofit organization that has no parent and issues no stock.

California Newspaper Publishers Association is a mutual benefit corporation organized under state law for the purpose of promoting and preserving the newspaper industry in California.

The parent company of Deseret News Publishing Company, publisher of the Deseret News, is Deseret Management Corporation.  No publicly held corporation owns 10% or more of the stock of Deseret Management Corporation.

First Amendment Coalition is a nonprofit organization with no parent company. It issues no stock and does not own any of the party's or amicus' stock.

The Investigative Reporting Workshop is a nonprofit professional newsroom affiliated with the School of Communication at American University.  It issues no stock.

KSL Broadcast Group is owned by Bonneville International Corporation.  No publicly held company owns 10% or more of Bonneville.

KSTU Fox 13 is owned by Local TV, LLC.  Local TV LLC owns and/or operates 21 broadcast television stations in the United States.  No publicly held corporation owns 10% or more of Local TV, LLC.

National Press Photographers Association is a 501(c)(6) nonprofit organization with no parent company. It issues no stock and does not own any of the party's or amicus' stock.

National Public Radio, Inc. is a privately supported, not-for-profit membership organization that has no parent company and issues no stock.

The Newspaper Guild – CWA is an unincorporated association. It has no parent and issues no stock.

North Jersey Media Group Inc. is a privately held company owned solely by Macromedia Incorporated, also a privately held company.

The Reporters Committee for Freedom of the Press is an unincorporated association of reporters and editors with no parent corporation and no stock.

The Salt Lake Tribune's parent company is MediaNews Group, based in Denver, Colo. No publicly held company owns 10% or more of the stock of the parent company.

The Spectrum is a division of Gannett Satellite Information Network, Inc., a wholly-owned subsidiary of Gannett Co., Inc.  Gannett Co., Inc. is a publicly traded company.

Stephens Media LLC is a privately owned company with no affiliates or subsidiaries that are publicly owned.

Student Press Law Center is a 501(c)(3) not-for-profit corporation that has no parent and issues no stock.

The Utah Headliners has no parent corporation and no publicly held corporation owns 10% or more of its stock.

## SUMMARY OF THE ARGUMENT

By criminalizing audio and image recording at meat-processing plants, the Utah "ag gag" statute weakens food safety guarantees at the same time it stifles free speech.  Journalists and organizations that conduct investigations into meat-processing facilities have long been credited with advancing the safety of the meat the public consumes.  Federal inspection has drastically improved the safety of the meat in the past century, but problems within the inspection system leave a gap in food safety that journalists and animal rights organizations have filled.  While no journalist has the right to trespass on private property, the overbreadth of the Utah statute poses a substantial risk of criminalizing lawful – and constitutionally protected – newsgathering activity. Finally, Plaintiffs have standing to challenge the constitutionality of the Utah statute as courts have long recognized a more flexible standing requirement in First Amendment cases.

## ARGUMENT

## I.   THE UTAH "AG GAG" STATUTE INFRINGES ON THE FIRST AMENDMENT RIGHTS OF THOSE WHO WANT TO INFORM THE PUBLIC ABOUT IMPORTANT MATTERS SUCH AS FOOD SAFETY.

Utah already has laws that deal with trespass and fraud.  The new law imposing penalties for agricultural operation "interference," Utah Code Ann. § 76-6-112 (West 2012), makes certain acts *more* illegal and criminalizes other arguably legitimate information-gathering activities – even though they cause no harm – simply because they involve recording images and sounds on the property.  The intention is obviously to stop activists who wish to record animal abuse or other improprieties in the food production industry.  As a result, those who seek to inform the public about abuses are more likely to be prosecuted simply because they sought to document the actions they are revealing.  Because unsubstantiated allegations can lead to libel suits and

1

charges of interference with business operations, it seems particularly disconcerting that the state

would seek to criminalize the act of gathering documentary evidence of a violation.  The

whistleblowers that come forward with information about abuses play an important role in a civil

society, and the journalists rely on their information – including their documentation of that

information through audio and video recordings – to help the public hold the companies and

government regulators accountable as they undertake actions that affect the safety of the food we

eat.

