KYLE J. KAISER (13924)
DANIEL R. WIDDISON (11979)
Assistant Utah Attorneys General
SEAN D. REYES (7969)
Utah Attorney General
Attorneys for Defendants
160 East 300 South, Sixth Floor
P.O. Box 140856
Salt Lake City, Utah 84114-0856
Telephone: (801) 366-0100
Facsimile: (801) 366-0101
E-mail: kkaiser@utah.gov
E-mail: dwiddison@utah.gov

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ANIMAL LEGAL DEFENSE FUND, PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, COUNTERPUNCH, AMY MEYER, WILL POTTER, DANIEL HAUFF, JAMES McWILLIAMS, JESSE FRUHWIRTH,<br><br>Plaintiff,<br><br>v.<br><br>GARY R. HERBERT, in his official capacity as Governor of Utah; JOHN SWALLOW, in his official capacity as Attorney General of Utah,<br><br>Defendants. | **DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS**<br><br><br>Case No. 2:13-cv-00679-RJS<br>Judge: Robert J. Shelby |

Defendants Governor Gary R. Herbert and Attorney General John Swallow[1], by and through their counsel of record, and pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure hereby submit the following reply memorandum in support of their motion to dismiss.[2]

## INTRODUCTION

Plaintiffs challenge Utah's Agricultural Operation Interference law, H.B. 187, codified as Utah Code Ann. § 76-6-112. But Plaintiffs' arguments in their Memorandum in Opposition to the State's motion to dismiss challenge not only Utah's law, but all so-called "ag gag" laws across the country. In reality, Utah's H.B. 187, and the arguments presented in the State's Motion to Dismiss, are much more limited.

Utah's law proscribes four types of behavior: (a) surreptitiously leaving a recording device in an agricultural operation; (b) obtaining access to an agricultural operation under false pretenses; (c) obtaining employment for the purpose of recording the operation and production of a recording thereof; and (d) recording an agricultural operation while committing a criminal trespass. Utah's law criminalizes neither whistleblowing activity, nor the possession of video recordings made at an agricultural facility. There is no limit on what whistleblowers can say, how they can say it, or who they can say it to, unlike other states' laws, such as Missouri's.[3] The

---

[1] Concurrently with this reply memorandum, Defendants have filed a motion to substitute the real party in interest to reflect the appointment of a new Attorney General.
[2] Amicus briefs in opposition to Defendants' motion were filed by The Reporters Committee For Freedom of the Press and 16 others as well as Center for Food Safety, Public Justice, Healthy Food Action, and Food & Water Watch.
[3] Mo. Rev. Stat. § 578.013 (2013) that criminalizes not only improper access to an agricultural facility, but also requires anyone in possession of a recording of a "farm animal subjected to

ii

law does not "criminaliz[e] speech that is inconsistent with the goals and interest of the agricultural industry", only conduct that threatens the safety, security and property rights of agricultural operations.  This distinction is significant to the Court's analysis of the purpose and effect of H.B. 187.

In painting with such a broad brush, Plaintiffs and the amici fail to fully and properly address the issues in this motion—whether each and every putative Plaintiff has standing, whether Plaintiffs' equal protection challenge based on animus states a claim, and whether the federal False Claims Act could preempt H.B. 187.  Plaintiffs lack standing, and fail to state a claim on their equal protection and preemption claims, and thus the State is entitled to dismissal on those grounds.

## STATEMENT OF FACTS

Plaintiffs did not directly address the statement of facts laid out in Defendants' opening brief, but instead, recast the substance of their factual allegations focusing on the policy objectives of their position, not the legal issues.  To the extent a response is required to the numbered paragraphs included in the statement of facts section of Plaintiffs' opposition memorandum, Defendants respond as follows:

1. Undercover Investigations of Animal Agriculture Expose Inhumane and Unsafe Practices.

Response:  The allegations in this paragraph are irrelevant to this motion.

