Stewart Gollan (Utah Bar # 12524)
584 Wall Street
Salt Lake City, UT 84103
(801) 413-3406
sgollanlaw@gmail.com

Justin Marceau (California Bar # 243479)
2255 E. Evans Ave.
Denver, CO 80208
jmarceau@law.du.edu

Matthew Liebman (California Bar # 248861)
170 E. Cotati Ave. Cotati, CA 94931,
mliebman@aldf.org

Matthew Strugar (California Bar # 232951)
2154 W. Sunset Blvd.
Los Angeles, CA 90026
matthew-s@petaf.org

Alan Chen (Illinois Bar # 6197902)
2255 E. Evans Avenue
Denver, CO 80208
achen@law.du.edu

Edward T. Ramey (Colorado Bar # 6748)
Heizer Paul LLP
2401 15th St., Suite 300
Denver, CO 80202
eramey@hpfirm.com

IN THE THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ANIMAL LEGAL DEFENSE FUND, *et al.,*<br><br>Plaintiffs,<br><br>vs.<br><br>GARY R. HERBERT, in his official capacity<br>as Governor of Utah, *et al.*,<br><br>Defendants. | **PLAINTIFFS' RULE 26(a)(2)<br>DISCLOSURE REPORT OF EXPERT<br>TRAVIS POWELL**<br><br>Case No. 2:13-cv-00679-RJS-EJF<br><br><br>Judge Robert J. Shelby<br>Magistrate Evelyn J. Furse |

Plaintiffs, through counsel, hereby disclose Travis Powell as a witness, they intend to use at trial to present evidence under Fed. R. Civ. P. 702, 703, and/or 705 as follows:

1

1. Travis Powell's report including all information required by Fed. R. Civ. P. 26(a)(2)(B)(i)-(vi) is attached hereto as Exhibit "A."

2. Attachments to Travis Powell's report are included as Attachments 1-13.

Dated this 29th day of January, 2016.

*/s/ Stewart Gollan*

_____
Stewart Gollan
Attorney for Plaintiffs

# CERTIFICATE OF SERVICE

I certify that on the 29th day of January, 2016 I caused to be delivered a true and correct

copy of the foregoing **PLAINTIFFS' RULE 26(a)(2) DISCLOSURE REPORT OF EXPERT**

**TRAVIS POWELL** *via* the Court's ECF system and electronic mail to the following:


Kyle J. Kaiser
David N. Wolf
Utah Attorneys General
kkaiser@utah.gov
dnwolf@utah.gov

Dated this 29th day of January, 2016.

/s/ Stewart Gollan

_____

Stewart Gollan
Attorney for Plaintiffs

# EXHIBIT "A"

# Expert Report of Travis Powell



# EXPERT WITNESS REPORT

**Animal Legal Defense Fund, et al. v. Herbert,**

**United States District Court for the District of Utah, Case No. 2:13-cv-00679-RJS**

**Prepared by:**

**Travis Powell**
**Animal Legal Defense Fund**
**919 SW Taylor St. # 400**
**Portland, OR 97205**

170 East Cotati Avenue
Cotati, California 94931

T 707.795.2533
F 707.795.7280

info@aldf.org
aldf.org

Winning the case against cruelty

Printed on Recycled Paper



## I.    Succinct Statement of Opinions

1. Based on my experience, my personal knowledge of secrecy practices of animal agriculture facilities, my experience going undercover and documenting inadequate government oversight in animal agriculture facilities, and my review of relevant literature,[1] I have concluded that, without undercover investigations by animal protection groups, there would be no real public access to information about practices and conditions in animal agriculture facilities. These companies are motivated by profit to prevent the public from seeing what happens to animals inside their facilities.

2. Based on my experience and personal knowledge of secrecy practices of animal agriculture facilities, I have concluded that there are no comparable or adequate alternatives to undercover, employment-based investigations to obtain raw footage or an unadulterated view of the practices and conditions within animal agriculture facilities.

3. Based on my experience and personal knowledge of secrecy and employee intimidation practices of animal agriculture facilities, I have concluded that, unlike undercover investigators, so-called "bona-fide" employees of animal agriculture facilities are extremely unlikely, and in most cases unable, to blow the whistle on their employers. Without undercover investigations, revelations of legal violations and other issues within food production would never come to light.

4. Based on my experience and review of the available literature, I have concluded that government oversight of industrial agriculture is inadequate.

5. Based on my experience, personal knowledge, and review of the available literature and the text of the law, I have concluded that the effect of the ag gag law, which criminalizes undercover investigations, is to leave the agriculture industry in Utah without effective oversight, transparency, or accountability.

