EXHIBIT "A"

Expert Report of Dr. Amy Kristin Sanders

Expert Report

for

Animal Legal Defense Fund, et. al.

v.

Herbert

Submitted by Amy Kristin Sanders, J.D./Ph.D.

January 29, 2016

## Introduction

Dr. Amy Kristin Sanders is an associate professor in residence at Northwestern University's campus in Doha, Qatar, where she teaches courses in media law and ethics as a member of the journalism faculty. A member of the Florida and Missouri Bar Associations, Sanders worked as a copy editor and page-designer for a mid-sized local newspaper in Florida before coming to the academy.

Based on her professional and academic career, Dr. Sanders was asked to provide her expertise regarding journalistic practice and ethics in the United States. In particular, she was asked to provide her expertise as to the role of surreptitious surveillance in the information-gathering process.

Her conclusions are:

I.     Utah Code Ann. §76-6-112 addresses investigative behaviors that many professional organizations believe deserve significant ethical scrutiny.

II.    Utah Code Ann. §76-6-112 does not prohibit organizations from reporting on the agricultural industry and its practices through traditional investigative means.

III.   As written, Utah Code Ann. § 76-6-112 doesn't single out animal activism organizations but applies to all people.

## Background

Dr. Amy Kristin Sanders joined the faculty of Northwestern University in Qatar in August 2014. Prior to her international appointment, she earned tenure and promotion to associate professor status at the University of Minnesota's School of Journalism and Mass Communication in 2013.  She also maintained affiliate faculty status with the University of Minnesota Law School from 2009 to 2014. Her relevant teaching experience includes both undergraduate and graduate level courses in media law & ethics, news writing and reporting,

1

media & society, introduction to mass communication, law of Internet speech, and mass communication law research.

Dr. Sanders' scholarly research focuses on legal responses to technological changes in mass communication and their relation to freedom of speech issues. She is the author of more than a dozen scholarly journal articles, a book chapter, an encyclopedia article and a law school casebook, *The First Amendment and the Fourth Estate: Mass Media Law* (11th ed. Foundation Press). She regularly speaks to civic and industry groups on journalism and legal topics. She is also a regular presenter and attendee at numerous national and international conferences including Broadcast Education Association, the Association for Education in Journalism and Mass Communication, International Association of Mass Communication Research and Law & Society Association.

Dr. Sanders' professional background includes full-time work as a copy editor and page designer for *The Gainesville Sun*, a daily Florida newspaper with a Sunday circulation of more than 50,000 that was owned by The New York Times Regional Media Group.  In this position, she was often tasked with selecting stories for the local news and business sections of the newspaper, as well as copy editing stories, writing headlines and designing pages for those sections.

Dr. Sanders has a Ph.D. in Mass Communication from the University of Florida College of Journalism and Communications. She earned her law degree and a Master of Arts degree in Professional Journalism from the University of Iowa. She holds a Bachelor of Arts degree in Communication: Journalism and a Bachelor of Science degree in Justice Systems from Truman State University in Kirksville, Mo.

In preparation of this report, Dr. Sanders reviewed these case-related materials:

- Civil Rights Complaint, *Animal Legal Defense Fund, et. al. v. Herbert*.

- Deposition of PETA Corporate Designee, Jeffrey Kerr

- Deposition of ALDF Corporate Designee, Carter Dillard

- Deposition of Amy Meyer

- Photographic and video recordings produced by Amy Meyer

In addition to case-related materials, she reviewed the following materials in preparation of this expert report:

- American Society of Newspaper Editors: *Canons of Journalism*

- New York Times Company: *Standard and Ethics*

- Pew Research Center: *State of the News Media 2015*

- The Poytner Institute: *The 11 Layers of Citizen Journalism*

- Radio Television Digital News Association: *Code of Ethics*

- Society of Professional Journalists: *Code of Ethics*

- Various scholarly and industry publications, as cited herein

**Expert Analysis**

The introduction of the Internet as a mass communication technology has increased communication opportunities by reducing the influence of the institutional press and allowing alternative voices to robustly engage in the gathering and dissemination of information.[1] As individuals and activist groups began to engage in the functions traditionally carried out by the institutional press, scholars coined the term "citizen journalism" to describe their actions. Although it has no single definition, citizen journalism can encompass practices ranging from simply encouraging feedback and interaction with the institutional media through open commenting to crowd- and open-sourced reporting to independent citizen blogging and reporting.[2]

