# EXHIBIT "A"

## Counter Expert Report of Dr. William James

February 25, 2016



www.williamjamesandassociates.com

dr.wm.james@gmail.com

(703) 798-7584

# William James and Associates, LLC

Animal Legal Defense Fund, People for the Ethical Treatment of Animals, Counterpunch, Amy Meyer, Will Postter, Daniel Hauff, James McWilliams, Jesse Fruhwirth,

v.

Gary R. Herbert, in his official capacity as Governor of Utah; Sean D. Reyes, in his official capacity as Attorney General of Utah

## EXPERT REPORT (SUPPLEMENTAL)

### Risks associated with clandestine documentation activities inside animal agriculture enterprises

I. Introduction

The statute at issue is Utah Code 76-6-112[1] (Statute), agricultural operation interference.  Under this law, someone commits agricultural operation interference if he or she records images or sounds from an agricultural operation without consent, or gains access to an agricultural operation under false pretenses with the intent to record images or sounds without consent.

This supplemental report addresses particular points raised in the opinions submitted for plaintiffs by Mr. Sean Thomas and Mr. Travis Powell.  They object to the statute on the grounds that some of the activities prohibited by the law are necessary to pursue the goals of the plaintiffs.

It is important to note the statute's language is neutral as to the purposes of those who interfere with agricultural operations, applying penalties without distinction in regard to the intentions of those guilty of violating the statute.  The protections of the statute, however, are general.  The statute mitigates the risks associated with interference of agricultural operations, which include threats to animal health and welfare, exposure of employees to unsafe working conditions, and of consumers to unsafe food.

1

February 25, 2016

II. Qualifications*

At the time of my retirement from the U.S. Department of Agriculture's Food Safety and Inspection Service, I served as the Chief Veterinarian and a Senior Executive.  During my 28 year career I worked in the offices of Field Operations, Policy, Science, and International Affairs.  Among my responsibilities were coordination of animal humane handling enforcement throughout the country, and direction of ante-mortem and post-mortem inspection of livestock and poultry.

Currently, I am the Chief Consultant at William James & Associates, LLC.  Drawing from my experience, I provide assistance on humane handling of animals, international and domestic issues of regulatory compliance, foreign equivalence requirements, supply chain security, and other areas of food safety and international trade.

Education

Johns Hopkins University
Baltimore, Maryland
Graduated: *MPH*        1986 - 1987

Louisiana State University
Baton Rouge, Louisiana
Graduated: *DVM*        1976 – 1980

Professional Associations

American Veterinary Medical Association
National Association of Federal Veterinarians

Selected Awards

*Distinguished Alumnus Award* – For accomplishments in veterinary medicine and contributions to the community through public service.  LSU School of Veterinary Medicine, 2009

*Administrator's Excellence Award* – For outstanding accomplishments and professionalism in food safety and food defense.  FSIS, 2007

Selected Publications

*Salmonella serotypes in selected classes of food animal carcasses and raw ground products, January 1998 through December 2000,* Columb P. Rigney, DVM, MPH, DACVPM …, William James, DVM, MPH, Journal of the American Veterinary Medical Association, pp. 524-530, Vol 224, No. 4, February 15, 2004.

*See attached curriculum vitae for more complete qualifications.

2

February 25, 2016

*Use of a Priority Rating Process to Sort Meatborne Zoonotic Agents in Beef*, Kenneth E. Petersen, DVM, William O. James, DVM, MPH ..., Journal of Agromedicine, pp. 17-36, Vol. 3, No. 1, 1996.

*Cost-Effective Techniques to Control Human Enteropathogens on Fresh Poultry*, William O. James, et al, Poultry Science, 72:1174-1176, June 1993.

Selected Work Experience

United States Department of Agriculture, Food Safety and Inspection Service, Office of Field Operations, 2008 – 2011, Washington, DC
*Chief Public Health Veterinarian (Senior Executive Service)* representing FSIS before the world on issues of veterinary public health and animal welfare.  Responsible for a public health program that conducts inspections and enforces regulatory requirements at establishments slaughtering food animals and/or processing meat, poultry and egg products.  Oversee activities of five of OFO's 15 Districts, with combined employment of 3,200 people, combined budgets of $250 million, and regulate almost 1,400 establishments in 16 States, covering wide geographic regions in the Midwest, Southeast, and Mid-Atlantic.

