Jesse C. Trentadue (#4961)
Noah M. Hoagland (#11400)
SUITTER AXLAND, PLLC
8 East Broadway, Suite 200
Salt Lake City, Utah 84111
Telephone: 801-532-7300
E-Mail: jesse32@sautah.com
E-Mail: nhoagland@sautah.com

John G. Dillard (appearing *pro hac vice*)
OLSSON FRANK WEEDA TERMAN MATZ PC
600 New Hampshire Ave., NW
Suite 500
Washington, DC 20037
Telephone: 202-789-1212
Email: jdillard@ofwlaw.com

*Attorneys for Amici Curiae*

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| ANIMAL LEGAL DEFENSE FUND, PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, AMY MEYER, <br><br> Plaintiffs, <br> v. <br><br> GARY R. HERBERT, in his official capacity as Governor of Utah; SEAN D. REYES, in his official capacity as Attorney General of Utah, <br><br> Defendants. | **BRIEF OF ANIMAL AGRICULTURE ALLIANCE, PROTECT THE HARVEST, AND STATE AGRICULTURAL AND RURAL LEADERS AS AMICI CURIAE IN SUPPORT OF DEFENDANTS** <br><br> Case No. 2:13-cv-00679-RJS <br> Judge Robert J. Shelby |

# **TABLE OF CONTENTS**

STATEMENT OF INTEREST ................................................................................................... iii
INTRODUCTION .......................................................................................................................... 1
ARGUMENT .................................................................................................................................. 2
    A. Federal Policy Supports Promoting Security at Agricultural Operations ........................... 3
    B. Undercover Employees Pose a Heightened Threat to Biosecurity ..................................... 5
    C. Employees Hired Under False Pretenses Undermine Efforts to
       Ensure Animal Welfare and Food Safety ........................................................................... 7
CONCLUSION ............................................................................................................................. 10
CERTIFICATE OF SERVICE ..................................................................................................... 12

## STATEMENT OF INTEREST

*Amicus* Animal Agriculture Alliance (Alliance) is an industry-united nonprofit organization that helps bridge the communication gap between farm and fork. The Alliance connects food industry stakeholders; engages with food chain influencers and promotes consumer choice by helping them better understand modern animal agriculture; and protects the future of animal agriculture.

*Amicus* Protect the Harvest (PTH) is a non-profit organization that works with stakeholders to educate the general public about agriculture and promote favorable food security policies.

*Amicus* State Agriculture and Rural Leaders (SARL) is a national nonprofit organization dedicated to promoting factual and science based policy related to agriculture and rural communities, fostering cooperation and leadership among policy makers, and educating on technology, processes and issues related to food production and rural communities. SARL is process neutral in support of the sustainable production of safe, wholesome food and strong, viable rural communities.

Together, as organizations dedicated to securing the future of animal agriculture, *Amici* have a strong interest in protecting the safety, wholesomeness, and quality of our food supply.

## **INTRODUCTION**

Our nation's food system is a source of global envy.  The American people enjoy access to abundant supplies of food.  We spend less of our disposable income on food than any other nation on the planet.  And, on top of that, we have one of the most effective and advanced food safety systems in the world.  Advances in scientific understanding and technology have led to substantial improvements in food safety and the reduction of food borne illness outbreaks.  Although our food system is more mechanized and automated than it was 100 years ago, it is still a system based on people.

The people that work in our food system, whether they be at a farm, ranch, or a processing plant, are all entrusted, to some degree, with an immense responsibility – ensuring the wholesomeness and safety of our nation's food.  Although our food system is subject to regulatory oversight, an employee's careless error, ambivalence, or malfeasance can result in food safety failures that have far reaching consequences.

Given the human element of our food production system, it is critical that employers have assurance that the employees they hire are knowledgeable and trustworthy.  Furthermore, it is critical that farmers, ranchers, and processors can be assured that they understand who they are hiring.  A job applicant that falsifies prior experience or conceals ulterior motives poses a major risk to both animal welfare and food safety.  Utah Code § 76-6-112 (the Act) promotes animal welfare and food safety by

providing assurance that employees are not hired under false pretenses or have ulterior motives that are not aligned with the promotion of food safety or animal welfare.