      **A.**      **<u>Investigations by journalists and other organizations into meat-processing facilities have long played a vital role in ensuring food safety.</u>**

      The watchdog role of the press in protecting the public's interest in a safe food supply

and the conditions under which that food is produced has a long and time-honored history.  In

many respects, investigative journalism was born out of Upton Sinclair's infamous 1906 exposé

on Chicago's slaughterhouses, *The Jungle*, and his contemporaries' works.  *See* James O'Shea,

*Raking the Muck*, Chi. Trib., May 21, 2006, *available at* http://bit.ly/18TwTjR.  Although his

novel is centered around a fictitious Lithuanian immigrant, Sinclair conducted extensive

research, interviewing health inspectors and workers and going undercover into the meatpacking

facilities to witness the unsanitary conditions firsthand.  James Diedrick, *The Jungle*,

Encyclopedia of Chicago (Janice L. Reiff, Ann Durkin Keating, & James R. Grossman, eds.

2005), *available at* http://www.encyclopedia.chicagohistory.org/pages/679.html.  Sinclair's work

is credited with aiding passage of the Pure Food and Drug Act and Meat Inspection Act, both

enacted in 1906, which instituted vigorous reforms in the meatpacking industry.  *Id.*; *see also*

Wallace F. Janssen, *The Story of the Laws Behind the Labels*, Food and Drug Admin.,

http://www.fda.gov/AboutFDA/WhatWeDo/History/Overviews/ucm056044.htm (last updated

Dec. 14, 2011) (originally published in *FDA Consumer*, June 1981) ("A single chapter in Upton

Sinclair's novel, *The Jungle*, precipitated legislation expanding federal meat regulation to

provide continuous inspection of all red meats for interstate distribution, a far more rigorous type

of control than that provided by the pure food bill.")

The spirit of reform that followed publication of *The Jungle* has repeated itself numerous

times in the century that followed.  In the late 1960s, Nick Kotz, reporter for the *Minneapolis*

*Tribune*, wrote a series of stories revealing widespread unsanitary conditions in the country's

meatpacking plants.  113 Cong. Rec. 21283–86 (1967).  His investigative reporting contributed

to the passage of the Meat Inspection Act of 1967, which extended the reach of federal

regulation to cover not only meat that crossed state borders but all slaughterhouses and meat-

processing facilities in the United States.  *Id.* at 21283.  During a congressional session leading

to the passage of the Act, Sen. Walter Mondale thanked Kotz for bringing the issue to Congress's

attention, saying "the press must take a major share of the credit for action in this area."  *Id.*

Kotz won a Pulitzer Prize for his reporting, as did Michael Moss of the *New York Times*

in 2010 for calling into question the effectiveness of injecting ammonia into beef to remove E.

coli.  *See 2010 – Explanatory Reporting,* The Pulitzer Prizes, http://www.pulitzer.org/

archives/8819.  Numerous others – such as David Willman with the *Los Angeles Times*, who

reported on the missteps of the Food and Drug Administration in approving the diabetes pill

Rezulin – have won Pulitzer Prizes for their investigative reporting on consumer safety and

federal regulatory oversight.  *See 2001 – Investigative Reporting,* The Pulitzer Prizes,

www.pulitzer.org/archives/6487; *The 2008 Pulitzer Prize Winners: Investigative Reporting*, The

3

Pulitzer Prizes, http://www.pulitzer.org/citation/2008-Investigative-Reporting (awarding the prize to the *Chicago Tribune* staff for reporting on "faulty governmental regulation of toys, car seats and cribs, resulting in the extensive recall of hazardous products and congressional action to tighten supervision" and *New York Times* reporters "for their stories on toxic ingredients in medicine and other everyday products imported from China, leading to crackdowns by American and Chinese officials").