2. The Animal Agricultural Industry Responds by Pushing Legislation to Criminalize Investigations.

---

abuse or neglect" to turn over such recording to the police within twenty-four hours, without editing.

Response:  The allegations in this paragraph are conclusory.  As outlined in Defendants' opening memorandum, there are legitimate, non-discriminatory justifications for H.B. 187.

3.a.  Legislators disparage Plaintiffs' speech as "just another version of domestic terrorism."

Response:  At this stage in the litigation, Defendants must accept as true all well-pleaded facts in the Plaintiffs' Complaint.  But, the speakers identified represent only five of the eighty-four legislators that voted in favor of H.B. 187 and its Senate counterpart.[4]

3.b.  The law gags speech critical of industrial animal agriculture.

Response:  The allegations in this paragraph are conclusory.  As outlined in Defendants' opening memorandum, the law criminalizes only a few very narrow behaviors while maintaining the integrity of other forms of journalism as well as legitimate whistleblowing.

4.a.  The ag gag law criminalizes Plaintiffs' investigations.

Response:  The allegations in this paragraph are conclusory.  Of particular note is Plaintiffs' claim that, "The ag gag law effectively criminalizes *any* investigation strategy that would reveal the conditions inside an animal production facility."  (Pl. Opp. at viii (emphasis added).)  Plaintiffs make this claim without providing any support, such as explaining how any other investigation strategy might compare to the specific type of undercover investigation they identify.  For example, investigations through witness interviews, permitted access, reviews of government inspection records, etc. are not affected by H.B. 187.  The statement is accurate only to the extent Plaintiffs allege that H.B. 187 would criminalize an undercover investigation by a private investigator who would gain access to a facility through deception or trespass.

---

[4] http://www.le.state.ut.us/~2012/bills/static/HB0187.html

4.b.  Prosecutors charge Plaintiff Meyer under the ag gag law for protected speech and activity.

Response:  Defendants do not dispute that Plaintiff Meyer was charged under H.B. 187, but note that the charges were eventually dismissed.  Furthermore, Plaintiff Meyer was not engaged in any behavior that violated the law, nor has she expressed an interest in such behavior in the future.

4.c.  The ag gag law blocks newsgathering and academic Plaintiffs from accessing vital information.

Response:  The factual allegations that the journalism and academic Plaintiffs use these types of reports are not disputed at this stage in the litigation; the conclusory allegation that H.B. 187 blocks access to vital information is disputed as the Plaintiffs have not shown that this information could not be obtained by some other method.

## **ARGUMENT**

In addressing standing, Plaintiffs group themselves into two camps: speakers and listeners.  Plaintiffs have failed to meet their burden for either group as the speakers do not allege facts with enough specificity to create a case or controversy, and the listeners lack a distinct injury giving rise to standing.  Alternatively, Plaintiffs have failed to show that the law is invalid under the animus doctrine of the Equal Protection Clause of the Fourteenth Amendment.  Furthermore, by passing the False Claims Act, Congress has not preempted the law, explicitly or implicitly.

I.   THE PLAINTIFFS LACK STANDING TO CHALLENGE THE STATUTE.

In analyzing the standing issue, Plaintiffs divide themselves into two groups: speakers and listeners.  Plaintiffs argue that the speakers, ALDF, PETA, Hauff and Meyer, each meet the three part standard laid out in *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082 (10th Cir. 2006).  The listeners, Plaintiffs argue, have a form of derivative standing based on a broad, diffuse "informational injury."  In both cases, Plaintiffs' arguments fail.