## II.    Statement of Qualifications

My name is Travis Powell. I have been involved in undercover investigations for approximately nine years, both as an independent investigator and as an employee for animal advocacy organizations. I have been involved in approximately 50 investigations over the course of my career. Of those, 15 were long-term employment-based investigations. I currently manage the investigations department for the Animal Legal Defense Fund. In this role, I direct a team of undercover investigators and contractors,

---

[1] The literature relied on is more specifically described in this report and attached as Appendices.



provide ALDF's guidelines for performance expectations, and direct the identification of target facilities.

My investigations have covered many different types of facilities, including animal agriculture facilities, puppy mills, fur farms, pounds, and zoos. The bulk of the employment-based investigations I have been involved in over the course of my career have been in the animal agriculture industry. These investigations have documented company-wide, repeated, and systemic abuse of animals and workers at facilities owned by some of the largest meat producers in the world. My investigations have led to extensive press coverage by major national and international news sources, enforcement actions by governmental authorities, cancelled contracts with suppliers, and changes to institutional practices that were cruel and unnecessary.

For two months in 2007, I conducted an undercover investigation at a Tyson poultry slaughter and processing plant in Georgia. I obtained employment in the "live hang" department by omitting my employment with PETA. My job was to hang live chickens onto hooks by their feet before their throats were slit, and in the course of my employment I documented other workers violently slamming birds into shackles, violently abusing the birds, hanging birds by their necks instead of by their feet, and urinating on parts of the conveyor belt that moves the birds to slaughter. I also caught on videotape a supervisor telling me that it was acceptable to rip the heads off of live birds that had been improperly shackled by the head. I documented all of this surreptitiously by using a hidden camera to take photos and videos without the manager or owner's permission. While employed, I was transferred to a different facility owned by Tyson in Tennessee and continued for another two months to document on hidden camera similar abuse there, demonstrating that this type of abuse and egregious violations of food safety standards was company-wide at Tyson. As a result of this investigation, several news networks covered the expose, including the undercover video that I shot. The investigation is available at http://www.peta.org/action/action-alerts/tyson-workers-torturing-birds-urinating-slaughter-line/.

For approximately four months in the spring of 2008, I conducted an undercover investigation at a Cargill beef slaughter and processing plant in Texas. I obtained employment by omitting my employment with PETA and my college degree. I also omitted past investigations when asked about my employment history.  I was employed on the processing line, where I cut the kidneys out of cow carcasses. My position was located on a work platform with a USDA contamination checkpoint. During the course of my employment, I documented USDA inspectors not doing their job, not looking at the carcasses, socializing with workers on the line, and looking on their phones. I surreptitiously used a hidden camera to take photos and video without the permission of the manager or the owner. As a result of this investigation, the USDA conducted an internal investigation into its personnel.

For four months in 2008, I conducted an undercover investigation at Aviagen Turkeys in West Virginia. I obtained employment by omitting my employment with an animal advocacy organization and



my college degree, but I included work history information at other agriculture facilities. During the course of my employment I documented workers stomping on turkeys' heads, punching turkeys, hitting turkeys on the head with blunt instruments, shoving feces and feed into turkeys' mouths, holding turkeys' heads underwater, and using pliers to cut off part of a turkey's beak without anesthesia. I also recorded one worker bragging about shoving a broomstick about two feet down the throat of a turkey "as a lesson" to her because she was pecking him and recorded a supervisor admitting that workers got angry and killed birds, and even that two of them "liked it," but that that he couldn't do too much about it. I obtained the footage by surreptitiously using a hidden camera to take photos and video without the permission of the manager or the owner. As a result of this investigation, 23 indictments for cruelty to animals were filed (11 felonies) against the former employees caught abusing the animals. Three of the former employees were convicted. That was the first case in which an individual has been convicted of animal cruelty for abusing factory-farmed poultry in the United States. The investigation is available at https://secure.peta.org/site/Advocacy?cmd=display&page=UserAction&id=1692.