---

[1] Amy Mitchell, *State of the News Media,* PEW RESEARCH CENTER.
http://www.journalism.org/2015/04/29/state-of-the-news-media-2015/
[2] Steve Outing, *The 11 Layers of Citizen Journalism,* POYNTER.ORG (May 31, 2005),
http://www.poynter.org/2005/the-11-layers-of-citizen-journalism/69328/

The goals of citizen journalists – and activist organizations such as Animal Legal Defense Fund and People for the Ethical Treatment of Animals who engage in citizen journalism – are not dissimilar from those of professional journalists in many instances and often include the gathering and distribution of information. In its Complaint, ALDF and its co-plaintiffs have asserted that Utah Code Ann. § 76-6-112 attempts to "silence the undercover investigations and corresponding media coverage that contributes to public debate."[3] The plaintiffs talk about conducting investigations or relying on such investigations as part of their reporting and research,[4] which they assert is designed to "contribute to important public debate about mass-produced meat, dairy and eggs." In essence, they are asserting a violation of the same First Amendment rights guaranteed to journalists and the institutional press.

Many journalism organizations such as the New York Times espouse the same objectives – to gather and disseminate information of public importance – which symbolize the hallmarks of traditional journalism. "The core purpose of The New York Times is to enhance society by creating, collecting and distributing high-quality news and information. Producing content of the highest quality and integrity is the basis for our reputation and the means by which we fulfill the public trust and our customers' expectations."[5] The Preamble to the Society of Professional Journalists' Code of Ethics echoes those sentiments: Members of the Society of Professional Journalists believe that public enlightenment is the forerunner of justice and the foundation of democracy. Ethical journalism strives to ensure the free exchange of information that is accurate, fair and thorough. An ethical journalist acts with integrity."

---

[3] Civil Rights Complaint at 3, Animal Legal Defense Fund, People for the Ethical Treatment of Animals, et. al. v. Gary R. Herbert, No. 2:13-CV-00679-RJS-EJF (D. Utah, Oct. 26, 2015).

[4] Deposition of Animal Legal Defense Fund, Through Its Designated Representative, Carter Dillard at 44-51, Animal Legal Defense Fund, People for the Ethical Treatment of Animals, et. al. v. Gary R. Herbert, No. 2:13-CV-00679-RJS-EJF (D. Utah, July 22, 2013).

[5] New York Times Company, *Standards and Ethics,* http://www.nytco.com/who-we-are/culture/standards-and-ethics/

A key point of divergence between groups such as ALDF and journalism organization such as the New York Times is the adoption of professional journalistic practice and ethical standards. Such distinction marks the difference between relying on deception – including falsifying employment applications and engaging in undercover employment-based surreptitious surveillance – as a core information-gathering practice and understanding the harm the results from such misrepresentations. Harrowed figures in journalism, including former executive editor of the Washington Post Ben Bradlee, have been quoted expressing a zero-tolerance policy for deception in journalism. Reportedly in the Pulitzer Prize deliberations, Bradlee remarked that "awarding the prize the the *Sun-Times* [for its undercover sting operation that exposed corruption in Chicago politics] would send the wrong message to young reporters everywhere that it was all right to lie to get a story, to pretend to be not a reporter but someone you were not."[6] Chicago Tribune executive editor Jack Fuller recalled the debate about the prize, noting that Bradlee said to him, "We would not allow reporters to misrepresent themselves in any way, and I don't think we would be the hidden owners of anything."[7] Similarly, well-known American journalist Howard Kurtz has publicly condemned lying, deception and fabrication, noting they are not legitimate journalistic methods. "No matter how good the story, lying to get it raises as many questions about the journalists as their subjects."[8]

Most professional organizations, including the New York Times and Washington Post view deceptive tactics, including surreptitious surveillance and recording, as a last resort, if they are even permitted. Instead, they rely on traditional forms of information-gathering to form a solid foundation for the stories they publish.  On the contrary, it seems the plaintiffs view undercover, employment-based operations as an expeditious approach to obtaining

---

[6] Tom Goldstein, *The Brief Against Deception in Reporting,* 13 J. MAGAZINE & NEW MEDIA RES. 1, 3 (2012).
[7] Mark Lisheron, *Lying to Get the Truth,* AM. JOUR. REV. ¶ 73 (Oct./Nov. 2007), http://ajrarchive.org/Article.asp?id=4403
[8] *Id.* at ¶ 7.

information designed to foster public outrage as a means of obfuscating the manner in which the information was obtained.