USDA, FSIS, Office of Public Health Science, 2002 – 2004, Washington, DC
*Executive Director* for public health and scientific program services.  Charged with oversight of four divisions: Microbiology Division, Risk Assessment Division, Human Health Sciences Division, Zoonotic Diseases and Residue Surveillance Division.

Selected Presentations

*Private Sector Best Practices for Compliance with Meat Inspection Regulations* to World Meat Industry Development Conference
Qingdao, China; September 2015

*Systematic Approach to Animal Welfare* to American Meat Institute Foundation Animal Care and Handling Conference
Kansas City, MO; October 2013

*Investigation of Downer Cow Abuse in California* to AVMA Annual Convention
Seattle, WA; July 2009

III. Compensation

My rate of compensation is $200 per hour to a maximum of $1,600 per day for consultation, research, report writing, depositions, and trial testimony.  I charge $800 per travel day, plus expenses.

February 25, 2016

IV. Case History Disclosure

Cases in which I have provided expert reports or depositions:

United States of America v. Jesse J. Amaral, Jr., Felix Sandoval Cabrera, and Eugene D. Corda (U.S. District Court, Northern District of California, San Francisco Division; CR 14 437; August 14, 2014)

Foster Poultry Farms, Inc. v. Certain Underwriters at Lloyd's, London (U.S. District Court, Eastern District of California1:14-cv-00953 WBS-SAB; July 16, 2015)


V. Opinion

*Opinions on Mr. Sean Thomas' report, dated January 29, 2016*
The written opinion of Mr. Thomas begins on page one with a reference to the incidents surrounding the Hallmark-Westland Meat Packing Company (Hallmark), reported in January 2008 when the Humane Society of the United States (HSUS) released videos to the public that documented the egregious abuse of cattle awaiting slaughter.  The abuses, which took place in the fall of 2007, included electric shocks, spray from high-pressure water hoses, and the ramming of cattle with a forklift.  The abuses were committed by employees of the establishment in an apparent attempt to force non-ambulatory cattle to rise for slaughter.[2]

This was a tragic episode, and represented a failure of local inspection personnel of the U.S. Department of Agriculture's (USDA) Food Safety and Inspection Service (FSIS) to enforce humane handling requirements.  FSIS also determined, as part of its own investigation, that Hallmark employees violated the ban[3] on slaughter of non-ambulatory disabled cattle by failing to notify the FSIS Public Health Veterinarian (PHV) when animals became non-ambulatory after having passed ante-mortem inspection.

Mr. Thomas proceeds to state in his "Succinct Summary of Opinions" on page two that activities prohibited by the Statute are necessary "…to reliably expose the cruel and often illegal behaviour *endemic* to this industry…" (emphasis mine).  HSUS performed a public service in exposing the abuses at Hallmark, but to call the abuses endemic mischaracterizes the accomplishments of FSIS as described in the report "Evaluation of FSIS Management Controls Over Pre-Slaughter Activities" by the U.S. Department of Agriculture's Office of Inspector General (OIG), published later the same year.[2]

The OIG audit was conducted to determine, in part, if the events that took place at Hallmark were isolated or systemic (or, to use Mr. Thomas' term, endemic).  To make that assessment, OIG evaluated the adequacy of FSIS' pre-slaughter controls at 10 other slaughter establishments which slaughtered cattle similar to those slaughtered at Hallmark.

OIG stated, "…nothing came to our attention to indicate that unsuitable animals were passed for slaughter at these establishments."  The OIG report proceeds to say, "Therefore, we concluded that the events that occurred at Hallmark were not a systemic failure of the inspection

4

February 25, 2016

processes/system as designed by FSIS."  The report continues, "We did not observe any systemic inhumane handling incidents at the 10 establishments visited during this audit, nor did anything come to our attention that would lead us to believe any were occurring when we were not there."

However, FSIS took actions to prevent such incidents in the future.  At Hallmark, egregious humane handling violations occurred when its employees attempted to move non-ambulatory cattle.  In response to the events at Hallmark, USDA issued a rule[4] to ban the slaughter of all cattle that become non-ambulatory disabled after passing ante-mortem inspection.  These animals must be condemned and properly disposed of rather than slaughtered.