## **ARGUMENT**

Maintaining a safe, reliable, and secure food system is of utmost concern to society. While safe food is something that most Americans take for granted, lapses in good food safety practices and biosecurity can have devastating consequences. While undercover animal activists may have the stated goal of promoting animal welfare, past experience has demonstrated that their primary purpose in seeking undercover employment is to document and publish, not immediately stop and correct, perceived lapses in animal welfare practices.

Failure to timely report lapses in good animal welfare and food safety practices can result in major consequences for animal safety and public health. However, employees who take jobs under false pretenses with the intention of uncovering perceived deficiencies in our animal agriculture operations have an incentive to allow lapses in animal welfare and food safety practices to persist. If perceived abuse or insanitary conditions are allowed to continue, then more sensational footage can be gathered for publicity. Plaintiffs would have this Court believe that their desire to record this information while employed under false pretenses trumps any hazards they pose to public

health and safety. This view trivializes the critical role that farm, ranch, and processing plant employees play in protecting our food production systems.

Moreover, concealing details about an employee's work history can pose major biosecurity risks. Pathogenic outbreaks can have devastating consequences for livestock and poultry operations. Diseases, such as highly pathogenic avian influenza (HPAI), sicken and can kill animals that become infected. Flocks and herds subject to pathogenic outbreaks must be depopulated through euthanasia to stem the flow of disease, costing the economy billions of dollars. One of the most effective means of preventing the spread of disease outbreaks is to restrict those who have contact with animals. Farm operations cannot effectively control these hazards if they hire individuals that conceal their work history, which may include exposure to pathogens in an affected area or operation.

The Act promotes biosecurity and the safety of our food system by protecting agricultural operations from those that seek employment under false pretenses or conceal critical information from their employment history.

### A.   Federal Policy Supports Promoting Security at Agricultural Operations

The Act is consistent with federal policy, which recognizes the important role agriculture plays in preserving our national security. In 2003, the U.S. Department of Homeland Security (DHS) designated America's food and agriculture sector as "critical infrastructure." *See* U.S. Department of Homeland Security, "Critical Infrastructure

3

Sectors: Food and Agriculture Sector," *available at* https://www.dhs.gov/food-and-agriculture-sector.  As critical infrastructure, DHS has developed policies geared towards protecting agriculture and food products from biosecurity risks and contamination.  *See* U.S. Department of Homeland Security, *Food and Agriculture Sector-Specific Plan: 2015*, *available at* https://www.dhs.gov/sites/ default/files/publications/nipp-ssp-food-ag-2015-508.pdf.  DHS recognizes that our agriculture and food sector is vulnerable to both accidental and intentional acts that could disrupt our national food supply.  *Id*. at 5.

Our major federal food regulatory agencies also recognize the importance of securing our food supplies.  Pursuant to the Food Safety Modernization Act, the federal Food and Drug Administration (FDA) has promulgated a regulation that will require most FDA-inspected facilities to adopt food defense plans.  *See* "Mitigation Strategies To Protect Food Against Intentional Adulteration," 81 Fed. Reg. 34,166 (May 27, 2016).  One of the primary mitigation strategies promoted by this rule is the use of background checks on employees to identify potential security risks.  *See* 81 Fed. Reg. at 34,201.

In addition, the U.S. Department of Agriculture's Food Safety Inspection Service (FSIS) recognizes the need to protect our agricultural sector to ensure confidence in our national food supply.  *See* U.S. Department of Agriculture Food Safety Inspection Service, *Food Defense Overview*, *available at* http://www.fsis.usda.gov/wps/portal/fsis/topics/food-defense-defense-and-emergency-response/food-defense-overview.  FSIS encourages plants under its jurisdiction to adopt

4

food defense plans to guard against intentional or accidental contamination of meat, poultry, and egg products.

A common theme shared by the agencies' approach to food defense is the critical role that employees play in food safety. Both agencies recognize that there is a need to verify an employee's background to ensure that they do not pose a risk to food security. The Act promotes this policy by deterring employees from concealing their prior employment or obtaining employment under false pretenses.