The government's inspection system itself is often flawed, which makes independent observation and verification even more important. At times inspection teams are short staffed, and inspectors can be undermined by their supervisors or choose to turn a blind eye to problems. *See generally Continuing Problems in USDA's Enforcement of the Humane Methods of Slaughter Act: Hearing Before the Subcomm. on Domestic Policy of the H. Comm. on Oversight & Gov't Reform*, 111th Cong. (2010). USDA inspector Dean Wyatt repeatedly reported abuses in a Vermont facility he observed, and rather than taking action against the plant, his supervisors demoted and reprimanded him. *Id.* at 38-39. They told him "to drastically reduce the amount of time [he] spent on humane handling enforcement because [he] was finding too many problems." *Id.* at 38. It was not until the Humane Society of the United States (HSUS) conducted an undercover investigation of the very plant Wyatt complained about that the USDA finally ordered a criminal investigation and shut down the plant. *Id.* at 46, 51 (statement of Dr. Dean Wyatt, FSIS Supervisory Public Health Veterinarian). Wyatt said the HSUS footage showed even more egregious violations than he was aware of and even captured one of his own subordinates, a federal investigator, standing by while plant workers skinned a calf while it was

4

still alive, in violation of the Humane Methods of Slaughter Act.  *Id.*  The video shows the investigator saying, "If Doc [Wyatt] knew about this, he would shut you down."  *Id.*

The video from Vermont was not the first time HSUS succeeded in exposing abuses in meat-processing plants.  HSUS released a video in 2008 from the Hallmark Meat Packing plant in California, showing workers use electric shocks, high-intensity water sprays, and forklifts to push cows that were too sick to stand on their own.  David Brown, *USDA Orders Largest Meat Recall in U.S. History*, Wash. Post, Feb. 18, 2008, *available at* http://wapo.st/182ZgvW.  The USDA prohibits the slaughter of animals that cannot walk in part of concerns the cow might be infected with bovine spongiform encephalopathy, commonly known as "mad cow disease," which could spread to humans who consume the meat.  *Id.*; Press Release, *Statement by Secretary of Agriculture Ed Schafer Regarding Hallmark/Westland Meat Packing Company Two Year Product Recall*, USDA (Feb. 17, 2008), http://1.usa.gov/1830APr.  As a result of the HSUS video, 143 million pounds of beef were recalled – a full two years' worth of production from the plant, which was the largest meat recall in U.S. history.  Brown, *supra*.  Additionally, the USDA suspended production at the plant, and felony animal cruelty charges were brought against two employees.  Press Release, *Statement by Secretary of Agriculture Ed Schafer Regarding Animal Cruelty Charges Filed Against Employees at Hallmark/Westland Meat Packing Company* (Feb. 15, 2008), http://1.usa.gov/1832lft.

> **B.**      **The Utah "ag gag" statute creates a significant conflict with the government's interest in protecting the health of its citizens against the harms of contaminated meat.**

Journalists and organizations that investigate meat-processing plants are not "us[ing] propaganda to raise money" and to "make slick advertising and shut us down," as Rep. John

Mathis, sponsor of the bill in the Utah House of Representatives, contended.  *Hearing on H.B. 187 Before the H. Law Enforcement & Criminal Justice Standing Comm.*, at 0:44:15, 1:04:12 (Feb. 14, 2012), *audio available at* http://bit.ly/1hgtHHk.  Rather, investigative journalists typically are motivated by the same concerns as the government regulators themselves – making sure the American people can safely consume the meat that is placed on their dinner tables – which makes "ag gag" statutes such as Utah's all the more perplexing.  Where it should be extending the leash, the Utah statute instead muzzles the watchdog.