> A. *The speakers lack standing because they have not alleged facts concrete enough to create a case or controversy.*

In *Walker*, a divided court concluded that plaintiffs who have expressed a present desire to engage in speech in Utah had standing based on the chilling effect the challenged law had on their free speech interest.  However, even the *Walker* majority recognized the difficulty in determining the appropriate interest necessary for standing in a free speech case: "Line-drawing in standing cases is rarely easy, but where the plaintiff's alleged injury is a chilling effect on the freedom of speech, the standing inquiry is particularly delicate. . . [I]n speech cases as in others, courts must not intervene in the processes of government in the absence of a sufficiently 'concrete and particularized' injury." *Id.* at 1088 (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992)).  The Court warned of the erosion of Article III standing, stating, "If all it took to summon the jurisdiction of the federal courts were a bare assertion that, as a result of government action, one is discouraged from speaking, there would be little left of the Article III threshold in First Amendment cases." *Id.* at 1089.   Therefore, it is vital to analyze each Plaintiff's claim of harm individually and with specificity, rather than grouping them together.

1

1. ALDF lacks standing.

A key component of the standing inquiry is the concreteness of the plaintiff's injury. Plaintiffs must support their claim of injury with: (1) evidence that in the past they have engaged in the type of speech affected by the challenged government action; (2) affidavits or testimony stating a present desire, though no specific plans, to engage in such speech; and (3) a plausible claim that they presently have no intention to do so because of a credible threat that the statute will be enforced. *Walker*, 450 F.3d at 1089. While ALDF alleges that it has "concrete plans" to conduct an undercover operation in Utah, it largely ignores the past action element. ALDF alleges that it has "conducted undercover investigations at animal facilities around the country" (Complaint, ¶ 19), but later clarifies that it "has conducted investigations in the past at animal shelters, roadside zoos, and other animal facilities..." (Compl., ¶ 60). H.B. 187 has no application at any of those locations as it applies only to animal agricultural operations as defined by the statute. As such, ALDF has not alleged that it has in the past engaged in activities prohibited by the statute.[5] Combined with the speculative and incomplete nature of their allegations of a present desire to engage in prohibited activity, ALDF's claim of concrete injury fails to meet the legal standard set forth in *Walker*.

2. PETA lacks standing.

Unlike ALDF, PETA alleges to have in the past engaged in activity that, if undertaken in Utah, would violate the statute. However, PETA has not alleged that it has previously engaged in that activity in Utah. Furthermore, PETA fails to satisfy the second prong of the *Walker* test, a

---

[5] Indeed, in Plaintiff's Statement of Facts, when describing the undercover investigative activities relevant to the statute, absent is any mention of ALDF's specific past investigations. Pl. Opp. p. iv-v.

present desire to engage in proscribed activity. As noted by the majority in *Walker* and again by the lead dissent in that case, it is important to protect the integrity of Article III standing by holding potential plaintiffs to the requirement that they demonstrate an "injury in fact." *Walker* at 1089 and 1110 (Tacha, J., dissenting). Here, while ALDF has alleged at least some intention to specifically engage in an undercover investigation in Utah and taken the nominal step of contacting Hauff in furtherance of that objective, PETA has taken no such steps. Its entire interest is summed up in one line: "PETA is also interested and willing to conduct an investigation in Utah but for the threat of criminal prosecution under Utah Code Ann. § 76-6-112." Compl. ¶ 20. Absent is any allegation of specific steps it might take toward such an investigation, what types of operations it may target, or anything other than a bare statement of interest in engaging in the proscribed activity. This lack of specificity and overtness is fatal to PETA's standing.

       3.   Hauff lacks standing.

Hauff's standing is dependent on ALDF's standing.[6] Because ALDF lacks standing, so does Hauff. Hauff also alleges standing based on his "economic injury" but he has not sought a claim for damages and his economic injury claim is premature.

       4.   Meyer lacks standing.

Meyer does not allege that she has in the past engaged in activities which would actually violate the statute, nor does she allege an interest in future activity which would violate the statute. Accordingly, she fails to meet either the first or the second prong of the *Walker* test. As recognized by both the Plaintiffs and the Amici, Meyer has not violated the law and her

---

[6] However, ALDF's standing cannot be maintained by Hauff's standing. Because ALDF intends only to employ Hauff, ALDF's claim remains independent of Hauff's claim.

prosecution was erroneous. Meyer's injury is not related to this law, but rather, to an allegedly improper exercise of government authority. Whatever possible claim she may have against that authority does not transmogrify into legal standing to challenge the constitutionality of a statute that does not implicate her past actions.