For five months in 2011, I conducted an undercover investigation at egg-laying facilities owned by Sparboe Farms in Minnesota, Iowa, and Colorado. I obtained employment by omitting my affiliation with Mercy for Animals (MFA), an animal advocacy organization, and my college degree. I surreptitiously used a hidden camera to take photos and video without the permission of the manager or owner during the course of my employment. I documented hens crammed into battery cages,[2] workers searing off the beaks of young chicks without any anesthesia,[3] rotted and decomposed dead hens left in cages with live hens still laying eggs for human consumption, a worker tormenting a live hen by swinging her around in circles by a catching pole, workers tormenting another live hen by trying to stuff her into their pants pocket, chicks trapped and mangled in cage wire and suffering from open wounds and torn beaks without veterinary care or euthanasia, and live chicks thrown into plastic bags to suffocate to death and be discarded. This investigation was significant because at that time Sparboe Farms represented to the public that it cared for the hens in a manner consistent with animal welfare standards known as the "Five Freedoms,"[4] but the conditions I documented—which are standard in the

---

[2] A battery cage is a system of confining egg laying hens that provides each bird with less space than a sheet of paper. It gets the name because the arrangement of rows and columns of connected cages within a single barn looks similar to the cells of a battery. Hens crammed into battery cages are unable to stretch their wings or engage in other natural behaviors.

[3] These chicks were destined to be raised to become laying hens themselves. Because they are crowded into battery cages, their beaks are cut to prevent them pecking each other to death. As stated by Dr. Ian Duncan, veterinarian, on the video in the link provided, "There is now good morphological, neurophysical, and behavioral evidence that beak trimming leads to both chronic and acute pain."

[4] The "Five Freedoms" are: (1) freedom from hunger and thirst; (2) freedom from discomfort; (3) freedom from pain, injury, or disease; (4) freedom to express normal behavior (by providing sufficient space and an appropriate environment); and (5) freedom from distress (i.e., mental suffering). Tina Conklin, Michigan State University Extension, An Animal Welfare History Lesson on the Five Freedoms (Feb. 25, 2014), http://msue.anr.msu.edu/news/an_animal_welfare_history_lesson_on_the_five_freedoms.



egg industry—violated each of those principles. Additionally, at the time of my investigation, Sparboe was the fifth largest egg producer in the United States, and was opposing the United Egg Producers' (an industry group) move to publicly support and promote federal animal welfare legislation for egg laying facilities to phase out battery cages, and other improvements. The release of the undercover video from my investigation was a catalyst in the United Egg Producers' agreement with the Humane Society of the United States in support of such legislation, and prompted several retailers to pledge to procure eggs from battery-cage free suppliers. The ABC Television Network also did an exclusive 20/20 episode on my undercover investigation at Sparboe. The news exclusive is available at http://abcnews.go.com/2020/video/investigation-inside-egg-factory-farm-animal-rights-group-video-unsanitary-conditions-2020-14987723. The investigation is available at https://www.youtube.com/watch?v=TYxKgvtojdg.

For four months in 2012, I conducted an undercover investigation at a pig weaning facility owned by Christensen Farms, in Minnesota. I obtained employment by omitting my affiliation with Mercy For Animals (MFA) and my college degree. I surreptitiously used a hidden camera to take photos and video without the permission of the manager or the owner. During the course of my employment I documented mother pigs confined in gestation crates[5] so small they could not move, mother pigs being so frustrated from their intense confinement that they chewed on the bars of their cages, mother pigs with prolapsed uteruses not being given veterinary treatment, piglets being castrated and having their tails cut off without anesthesia, sick or runt piglets being killed by slamming their heads on the concrete floor in front of their mothers and littermates, and other abuse and neglect. As a result of my investigation, Walmart, which sold pork produced from pigs born in that facility, announced a policy to procure meat from gestation-crate-free facilities, with other retailers following suit. The investigation is available at http://www.walmartcruelty.com/learnmore.php.

More recently, in July of 2015 I managed an undercover investigation at a Tyson chicken slaughter plant in Texas. An undercover investigator hired by ALDF obtained employment by omitting her affiliation with the organization and prior employment history. She worked in the live hang department of the plant. By surreptitiously using a hidden camera to take photos and video without the permission of the manager or owner, ALDF's undercover investigator documented workers violently slamming chickens into shackles, conveyor breakdowns leading to hundreds of birds piling up and

---

[5] A gestation crate is a metal enclosure used in intensive pig farming to hold a female breeding pig during her pregnancies and most of her life. The pen is so small that the sow can only stand up, sit, or lie down, she cannot turn around or walk at all. There is no bedding, the pens sit on top of slatted, hard (usually concrete) floors that allow waste to fall through where it is flushed and collected in a lagoon. They are used so that factory farms can keep hundreds of pigs in a single barn, and thousands of pigs on a single farm—avoiding the fighting and the cost that would occur in group housing if sows were to be kept so intensively of pigs in a single barn—avoiding the fighting that would occur in group housing if sows were to be kept so intensively—and making it easier for the sows to be managed by low-skilled workers.