### Analysis: Ethical Standards in Information Gathering in the United States

Investigative reporting, and related techniques of information gathering, has a long and controversial history in the United States. On one side, a staunch group harkens back to the muckraking ways of the Gilded Age, often championing Upton Sinclair's 1906 novel *The Jungle* as an example of the great works of the era. *The Jungle* indeed introduced a generation of Americans to the harsh conditions faced by immigrant laborers in industrialized cities, but it has also taken on a reputation of mythic proportion as the tale that reformed the meat-packing industry in the United States.  Activist groups and free-wheeling journalists, alike, rely on Sinclair's work of fiction as a justification for deception in the name of achieving a public good. They base their "ends justify the means" claims on a shallow foundation of historical precedent, hoping to avoid addressing the ethical implications raised by deception in the information-gathering process. As writer Karen Olsson noted in her 2006 critique on *Slate* commemorating the 100th anniversary of *The Jungle*, Sinclair's approach wasn't so much about telling the truth as it was about finding a way to win over the readers: "Although at the time some muckrakers did traffic strictly in fact, the audience for fiction was much larger than that for exposés. And so, believing that only a novel could extend an emotional appeal to a mass audience, Sinclair cast about for a story to give his facts more weight."[9]

Others in journalism and ethics, however, noting Sinclair's work is fictional, quickly point out that many of the investigative reporters of the muckraking era relied on far less provocative techniques to expose corruption and malfeasance on a large scale. Instead, this contingent promoted the traditional techniques of what has been termed "gumshoe

---

[9] Karen Olsson, *Welcome to the Jungle: Does Upton Sinclair's Famous Novel Hold Up?*, SLATE.COM ¶ 5 (July 10, 2006), http://www.slate.com/articles/arts/books/2006/07/welcome_to_the_jungle.html

journalism" or "shoe-leather reporting."[10] Ida Tarbell, known for her expose of John D. Rockefeller and his Standard Oil empire, based her writings on the "steady, painstaking work" of examining government and corporate documents, interviewing employees, lawyers and even the company's own senior executive, Henry H. Rogers.[11] "Many of the others whose names live on – Lincoln Steffens, Ida Tarbell, Ida B. Wells – did not misrepresent themselves or try to infiltrate the business or governmental bodies they wrote about."[12]

In her critique, even Olsson recognizes that Sinclair's approach of playing fast and loose with the facts isn't represented in today's modern muckraking. Novels like *The Jungle* have given way to narratives taking the form of literary non-fiction, and Olsson points to the work of veteran investigative journalist Eric Schlosser, whose book *Fast Food Nation* has been likened a modern-day version of Sinclair's 1906 work: "Today it's Eric Schlosser's *Fast Food Nation* that, like *The Jungle*, documents the problems of the meat industry, but without depending on a dramatic narrative. We now prefer our exposés to come with figures and footnotes, not melodrama—Schlosser's book still weaves in moving human stories to illustrate the impact of industrial development, but as nonfiction it has a rigor and range that *The Jungle* lacks." In addition to being well-researched and documented, Schlosser's *New York Times* bestseller, which started as two magazine articles for *Rolling Stone*, emphasized traditional information-gathering techniques, not deception and surreptitious surveillance.

As noted journalism historian Michael Schudson observed, the development of journalistic objectivity as a value – and subsequent professional ethics codes – emerged as a response to the era of scandalous, "yellow journalism."[13] By the 1920s, journalists in the

---

[10] Christine Russell, *From Gumshoe to Google Wave: Investigative Journalism Goes Multimedia,* COLUM. JOURN. REV. ¶ 3 (Mar. 25, 2010), http://www.cjr.org/behind_the_news/from_gumshoe_to_google_wave.php

[11] http://www.smithsonianmag.com/history/the-woman-who-took-on-the-tycoon-651396/?no-ist

[12] Lisheron, *supra* note 7, at ¶ 68.

[13] MICHAEL SCHUDSON, DISCOVERING OF NEWS: A SOCIAL HISTORY OF AMERICAN NEWSPAPERS (1978).