In the year the Hallmark violations occurred, FSIS inspected approximately 800 slaughter livestock establishments subject to the Humane Methods of Slaughter Act.  In 2007, FSIS conducted approximately 125,099 humane handling verification activities resulting in 524 noncompliance records (0.42 percent noncompliance rate).  Noncompliance records for humane handling may be issued when the violation is less than egregious, such as not having water available in pens.[6]

In October of 2008, FSIS appointed a senior executive to exercise oversight of FSIS humane handling efforts.  The following year the position of Humane Handling Enforcement Coordinator was created in FSIS, to help with identification of violations and correlation of enforcement actions of the humane handling regulations[5].

One or two District Veterinary Medical Specialists are assigned to each of the 10 FSIS District Offices to conduct humane handling audits in all the slaughter plants in each District, and to correlate PHVs in identification of violations and correlation of enforcement actions of the humane handling regulations.  In fiscal year 2013 (the last report[7] available), the number of inspection tasks performed in-plant across the country consumed 369,041 hours, which equates to approximately 177 full time employees in FSIS engaged in verifying that humane handling requirements are met.

Since 2008, FSIS has also established a Humane Methods of Livestock Slaughter web page with links to many resources available to slaughter plants and the general public.  These include compliance guides, training materials, enforcement reports, statutes and regulations, and other materials of interest.

To call the incidents that occurred at Hallmark *endemic* is factually incorrect.  Mr. Thomas' principal point in his short page-one summary is in error.  In fact, such occurrences are rare.

In his written opinion, Mr. Thomas offers two more "case examples" of older vintage than the Hallmark incident of seven years ago.  In reading his qualifications, it is clear Mr. Thomas is experienced in clandestine investigations.  However, his professional qualifications make no mention of education or expertise in animal welfare or food safety.

5

February 25, 2016

*Opinions on Mr. Travis Powell's report, dated January 29, 2016*
Mr. Powell begins his written opinion with a summary articulating five points, each of which is based upon his "experience", "personal knowledge", or "review of the available literature".  In reading his qualifications, it appears Mr. Thomas is experienced in undercover investigations.  However, his professional qualifications include no mention of education or expertise in animal welfare or food safety.

In his written opinion, Mr. Thomas cites six surreptitious investigations conducted under his direction resulting in claims by the Animal Legal defense Fund (ALDF) of inhumane treatment of animals or production of unsafe food.  For half of the cited investigations there is no information provided that experts in animal welfare or food safety corroborated his claims of inhumane treatment or unsafe food.  The outcomes of these three investigations are not given, except that they generated news coverage, an investigation by FSIS, and formal complaints by ALDF.

The other three investigations resulted in the following outcomes:

1) Aviagen Turkeys: This useful investigation resulted in three convictions for animal abuse.  However, the documented incidents occurred during 2008.  This was the same year the Hallmark incidents were revealed, seven years ago.

2) Sparboe Farms: The outcome was that some egg producers and buyers supported a move to phase out the use of cages to house egg-laying chickens.  It should be noted that animal welfare experts are not in agreement that other housing options result in more humane treatment of chickens.[9]  Additionally, information about husbandry practices for hens is publically available from many sources[17].  Clandestine investigations are not necessary for distribution of this type of information.

3) Christensen Farms: The outcome was that some retailers decided to phase in the procurement of pork from farms that do not use gestation stalls for sows during pregnancy, birth, and weaning of piglets.  It should be noted that animal welfare experts are not in agreement that other gestation options result in more humane treatment of pigs[10].  Information about this husbandry practice is also publically available[18, 19].  Surreptitious investigations are not needed to obtain this information.

The six investigations cited by Mr. Thomas provide scant support for the section of his written opinion titled "Basis For Opinions", in which he makes five assertions as follows.

1) "*The public lacks access to truthful and complete information about animal agriculture.*"
This is a general statement with which I disagree.  There are volumes of information about modern animal husbandry practices available on the internet[11, 12, 13, 14], and courses taught in colleges and universities around the nation[15, 16].

The USDA issues countless reports and analyses on animal agriculture, including animal welfare and food safety.  For example, in fiscal year 2013 FSIS enforced 72 inhumane handling suspensions at 60 FSIS facilities.  There were 588 non-compliances recorded by FSIS during this

same time period due to violations of humane handling requirements[7]. This is possible because FSIS veterinarians and inspectors are always on-site conducting post-mortem inspection of every animal slaughtered, with additional off-line personnel performing duties such as ante-mortem inspection and humane handling verification procedures.

2) "*Whistleblowing by Employees Who Are Not Undercover Investigators Is Unlikely.*"
This is another general statement, in support of which only anecdotal information is offered.

3) "*An undercover investigator's job is to document the truth.*"
This is a statement of an ideal, not a statement of fact. It is not an expert opinion.