### B.    Undercover Employees Pose a Heightened Threat to Biosecurity

It is common practice for undercover activists to conceal portions of their employment history to avoid detection by the farms, ranches, and processing plants where they wish to work undercover. These individuals often work at multiple agricultural operations across the country in succession and will conceal or falsify portions of their employment history to prevent being "flagged" as a potential undercover activist. This practice poses a major threat to biosecurity.

Modern animal agriculture operations are particularly vulnerable to pathogenic outbreaks. If a disease is carried onto an individual livestock or poultry facility, it could infect thousands of animals at a time. The spread of disease to other facilities can exponentially multiply the damage caused by outbreaks.

The HPAI outbreak of 2014-15 demonstrates the devastation that can accompany

5

pathogenic outbreaks. Over the course of several months, turkey and chicken flocks in 13 states were infected with the virus. *See* John Newton and Todd Kuethe, *An Outbreak Unlike Any Other: Perspective on the 2014-2015 Avian Influenza*, FARMDOC DAILY (5):85, University of Illinois at Urbana-Champaign, Department of Agricultural and Consumer Economics, May 8, 2015, *available at* http://farmdocdaily.illinois.edu/2015/05/perspective-on-2014-2015-avian-influenza.html. The outbreak resulted in the death of 49.5 million chickens and turkeys and caused an economic loss of $3.3 billion. *See* Maryn McKenna, *Bird Flu Cost the US $3.3 Billion and Worse Could Be Coming*, NATIONAL GEOGRAPHIC PHENOMENA, July 15, 2015, *available at* http://phenomena.nationalgeographic.com/2015/07/15/bird-flu-2/.

With so much at stake, agricultural operations employ biosecurity precautions to guard against potential outbreaks. One of the primary biosecurity measures used is restrictions on the entry of individuals that could pose a risk of carrying pathogenic diseases. Many operations will not allow individuals to enter their facility if they have had contact with another herd or flock in the recent past. This reduces the risk of contaminating animals with microbes that may be carried on their person.

Undercover activists can thwart efforts to control the spread of pathogenic outbreaks by concealing portions of their job history. Ordinarily, if a farm employee worked in a facility that suffered a pathogenic outbreak, they would be required to undergo a quarantine period before working at another facility. However, undercover

6

activists often conceal portions of their prior employment and work brief stints at a number of farming operations. By concealing their employment history, the farm operations that hire them could be unknowingly introducing potential disease vectors to their flocks or herds. The Act mitigates this risk by deterring those who would conceal their employment history to obtain a job under false pretenses.

### C. Employees Hired Under False Pretenses Undermine Efforts to Ensure Animal Welfare and Food Safety

Undercover activists are employed by organizations in hopes of observing and recording instances of animal abuse. The footage they gather is compiled over the course of weeks or months. They do not have an incentive to stop lapses in animal welfare or food security. Instead, the more footage of animal abuse (perceived or real) that they can gather, the better. In most instances, organizations underwriting these undercover employees will not release footage for weeks or months after the incidents that are depicted actually occur.

This contradicts animal welfare best practices, which calls for immediate corrective actions whenever an animal's well-being is harmed. Failure to immediately report and correct a lapse in animal welfare practices can lead to prolonged suffering and, in some cases, create food safety hazards.

Moreover, there are several documented instances where activists have actually violated animal welfare standards in order to gather sensational footage of lapses in animal welfare practices. These include:

- Heflin, Alabama – an undercover activist employed by People for the Ethical Treatment of Animals (PETA) gathered video footage at a Tyson Foods, Inc. plant from December 2004 to February 2005. The undercover employee served as a supervisory role to monitor and prevent birds from entering a scalding tank while alive. The undercover activist taped employees allowing live chickens to be place in the scalding tank. The undercover activist violated Tyson's animal welfare policy by allowing some conscious birds to enter the scalding tank for the sole purpose of videotaping what he should have been preventing. The video was released in March 2005. *See Tyson, PETA clash over chicken slaughter*, USA TODAY, May 5, 2005, *available at* http://usatoday30.usatoday.com/money/industries/food/2005-05-25-tyson-peta_x.htm.