The owners and operators of meat-processing plants are protected by law from activities that are truly designed to interfere with their operations.  Trespass, fraud, and other laws are sufficient to address acts by individuals or organizations that overstep legal bounds.  But a blanket gag on all image and audio recording on agricultural operations is overly broad and unnecessary, and it works against the state interest in protecting the health and welfare of its citizens and in obtaining the best evidence of possible abuses.  Rep. Mathis said, "I don't see much difference between my barn and my house" and likened recordings in meat-processing facilities to placing a recording device under a married couple's bed.  *Hearing on H.B. 187*, *supra*, at 0:43:35, 0:56:05.  But the two are not comparable.  Plant operations are highly scrutinized by the federal government, with inspectors regularly visiting the premises, observing operations, testing meat products, and examining livestock.  *See Food Safety*, in *Agriculture Fact Book*, USDA (2001–2002), http://www.usda.gov/factbook/chapter9.htm.  Clearly, the public interest in a safe food supply outweighs whatever interests meat-processing plants may have in keeping their operations concealed from public view.

Investigator Dean Wyatt was praised at the congressional hearing as "a principled man, an exemplar of the highest standards" for reporting abuses he witnessed in meat-processing facilities. *Continuing Problems in USDA's Enforcement of the Humane Methods of Slaughter, supra,* at 52, 61. Reporter Nick Kotz was invited to the White House for his investigative journalism that led to the passage of the Meat Inspection Act of 1967. O'Shea, *supra*. In Utah, Plaintiff Amy Meyer attempted, as many before her, to document slaughterhouse abuses in plain sight from public property, but instead of an invitation to the White House, she was charged under the statute. Compl. ¶ 22.

Scrutiny of meat-processing facilities can only lead to better food safety. Silencing the speech of non-government actors such as journalists with the threat of criminal conviction would leave a federal inspection system that is fraught with its own problems as the lone watchdog over the meat the public consumes. A law that restricts expressive activity while at the same time jeopardizing food safety is repugnant to public policy not in one but two ways.

## II.   PLAINTIFFS HAVE STANDING TO CHALLENGE THE CONSTITUTIONALITY OF THE UTAH STATUTE ON FIRST AMENDMENT GROUNDS.

The U.S. Supreme Court has long recognized that flexible standing rules apply when a party seeks to challenge a statute on First Amendment grounds. *See Broadrick v. Oklahoma*, 413 U.S. 601, 611-12 (1973). The Tenth Circuit, following this precedent, has acknowledged in First Amendment cases that "the standing inquiry is particularly delicate. By definition, the injury is inchoate: because speech is chilled, it has not yet occurred and might never occur . . . ." *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1088 (10th Cir. 2006).

Because the First Amendment requires "breathing space," the Supreme Court has held that litigants can sue "not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick*, 413 U.S. at 612; *see also* Nicolas Cornell, Note, *Overbreadth and Listeners' Rights*, 123 Harv. L. Rev. 1749 (2010) ("Insofar as the First Amendment protects a general right of the citizenry to open and undistorted discourse, such a right is an appropriate basis for standing."). Flexible rules on standing are especially important when the plaintiff faces the threat of criminal prosecution for engaging in speech and "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." *See Babbitt v. UFW Nat'l Union*, 442 U.S. 289, 298 (1979).

The Supreme Court in *Secretary of Maryland v. Joseph H. Munson Co.* rationalized broad standing in First Amendment cases by noting that "[s]ociety as a whole [is] the loser" when individuals curtail their speech or expression for fear of violating a statute. 467 U.S. 947, 956 (1984). When First Amendment interests are at stake, a court's traditional interest in judicial economy and avoidance of premature interpretation of a statute is outweighed by society's interest in challenging a statute that has the potential to chill speech. *Id.* at 955-56. Therefore, any party who can show injury-in-fact to satisfy the Constitution's Article III "case or controversy" requirement and who can properly frame the issues has standing to bring a facial First Amendment challenge. *Id.* at 956, 958.

Similarly, journalists and the public have consistently been allowed to challenge statutes and judicial decisions limiting public access to court proceedings and records without having to prove an individualized interest. The key Supreme Court access cases – *Nixon v. Warner*

8

*Communications, Inc.*, 435 U.S. 589 (1978); *Gannett Co., Inc. v. DePasquale*, 443 U.S. 368

(1979); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980); *Press-Enterprise Co. v.*

*Superior Court of California, Riverside* ("*Press-Enterprise I*"), 464 U.S. 501 (1984); and *Press-*

*Enterprise Co. v. Superior Court of California, Riverside* ("*Press-Enterprise II*"), 478 U.S. 1

(1986) – do not examine the question of standing to bring an action for access.  These cases

establish a presumption of a right of access based on the important public interests at stake and

do not even pause to consider whether the parties have demonstrated any particular harm.