 B. *The listeners likewise lack standing.*

 The remaining Plaintiffs, Counterpunch, Potter, McWilliams, and Fruhwirth, are all categorized as "listeners." Plaintiffs boldly claim that "These Plaintiffs need not allege an intent to violate the statute, but merely that their ability to obtain information from a willing speaker is compromised by the statute." Put differently, Plaintiffs argue that they have suffered a sufficient "informational injury"—anyone who wishes to hear speech that may be indirectly curtailed by a statute automatically has standing to challenge the law.

 In support of their argument, Plaintiffs rely on *Kansas Jud. Review v. Stout*, 519 F.3d 1107 (10th Cir. 2008). In *KJR*, a panel of the Tenth Circuit held that where a judge who was directly affected by a free speech restriction was willing to challenge the law, a party who was not directly affected, but who had an interest in the restricted speech, also had standing. Stated concisely, "Thus, provided there is a willing speaker, [the listener] has standing to challenge [the law]."

 However, the Court's holding in *KJR* is reached without much discussion, and without any mention of the standing requirements in *Walker*. The Tenth Circuit's concern about erosion of Article III standing in First Amendment cases is perhaps no clearer than a case where a speaker alleges a loose connection with the challenged restriction, and the standing of any number of listeners, no matter how removed, is piggybacked on that shaky foundation. The

4

Court's holding in *KJR* is instructive on this point.  In that case, a journal that publishes judge's views on specific issues challenged a judicial canon that arguably prevented judges from responding to their inquiries.  While KJR did not engage in any behavior that violated the canons, the Court concluded that because KJR has found a "willing speaker", it had standing. *KJR* at 1115. The regulation directly proscribed the speech of judges, and the journal's central purpose was publishing the judicial comments that became prohibited, a close connection in a unique circumstance where the listener is even more affected by the regulation than the speaker.

   Here, none of the listener Plaintiffs alleges a connection even remotely close to the link in *KJR*.  The journalist listeners, Fruhwirth, Potter and Counterpunch only allege to report on the results of such investigations.  They do not themselves conduct the investigations, nor do they allege that their mission is centrally tied to the outcome of only these investigations.  Rather, they allege that they report on animal activism generally, and would report on these investigations, if conducted.  Even further removed is Plaintiff McWilliams, who merely relies on the materials produced by these investigations in his scholarship.  If Article III standing is to have any meaning, it should require more than a loose connection with the restricted speech. [7] This is particularly important given the prudential benefit protected by Article III standing—that a plaintiff has "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination." *Wyoming ex rel Crank v. United States*, 539 F.3d 1236, 1241 (10th Cir. 2008) (citations and quotations omitted).

---

[7] Amicus Reporters Committee For Freedom of the Press argues that standing is appropriate for *any* listener.  ("Indeed, the public interest in access, by itself, is enough." Reporters' Brief, at 9.) However, all of the cases cited in support of this position were decided in the context of open courts access, not First Amendment speech generally.

Neither the "speaker" nor the "listener" Plaintiffs have independent standing to challenge H.B. 187. Therefore, the case should be dismissed.

## II. PLAINTIFFS HAVE FAILED TO STATE A CLAIM UNDER AN ANIMUS THEORY OF EQUAL PROTECTION.

Plaintiffs argue that their equal protection claim must survive this motion to dismiss because it either: is subject to strict scrutiny because the law implicates the fundamental right to free speech, or alternatively, because the law is motivated by unconstitutional animus. To the extent that Plaintiffs' equal protection claim is simply a new coat of paint on their First Amendment vehicle, the State's motion does not encompass the fundamental right aspect of their Equal Protection claim.