causing mass suffocation and death, birds that appeared to be already dead going into slaughter for human consumption, and workers ripping the heads off of live birds that were deemed too small for slaughter. Additionally, the undercover investigator documented her own suffering after just a few weeks of working in the plant: she was sprayed with feces in her eyes and mouth, suffered from heat rashes, eye discharge, blisters, carpal tunnel syndrome, infected scratches and cuts, fatigue, and respiratory problems from the poor air quality in the live-hang area. Many of these conditions were caused or exasperated by Tyson's failure to provide adequate safety equipment to its workers. This undercover investigation documented many of the same abuses and violations that my investigation eight years ago uncovered, and demonstrates that these abuses and violations are "business as usual" for Tyson, the largest meat company in the world. As a result of this undercover investigation, ALDF filed formal complaints with the USDA Food Safety and Inspection Service (FSIS), the Occupational Health and Safety Administration (OSHA), and the Securities and Exchange Commission. FSIS and OSHA opened investigations into the plant. The investigation and copies of the formal complaints are available at http://aldf.org/about-us/programs/undercover-investigations-program/tyson-cruelty/.

I have gained my expertise in this field through extensive experience conducting and assisting with investigations, and through informal and formal training from investigators that I have worked for and with. Additionally, I have reviewed the filings in this case, the Utah ag-gag statute, Utah Code Ann. § 76-6-112, and reports prepared by non-governmental organizations (NGOs) and peer-reviewed academic articles to prepare this report. I have never testified in court before, but I have submitted written testimony to assist law enforcement investigations of facilities. I am not being compensated for my testimony.

## III.    Purpose and Summary of Opinions

I have been asked by ALDF, who are counsel for Plaintiffs, to provide expert testimony in this case. My expertise was developed over approximately nine years of planning, conducting, and managing undercover investigations. Specifically, I was asked to describe my experience as an undercover investigator, compare employment-based undercover investigations with other types of investigation techniques, and discuss whether information and documentation obtained by employment-based undercover investigations into factory farms could be available through other channels. I was asked to give my opinion on the impact of Utah's ag gag law, Utah Code § 76-6-112, on journalism, investigation, and whistleblowing with regard to food production.

1. Based on my experience, my personal knowledge of secrecy practices of animal agriculture facilities, my experience going undercover and documenting inadequate government oversight in animal agriculture facilities, and my review of relevant literature,[6] I have concluded that, without undercover investigations by animal protection groups, there would be no real public

---

[6] The literature relied on is more specifically described in this report and attached as Appendices.



access to information about practices and conditions in animal agriculture facilities. These companies are motivated by profit to prevent the public from seeing what happens to animals inside their facilities.

2. Based on my experience and personal knowledge of secrecy practices of animal agriculture facilities, I have concluded that there are no comparable or adequate alternatives to undercover, employment-based investigations to obtain raw footage or an unadulterated view of the practices within food production facilities.

3. Based on my experience and personal knowledge of secrecy and employee intimidation practices of animal agriculture facilities, I have concluded that, unlike undercover investigators, so-called "bona-fide" employees of food production facilities are extremely unlikely, and in most cases unable, to blow the whistle on their employers. Without undercover investigations, revelations of legal violations and other issues within food production would never come to light.

4. Based on my experience and review of the available literature, I have concluded that government oversight of industrial agriculture is inadequate.

5. Based on my experience, personal knowledge, and review of the available literature and the text of the law, I have concluded that the effect of the ag gag law, which criminalizes undercover investigations, is to leave the agriculture industry in Utah without effective oversight or transparency.

I discuss each of these opinions in greater detail below.

## IV. Basis For Opinions

### A. The public lacks access to truthful and complete information about animal agriculture

There are three main reasons why production practices in animal agriculture are shrouded in secrecy and why, without undercover investigations, the public would lack access to truthful and complete information about animal agriculture facilities: (1) inadequate government oversight; (2) the location of the facilities; and (3) secrecy practices of the facilities.

#### 1. There is inadequate government inspection or oversight

First, government inspection and oversight of the treatment of animals in agriculture is woefully inadequate. There is no federal law governing the treatment of animals on farms – federal law regulates



only the transportation of farmed animals and their slaughter.[7]  Although some states, such as California, have created on-farm regulations to eliminate some forms of farmed animal cruelty, Utah has no law requiring the humane treatment of animals on farms. In fact, Utah excludes livestock from its animal cruelty law, so long as the treatment is "customary,"[8] as many routine forms of mutilation and intensive confinement are. As the Plaintiffs' Complaint in this case makes clear, the Utah Department of Agriculture is invested in promoting Utah farms, not regulating them.[9] Similarly, at the federal level, the United States Department of Agriculture (USDA), which is in charge of inspecting slaughter facilities and ensuring food safety through its Food Safety and Inspection Service (FSIS), is also the agency charged with advertising for the industry, through its other arm, the Agricultural Marketing Service.