United States and Canada were embracing notions of objectivity and evolving standards of

morality that had been codified by professional organizations. As early as 1923, the

American Society of Newspaper Editors' Canons of Journalism stressed the importance of

honesty as a hallmark of sound investigation. Although the original text doesn't use the word

deception, *Article IV: Sincerity, Truthfulness, Accuracy* states "Good faith with the reader is

the foundation of all journalism worthy of the name. … 1. By every consideration of good

faith a newspaper is constrained to be truthful. It is not to be excused for lack of thoroughness

or accuracy within its control, or failure to obtain command of these essential qualifies."[14]

As technology evolved, so too has the temptation to use deceptive means to gather

information. Subsequent ethics codes have addressed both deception in general as well as the

more specific practice of surreptitious surveillance. Both industry-wide and organization-

specific codes of ethics take strong stances against deception. For example, the Society of

Professional Journalists' Code of Ethics states, "Avoid undercover or other surreptitious

methods of gathering information unless traditional methods will not yield information vital

to the public."[15] The Radio Television Digital News Association's Code of Ethics states,

"Deception in newsgathering, including surreptitious recording, conflicts with journalism's

commitment to truth."[16] These codes don't make exceptions based on an organization's

desire to tell a better story or belief that members of the public will only be moved to action if

they actually "see" certain activities through photographs or video.

Similarly, although the American public – when surveyed – generally supports

investigative reporting, support for the practice decreases when specific methods are queried.

According to a 1997 nationwide survey conducted by the Pew Research Center, 84% of

Americans surveyed said they approved of the media's practice of uncovering and reporting

---

[14] American Society of Newspaper Editors, *Canons of Journalism, http://ethics.iit.edu/ecodes/node/4457*

[15] *Society of Professional Journalists, Code of Ethics,* http://www.spj.org/ethicscode.asp

[16] Radio Television Digital News Association, *Code of Ethics,*
http://www.rtdna.org/content/rtdna_code_of_ethics#sthash.DnCh85t1.dpuf

on corruption and fraud in the government and businesses.[17] However, when asked about whether they favored specific practices as a part of that investigative reporting, support waned significantly. For example, only about one-third of respondents said it was acceptable for reporters to conceal their identity.[18] Fewer than half approved of the use of hidden cameras or microphones. Just over half found it acceptable to quote unnamed sources.[19] Not surprisingly, then, many major journalism organizations are concerned about the impact that surreptitious surveillance and deceptive undercover investigations have on public trust and perception of the media. This study, and others, suggest that public trust in information doesn't increase simply because something is recorded using surreptitious surveillance.

For many journalists and journalism organizations, strong ethical prohibitions on deception and surreptitious surveillance are designed to protect that public trust. From an ethical perspective, such deception takes away the autonomy of the deceived party. "The deceiver places himself like a master over a slave, the deceived, deciding what the deceived should know and, as a result, how he will likely act given his tampered viewed of the world. The deceived is denied the knowledge he needs to make optimal decision."[20] Further consideration of ethical theory suggests that such deception ultimately harms the public good, regardless of the outcome. "As the argument goes, lying to serve public interests is a self-defeating maxim, as it will inevitably promote more deception, as people learn their only way to survive in a deceptive world is to play the game themselves."[21]

As a result, many media ethicists argue that the media have no greater right to deceive to serve the public good than would any other citizen. "Does [the journalist] have some authority to break rules, whereas the average citizen does not? The answer must be no,

---

[17] Lars Willnat & David H. Weaver, *Public Opinion on Investigative Reporting in the 1990s: Has Anything Changes Since The 1980s,* 75 JOURN. & MASS COMM. QTLY. 449, 453 (1998).

[18] ID.

[19] ID.

[20] Paul Braun, *Deception in Journalism,* 3 J. MASS MEDIA ETHICS 77, 78 (1987).

[21] EDMUND B. LAMBETH, COMMITTED JOURNALISM: AN ETHIC FOR THE PROFESSIONAL 19 (1986).

because the reporter acts on the behalf of the public and therefore represents them in his actions. He is given no license to act in ways the public would deem irresponsible in order to cover (or uncover) a story."[22] Given this justification, it is fair to see why journalism organizations who do not outright prohibit deceptive practices – such as employment-based surreptitious surveillance – permit them only once traditional means of reporting have been exhausted.