4) "*Undercover investigations are the only way to capture accurate information and document what is going on in industrial animal agriculture facilities.*"
There is a short justification written for this assertion. It lacks supportable detail. It is not an expert opinion.

5) "*Utah's ag gag law will result in lack of transparency and oversight of Utah's agricultural industry.*"
This assertion presupposes the previous assertions are correct. It is not an expert opinion.


VI. Conclusion

There are risks to animals and to people associated with activities by individuals when engaged in stealthy activities such as secret documentation of animal handling practices on farms and in packing plants. Among the risks are threats to animal health and welfare, exposure of employees to unsafe working conditions, and of consumers to unsafe food.

Opinions expressed by some who believe the Statute should be overturned because their intentions are good when engaging in these risky practices ignore the potential consequences for harm to animals and people.


Signed

Dr. William James

February 25, 2016

7

February 25, 2016

References

1. Utah Code 76-6-112, Agricultural operation interference – Penalties
http://le.utah.gov/xcode/Title76/Chapter6/76-6-S112.html?v=C76-6-S112_1800010118000101

2. Evaluation of FSIS Management Controls Over Pre-Slaughter Activities (Audit Report 24601-7-KC); U.S. Department of Agriculture, Office of Inspector General; November 2008
http://www.usda.gov/oig/webdocs/24601-07-KC.pdf

3. Title 9 Code of Federal Regulations 309.3 (e)

4. Prohibition of the Use of Specified Risk Materials for Human Food and Requirements for the Disposition of Non-Ambulatory Disabled Cattle; Prohibition of the Use of Certain Stunning Devices Used To Immobilize Cattle During Slaughter; 07/13/2007
https://www.federalregister.gov/articles/2007/07/13/07-3350/prohibition-of-the-use-of-specified-risk-materials-for-human-food-and-requirements-for-the

5. Title 9 Code of Federal Regulations 313

6. (USDA, FSIS) QUESTIONS AND ANSWERS HALLMARK/WESTLAND MEAT PACKING CO.; 03/07/2008
http://www.usda.gov/wps/portal/usda/usdahome?contentid=USDA_Actions.xml

7. Humane Handling Quarterly Report for the 12-month Period Ending September 30, 2013; May 22, 2014
http://www.fsis.usda.gov/wps/portal/fsis/topics/regulatory-compliance/regulatory-enforcement/humane-handling-quarterly-reports/hh-enforcement-reports/hher-q4-fy2013

8. Humane Methods of Livestock Slaughter; September 24, 2015
http://www.fsis.usda.gov/wps/portal/fsis/topics/regulatory-compliance/humane-handling

9. Welfare Implications of Laying Hen Housing; American Veterinary Medical Association Animal Welfare Division; January 26, 2012
https://www.avma.org/KB/Resources/LiteratureReviews/Pages/Welfare-Implications-of-Laying-Hen-Housing.aspx

10. Welfare Implications of Gestation Sow Housing; American Veterinary Medical Association Animal Welfare Division; November 19, 2015
https://www.avma.org/KB/Resources/LiteratureReviews/Pages/Welfare-Implications-of-Gestation-Sow-Housing.aspx

11. Meat Mythcrushers
http://www.meatmythcrushers.com/

12. Animal Agriculture Alliance
http://www.animalagalliance.org/main/index.cfm

8

February 25, 2016

13. American Veterinary Medical Association
https://www.avma.org/Pages/home.aspx

14. The Glass Walls Project
http://animalhandling.org/ht/d/sp/i/80622/pid/80622

15. Louisiana State University, College of Agriculture, School of Animal Sciences
http://www.lsuagcenter.com/portals/our_offices/departments/animal-sciences

16. Utah State University, College of Agriculture and Applied Sciences, Department of Animal, Dairy, and Veterinary Sciences
https://advs.usu.edu/students/degrees

17. Small Flock Management of Poultry; Mississippi State University Extension Service; August 21, 2014
http://msucares.com/poultry/management/poultry_care.html

18. Gestation and Farrowing Crates for Pigs; Purdue University Food Animal Education Network
http://www.ansc.purdue.edu/faen/gest%20crates.html

19. Sow stalls – a brief history; Prof John J. McGlone, Texas Tech University, Lubbock, TX; Apr 23, 2014
http://www.pigprogress.net/Home/General/2013/12/Sow-stalls--a-brief-history-1388603W/

9