- Spencer, Iowa – An undercover activist employed by Mercy for Animals (MFA) worked at a Hy-Line International chicken hatchery for two weeks in May 2009. The undercover employee videotaped footage of male chicks being euthanized improperly. The facility's equipment had been tampered with such that it prevented instantaneous euthanasia. The undercover employee did not notify management and was suspected of being responsible for tampering with the plant's equipment to stage more compelling video footage. This video was not released until August 2009. *See Hy-Line Issues Further Statement over*

*Welfare Issue*, THE POULTRY SITE, Sept. 11, 2009, *available at* http://www.thepoultrysite.com/poultrynews/18534/hyline-issues-further-statement-over-welfare-issue/.

- <u>Marietta, Pennsylvania</u> – An undercover activist employed by MFA captured video while working at Shady Brae Farms in March 2016. The video depicted hens in cages and some in need of veterinary attention. Notably, the undercover activist failed to notify management of the need for veterinary care of the birds under his care. The undercover activist compromised animal welfare practices and then documented the results of his actions. An independent, third-party assessment of the facility determined that the farm was not in violation of good standards of animal care. The video was released in April 2016. *See* Tim Stuhldreher, *Local egg farm says activist was 'unknowingly hired,'* LANCASTER ONLINE, April 13, 2016, *available at* http://lancasteronline.com/news/local/local-egg-farm-says-activist-created-problems-seen-in-undercover/article_5eb90c22-01a3-11e6-90fc-67d005de7084.html.

In addition to immediately reporting and correcting lapses in animal welfare practices internally, instances of serious animal abuse should be reported to law enforcement authorities or regulatory agencies to ensure unlawful conduct ceases, wrongdoers are punished, and the food supply is protected. While undercover activists

9

have occasionally turned over their edited recordings to law enforcement and regulatory authorities, they most often wait until weeks or months after the events depicted in their recordings occur. This makes prosecution of abuse events more difficult. Also, if the abuse or neglect has implications on an animal's fitness in the food supply, these animals are often processed and eaten by consumers when videos depicting their abuse are publicized.

The Act promotes animal welfare and food safety by deterring those undercover activists that have an incentive to allow unlawful and unsafe conditions to persist.

## CONCLUSION

*Amici* represent companies and organizations with interests in the livestock and poultry industry. *Amici's* members strongly believe in the principles of animal welfare. They know that good animal welfare practices are a prerequisite for producing safe and wholesome products derived from the animals they raise. They also understand that consumers expect the animals they consume to be treated with care. They, more than anyone, desire to immediately correct abuse and root out bad actors that would imperil the reputation of the animal agriculture community.

While undercover activists may desire to expose what they perceive as inhumane actions in agricultural operations, they also pose biosecurity risks to these operations and have an incentive to allow lapses in animal welfare and food safety to persist. The Act deters conduct that places agricultural operations at risk. The First Amendment does not

10

provide a right to seek employment under false pretense or lie to gain access to an agricultural facility. Nor will the Act prohibit the organizations that underwrite activists from engaging in future speech.

For reasons stated herein, *amici* support Defendant's Motion for Summary Judgment and respectfully request that this Court grant Defendant's Motion in full.

DATED this 2nd day of August, 2016.

| OLSSON FRANK WEEDA TERMAN MATZ PC | SUITTER AXLAND, PLLC |
|---|---|
| /s/ John G. Dillard<br>John G. Dillard<br>(appearing *pro hac vice*)<br>*Attorney for Amici Curiae* | /s/ Noah M. Hoagland<br>Jesse C. Trentadue<br>Noah M. Hoagland<br>*Attorneys for Amici Curiae* |

## CERTIFICATE OF SERVICE

I hereby certify that on the 2nd day of August, 2016, I served a copy of the **BRIEF OF ANIMAL AGRICULTURE ALLIANCE, PROTECT THE HARVEST, AND STATE AGRICULTURAL AND RURAL LEADERS AS AMICI CURIAE IN SUPPORT OF DEFENDANTS** with the Court's CM/ECF system, which provided notice to all counsel of record.

/s/ Noah M. Hoagland