Instead, the public interest in access, by itself, is enough.

   Here, the plaintiffs have standing to challenge the Utah statute on First Amendment

grounds.  Plaintiffs Counterpunch, Will Potter, James McWilliams, and Jesse Fruhwirth are

journalists whose work is impaired by the Utah statute.  *See* Compl. ¶¶ 21, 23, 25, 26.  It is easy

to imagine a scenario where a journalist with permission to enter an agricultural operation, but

who subsequently writes a story that the owner finds unflattering, is then accused of having

gained access under false pretenses – an offense under the statute.  *See* Utah Code Ann. § 76-6-

112(b).  The ability of journalists to report reliable information regarding the conditions inside

Utah's meat-processing facilities will be effectively eviscerated.  The Utah statute, therefore,

impairs their ability to engage in constitutionally protected speech.

   Plaintiff Amy Meyer was charged with violating the Utah statute for taking photographs

of a slaughterhouse while standing on public property.  Compl. ¶ 22.  She was criminally

charged and was subject to the criminal process and mandatory appearances before a judge

dismissed the charges without prejudice.  *Id.*  Meyer's case is a perfect example of how the

overbreadth of the Utah statute may cause an individual to refrain from engaging in

constitutionally protected speech – as she did, standing on public property – for fear of criminal prosecution.

Plaintiffs the Animal Legal Defense Fund (ALDF), People for the Ethical Treatment of Animals (PETA), and Daniel Hauff have conducted or assisted with undercover investigations of animal facilities in the past and would like to continue to do so in Utah.  Compl. ¶¶ 19, 20, 24. However, they are prevented from investigating facilities for fear of criminal prosecution under the Utah statute.

First Amendment cases require flexible standing rules because the statutes they challenge present a unique harm: chilling speech.  Plaintiffs here have shown that they are prevented from engaging in speech by the Utah statute, and they therefore have standing.

<u>CONCLUSION</u>

For the foregoing reasons, as well as those set forth in the opposition memorandum of Plaintiffs, the Court should deny Defendants' motion to dismiss.

Respectfully Submitted this 10th day of December 2013.

/s/ Bruce D. Brown
Bruce D. Brown
Gregg P. Leslie
THE REPORTERS COMMITTEE
   FOR FREEDOM OF THE PRESS


     and

Jeffrey J. Hunt
Bryan S. Johansen
PARR BROWN GEE & LOVELESS

*Attorneys for Amicus Curiae*

10

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 10th day of December 2013, I filed the foregoing

*amicus curiae* memorandum via the CM/ECF system, which electronically served the following:

STUART GOLLAN
Utah Legal Clinic
214 East Fifth South Street
Salt Lake City, Utah 84103
(801) 328-9531
stewartgollan@utahlegalclinic.com

JUSTIN MARCEAU
(*Pro Hac Vice application pending*)
Of Counsel, Animal Legal Defense Fund
University of Denver
Sturm College of Law
2255 E. Evans Avenue
Denver, CO 80208
(303) 871-6449
jmarceau@law.du.edu

MATTHEW LIEBMAN
(*Pro Hac Vice application pending*)
Animal Legal Defense Fund
170 East Cotati Avenue Cotati, CA 94931
(707) 795-2533, ext. 1028
mliebman@aldf.org

MATTHEW STRUGAR
(*Pro Hac Vice application pending)*
PETA Foundation
2154 W. Sunset Blvd.
Los Angeles, CA 90026
(323) 210-2263
matthew-s@petaf.org