But Plaintiffs have framed an alternative theory—that the law violates equal protection because of the Legislature's animus. (Compl. ¶¶ 149-150). This motion focuses on the alternative theory that if the law does not implicate a fundamental right, then the law must be held unconstitutional under the animus doctrine. To the extent Plaintiffs' Fourth Cause of action states an alternative legal theory, its dismissal is appropriate at this stage.

In support of their animus theory, Plaintiffs argue that "Laws motivated by animus fail rational basis review." Pl. Opp. at 15. They argue that where animus is present, laws that would normally be reviewed under rational basis review, are subjected to a more rigorous form of scrutiny, termed "rational basis with bite." *Id*. While this theory of more careful consideration has been articulated by some scholars, it has yet to be adopted by any court.

Plaintiffs counter the rational basis proffered for the law by comparing it to the animus evidenced by the selected statements from the legislative record. But, it is not enough to show that the animus is greater than the rational basis—animus must be the sole factor in passing the

6

law.  "[A] political decision that is supported by valid and articulable justifications cannot be invalid simply because some participants in the decision making process were motivated by a purpose to disadvantage a minority group." *City of Mobile v. Bolden*, 446 U.S. 55, 92 (1980).

Plaintiffs rely heavily on the Supreme Court's recent opinion in *United States v. Windsor*, 133 S. Ct. 2675 (2013).  Plaintiffs' characterization of *Windsor* that it "stands for the proposition that any concrete showing of animus warrants relief under the Equal Protection Clause.  Stated more directly, when there is a strong showing of animus the law in question should be held unconstitutional," Pl. Opp. at 17, is blindly overstated.  The *Windsor* majority began its animus analysis by looking at whether the *Federal* government had a legitimate interest in choosing to recognize only certain marriages enacted by the various states, recognizing that the tension between Federal and state power weighed heavily against any rational basis offered for the law. *Windsor* 133 S. Ct. at 2695.  The Court then focused its inquiry on whether the law was motivated by "a bare. . . desire to harm a politically unpopular group" and then elaborated on the harmful effects of the law which ran contrary to traditional Federal/state relations. *Id.* at 2698–99.  The Court then struck down the challenged law, applying the rule established in *Moreno* that "a bare desire to harm a politically unpopular group cannot constitute a legitimate government interest." *Id.* at 2695.

Plaintiffs further offer part of the Court's final summary in support of their animus theory, "The federal statute is invalid, for no legitimate purpose *overcomes* the purpose and effect to disparage and effect to disparage and injure...." Pl. Opp. at 17 (quoting *Windsor,* 133 S. Ct. at 2696 (emphasis in Plaintiffs' brief)).  But the Court in *Windsor* did not require a legitimate purpose to "overcome" any animus.  Instead, the Court focused on the fact that DOMA deviated

7

from the long history of state control in this area and then analyzed the effect of the law.  *Id.* at 2695–6; 2699 .  Because the Court did not hold that animus could render invalid and otherwise legitimate government purpose, *Windsor* still stands for the same proposition that existed previously: the lack of a rational basis—a "bare desire to harm"—is unconstitutional.  The *Windsor* Court did not silently overrule the long history of animus cases; it applied them.[8]

Here, while the record contains statements by certain legislators that undoubtedly express a negative view toward particular organizations, that does not, itself, state a claim for an equal protection violation.  It is not a balancing test between the animus and the rational basis, but rather, the focus is on whether the law can be supported under a rational basis analysis.  *See Heller v. Doe*, 509 U.S. 312, 320 (1993) ("[A] classification must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."  (Internal quotations and citations omitted.))