Most of the time oversight from USDA is non-existent. In my experience working in slaughter and processing facilities, and to my knowledge from other undercover investigators working in slaughter and processing facilities, inspectors are often not present. I have also seen, and documented, government inspectors not inspecting the carcasses, socializing and talking to workers, and looking at their cell phones while on the job. Consistent with my experience, non-profit public research agencies and investigative journalists have reported on the cozy relationship between the industry and the USDA,[10] and reports by the General Accounting Office (GAO) have *repeatedly* concluded that the USDA has failed to implement sufficient systems to address contamination of pathogens from meat products.[11] A

---

[7] The "Twenty Eight Hour Law", 49 U.S.C. § 805, states that animals cannot be transported by "rail carrier, express carrier or common carrier" for more than 28 hours consecutively without being unloaded for 5 hours for rest, water, and food. But this law is rarely enforced, and the USDA claims it does not apply to birds. ALDF, Farmed Animals and the Law, http://aldf.org/resources/advocating-for-animals/farmed-animals-and-the-law/. Additionally, the "Humane Methods of Slaughter Act", 7 U.S.C. § 1901 et seq., requires that an animal be rendered unconscious and insensitive to pain prior to slaughter. But it also is inadequately enforced and does not apply to birds, who make up 90% of the animals slaughtered for food. ALDF, Farmed Animals and the Law.

[8] Utah Code Ann. § 76-9-301(1)(b)(2)(c). Of course, the industry itself determines its own customs, such that "customary" practices include virtually anything the industry decides is profitable, including practices that cause immense animal suffering.

[9] As described in paragraphs 73 to 80 of the Plaintiffs' Complaint in this case (CM/ECF Doc. 2) the Utah Department of Agriculture's website contains a series of videos and statements advertising agricultural products produced there, and making claims that, for example, Utah's eggs are "some of the safest in the country" and making statements about the welfare of the egg-laying hens. Complaint at paragraph 78.

[10] Felicia Nestor and Wenonah Hauter, The Jungle: Is America's Meat Fit To Eat? 3–4 (2000) (available at http://www.citizen.org/documents/TheJungle2000.PDF); Eric Schlosser, *The Cow Jumped Over the USDA*, N.Y. TIMES, http://www.nytimes.com/2004/01/02/opinion/the-cow-jumped-over-the-usda.html (Jan. 2, 2004).

[11] U.S. General Accounting Office, Better USDA Oversight and Enforcement of Safety Rules Needed to Reduce Risk of Foodborne Illnesses, GAO-02-902 (2002) (available at http://www.gao.gov/new.items/d02902.pdf); GAO, Report to Congressional Requesters, Oversight of Food Safety Activities: Federal Agencies Should Pursue Opportunities to Overlap and Better Leverage Resources, GAO-05-213 (2005) (available at http://www.ncifap.org/_images/GAO_Oversight_of_Food_Safety_Activities_March_2005.pdf) (describing inadequacies and inefficiencies in the various overlapping agencies with jurisdiction to inspect food safety); GAO, Food Safety: USDA Needs to Strengthen Its Approach to Protecting Human Health From Pathogens in



survey of USDA inspectors conducted by the NGOs Public Citizen and the Government Accountability Project is particularly telling. Inspectors reported instances where—pursuant to USDA inspection systems—they did not take direct action against observed contamination (feces, vomit, metal shards, etc.), they were instructed not to document violations, and they were threatened with retaliation by the company and the agency for raising issues and attempting to take enforcement actions.[12] These problems were also presented in testimony before the House of Representatives' Subcommittee on Domestic Policy, in a hearing on "Continuing Problems in USDA's Enforcement of the Humane Methods of Slaughter Act."[13] Dr. Dean Wyatt, a USDA Supervisory Public Health Veterinarian and whistleblower, testified about his supervisors at the USDA retaliating against him when he tried to enforce the law:

> If I had more time I would tell you about how I observed a  pig slipping and falling – several pigs, actually – slipping and falling because they were being driven too fast, too hard on a slippery surface. District office called me. They chewed me out. They said they would not support my NR [Noncompliance Record]. I was going to be demoted to a non-supervisory position for 2 weeks.
>
> I would tell you about an angry animal handler who was bludgeoning a pig over the head and nose several times with a paddle simply because it was down and could not get up. It couldn't get up. It couldn't get out the door. Myself and the other veterinarian on duty were given a letter of reprimand for trying to enforce the law.
>
> I would tell you how the district office called me, told me to drastically reduce the amount of time I spent on humane handling enforcement because I was finding too many problems. I called my supervisor [one] day because I had a humane handling issue and I wanted to talk to him about it, and he said that I needed to document that on an NR, which I did, draft NR. As the draft NR reached the district office, then they had a fit. They berated me on the phone for half an hour. The whole management staff of the district office, they said there was no way I could have seen what I actually did see. In the end, they told me I either had to transfer, I would be terminated. I was told to immediately leave the plant, to never come back. I was supposed to report for duty the next day at a graveyard shift at a poultry plant in Arkansas.[14]

---

Poultry Products, GAO-14-744 (Sept. 30, 2014) (available at http://www.gao.gov/products/GAO-14-744); GAO, Testimony Before the Subcommittee on Regulatory Affairs and Federal Management, Committee on Homeland Security and Governmental Affairs, U.S. Senate, Government Efficiency and Effectiveness: Implementing GAO Recommendations Can Achieve Financial Benefits and Strengthen Government Performance, GAO-16-272T, at 23 (Dec. 10, 2015) (available at http://www.gao.gov/assets/680/674093.pdf) (concluding that the USDA had failed to adequately take steps to protect the public from pathogens derived from poultry products).

[12] Felicia Nestor and Wenonah Hauter, The Jungle: Is America's Meat Fit To Eat? 3–4 (2000) (available at http://www.citizen.org/documents/TheJungle2000.PDF).

[13] Continuing Problems in USDA's Enforcement of the Humane Methods of Slaughter Act, Hearing before the Subcommittee on Domestic Policy of the Committee on Oversight and Government Reform, House of Rep 111th Cong. 2nd Session Mar 4, 2010 Serial No 111-136 (available at https://www.gpo.gov/fdsys/pkg/CHRG-111hhrg65127/html/CHRG-111hhrg65127.htm).

[14] Dr. Wyatt's testimony is published at the transcript of the testimony cited in footnote 13 of this Report.



Based on my experience and knowledge, and a review of the literature from the GAO and Congressional testimony about the inadequacy of official inspection of animal agriculture facilities, I conclude that the public cannot rely on the government for accurate information about these facilities and food safety.

**2. Animal agriculture facilities are located in remote, isolated towns**

A second reason why the public is unable to access information about industrial animal agriculture is that the location of these facilities ensures that what happens inside factory farms and slaughterhouses remains out of sight. In my experience, animal agriculture corporations specifically target impoverished, rural, and remote areas across the United States to establish facilities. In these sparsely-populated areas, jobs are scarce and locals have few other options to support themselves than to work for the facility. These are often in "right-to-work" states with a weak labor presence to represent the workers. In my experience, the facilities themselves are located on large tracts of land and surrounded by a locked gate. No one outside of the operation is allowed in. In my experience, the corporations also target disenfranchised populations to hire as workers. These are often local residents, convicts, and undocumented immigrants because they are easily exploitable. When I conducted an undercover investigation as an employee of Sparboe Farms, the company moved the bulk of its operations from its headquarters in Minnesota to rural Northern Iowa. There, I worked on a crew with undocumented immigrants[15] and we were regularly made to work unbelievable long shifts, for 12 hours or more, and on one occasion worked on three different farms in three different locations in a single 32 hour period without rest except when we drove from one farm to the next. Based on my experience, I conclude that the public is unable to access the truth about animal agriculture facilities because they are intentionally located far away from populated cities, and intentionally hire easily exploitable workers who are unlikely to speak out about abuses or conditions.

**3. Animal agriculture facilities use secrecy practices to keep information from the public**

Third, the industry engages in a number of secrecy practices to intimidate workers and prevent them from speaking out about conditions in the facilities. In my experience, non-disclosure agreements are standard, as is failure to post required notices about whistleblowers' and workers' rights. I have also seen posted notices threatening employees that they could be prosecuted for bringing a cell phone or camera onto the job. The non-disclosure agreements and failure to post notices about workers' legal protections have an especially chilling effect on employees because many do not speak English, are not aware of whistleblower protections under the law, and mistakenly believe that non-disclosure

---

[15] These individuals told me that they had entered the country without documents.



agreements are more than just company policy. They believe that the non-disclosure agreements mean that it is against the law for them to speak out about conditions in the facility.