### Analysis: Impact of Utah Code Ann. § 76-6-112 on Information-Gathering

If, as many professional codes of ethics suggest, deception should only be relied upon as a last resort – once traditional means of information gathering have been exhausted – Utah Code Ann. § 76-6-112 does not "gag speech that is critical of industrial animal agriculture" as the plaintiff asserts. In fact, the statute at issue leaves open numerous alternative methods of gathering information related to agricultural production. In no way does the statute limit the traditional methods of "gum shoe" journalism or "shoe leather" reporting employed by early muckrakers like Ida Tarbell and Lincoln Steffens.

Under Utah Code Ann. § 76-6-112, ALDF, PETA and other organizations can continue to engage in numerous information gathering practices. It does not prohibit journalists or activists from relying on government documents and records. In fact, ALDF designated representative Carter Dillard admitted during deposition: "There will be – generally we're going to find in a battery hen facility, for examples, stocking densities where animals by the publicly released documents of that facility we know the animals are intensively confined, it's just a matter of seeing it and documenting it."[23] Utah Code Ann. § 76-6-112 does not prevent ALDF from accessing information about the number of animals in

---

[22] Braun, *supra* note 20, at 82.

[23] ALDF Deposition, *supra* note 4, at 59. See also *id*, at 36-37. "So I believe you'd asked whether people in our investigations department, or program, as we'll call it, interview whistleblowers. The answer is in some cases, yes. Depending on what the whistleblower is saying it may also be an attorney that interview them and the attorney may interview them first of sometimes the investigators will interview them first. It really depends on the situation." *Id.*

a facility and the density with which they are house; it prevents them from engaging in deception to surreptitiously "[see] it and [document] it."

The statute does not prohibit ALDF and other organizations from approaching key players in the agriculture industry, including those who run the operations ALDF seeks to investigate. In the ALDF deposition, Carter Dillard noted, "To get into those facilities, we would need an investigator on the inside, we need them with access to the animals." Often journalists will approach the targets of their investigations once they have substantive evidence of wrongdoing to ask for comment or refutation. Utah Code Ann. § 76-6-112 does not limit ALDF's ability to confront facility operators with information obtained in publicly available documents or from other traditional information-gathering methods. It does not prevent them from asking to facility operators to open up their facilities for inspection.

Further, the statute does not prevent ALDF and other organizations from seeking out employees of agricultural facilities to inquire about conditions inside the facilities. In his deposition, ALDF representative Carter Dillard suggested the organization struggled to effectively use whistleblowers: "As I've said before, there – things like developing, you know, whistleblowers has not proven reliable." Recruiting whistleblowers is never an easy task, but it is certainly a valuable information-gathering technique that would be lawful under Utah Code Ann. § 76-6-112. ALDF representative Carter Dillard noted in his deposition that the investigation of the Cuesta Farms in Florida began because "we were originally approached by someone who had access to backyard slaughter farms in Florida, someone separate from ALDF. That person was able to go in and wear a camera and actually audio record conversations with the slaughterer."[24] As written, the statute permits ALDF and other organizations to make use of surreptitiously recorded video and audio provided by these unaffiliated whistleblowers.

---

[24] ALDF Deposition, *supra* note 4, at 116.

The very advances in technology that have allowed groups like the plaintiffs to engage in citizen journalism also provide greater opportunities for in-depth information-gathering using traditional investigative techniques that are complemented by our networked society. "While investigative journalism still requires old-school skills like stakeouts, meetings with confidential sources, and painstaking scrutiny of documents obtained through Freedom of Information Act requests, reporters and their organizations are increasingly using social media and Web technology to ferret out incriminating information that perpetrators of fraud, discrimination, and even murder are seeking to keep hidden."[25] ALDF, like many journalism organizations, has also taken advantage of these new technologies to aid in its information-gathering efforts. In his deposition, ALDF representative Carter Dillard noted that ALDF had "[operated] a drone over the landowner's facility" in at least one of its investigations.[26]

Journalists, and activists alike, have become quite adept at using these technologies to complement their investigations. Major media organizations, including CNN and NPR, regularly rely on social media tools such as Instagram, Vine, Facebook and Twitter, and even drones, to help them access sources and information necessary to their reports. In 2010, the Columbia Journalism Review detailed numerous investigative pieces[27] that exposed corruption, fraud and law-breaking based largely on the combination of new technology and traditional information-gathering techniques – all of which are permissible under Utah Ann. Code § 76-6-112. "All reputable news media – including the AP – agree that journalists should inform their sources of their real identity and avoid deceit in their reporting."[28] As one scholar notes, some well-publicized undercover reports, such as the *Food Lion* case or NBC's

---

[25] Russell, *supra* note 10, at ¶ 1.