*Attorneys for Plaintiffs*

KYLE J. KAISER (13924)
DANIEL R. WIDDISON (11979)
Assistant Utah Attorneys General
160 East 300 South, Sixth Floor
P.O. Box 140856
Salt Lake City, Utah 84114-0856
Telephone: (801) 366-0100
Facsimile: (801) 366-0101
E-mail: kkaiser@utah.gov
E-mail: dwiddison@utah.gov
*Attorneys for Defendants*

/s/ Bruce D. Brown

Bruce D. Brown

11

## APPENDIX A: DESCRIPTION OF AMICI

The Association of American Publishers, Inc. ("AAP") is the national trade association of the U.S. book publishing industry.  AAP's members include most of the major commercial book publishers in the United States, as well as smaller and nonprofit publishers, university presses and scholarly societies.  AAP members publish hardcover and paperback books in every field, educational materials for the elementary, secondary, postsecondary and professional markets, scholarly journals, computer software and electronic products and services.  The Association represents an industry whose very existence depends upon the free exercise of rights guaranteed by the First Amendment.

The California Newspaper Publishers Association ("CNPA") is a nonprofit trade association representing the interests of nearly 850 daily, weekly and student newspapers throughout California.  For over 130 years, CNPA has worked to protect and enhance the freedom of speech guaranteed to all citizens and to the press by the First Amendment of the United States Constitution and Article 1, Section 2 of the California Constitution.  CNPA has dedicated its efforts to protect the free flow of information concerning government institutions in order for newspapers to fulfill their constitutional role in our democratic society and to advance the interest of all Californians in the transparency of government operations.

The Deseret News (www.deseretnews.com) is the first news organization and the longest continuously operating business in the state of Utah.  Owned by the Church of Jesus Christ of Latter-day Saints, The Deseret News offers news, information, commentary, and analysis from an award-winning and experienced team of reporters, editors, columnists, and bloggers.  Its

mission is to be a leading news brand for faith- and family-oriented audiences in Utah and around the world.

First Amendment Coalition is a nonprofit public interest organization dedicated to defending free speech, free press and open government rights in order to make government, at all levels, more accountable to the people.  The Coalition's mission assumes that government transparency and an informed electorate are essential to a self-governing democracy.  To that end, we resist excessive government secrecy (while recognizing the need to protect legitimate state secrets) and censorship of all kinds.

The Investigative Reporting Workshop, a project of the School of Communication (SOC) at American University, is a nonprofit, professional newsroom.  The Workshop publishes in-depth stories at investigativereportingworkshop.org about government and corporate accountability, ranging widely from the environment and health to national security and the economy.

KSL Broadcast Group is owned by Bonneville International Corporation and operates KSL-TV, KSL.com, and KSL Newsradio.  Founded in 1964, Bonneville International's heritage traces its early roots to KSL Radio, which first went on the air in May of 1922 (originally as KZN) in Salt Lake City, and to KSL-TV, which had its on-air debut in 1949. Bonneville currently owns and operates nine radio stations in the Los Angeles, Seattle, Phoenix, and Salt Lake City markets. Bonneville is headquartered in Salt Lake City. KSL Broadcast Group provides leadership that builds up, connects, informs and celebrates Utah's communities and families.

KSTU Fox 13 broadcasts 55 hours of locally produced newscasts a week in the Salt Lake City, Utah market.   KSTU also provides local news and information on its website, fox13now.com.

The National Press Photographers Association ("NPPA") is a 501(c)(6) non-profit organization dedicated to the advancement of visual journalism in its creation, editing and distribution.  NPPA's approximately 7,000 members include television and still photographers, editors, students and representatives of businesses that serve the visual journalism industry. Since its founding in 1946, the NPPA has vigorously promoted the constitutional rights of journalists as well as freedom of the press in all its forms, especially as it relates to visual journalism.  The submission of this brief was duly authorized by Mickey H. Osterreicher, its General Counsel.

National Public Radio, Inc. is an award-winning producer and distributor of noncommercial news programming.  A privately supported, not-for-profit membership organization, NPR serves a growing audience of more than 26 million listeners each week by providing news programming to 285 member stations that are independently operated, noncommercial public radio stations.  In addition, NPR provides original online content and audio streaming of its news programming.  NPR.org offers hourly newscasts, special features and 10 years of archived audio and information.