The law has a number of rational, non-discriminatory motivations, such as safety of the workplace, protection of private property rights, maintaining integrity of the workforce, and protection against fraud.  Each of these motivations has a long history of recognition by the courts, and any is sufficient to overcome the Plaintiffs' claims of any individual legislators' purported desire to harm their groups.  Amicus Center For Food Safety focuses on the policy advantages of undercover investigations, but under rational basis review, those policy

---

[8] The First Circuit predicted this outcome with prescience in *Commonwealth of Mass. v. United States Dept. of Health and Human Services*, 682 F.3d 1, 11–12 (1st Cir. 2012). ("Before providing such scrutiny, a separate element absent in *Moreno*, *City of Cleburne*, and *Romer* — federalism— must be considered. . . In our view, neither the Tenth Amendment nor the Spending Clause invalidates DOMA; but Supreme Court precedent relating to federalism-based challenges to federal laws reinforce the need for closer than usual scrutiny of DOMA's justifications and diminish somewhat the deference ordinarily accorded.")

considerations cannot supplant a legitimate, rational basis for the law.

Plaintiffs challenge the private property protection and trespass justifications by arguing that existing laws already provide adequate protection for those interests.  However, Plaintiffs ignore that the allegations of their Complaint establish that this industry, unlike the other industries outlined in their argument, has been specifically targeted not only for undercover investigation, but for elimination from the marketplace.  *See* Compl. ¶ 20.  The added threat to this specific industry heightens the concerns about workforce integrity and protection of private property articulated as the justifications for the law.  This unique targeting also mitigates any concern that this law is motivated solely by animus—the government is reacting to a credible threat not present in any other industry.

Because H.B. 187 is supported by legitimate legislative objectives, articulated by the State in its original Memorandum, Plaintiffs' animus claim must fail.

### III. PLAINTIFFS HAVE FAILED TO STATE CLAIM THAT H.B. 187 IS PREEMPTED BY FEDERAL LAW.

Finally, Plaintiffs argue that H.B. 187 undercuts the objectives of the False Claims Act through conflict preemption.  Pl. Opp. at 24.  However, in doing so, Plaintiffs overstate the effect of H.B. 187.  Plaintiffs describe the effect of H.B. 187 as "forbidding undercover audio and video recordings of agricultural operations (and access to the same)..." *Id.*  The law has absolutely no restriction on access to undercover recordings.  If a person unlawfully obtains an undercover recording and then disseminates it to the public, there is no restriction whatsoever on the possession or dissemination of that recording.  The conflicting state law must "thwart the federal policy in a material way".  *Mt. Olivet Cemetery Assoc. v. Salt Lake City*, 164 F.3d 480 489 (10th Cir. 1998) (internal quotations omitted).  Whistleblowing is still permitted under H.B.

187; fraud and waste can still be reported; and qui tam relator actions can still go forward, with all the advantages that discovery in Federal court proceedings provides.  Furthermore, because fraud, deceit, employee background checks, trespass, and safety are issues that are well within state law, laws that further those objectives cannot be in material conflict with the False Claims Act.  The anecdotal evidence offered by Plaintiffs in support of their preemption claim cannot overcome the materiality requirement of conflict preemption.[9]

## CONCLUSION

Because the Plaintiffs have failed to establish that they have suffered an injury in fact, they lack standing.  Furthermore, their alternative animus equal protection claims lack merit because even if Plaintiffs are able to establish that the law was fueled by animus, there exist a number of rational bases for its enactment and their claim fails.  Finally, Plaintiffs cannot show that the False Claims Act preempts H.B. 187 and their preemption claim fails.  For these reasons, Defendants respectfully request that the Complaint be dismissed, in its entirety, or in the alternative, that the Court dismiss those Plaintiffs that lack standing, as well as Plaintiffs' Third and Fourth causes of action.

---

[9] In *South Dakota Mining Assoc. Inc. v. Lawrence County*, 155 F.3d 1005, 1011 (8th Cir. 1998), the court struck down a state law that prohibited any and all mining on Federal land, which presented a clear and irreconcilable conflict with the Federal policy of mineral exploration. H.B. 187 is so far removed from that level of interference that the comparison has no meaning.

DATED:  January 9, 2013

                OFFICE OF THE UTAH ATTORNEY GENERAL

                /s/ Daniel R. Widdison
                KYLE J. KAISER
                DANIEL R. WIDDISON
                Assistant Utah Attorneys General
                Attorneys for Gary R. Herbert and John Swallow