It is my opinion that these three factors converge to make it impossible for the public to have access to the truth about practices and conditions on factory farms and in slaughtering and processing facilities. This is consistent with consumer surveys that have found that the public generally lacks information about animal agriculture practices.[16] Eighty-six percent of Americans admit that they are either not at all, not very, or only somewhat knowledgeable about welfare issues affecting animals raised for food.[17] It is in the interest of the corporations to keep the public in the dark about the truth as much as possible, or to lead consumers to believe that animal welfare conditions are better than they really are. Studies also show that consumers care about the welfare of animals raised for food – 95% of consumers in a national survey conducted by American Humane reported that they are "very concerned" about the welfare of farm animals.[18] Consumers also generally support greater regulation of the treatment of animals raised for food.[19] Based on these statistics about consumer preferences, I conclude that corporations selling meat and animal products have a great financial incentive to keep the public less informed about the reality of animal agriculture. Therefore, it is my opinion that they engage in a variety of secrecy practices as I described above, in order to keep the public in the dark.

### B.  Whistleblowing by Employees Who Are Not Undercover Investigators Is Unlikely

For many of the reasons just discussed in the previous section, it is also unlikely that employees of factory farms and slaughterhouses will blow the whistle about cruelty to animals, food safety violations, or workers' rights violations. As discussed, many of the workers in these facilities are disenfranchised, who do not know about the whistleblower protections afforded by the law. With few employment options other than the plant or facility in the area, workers will be afraid to "cause trouble" for fear that they will not be able to provide for their families if they are fired. One example comes to

---

[16] Dr. Ann Cummins, et al., Center for Animal Welfare Science at Purdue University, Perceptions of United States Residents: Animal Agriculture and Meat Products 9 – 10 (2015) (available at https://vet.purdue.edu/CAWS/files/documents/062215-WhitePaperNATIONAL.pdf) (consumer survey demonstrating that most respondents largely uneducated about farming and agriculture in the United States).
[17] Faunalytics.org, Animal Tracker: Responses Year 6 (2013), https://faunalytics.org/animaltracker/topic_responses_all.php.
[18] Animal Welfare Institute, Consumer Perceptions of Farm Animal Welfare (available at https://awionline.org/sites/default/files/uploads/documents/fa-consumer_perceptionsoffarmwelfare_-112511.pdf).
[19] Glynn T. Tonsor and Christopher A. Wolf, Drivers of Resident Support for Animal Care Oriented Ballot Initiatives, 42(3) Journal of Agricultural and Applied Economics 419, 423 (2010). Additional surveys show that the public broadly supports regulating the treatment of farm animals. Animal Welfare Institute, Consumer Perceptons of Farm Animal Welfare at 3 (available at https://awionline.org/sites/default/files/uploads/documents/fa-consumer_perceptionsoffarmwelfare_-112511.pdf).



mind from an investigation that I did during my career. I worked on a crew of men in a turkey breeding facility; the crew leader took the job because he needed health insurance for his daughters. The men on his crew, who were hired by the company, were abusing the animals (the men were eventually indicted for animal cruelty). The crew leader never participated in the abuse, but was afraid to report his crew member's actions because he feared he would lose his job and his daughters could no longer receive healthcare. When the investigation was eventually released, the company blamed him for the actions of his crew and fired him.

In my experience, workers at factory farms and slaughter and processing facilities live in constant fear of retaliation from management if they complain about anything, be it animal welfare, violations of the law, working conditions, or injuries. My experience is consistent with numerous reports based on interviews with workers in these industries.[20] In my experience, even if the worker was aware of whistleblower protections, the immediate costs of getting fired, losing their livelihood and sometimes also benefits, and the uncertainty of getting reinstated or any backpay under the law is a calculus that makes it very unlikely for a worker who is not an undercover investigator to take the risk to blow the whistle on the company.

In my experience there is also a culture within these facilities that is best described as a culture of masculinity. For many of the workers, being able to endure the difficult work and meet company standards without complaint is a way to prove yourself as a man. There is also pressure among workers to fit in, and if an employee does not fit in, he will likely not be able to stay and do the job for very long. In my experience, the managers at the companies exploit this among the workers. There is also a culture at the corporate level of focusing on the bottom line, no matter what, and exploiting the people, the community, and the animals in order to maximize profit. My opinion is that there is no accountability at the corporate level. Abuse of animals and people is systemic in the operations, meaning that the abuse occurs as a result of conditions imposed by the company, but when the abuse is captured either by investigation or inspection, the company blames the low level employees. One example is unloading poultry from transport crates when they have arrived at the slaughterhouse. In my experience, workers, because the company has scheduled delivery trucks to arrive so close together, have to unload the chickens so fast that they grab several at a time and handle them roughly. And when they have been caught, the company has blamed the individual employees on the job rather than taking responsibility for company's creation of the abusive environment.