[26] ALDF Deposition, *supra* note 4, at 119.

[27] Russell, *supra* note 10, at ¶ 1-12.

[28] Stefanie Chernow, *The Ethics of Undercover Journalism: Where the Police an Journalists Divide,* ETHICAL JOURNALISM NETWORK ¶ 17 (Nov. 14, 2014), http://ethicaljournalismnetwork.org/en/contents/the-ethics-of-undercover-journalism-where-the-police-and-journalists-divide

To Catch a Predator have captured the public's attention – and resulted in legal action – which gives the impression that journalists routinely engage in such deception; however, he continues "But it must be underscored that these stories represent a tiny fraction of investigative stories."[29]

In fact, ALDF has conducted numerous successful investigations without the use of deceptive, employment-based, surreptitious surveillance. ALDF representative Carter Dillard noted several successful investigations in his deposition, including those at Judy's Family Farm and Olivera's Egg Farm, that relied on methods permitted under Utah Code Ann. § 76-6-112. These methods included "surveillance from the ground," "flyover by the director of development and the pilot" and an investigations that were initiated as a result of "complaints from people living in the area."[30] Similarly, Utah Code Ann. § 76-6-112 would not prohibit "[using] a pretext to interview people associated with the facility in order to find out information, how they were producing the eggs, where they were being sold, and to photograph from again not employment based inside, from the outside of the facility" as was the case with ALDF's investigation of Olivera's Egg Farm.[31]

Most importantly, perhaps, Utah Code Ann. § 76-6-112 does not prohibit ALDF or others, including law enforcement, from recruiting employees who are already employed at a particular facility from recording areas to which they have lawful access as a part of their employment. As a result, the statute permits the activities of legitimate whistleblowers so long as they do not engage in criminal trespass or other unlawful activity during their information-gathering. Further, it places no publication restriction on information, including photos, video and audio, that can be obtained in this fashion.

---

[29] Goldstein, *supra* note 6, at 3.
[30] ALDF Deposition, *supra* note 4, at 105.
[31] ALDF Deposition, *supra* note 4, at 109.

Although journalists and activists who encourage others to engage in surreptitious surveillance might find themselves at odds with other legal precedent, many organizations – both journalistic and activist in nature – have successfully set up drop sites to allow independent whistleblowers the ability to securely publicize their findings. Similarly, as the Columbia Journalism Review noted, many investigative pieces started as the result of a tip that allowed reporters to follow-up by triangulating information from documents, in-person interviews and sources located through social media and other technologies.

### Analysis: Utah Code Ann. § 76-6-112 Does Not Single Out Animal Organizations

Of particular note, Utah Code Ann. § 76-6-112 applies to anyone who engages in deception with the intent to record. As written, it doesn't single out animal activists or organizations like ALDF or PETA. It is particularly striking to note that the statute, as written, contains no law enforcement exception that would allow police officers to engage in deception for the purposes of conducting undercover operations aimed to uncover illegal operations. Law enforcement, like journalists and animal activist groups, are permitted to use traditional means of information-gathering, including the cultivation of whistleblowers, or confidential informants, to provide information about conditions inside agriculture facilities.

### Conclusion: Utah Code Ann. § 76-6-112 Provides Ample Information-Gathering Opportunities

After reviewing the case materials and evaluating Utah Code Ann. § 76-6-112, it is my expert opinion that the statute permits numerous information-gathering approaches, including both traditional methods as well as methods relying on more recent technologies. The methods that would be prohibited by Utah Code Ann. § 76-6-112 – including deception-based, surreptitious surveillance – are methods that many professional organizations prohibit or subject to significant ethical scrutiny. At a number of the organizations, surreptitious surveillance is not permitted if other alternatives exist to obtain information – the kind of

alternatives that are permitted by Utah Code Ann. § 76-6-112. These alternatives include, but are not limited to: information gathering from public property and public documents, reliance on whistleblowers as well as the use of footage obtained by employees already employed at production facilities.