The Newspaper Guild – CWA is a labor organization representing more than 30,000 employees of newspapers, newsmagazines, news services and related media enterprises.  Guild representation comprises, in the main, the advertising, business, circulation, editorial, maintenance and related departments of these media outlets.  The Newspaper Guild is a sector of

14

the Communications Workers of America.  CWA is America's largest communications and media union, representing over 700,000 men and women in both private and public sectors.

North Jersey Media Group Inc. ("NJMG") is an independent, family-owned printing and publishing company, parent of two daily newspapers serving the residents of northern New Jersey: *The Record* (Bergen County), the state's second-largest newspaper, and the *Herald News* (Passaic County).  NJMG also publishes more than 40 community newspapers serving towns across five counties and a family of glossy magazines, including (201) Magazine, Bergen County's premiere magazine.  All of the newspapers contribute breaking news, features, columns and local information to NorthJersey.com.  The company also owns and publishes Bergen.com showcasing the people, places and events of Bergen County.

The Reporters Committee for Freedom of the Press is a voluntary, unincorporated association of reporters and editors that works to defend the First Amendment rights and freedom of information interests of the news media. The Reporters Committee has provided representation, guidance and research in First Amendment and Freedom of Information Act litigation since 1970.

The Salt Lake Tribune has been Utah's news source since 1871, and its website sltrib.com reaches between 150,000 and 200,000 readers each day.

The Spectrum, a division of Gannett Satellite Information Network, Inc. is a daily newspaper serving St. George and Southern Utah.  The Spectrum also publishes the Cedar City Daily News and runs a news website, www.thespectrum.com.

Stephens Media LLC is a nationwide newspaper publisher with operations from North Carolina to Hawaii.  Its largest newspaper is the *Las Vegas Review-Journal*.

15

Student Press Law Center ("SPLC") is a nonprofit, nonpartisan organization which, since 1974, has been the nation's only legal assistance agency devoted exclusively to educating high school and college journalists about the rights and responsibilities embodied in the First Amendment to the Constitution of the United States.  SPLC provides free legal assistance, information and educational materials for student journalists on a variety of legal topics.

The Utah Headliners Chapter of the Society of Professional Journalists ("SPJ") is a voluntary, not-for-profit professional association of news reporters, editors, photographers, publishers and owners of various news organizations throughout the State of Utah.  SPJ works to protect the constitutional rights of freedom of the press, to preserve the public's right to know, and to require that the public's business be conducted in public.

## APPENDIX B: ADDITIONAL COUNSEL

Jonathan Bloom
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Counsel for The Association of American
Publishers, Inc.

Jim Ewert
General Counsel
California Newspaper Publishers Association
2000 O Street, Suite 120
Sacramento, California 95811

Peter Scheer
First Amendment Coalition
534 Fourth St., Suite B
San Rafael, CA 94901

Charles Lewis
Investigative Reporting Workshop at
American University
3201 New Mexico Ave. NW
Suite 249
Washington, DC 20016-2723

Mickey H. Osterreicher
1100 M&T Center, 3 Fountain Plaza
Buffalo, NY 14203
Counsel for National Press Photographers
Association

Denise Leary
Ashley Messenger
National Public Radio, Inc.
1111 North Capitol St. NE
Washington, D.C. 20002

Barbara L. Camens
Barr & Camens
1025 Connecticut Ave., NW
Suite 712
Washington, DC 20036
Counsel for The Newspaper Guild – CWA

Jennifer A. Borg
General Counsel
North Jersey Media Group Inc.
1 Garret Mountain Plaza
Woodland Park, NJ 07424

Mark Hinueber
Vice President/General Counsel & Director of
Human Resources
Stephens Media LLC
P.O. Box 70
Las Vegas, NV 89125

Frank D. LoMonte
Student Press Law Center
1101 Wilson Blvd., Suite 1100
Arlington, VA 22209