---

[20] Human Rights Watch, Blood, Sweat, And Fear: Workers' Rights in U.S. Meat and Poultry Plants (2004) (available at https://www.hrw.org/sites/default/files/reports/usa0105.pdf); Southern Poverty Law Center and Alabama Appleseed, Unsafe at These Speeds: Alabama's Poultry Industry and its Disposable Workers (2013) (available at https://www.splcenter.org/sites/default/files/Unsafe_at_These_Speeds_web.pdf); Oxfam America, Lives On the Line: The Human Cost of Chicken (2015) (available at http://www.oxfamamerica.org/static/media/files/Lives_on_the_Line_Full_Report_Final.pdf).



### C. An undercover investigator's job is to document the truth

As an undercover investigator, my goal is to be a fly on the wall. To do so, I had to fit in and do the job as well as possible. As an investigator, I performed every duty assigned to me and followed all the same safeguards as other employees, including undergoing training where necessary and complying with biosafety protocols. I, like any employee, followed the orders and directives of the company, even if it meant that I caused suffering to animals. I also could not advocate for animals or attempt to change company practices while employed because it was not my job, any more than it would be the job of any other low-level employee. My job was to be the eyes and ears of the public and to document the truth of what I witnessed. To obtain the most accurate, complete, and truthful information and documentation of what occurs behind the walls of factory farms, it is necessary to do the job as any other employee would, to fit in and become part of the "team," to be there long enough to observe whether issues are systemic or isolated incidents, and to capture what happens when the company believes no outsiders are watching. That is the guidance I give to the investigators I work with, mentor, and manage. By doing so, we can provide the public with the most truthful account of where the food that they eat, and feed to their children, comes from.

### D. Undercover investigations are the only way to capture accurate information and document what is going on in industrial animal agriculture facilities

Based on my extensive experience and knowledge about lack of oversight and the practices in industrial animal agriculture to ensure secrecy, it is my opinion that only employment-based, undercover investigations will accurately document conditions within these facilities. Almost all of the production in animal agriculture happens behind locked doors in windowless buildings, and there is no other way to get in except to be employed by these facilities. Although facilities will on rare occasions allow journalists to come for a tour, they are given what is referred to in the industry as the "white glove tour." They are only taken to one part of the facility. For example, if the journalist is visiting a growing facility, they will only be taken to see the animals in one barn and no others. The barn that is chosen will be cleaned specifically in preparation for the visit. In fact, I have been that employee cleaning the barn when someone outside of the company was coming for a tour.

It is my experience that only long-term, employment-based investigations will obtain information about violations that are present or ongoing. As just one example from my career, while employed undercover at a slaughter plant, I documented USDA investigators repeatedly failing to do their job and inspect carcasses that were being processed and shipped off into the food supply. I documented USDA inspectors socializing with workers, and looking at their phones instead of the meat.



My investigation led to an internal personnel investigation within the agency. Had I only taken a one-day tour of the facility, rather than worked there as an employee for several months, I would not have been there to document that dereliction of duty by the inspectors. It is also just a basic fact of human nature that we will behave differently when we know we are being watched. So, in order to document what really happens inside these facilities—from company practices to the actions of individual workers—it is necessary to essentially be a fly on the wall. The cost of only investigating industrial animal agriculture facilities when they know we are watching is that these facilities will be unaccountable for animal cruelty, public health and safety, and worker exploitation.

### E. Utah's ag gag law will result in a lack of transparency and oversight of Utah's agriculture industry

The lack of effective government oversight of animal agriculture, the intimidation and silencing of vulnerable workers, and the secrecy of the industry about its practices, mean that the only reliable source of information about industrial animal agriculture is from undercover investigations. It is my opinion that Utah's ag gag law, by criminalizing such investigations, will mean that there is effectively an absolute bar for the public to obtain information about how food is produced in the state. Without any way to know what is happening, it is my opinion that factory farms and slaughter and processing plants will continue to engage in animal and worker abuse, and to put the public safety at risk, without being held accountable.

Signed:

_Travis Powell_

Travis Powell

I declare under the penalty of perjury that the foregoing is true and correct. Executed on

_____29-Jan 2016_____ in _____Chicago, IL_____.