(1709)

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

_____

ANIMAL LEGAL DEFENSE FUND,
PEOPLE FOR THE ETHICAL                CASE NO. 2:13-CV-679
TREATMENT OF ANIMALS, AND
AMY MEYER,

        PLAINTIFFS,

  V.

GARY R. HERBERT, IN HIS              SALT LAKE CITY, UTAH
OFFICIAL CAPACITY AS                 OCTOBER 25, 2016
GOVERNOR OF UTAH; SEAN D.
REYES, IN HIS OFFICIAL
CAPACITY AS ATTORNEY
GENERAL OF UTAH,

        DEFENDANTS.

_____

CROSS-MOTIONS FOR SUMMARY JUDGMENT
BEFORE THE HONORABLE ROBERT J. SHELBY
UNITED STATES DISTRICT COURT JUDGE

```
 1
 2
         APPEARANCES:
 3
 4
         FOR THE PLAINTIFF:
 5                                  UNIVERSITY OF DENVER STURM
                                     COLLEGE OF LAW
 6                                  BY:   JUSTIN F. MARCEAU, ESQ.
                                    2255 E. EVANS AVENUE
 7                                  DENVER, COLORADO 80208
                                    (617) 256-9073
 8
                                    ANIMAL LEGAL DEFENSE FUND
 9                                  BY:  MATTHEW LIEBMAN, ESQ.
                                    170 EAST COTATI AVENUE
10                                  COTATI, CALIFORNIA 94931
                                    (707) 795-2533
11
                                    LAW OFFICE OF MATTHEW STRUGAR
12                                  BY:  MATTHEW D. STRUGAR, ESQ.
                                    2154 W. SUNSET BLVD.
13                                  LOS ANGELES, CALIFORNIA 90026
                                    (323) 696-2299.
14
                                    BY:   STEWART W. GOLLAN, ESQ.
15                                  584 WALL STREET
                                    SALT LAKE CITY, UTAH 84103
16                                  (801) 413-3406

17       FOR THE DEFENDANTS:
                                    UTAH ATTORNEY GENERAL'S OFFICE
18                                  BY:   KYLE J. KAISER, ESQ.
                                          DARIN B. GOFF, ESQ.
19                                  160 EAST 300 SOUTH, 6TH FLOOR
                                    PO BOX 140856
20                                  SALT LAKE CITY, UTAH 84114-0856

21       COURT REPORTER:
                                    RAYMOND P. FENLON
22                                  351 SOUTH WEST TEMPLE, #7.430
                                    SALT LAKE CITY, UTAH 84101
23                                  (801) 809-4634

24

25
```

2

```
1                    P-R-O-C-E-E-D-I-N-G-S

2                         (1:38 PM)

3          THE COURT:  Good afternoon, everyone.  We'll call

4     case number 2:13-CV-679.  This is The animal Legal Defense

5     Fund, et al. versus Governor Herbert, et al.

6          Counsel, I have your names.  Many of you are familiar to

7     me.  Why don't we take a moment and make our appearances,

8     please.

9               MR. LIEBMAN:  Good afternoon, Your Honor.  Matthew

10    Liebman of the Animal Legal Defense Fund on behalf of the

11    plaintiffs.

12               MR. GOLLAN:  Stewart Gollan on behalf of the

13    plaintiffs, Your Honor.  And I apologize, I will need to step

14    out for a portion of today's hearing.  I've been unfortunately

15    double-booked in State Court, but I will not be making any

16    argument so I shouldn't be --

17               THE COURT:  I've heard of State Court.

18               MR. GOLLAN:  Yes.

19               THE COURT:  Is that near here?

20               MR. GOLLAN:  It is very near here.

21               MR. KAISER:  Good afternoon, Your Honor.  Kyle

22    Kaiser and Darin Goff from the Utah Attorney General's Office

23    representing Governor Herbert and Attorney General Reyes.

24               THE COURT:  Thank you.  All right.  Well, welcome to

25    all of you.  This is the time set for hearing on your
```

cross-motions for summary judgment.  I would estimate that
about 95 percent of the time when I come to the bench we begin
a hearing like this with a preliminary ruling.  Having
reviewed your briefs, ordinarily I have formulated some
initial view at least of how the issues might turn out and
why, and I usually try to explain that at the outset in hopes
that it will narrow the focus of our argument.

There are a lot of issues.  There is an awful lot of
paper.  There are a lot of questions in my mind.  I have not
even attempted today to formulate a preliminary opinion in
advance of coming to the bench, nor am I certain that I could
have.  I mean there are really a lot of things I'm very
interested to learn from all of you today.

I thought about ways to structure this argument to make
it most efficient, and most of those failed also in my mind.
So we'll go as we go, I think maybe issue by issue, and maybe
hear from each side as we step through things.

And let me just say at the outset, there were a number of
amicus briefs that were filed.  There's been an awful lot to
read.  And while I appreciated the amicus briefing and all of
you had the benefit of reviewing that also, my anticipation is
we'll hear today from the parties only.  So we'll narrow our
discussion in that respect.

I'd like to start I think with what may seem -- maybe
it's the most obvious place to start.  Are there First

1    Amendment interests implicated by this statute?  Why don't we

2    start there, and maybe why don't we start with the plaintiffs.

3         Mr. Liebman, will that be you?

4              MR. LIEBMAN:  Yes, Your Honor.

5              THE COURT:  If you'd come to the podium, please.  In

6    a lot of the briefing, as you're coming up and getting

7    situated, and in some of the amicus briefing as well, there

8    are sort of two divisions that a lot of folks draw here.  One

9    is the misrepresentation right that may be implicated, and one

10   is the recording right, if there is one.  Alvarez may tell us

11   something about the representation or misrepresentation

12   element.  And we don't have a lot of clear guidance that I can

13   see, none that is binding on me about recording.  And why

14   don't we start there.  Is recording -- does recording give

15   rise to a First Amendment interest?

16             MR. LIEBMAN:  It does, Your Honor.

17             THE COURT:  It depends, doesn't it?

18             MR. LIEBMAN:  Well, photography and videography are

19   simply more high tech, high fidelity forms of drawing a

20   picture or taking notes in a note pad.  And recording is both

21   inherently expressive, like drawing a picture, but also a form

22   of conduct that is protected as preparatory to speech.

23        And the Court in Idaho District Court in the Otter case

24   following the Seventh Circuit in ACLU versus Alvarez noted

25   that just as the First Amendment protects the process of

1    writing down words on paper or painting a picture, the act of

2    audiovisual recording is a form of purely expressive activity

3    that's entitled to full First Amendment protection.

4         THE COURT:  Let me invite you just to lift that

5    microphone a little bit so our court reporter can hear you

6    clearly as you're speaking.

7         MR. LIEBMAN:  If I can add another case to that, the

8    Rideout case.  That's the First Circuit ballot selfie case.

9    There's a similar case out of Indiana, the Indiana Civil

10   Liberties Union versus Indiana Secretary of State, which also

11   prohibited taking photographs of one's ballot.  And in both of

12   those cases the courts took as a given that photography was a

13   form of expression, and taking a picture of your ballot was

14   within the ambit of the First Amendment.

15       But even if the Court doesn't accept that the act of

16   taking a photograph is inherently expressive, it's at least a

17   form of conduct that is preparatory to speech.  And the

18   Supreme Court in the Citizens United case makes clear that

19   restraints on speech can operate anywhere in the chain of the

20   production process.  And if you stop speech in early stages or

21   eliminate the ability to create speech in the first place,

22   that restraint has to be analyzed under -- under the First

23   Amendment.

24       THE COURT:  Well, but if there's a restraint on an

25   ability to record, that doesn't necessarily -- it may impair

6

1    speech, but it doesn't prohibit speech, does it?  I mean you

2    can still write about what you've seen.  You can still speak

3    about it.  You just might not have all the different media

4    available to you that you might want as a speaker.  Are you

5    entitled to any media that you wish to utilize to convey your

6    speech about important ideas?

7              MR. LIEBMAN:  Well, restraints on any form of speech

8    have to be analyzed under the First Amendment.  So those

9    restraints would still have to be subject to a content

10   neutrality analysis and either strict scrutiny or intermediate

11   scrutiny as the case may be.  And so, you know, a law that

12   said no one can write with pencils would leave open the

13   opportunity to write with pens, but it's still a restraint on

14   speech, and if somebody prefers to write in pencil, that's

15   certainly within their rights under the First Amendment.

16        So the First Amendment doesn't sort of only apply where

17   there's an absolute prohibition on the oppor-- ability to

18   communicate.  If we take for example the McCullen case, this

19   is the Supreme Court case where there are the buffer zones

20   around abortion clinics in Massachusetts.  And it was

21   certainly the case that those individuals were able to

22   communicate in other ways.  They could take out advertisements

23   in the paper, they could put up blogs, they could post on

24   Facebook.  But the fact that that buffer zone restrained their

25   ability to do a form of speech that was crucial to their

```
 1   counseling, that is approaching individuals and having
 2   one-on-one conversations with them, was enough to invalidate
 3   that statute.
 4        And the same applies here.  It's not the case that the
 5   First Amendment has a -- an ample alternative channels inquiry
 6   unless we get to intermediate scrutiny and we're dealing with
 7   a content-neutral statute that's already narrowly tailored to
 8   a significant government interest.  And in strict scrutiny
 9   there's no alternative channel inquiry at all.
10            THE COURT:  Well, we're just going one step at a
11   time.  We'll get there when we get there.  I think you've just
12   told me what I read in your briefs about recording as a First
13   Amendment right or implicating First Amendment rights.
14   Anything you wish to add beyond what you've said on that
15   point?
16            MR. LIEBMAN:  Well, on the recording point, the only
17   point I would add is that recording, as we explained in our
18   brief, and as the Court described in the Otter case, is a
19   uniquely persuasive form of speech and restraints on it should
20   be closely scrutinized.  It's the only form of speech that is
21   in a sense self-validating, self-authenticating, and as the
22   Court read in Otter, it can vindicate an undercover
23   investigator or a whistleblower who is otherwise not believed.
24        So on the question of protected videography, I think the
25   Otter case, the Rideout case and the ACLU versus Alvarez case
```

1    established that it is a form of speech that at least has to

2    be subjected to scrutiny under the First Amendment.

3            THE COURT:  What about at different times in the

4    papers referring to subpart (a) of the statute, some people

5    refer to as bugging devices, is that First Amendment material,

6    leaving a recording device somewhere or planting one where

7    you're not present and just leaving it there?

8            MR. LIEBMAN:  I think it is.  It's still a form of

9    recording.  And if we accept the idea that recording is

10   analogous to, you know, high fidelity notebook, then it's

11   still protected.  The analysis of whether or not it survives

12   First Amendment scrutiny might be somewhat different, the

13   privacy interests might be different, but for the threshold

14   question of whether it's within the ambit of the First

15   Amendment, it's still a restraint on recording and a

16   content-based one at that.

17           THE COURT:  Does it depend on the purpose or intent

18   of the person who placed the recording device?

19           MR. LIEBMAN:  I don't think it does.  I mean the

20   countervailing interests might be more significant, especially

21   here where we're talking about recording a matter of public

22   concern in a facility that already has a reduced expectation

23   of privacy.  And so, you know, the narrower version is that at

24   least where we're talking about creation of speech that --

25   that is on the utmost political questions, in places where

 1   there's not a privacy expectation, at least that ought to be

 2   protected.

 3        And the balance might strike out differently if someone

 4   were trying to record intimate details in the home for

 5   example, but I think as a threshold it's certainly a question

 6   of -- it's certainly within the ambit of the First

 7   Amendment.

 8             THE COURT:  And if Samsung places a recording device

 9   at a conference room in an Apple facility, that's First

10   Amendment speech --

11             MR. LIEBMAN:  Well --

12             THE COURT:  -- in addition to corporate espionage?

13   Is it protected in some way?

14             MR. LIEBMAN:  I think that the -- there we would be

15   dealing, you know, if it's a -- a violation of, for example, a

16   corporate espionage statute, we're looking at a law of general

17   applicability and those get intermediate scrutiny under

18   O'Brien.

19             THE COURT:  But is that act of placing a recording

20   device in my competitor's conference room, is that a protected

21   First Amendment right that I'm exercising?

22             MR. LIEBMAN:  It's not a protected right.  So if the

23   question is it at the threshold within the ambit of the First

24   Amendment, you know, there's two ways of looking at it.  One

25   is that because it's not on a matter of significant public

1    concern, and it's not -- you know, a boardroom would have some

2    expectation of privacy, then that might fall outside of the

3    First Amendment altogether.

4        The other way of looking at it is that it's still speech

5    and so falls within the protections of the First Amendment,

6    but it might not be protected once you get to the actual First

7    Amendment analysis because the privacy concerns outweigh

8    the -- whatever interest the individual has.  And if Samsung

9    is bugging Apple, that sort of financial motive is drastically

10   different than here where the purpose of these investigations

11   is to expose food safety violations and animal cruelty that

12   affect billions of animals and hundreds of millions of

13   consumers.

14           THE COURT:   And if a neighbor just has a prurient

15   interest about what's happening next door and comes over one

16   day when they're invited in for brunch and they just leave a

17   recording device in their neighbor's house, they're exercising

18   a First Amendment right are they?

19           MR. LIEBMAN:   Well, its the same question.   And

20   certainly the Supreme Court has hot been clear about what it

21   is that passes the threshold inquiry of whether it's speech or

22   whether it simply fails under the application of the scrutiny.

23   But I think in that case, you know, the home is different.

24   The Supreme Court has said repeatedly in Fourth Amendment

25   cases, in privacy cases, that the home is different and

1   certainly prurient interest is going to be different from sort

2   of the public service interest that these investigations

3   entail.

4        And so whether that's a threshold question or an

5   application of the test question, I think the Supreme Court

6   hasn't given great guidance on it, although it has said

7   there's a very limited set of categories of speech that are

8   excluded.  Those are things like obscenity and fighting words

9   and defamation.

10       And it has never said that invasions of privacy are per

11  se outside of the ambit of the First Amendment.  So if it

12  doesn't fall in one of those categories, it probably is within

13  the ambit of the First Amendment.  But just because it's

14  within the ambit of the First Amendment doesn't mean it

15  survives the applicable level of scrutiny.

16       And so I would say that the corporate espionage example

17  and the neighbor bugging their -- their neighbor's house would

18  probably, if it doesn't fail at the outset of whether it's

19  protected speech at all, would at least fail once we're

20  applying the relevant interests.  In this case the balance

21  strikes out differently than in the espionage or the prurient

22  neighbor example.

23            THE COURT:  So I'm not a policy-making court.  I'm

24  just a lowly trial court, as I often say, just trying to apply

25  the rules as best I understand them and as given to me by the

1    courts above.  But what sense does that make to say that we're

2    exercising a protected First Amendment speech right to just

3    receive information, to record it, or to hear it -- for

4    example, to place a bug and listen to audio conversations that

5    happen at a workplace?  How does that make -- what part about

6    that is expressive in a First Amendment sort of way?

7            MR. LIEBMAN:  Well, I mean expression doesn't have

8    to go to other parties.  I mean if I'm taking notes in a

9    private journal, that's a form of expressive communication.

10   And so, you know, the idea is if this recording is speech,

11   then it's -- it's speech wherever it takes place.  You know,

12   the Supreme Court hasn't directly addressed the recording

13   issues, but as it's been addressed by the Seventh Circuit in

14   ACLU versus Alvarez, the Glik versus Cunniffe case, I believe

15   it's the First Circuit, courts do seem to agree that

16   recording, that is the receipt of information or the creation

17   of information, is a form of speech that's protected by the

18   First Amendment.  And there's no principled reason to draw a

19   distinction between it taking place in public versus it taking

20   place in private, unless there's a countervailing privacy

21   interest, which doesn't exist here.

22           The COURT:   And it may be that in today's climate

23   we're all journalists.  Everyone with an iPhone is a

24   journalist I suppose in some respect.  But is the intent of

25   the person recording the image or the sound not relevant?  For

1   example, it seems to me that the argument is stronger here for

2   the plaintiffs insofar as they maintain the very purpose for

3   recording an image or a sound is to utilize that in advancing

4   speech about an issue of importance to the plaintiffs, and

5   it's bound up in the whole concept of the speech that they

6   wish to make about the subject matter.

7         MR. LIEBMAN:  I think that's right.  And the Supreme

8   Court has said that political speech occupies the highest rung

9   of First Amendment protection.  Certainly we can get into more

10  marginal cases, and those might fall lower on the First

11  Amendment spectrum.  But typically the court has been pretty

12  bullish in protecting free speech.  Someone who, you know,

13  creates a nonsensical poem, like the Jabberwocky for example,

14  is still entitled to protection under the First Amendment,

15  even if it's nonsensical, if it doesn't mean anything.

16      And so I think what the Supreme Court has been -- how

17  they've been analyzing these questions is to typically assume

18  that something is speech, and then unless it falls into one of

19  those exempted categories, which it has guarded fairly

20  jealously, has been loath to create new categories of speech

21  that are totally outside of the First Amendment.  In Alvarez

22  it says false statements are protected.  In Stevens it says

23  that videos of animal cruelty are protected.  And so without a

24  clear category that's exempt, if it's speech, it's speech.

25      Now, again, the analysis of whether it survives

constitutional scrutiny might be different depending on the circumstances, but typically the motive for speech doesn't really address whether or not it is speech.  And let me give Your Honor another example of that, the recent case from the Supreme Court.  Heffernan is the name of it.  This is the case where a police officer was seen carrying yard signs that opposed the mayor.  The mayor saw this and fired him, but it turns out that he actually didn't support this other candidate, didn't have any interest in who won.  He was picking up some signs for his mom.

And so the Third Circuit said, well, you weren't expressing yourself.  This wasn't expressive conduct or speech and so there's no First Amendment violation.  The Supreme Court reversed and said it really sort of doesn't matter whether or not the speaker had one motive or the other or any motive, even intended to speak.  What we're trying to protect against is a governmental motive to silence speech.  And because the termination of this officer was based on the government's perception that this person was engaging in speech activity, that was enough for his termination to be declared unconstitutional under the First Amendment, even though he wasn't even speaking.

So that's been in some cases referred to as a negative version of the First Amendment, that it's not just worried about the motive of the speaker but also sort of stopping the

government's intent to silence, stopping the government's
motivation to crack down on speech.  And here, you know, I'm
sure we'll get into the legislative history which makes it
quite clear that that was the intention of the statute.

        THE COURT:  Let's turn to section (b) then for a
moment.  And I think people have referred to this at times as
the misrepresentation interest that's implicated here,
obtaining access to an agricultural operation under false
pretenses, the idea being I think that false pretenses are a
protected form of speech.  But is this provision in the
statute drawn to the representation or the fact of access?

        MR. LIEBMAN:  Well, I think it's the fact of access.
It's the false pretenses.  You know, someone could say, you
know, I've always wanted to work for Tyson Foods, and if it's
true, they might get the job, if it's false, they don't.  So
just as in Alvarez, we have a statute that targets falsity and
nothing more.

    And so the very same candidate that makes one statement
could gain access, you know, without a problem and the other
person would be gaining access by false pretenses.  So I think
what's relevant is the false pretenses portion of that rather
than the gaining access portion.

        THE COURT:  Well, except it's not a violation of the
a statute to make a false pretense.  Suppose I go and apply
for a job at Tyson Foods and I misrepresent my employment

1    history, but then I'm never hired, and I'm not invited onto

2    the facility, then the false pretense, that's an insufficient

3    basis to give rise to liability under the statute.

4              MR. LIEBMAN:  I think that's right, although I don't

5    think Alvarez says that you can criminalize some subset of

6    lies.  I mean if there's a criminalization of

7    misrepresentations, even if it's a subset and not all lies,

8    that still demands analysis under the First Amendment and

9    under Alvarez the strict scrutiny standard.

10             THE COURT:  So if this is a component of subsection

11   (b), then it's enough?  It's both a misrepresentation and

12   access, but because the misrepresentation is part of it,

13   that's inherently an expression of speech so there's a First

14   Amendment interest; is that right?

15             MR. LIEBMAN:  I think that's right, yes, Your

16   Honor.

17             THE COURT:  All right.  Anything more on subsection

18   (b)?

19             MR. LIEBMAN:  Well, I think it is important to note

20   that the kinds of lies that we're talking about here are

21   drastically different from the ones in Alvarez.  I mean these

22   are what have been referred to as truth facilitating lies.

23   These are lies that actually further the First Amendment

24   purpose of truth-seeking by opening up conversation on matters

25   of significant concern.

1        And so, you know, in Alvarez we have someone who is

2   telling a lie to elude the respect that had evaded him, as the

3   Court put it.  And that kind of low value lie, if that's

4   protected, certainly a lie that actually enhances the

5   fundamental purposes of the First Amendment ought to be

6   protected as well.

7        And I do want to note that it's certainly true that the

8   Alvarez court mentioned that false claims made to secure

9   offers of employment might be unprotected, but I do -- I think

10  it's important to locate that in context.  And the context of

11  that statement makes it clear that what the court is looking

12  at is routine resume fraud, something like somebody

13  embellishing their credentials to obtain a job that they're

14  otherwise not qualified for.

15       And that's simply not what happens with undercover

16  investigations.  These are people omitting educational

17  background or omitting their affiliation with an animal rights

18  group, not sort of lying about their skill or experience.  I

19  mean certainly if someone lied about having a veterinary

20  degree to obtain a position, that might be a very different

21  case.  But here the kinds of investigations we're talking

22  about are sort of lies of omission or things that undersell

23  their background.

24       And so that's not the kind of offer of employment that

25  Justice Kennedy is talking about in that passage.  He puts it

1   in the context of fraud or securing monies or other valuable

2   considerations, all of which imply sort of something that

3   happens at the expense of the recipient of the lie.  But here

4   the recipient isn't harmed in any way.

5       Just as in Food Lion, that's the Fourth Circuit case

6   about the ABC investigators, the employer got what they hired

7   for, which is someone who is going to perform the job, and

8   that's what happens in these investigations.

9           THE COURT:  Then an exposé on national television

10  and everything that followed.  I suspect that any company

11  owner would take a very different view about whether there's

12  any harm attendant to this kind of lie.  I mean you're telling

13  me one side of the lie or misrepresentation, that it's not

14  harmful insofar as it doesn't inherently bring with it any --

15  I mean I actually wonder if you're -- I don't want to

16  attribute this to you.  I think you may have stated it more

17  accurately than I'm about to.  But it's one thing to look at

18  the speaker and ask whether the misrepresentation provides

19  some benefit to the speaker, and it seemed like in some sense

20  that's what Justice Kennedy was talking about.

21      For example, you could imagine someone misrepresenting

22  that they were a Medal of Honor winner for the purpose of

23  obtaining some benefit that is attendant to that, a health

24  benefit or an insurance benefit or something, or cash prize,

25  none of which is real.  I just made all that up.  But that's

1    one thing, but it doesn't tell us anything about the effect of

2    the misrepresentation on the party to whom you've made the

3    misrepresentation.

4            MR. LIEBMAN:   Yeah.   I think the circuit courts have

5    dealt with this in a number of cases where we have analogous

6    undercover investigations or someone misrepresents who they

7    are and then does an exposé, the Food Lion case from the

8    Fourth Circuit, the Desnick case from the Seventh Circuit, and

9    the Medical Labs case from the Ninth Circuit.   In each of

10   those cases we have an undercover investigator or journalist

11   misrepresenting who they are and what they're there for, going

12   in, doing the job or, you know, participating in a meeting and

13   recording it and then putting out an exposé.   In each of those

14   cases the Court said that kind of conduct is -- it's not

15   fraud, it's not trespass, it's not invasion of privacy, and

16   it's otherwise not unlawful.   So to say that there's some

17   legally cognizable harm where the circuit court seems

18   unanimous that these kind of undercover investigations don't

19   cause a legally cognizable harm would be inconsistent.

20       And certainly, you know, these investigations at the end

21   of day do cost money in terms of reputational harm and things

22   like that, but these courts make clear that that kind of harm

23   is attributable to the wrongful conduct and not to the

24   misrepresentation.   If the misrepresentation happened and they

25   found nothing wrong, then there wouldn't have been an injury,

1    so it's not even a but for cause much less a proximate cause

2    of the ultimate financial loss.

3         THE COURT:  It's an essential precursor to the harm

4    that follows.  I mean in the instance where the

5    misrepresentation is made for the purpose of obtaining

6    employment, for the purpose of obtaining the video, for the

7    purpose of releasing the video, for the purpose of causing

8    economic injury, that all follows naturally in scope, does it

9    not?

10        MR. LIEBMAN:  It does, but there's an attenuation.

11   There's an intervening cause, which is the misconduct that's

12   being exposed.  And certainly the courts in Food Lion, Desnick

13   and Medical Labs all sort of deal with this question of

14   whether or not the ultimate harm is attributable to the

15   investigator or attributable to the person that did the

16   misdeed, and they come out on the side of the investigators in

17   holding that their investigation, their misrepresentation

18   isn't the proximate cause of the financial injury that

19   ultimately befalls the investigated entity.

20        THE COURT:  And how did the employment -- excuse

21   me -- the housing discrimination cases involving testers, in

22   your view how does that fit into this analysis?

23        MR. LIEBMAN:  Well, I think those cases support the

24   same idea, that someone can go in pretending to be seeking

25   housing when in fact they're going in to determine whether or

1    not there's racial discrimination.  And to hold that mis --

2    the state can criminalize misrepresentations made to gain

3    access would put in jeopardy the use of testers in the fight

4    to combat housing discrimination.

5        And so to the extent that that -- you know, we could say

6    that -- that a tester is the but for cause of, you know,

7    housing discrimination lawsuit against the property owner, but

8    I think we would recognize that it's the discrimination that's

9    what we should be condemning rather than the tester for

10   sussing out the discrimination, and the same applies in this

11   case.

12           THE COURT:  All right, thank you.  Anything more on

13   subsection (b) before we hear from the State?

14           MR. LIEBMAN:  No, Your Honor.

15           THE COURT:  Thank you.

16       Mr. Kaiser.

17           MR. KAISER:  Yes, Your Honor.

18           THE COURT:  So this is the First Amendment wearing a

19   cape and boots and it has a big 1 on the chest I guess.

20           MR. KAISER:  That's right.  And I think the answer

21   to your question is that there is no First Amendment

22   protection for the types of conduct that are prohibited by the

23   statute.  And, you know, there's a lot of paper in this case,

24   but I think the Court's opinion can be short because there is

25   no protection under the First Amendment for these two types of

1    rights that the plaintiffs are asking the Court to create

2    almost out of thin air.  And because there is no First

3    Amendment protection, then the First Amendment analysis can be

4    short.

5              THE COURT:  So is recording in other contexts a

6    First Amendment right?

7              MR. KAISER:  It's a very difficult question, Your

8    Honor.  Opposing counsel talked about recording as equating to

9    a painting.  Well, if someone writes something and there's no

10   one there to see it or read it, is it really a communication?

11   Maybe, maybe not.

12             THE COURT:  Mr. Liebman says there need not be a

13   communication for there to be a First Amendment right.

14             MR. KAISER:  Well, and I think that's a pretty

15   strong reading of the First Amendment which says Congress

16   shall make no law respecting the establishment of religion,

17   prohibiting the free exercise of religion, the abridging the

18   freedom of speech.  Speech includes conversation and

19   communication.  But even, Your Honor, even if there's some

20   sort of First Amendment right to record, there is no case that

21   says there's a right to record on private property.

22             THE COURT:  Is there a case that says there's not?

23             MR. KAISER:  Yes, absolutely, Your Honor.

24             THE COURT:  Well --

25             MR. KAISER:  I've got five for you.  And the first

1    starts with Lloyd versus Tanner, 407 US 551.  And I will admit

2    these aren't recording cases, but these are even farther.

3    These are exercising free speech rights, speech rights, on

4    private property.  And Lloyd versus Tanner is the first of the

5    Supreme Court's mall cases.

6            THE COURT:  Does it -- private property as a concept

7    weaves throughout the briefing in this case --

8            MR. KAISER:  Yes.

9            THE COURT:  -- in an obtuse and amorphous way.

10           MR. KAISER:  I apologize.

11           THE COURT:  And I don't know that it's a fault, but

12   don't we need to be precise when we're talking about private

13   property?  If we're talking about the location of the

14   recording being outcome determinative about whether there's a

15   First Amendment right, then don't we need to be precise?  Is

16   there a difference for example between recording in my

17   neighbor's bedroom as opposed to recording in the open space

18   in the public area of a Taco Bell?

19           MR. KAISER:  Well, the Supreme Court on that has

20   said no, there is no difference, because -- because private

21   property rights extinguish your First Amendment rights.  And

22   we see that in five --

23           THE COURT:  Private property rights extinguish First

24   Amendment rights?

25           MR. KAISER:  Perhaps that's an inarticulate way of

saying it.  But let's look at these cases.  Let's look at

Lloyd v. Tanner.  This was a mall, and a group of people

wanted to handbill in the mall to protest the Vietnam war.

Now, that's core political speech, and that's -- that's

exercising not only your speech right but to assemble and to

petition.  I mean it's the core of the First Amendment.  But

this mall was a privately owned structure and the

government -- and the mall had a prohibition on handbilling,

leaf --

          THE COURT:  Are we about to talk about time, place

and manner restrictions of speech?

          MR. KAISER:  No, Your Honor, absolutely not.

Because in Lloyd v. Tanner and Hudgens versus NLRB the Court

said the First Amendment doesn't apply.  This isn't a time,

place, manner restriction.  This is the private property owner

has a right to say no handbilling, and the First Amendment

doesn't guarantee any rights in that private property, even

core rights, even protesting.  And in Hudgens v. NLRB the

Court --

          THE COURT:  Well, protesting is different, is it?

          MR. KAISER:  Well, sure.  It's more than the -- than

what the plaintiffs are doing.  It's more protected.

          THE COURT:  There's trespass as an issue for

example.

          MR. KAISER:  Sure.

1          THE COURT:  There's not a right to trespass onto

2    property, private property, for the purpose of conducting your

3    protest.  For sure that's true.  But is that different than if

4    you're invited onto the property and you're engaged in

5    otherwise First Amendment protected activity?

6          MR. KAISER:  Well, I think that's -- I think that's

7    a difficult answer.  And I'm not sure that that replies to

8    this statute because of all three parts of our statute which

9    relates to recording, it's recording without the owner's

10   consent.

11         THE COURT:  So I really want to come back to

12   recording for a moment.  You're trying to steer me to other

13   cases.  I want to know is there a First Amendment right

14   implicated by recording?  Let's start with in public space a

15   police officer interaction with a suspect in the street.  Is

16   there a First Amendment right in your view for a citizen to

17   record that interaction?

18         MR. KAISER:  I'm not sure, but the Seventh Circuit

19   says -- has said yes.  And there's good reason for the Seventh

20   Circuit to say that.  And I think when the ACLU made an as

21   applied challenge to Illinois' wiretapping statute saying that

22   they only planned to record in public, of public officials

23   engaged in public duties, where -- where the conversation

24   could be heard by normal means, and the Seventh Circuit said

25   that's protected under the First Amendment.  When the Illinois

1    State's Attorney said recording is never ever protected, that

2    was -- that was Illinois' argument.  I think there's some

3    reason to at least give pause and say that might be a

4    circumstance in which recording is part of the speech act in a

5    public forum.

6            THE COURT:  Do you agree with me that the state of

7    the law on recording as a First Amendment right is that the

8    Supreme Court has not recognized it or disclaimed it, the

9    Tenth Circuit hasn't answered that question, and the only

10   circuits to have addressed it have found that there is such a

11   right in some circumstances?

12           MR. KAISER:  On public property in public places,

13   yes, I would concur with that.

14           THE COURT:  So then we have a secondary question

15   that arises maybe, and that is whether the -- whether that

16   right that might otherwise exist in some circumstances is

17   extinguished in others I suppose --

18           MR. KAISER:  Right.

19           THE COURT:  -- where it stops?  And I think you urge

20   that that right stops on private property I think you'd say

21   without consent.  Is that the line that you would draw?  Is

22   that the limiting principle?

23           MR. KAISER:  I'm not sure if consent makes a

24   difference.  I know in this case we don't have consent.  And I

25   know in the five Supreme Court cases that talk about the right

 1   to access information as pre-speech conduct there wasn't

 2   consent.  So I don't know about consent, Your Honor.  It

 3   doesn't make a difference in this case.

 4            THE COURT:   What are we to do with the police

 5   interaction with a suspect that takes place in a Taco Bell, in

 6   the public seating area of a Taco Bell?  Does a patron have a

 7   First Amendment right to record that police officer

 8   interaction?  They're on private property.  It's owned by -- I

 9   can't remember the name of the entity now.

10            MR. KAISER:  PepsiCo, or at least it was PepsiCo.

11            THE COURT:  Or Yum Yum Foods.

12            MR. KAISER:  Yum Brands.

13            The Court:  Yum Brands.  Is there a constitutional

14   right implicated by a patron observing a police arrest in a

15   Taco Bell and recording it?

16            MR. KAISER:  No.

17            THE COURT:   No First Amendment right?

18            MR. KAISER:  No.

19            THE COURT:  And your authority for that?

20            MR. KAISER:  Is Lloyd and Hudgens and Branzburg, and

21   a case that we didn't cite and we should have, Pell versus

22   Procunier.

23            THE COURT:  The last one, please.

24            MR. KAISER:  Pell versus Procunier, 417 US 817.

25   That's the -- that's the case where journalists wanted access

1   to -- to prisoners and contended that they had a First

2   Amendment right to engage in that activity.

3            THE COURT:  Well, I think I agree -- it seems to me

4   that the case law is relatively clear on this point.  The fact

5   that you're a journalist or you hold yourself out as a

6   journalist does not entitle you to special protections under

7   the law, that is, it doesn't -- you're not entitled then to go

8   to places that other citizens couldn't go.

9            MR. KAISER:  Right.

10           THE COURT:  You can't trespass onto the property in

11  Wyoming for the purpose of extracting samples off of

12  somebody's property.

13           MR. KAISER:  Right, exactly.

14           THE COURT:  But if you're an invited guest into the

15  Taco Bell as a customer, you're prohibited from -- you've

16  abandoned -- you have left your First Amendment protections at

17  the door.  Is that what you're saying?

18           MR. KAISER:  Yes.

19           THE COURT:  Okay.

20           MR. KAISER:  I mean I think there's -- it's more

21  complicated because I think there is an issue about consent

22  that is not -- that is not addressed in our statute, but I

23  think that the answer is yes.  If -- if you're in private

24  property, the First Amendment doesn't guarantee you those

25  speech rights.

1          THE COURT:  And the government --

2          MR. KAISER:  Well --

3          THE COURT:  The government, the government, can

4   reach into that private property and remove your First

5   Amendment rights or penalize you for exercising them, so that

6   the government could pass a statute saying -- now it's the

7   government under the First Amendment that should not abridge

8   free speech.

9          MR. KAISER:  That's right.

10          THE COURT:  The government can say it is heretofore

11   a misdemeanor to exercise your First Amendment rights in the

12   public spaces of fast food restaurants.  That's lawful?

13          MR. KAISER:  Well, I think -- I think there's an

14   interesting issue about consent that I have to be honest I

15   haven't really thought about.  But if you added the words

16   without consent, without the consent of the owner, I think

17   that that's absolutely right.  Because it's no different than

18   enforcing a trespass statute because you are exceeding your

19   authority to be there.  And if you don't have the authority to

20   do what you're doing, then -- then, you know, that's the end

21   of it.

22          THE COURT:  Well, except that the trespass statute

23   presents a different policy question, doesn't it, for not this

24   court but for other courts and legislatures, and that is

25   your -- your property interest, I think your ownership

1    interest, carries with it some right to exclude.

2            MR. KAISER:  Yes, right.

3            THE COURT:  So that's different I think.

4            MR. KAISER:  I think it is different.

5            THE COURT:  What about -- what about do

6    whistleblowers enjoy First Amendment protection on private

7    property or did they abandon their First Amendment rights also

8    when they walked through the door?

9            MR. KAISER:  Well, I haven't seen a case, Your

10   Honor, that says in general First Amendment -- now, what we're

11   talking about here is not the subsequent communication of

12   whatever information that they received.

13           THE COURT:  I'm just trying to determine if there

14   exists a right.

15           MR. KAISER:  And I think there's a big difference,

16   right, because when we look at things like Food Lion the

17   Fourth Circuit says publication damages are subject to the

18   First Amendment.  Bartnicki versus Vopper talks about the

19   First Amendment right to distribute wiretapped conversations

20   if you weren't part of the wiretapping.  And that's -- when we

21   talk about whistleblowers, we've got two sort of parts, right?

22   We've got the -- we've got the whistleblower, the action of

23   the investigation, and then we've got the subsequent

24   distribution of information.

25       You know, right now in the Ninth Circuit the Ninth

1    Circuit is looking at the Center for Medical Progress.  Those

2    are the folks who went into Planned Parenthood and other

3    abortion providers clinics and conferences and misrepresented

4    who they were, got some people to say some things on video and

5    then started releasing videos.

6        The District Court for the Northern District of

7    California enjoined even the dissemination of further videos.

8    And that's on appeal right now to the Ninth Circuit.  Dean

9    Chemerinsky, who wrote an amicus brief in opposition to us,

10   wrote an amicus brief in support of the injunction in that

11   case by saying that the Center for Medical Progress agreed

12   when they went in the door to keep everything private, and

13   this -- that contractual right is -- supercedes their First

14   Amendment rights.  There wasn't even a discussion of private

15   property there, which I think is interesting, but that cut off

16   the First -- any sort of First Amendment right.

17       And I think here we've got sort of the same thing.  We've

18   got --

19           THE COURT:  You could contract -- is the idea there

20   that I can contract to agree not to exercise my First

21   Amendment rights in some instances?

22           MR. KAISER:  That's the argument -- one of the

23   arguments that's being made.

24           THE COURT:  What sense does that make if my First

25   Amendment right would be exercised in private property but

1    I've abandoned it at the door?

2           MR. KAISER:  Well, because we're talking about the

3    exercise -- we're talking about two different rights, right?

4    In the Ninth Circuit case in the Center for Medical Progress

5    case we're talking about the distribution of information

6    gathered, and here we're still talking about information

7    gathering and whether that is constitutionally protected in

8    and of itself.  But let's assume that it is, whether it's

9    constitutionally protected on private property, it's not.

10          THE COURT:  So is it your way of thinking that it's

11   not a question about whether the recording might give rise to

12   a First Amendment right that can lawfully be restrained, it's

13   that -- on private property, it's just that there is no such

14   right at all to free speech on private property?  That's the

15   State's position?

16          MR. KAISER:  Well, let's -- rather than right to

17   free speech, let's call it conduct preparatory to speech or

18   speech activity.  I'm not sure --

19          THE COURT:  I really want to start -- I want to do

20   this one step at a time.  There's no reason to even get to

21   preparatory speech if you don't have a right to free speech in

22   the first instance.

23          MR. KAISER:  Absolutely.

24          THE COURT:  So the State's position is that the

25   state of the law is that there is no First Amendment free

1    speech protection on private property?

2              MR. KAISER:  That's right.

3              THE COURT:  Okay.  Well, then I don't think we need

4    to explore conduct preparatory to speech --

5              MR. KAISER:  Okay.

6              THE COURT:  -- and the like.  I think I understand

7    the State's position about that.  Why don't we then instead

8    talk about false pretenses.

9              MR. KAISER:  Sure.

10             THE COURT:  Misrepresentation.

11             MR. KAISER:  Absolutely.

12             THE COURT:  How is that not pure speech?  It's a

13   statement -- now, you may distinguish from Alvarez, but isn't

14   the statement made to gain admission to a property or gain

15   access to a property?  A statement, it's literal speech.

16             MR. KAISER:  It's literal speech but it's not First

17   Amendment speech.

18             THE COURT:  I guess there could be two reasons.  If

19   I make the misrepresentation in the office, what you've said a

20   moment ago is it can't be entitled to First Amendment

21   protection anyway because I'm on private property.  Is that

22   true?

23             MR. KAISER:  Yes.

24             THE COURT:  Okay.  But if I make the false statement

25   elsewhere, it could be subject to First Amendment protection

1    but not in this instance?

2            MR. KAISER:  Yes.

3            THE COURT:  So why not in this instance?

4            MR. KAISER:  Well, you know, I think Alvarez is a

5    very interesting case.  And I'm sorry that I'm not answering

6    it -- your question directly, but if you can give me a little

7    bit of leeway, I'll get to it.

8            THE COURT:  I have a sense you're headed there.

9            MR. KAISER:  Okay.

10           THE COURT:  I'm with you.

11           MR. KAISER:  You know, when I was taking First

12   Amendment in law school a decade or so ago, we talked about

13   threshold questions for the application of the First

14   Amendment, and one was whether speech was true or false.  And,

15   you know, there was a pretty good consensus that false speech

16   wasn't protected at all.  And then we -- then comes the Stolen

17   Valor Act which prohibits false speech with no context, right?

18   It says it is a crime to claim that you won the Medal of

19   Honor.  And the Supreme Court says, well, we've said false

20   speech is never protected or is outside the ambit of First

21   Amendment, but we didn't mean that.

22      Now, Alvarez didn't say that false speech is protected.

23   It just says that some types of -- that it -- it just says

24   that false speech isn't protected merely because it's false.

25           THE COURT:  I think I disagree with that, except

1    that you and I could talk about what it means.  I think it's a

2    four member plurality that made the statement.  But in this

3    point I think Justice Kennedy was clear.  The Court -- I think

4    I'm reading from page 2545.  This is after the discussion

5    we'll all be talking about at some point today.  I know the

6    phrase about the quotations from the earlier Supreme Court

7    cases discussing defamation, fraud, etcetera.

8         And then it goes on to say in those decisions the falsity

9    of the speech at issue is not irrelevant to our analysis but

10   neither was it determinative.  And then Justice Kennedy says,

11   the Court has never endorsed the categorical rule the

12   government advances that false statements receive no First

13   Amendment protection.

14           MR. KAISER:  If I didn't say it properly, that's

15   what I'm trying to say.

16           THE COURT:   That's probably what -- fair enough.

17   But isn't that a -- doesn't that strongly infer, and

18   especially in view of the outcome, the six members of the

19   Court agree, this false speech was protected.  So we do know

20   some false speech is protected.

21           MR. KAISER:  Yes, some false speech is protected,

22   but I wouldn't say that false speech is protected.  Does that

23   make sense?  Do you understand what --

24           THE COURT:  False statements do receive some First

25   Amendment protection, true or false?

1          MR. KAISER:  No.  Some false statements receive

2     First Amendment protection.

3          THE COURT:  Okay.

4          MR. KAISER:  Some.

5          THE COURT:  I follow you.  I understand the

6     distinction.

7          MR. KAISER:  Okay.  And I think that's an important

8     distinction because Justice Kennedy articulates two situations

9     where false speech does not afford First Amendment protection

10    because it's not -- it's not Justice Breyer's subsequent

11    balancing analysis.  It's a threshold question.  And those two

12    things that he articulates, right, are when the harm -- when

13    the speech itself causes harm or when there's a material

14    advantage gained by the speaker.  And we have both of those

15    things here in our statute.  And I think you hit the nail on

16    the head, Your Honor --

17         THE COURT:  Do you in section (b)?

18         MR. KAISER:  Yes, absolutely.

19         THE COURT:  Why?  We're told nothing in section (b)

20    of the statute about what the misrepresentation is required to

21    be.  It could be the Boy Scout troop that's getting the tour

22    of the poultry facility and a PETA representative disguised as

23    an assistant Boy Scout leader comes along with them.

24         MR. KAISER:  Sure.  It could be an independent

25    journalist.  It could be a competitor who wants to -- who

1   wants to see the newest process and claims that they're from

2   the USDA.  I mean it could be anything.

3              THE COURT:  So what's the harm --

4              MR. KAISER:  The harm --

5              THE COURT:  -- and what's the gain?

6              MR. KAISER:  Right.  So the harm is you get to be

7   where you otherwise can't be.

8              THE COURT:  That's the harm or the gain?

9              MR. KAISER:  That's -- that's the gain.  And I mean

10  it's both.  It's the -- it's the -- it's the immediate harm

11  resulting from the falsity.  And it's a gain, particularly in

12  an as applied challenge here because, you know, the plaintiffs

13  talk about their --

14             THE COURT:  Well, Mr. Liebman might say that if

15  that PETA representative does nothing more than walk around

16  with the Boy Scout troop through the facility, take the tour

17  that you might otherwise get as a member of the public, and

18  then walks out the door, no harm.  Is that true or is that

19  false?  Has the business owner been harmed?

20             MR. KAISER:  Yes, the business owner has been

21  harmed.

22             THE COURT:  What's the harm?

23             MR. KAISER:  The business owner and the private

24  property owner have been unable to control who accesses his

25  private property.  Now, we've articulated --

1          THE COURT:  The business owner actually did make a

2     determination about whether that person could access.  The

3     question is whether --

4          MR. KAISER:  I apologize for interrupting.

5          THE COURT:  No, it's all right.  Whether -- whether

6     the person was who they represented to be is the question.

7          MR. KAISER:  Right.  Right.  And in your

8     hypothetical that's probably the farthest most attenuated type

9     of harm, but that person could have been on five other farms

10    the other day also trying to get information.

11         THE COURT:  That's a different harm, is it?

12         MR. KAISER:  Maybe.  It's the right of a private

13    landowner to control who comes into that person's private

14    property.

15         THE COURT:  So what do we do with the tester cases

16    and the housing discrimination?  What do we do with the

17    Seventh Circuit case involving the undercover reporters who

18    purport to be patients?  What do we do about cases where the

19    courts have said that's a misrepresentation that is protected?

20         MR. KAISER:  Not protected by First Amendment, Your

21    Honor, not covered by common law intrusion or false lying or

22    defamation.

23         THE COURT:  In the tester cases what is it if it's

24    not a First Amendment right?  There's a misrepresentation.

25    I'm here to seek housing, and that's not true.  The person is

1    there to obtain information about the housing practices of the
2    landlord for the purpose of testing their compliance with the
3    law.  That's a misrepresentation.  The courts have sanctioned
4    that -- not sanctioned like penalize, but I mean they've said
5    that's acceptable.  That's speech that's a misrepresentation.
6    The courts across the board uniformly said that is not
7    unlawful.  It's protected activity.

8           MR. KAISER:  It's protected activity.  But when we
9    look at the totality of the cases, what we see is that there's
10   a right to control who comes on your private property.  And in
11   the tester cases we're talking about places that the public
12   can otherwise go.  I don't know if it makes a difference that
13   we're talking about a place -- a public place where the public
14   can otherwise go.

15     Certainly when you're talking about a biosecured
16   controlled farm, which, you know, there was legislative
17   testimony that that's equivalent to a house, and processing
18   facilities where there are risks inherent in -- in food
19   safety, food supply safety, and dangers inherent in the -- in
20   the premises itself --

21          THE COURT:  I feel like you just shifted our
22   conversation again.  I thought we were talking about whether
23   the misrepresentation could be a protected act of speech, and
24   there are cases that say that it's lawful to make
25   misrepresentations on private property to landowners, and I

1    think you've -- maybe your answer suggests that it depends on

2    what the land is.

3            MR. KAISER:  I think the tester -- I think the

4    tester cases are distinguishable because of the nature of the

5    testers.  The testers are not different from -- from law

6    enforcement folks who can make misrepresentations or who can

7    engage in folks -- engage in undercover operatives.  But law

8    enforcement is different from a private party excluding --

9            THE COURT:  The testers aren't law enforcement

10   officers.  They're private citizens, like PETA.  You could

11   argue whether representatives of PETA are the same or not, but

12   they're not law enforcement.  They're private citizens who go

13   in and make a misrepresentation.  How is that different

14   than -- let's not make it a PETA representative but some

15   citizen in Utah who feels strongly about animal rights.

16   What's the difference legally between the tester and the

17   person who cares about animal rights?  The question is whether

18   the First Amendment extends to protect the misrepresentation

19   of one but not the other on private property to a landowner.

20   Is there a legal distinction?

21           MR. KAISER:  Your Honor, I think -- I think there

22   is.  To the extent that the tester cases are -- are protected

23   by the First Amendment and not by other constitutional rights

24   or that the torts don't cover those -- the torts -- the state

25   torts don't cover those acts of conduct.  And I apologize that

1    as I sit here right now I can't recall in those tester cases

2    whether those are First Amendment cases or tort cases.

3              The Court:  Is it your view that the State of Utah

4    could criminalize a misrepresentation made by somebody to a

5    landlord in connection with an application for housing?

6              MR. KAISER:  Yes.

7              THE COURT:  The State could because there's no

8    constitutional First Amendment protection for a

9    misrepresentation?

10             MR. KAISER:  That's right.

11             THE COURT:  And it's made to, what, a private

12   property owner?

13             MR. KAISER:  No.  I mean if the misrepresentation

14   itself causes harm, maybe -- maybe that's where we have to go

15   back to, because an application for housing isn't in and of

16   itself causing harm.  Here access to an agricultural

17   operation, which I think is an important part to talk about,

18   does in and of itself cause harm.

19             The Court:  What about the misrepresentation made in

20   the employment application for the person who is never hired?

21   Is that protected or not protected?

22             MR. KAISER:  Well, in this case I don't think it

23   matters.

24             THE COURT:   But we're testing the First Amendment

25   right.

1          MR. KAISER:   Sure.

2          THE COURT:   Do I enjoy that First Amendment right if

3    I'm not hired because there was no harm, but if I am hired, it

4    wasn't a protected statement?   Is that the distinction --

5          MR. KAISER:   Well --

6          THE COURT:   -- under Alvarez?

7          MR. KAISER:   I think that's a natural result of

8    Alvarez that Justice Kennedy probably didn't -- probably

9    didn't consider.

10         THE COURT:   So is it the State's position that the

11   misrepresentation made on the employment application for the

12   person who is not hired is a protected activity?

13         MR. KAISER:   As a hypothetical matter, I'm really

14   not sure about that answer because how would someone make --

15   how would someone make a First Amendment claim based on that?

16   You know, how would that -- how would that ever arise as a

17   real claim?   I don't know.

18       I think that Alvarez says that there are -- there are two

19   types of misrepresentations which are excluded from the First

20   Amendment, right?   Those who the speech itself causes harm,

21   and the -- when the speech creates a material advantage to the

22   speaker.   I think you could probably make an argument

23   that -- that lying on the job application creates a material

24   advantage to the speaker even if the person wasn't hired

25   because the person might be considered higher, they might have

1    gotten an interview that they didn't otherwise get, they might

2    have gotten consideration more than if they'd lied, right?  If

3    I'm a felon and I lie and say I'm not a felon, there are a lot

4    of jobs that that automatically disqualifies me for.  So I'm

5    making a material advantage on an employment application that

6    Justice Kennedy recognizes.

7              THE COURT:  I think I keep interrupting you and I

8    think you're trying to tell me what the limiting principle of

9    Alvarez is more generally as it applies here.  Is it that the

10   speech that's protected is a misrepresentation from which

11   there's no harm to anyone who receives the misrepresentation

12   and no gain from anyone who makes it?  Is that what's

13   required?

14             MR. KAISER:  Yes, I think that's right.

15             THE COURT:  Well, didn't Mr. Alvarez receive a

16   benefit from the misrepresentation?  What he sought to do was

17   to elevate his standing with his peers artificially, falsely,

18   without merit.  That's the discussion in the case.  He

19   received a reputational benefit.  So is it a special kind of

20   benefit that is required or any benefit?

21             MR. KAISER:  Well, I don't think it's any benefit.

22   I think material advantage means -- means material.  I don't

23   think it means pecuniary but I think it means material.

24             THE COURT:  What does that mean?

25             MR. KAISER:  I don't know.  It means -- it means

1     what it means.

2             THE COURT:  None of us do.

3             MR. KAISER:  No, of course not.  I mean I think it

4     means important.  And don't forget that Alvarez is about -- is

5     about a broad statute that has no reference to any sort of

6     hook, no benefit, no harm in and of itself, right?

7             THE COURT:  But Congress said otherwise.  The

8     Congress thought it was demeaning to Medal of Honor winners,

9     diminished their reputation.  And Mr. Alvarez thought it was

10    helpful to make the misrepresentation because it boosted his

11    reputation.  So I don't know -- I don't know what principle to

12    apply if you're saying that a misrepresentation like that is

13    covered but one here isn't.

14        Is it the -- I think the State's position seems to be

15    it's that somewhere down the line that person that we hired

16    under false pretenses may do something that's really damaging

17    to our company.  That's the harm, is it?

18            MR. KAISER:  Yes, that's a harm.  But I think

19    there's another harm, which is that property owners have a

20    bundle of sticks, a bundle of rights in their property, and

21    one of those is the right to exclude.  And this statute

22    directly links the false pretense, the misrepresentation, to

23    the right to exclude.

24        And I really think that's one of the errors that was made

25    in ALDF versus Otter because the Court said that -- that the

1    misrepresentations in -- in Idaho's statute, which were to

2    misrepresent to gain access or to misrepresent to gain access

3    to files or information, wasn't tied to any direct harm or

4    benefit.  But if you look at the statute, it's right there.

5    The misrepresentation gets you to something you otherwise

6    wouldn't get.  And I don't think there's a constitutional

7    right to spy, and that's -- that's what these statutes are

8    protecting against.

9         You know, let's go back to your corporate espionage

10   hypothetical.  Samsung and Apple, maybe they're just after

11   trade secrets, but maybe Samsung is after -- they've heard

12   that Apple is engaging in unfair labor practices and they want

13   to get that information.  Well, if it harms Samsung in the

14   process, that's too bad.

15        But there's never been a constitutional right to engage

16   in sort of misrepresentations or those sorts of recordings --

17   I'm sorry, I guess I'm going back to the recording part, but I

18   think it applies in both.  And we've seen that, right?  We've

19   seen it over and over in Supreme Court cases which talk about

20   the -- the media has no right.  There's no particular

21   privilege to get information as part of -- as part of

22   information gathering to further their speech interests.

23             THE COURT:  So to be clear so I ensure I understand

24   the State's position when I go back to decide this case, any

25   misrepresentation, any misrepresentation made that enables a

1    person to gain access to private property for any purpose is

2    necessarily unprotected speech?

3            MR. KAISER:  I have to think about the breadth of

4    your statement there.

5            THE COURT:  What I've understood you to say is it's

6    the nature of the private property interest by the property

7    owner that prohibits any First Amendment protection for a

8    misrepresentation, because it's the right to control who

9    enters my property that supplants any speech right.

10           MR. KAISER:  Well, that a misrepresentation to gain

11   access to private property is --

12           THE COURT:  Unprotected.

13           MR. KAISER:  Unprotected.  And it's particularly

14   unprotected here when we're talking about property that is

15   biosecured, that involves sharp knives, that involves

16   dangerous animals, that involves the spread of disease.  This

17   property particularly demonstrates that -- that harm that

18   Alvarez is noting.  So even -- even if you disagree with me

19   with that overarching principle, it's certainly applicable

20   here.  Alvarez' exceptions are certainly applicable to Utah's

21   act.

22           THE COURT:  So the State extracts from the Alvarez

23   decision some responsibility then for the Court to weigh the

24   nature of the private property to determine the strength of

25   the private property owner's right to supplant a First

1    Amendment misrepresentation right.  Is that it?

2              MR. KAISER:  I don't know.  I think Alvarez requires

3    the Court to determine whether a falsity has a material

4    benefit or the falsity itself causes harm.  And in this

5    statute, whether it's as applied to the plaintiffs or on a

6    facial challenge, there is harm that is protected against by

7    the prohibition of the falsity.

8              THE COURT:  Now, let's get to that point now.

9    Mr. Liebman argued this, and Dean Chemerinsky makes this

10   point, many people have made this point.  I think Judge

11   Winmill might have made this point.  Some folks maintain that

12   the harm isn't the harm that you're articulating, the right to

13   control access to the property, and not just to control access

14   but to know everything that the property owner wants to know

15   about the person they're granting leave to enter, but the harm

16   was instead the harm that comes months later or weeks later

17   with the publication of something that was in the State's view

18   unlawfully recorded on the premises.  It's the reputational

19   harm, an injury, the economic injury, the injury to the

20   business owner and the -- and related business owner, the

21   industry.

22             MR. KAISER:  Sure.

23             THE COURT:  Which is it?  You would say it's both.

24   But this statute is drawn to one of those harms more than the

25   other.

1              MR. KAISER:  That's right, the former rather than

2       the later, because unlike Idaho's law, there is no restitution

3       provision.  Our law doesn't prohibit publication.  Our law

4       doesn't prohibit distribution.

5              THE COURT:  It absolutely does.

6              MR. KAISER:  It absolutely does?

7              THE COURT:  Doesn't it?  Necessarily of necessity it

8       criminalizes the distribution because the distribution could

9       only happen if the recording is made.

10             MR. KAISER:  If an unlawful recording is made,

11      absolutely.  But look at Bartnicki versus Vopper.  That's a

12      case in which unlawful recordings were made and there was no

13      liability for the distribution.  Look at all of the other ways

14      in which recordings can be made.

15             THE COURT:  So it's the State's view that the

16      prohibited conduct is not the publication of a video that's

17      recorded on the property?

18             MR. KAISER:  Absolutely not.

19             THE COURT:  Right.  Okay.  And no harm attendant to

20      that.  So the harm that we're focused on in this case is the

21      access to the property under false pretenses, not the

22      recording or publication of the -- of what's viewed there?

23             MR. KAISER:  That's the harm that subsection 2(b)

24      seeks to -- seeks to avoid.

25             THE COURT:  Is there harm from the recording itself

1    under subsection (c) or (d)?

2            MR. KAISER:  Well, to the extent that a landowner

3    refuses that -- that conduct on their property and folks do it

4    anyway, I think -- I think there's harm there.

5            THE COURT:   And is that harm to the private

6    property interest or private property right?

7            MR. KAISER:  Yes.

8            THE COURT:   And when we've been talking about this

9    private property right -- this is important clarification for

10   the suggestion that will follow after our recess in a

11   moment -- we're talking about whether there exists a First

12   Amendment protection in the first instance?

13           MR. KAISER:  That's right.

14           THE COURT:   When we transition to a discussion, if

15   we get to one -- well, we will have it.  I don't know whether

16   intermediate scrutiny will end up applying or if it will be

17   something else.  But when we start talking about the important

18   governmental interests that are put forward, we're not talking

19   about property interests or privacy interests, we're talking

20   about the four interests that the State articulated several

21   times in its papers; is that right?

22           MR. KAISER:  Well, no.  I think private property and

23   privacy interests are also an important governmental interest.

24           THE COURT:   I was afraid you were going to say that.

25   I mean I went through several times, I went through your

1    briefs looking for where the State said that, and that's

2    not -- that's not what I read the State to say.  At least in

3    two instances you enumerated four specific legitimate

4    government interests that supported the statute, and I didn't

5    see where privacy or property were among them.

6         If you'll give me a moment, I'll find it.  I have too

7    many tabs.  There was too much good stuff to read in all these

8    papers.  But they were the biosecurity risk, the risk to

9    animals, the risk of injury to coworkers, those four items.

10        Those are the four items that are discussed in the

11   introduction to your motion for summary judgment and the body

12   of your summary judgment motion, in the argument section of

13   your summary judgment motion, and in your reply in support of

14   your summary judgment motion.  And while there are references

15   to private property -- privacy interests and property

16   interest, undefined I think -- my clerk has his finger right

17   on it, as he often does.  I guess page 14 is where those are

18   set forth specifically.

19             MR. KAISER:  Of our original motion --

20             THE COURT:  This is your motion for summary

21   judgment.  No, that's not right.

22             MR. KAISER:  Yes.

23             THE COURT:  It's the State's response to the

24   plaintiffs' motion for summary judgment, right.  So I mean the

25   point here I think is twofold.  I was -- I'm trying to ensure

1    that I understand the State's argument when I go back to

2    conduct our analysis, but part of it is fairness to the

3    plaintiffs in engaging in their -- give me a moment.  I

4    actually think it was --

5              MR. KAISER:  Your Honor --

6              THE COURT:  Let me read in a couple places.  Roman

7    numeral IX from your opening brief in support of your motion

8    for summary judgment.  That wasn't where you laid it out with

9    numerals.  But, in any event --

10             MR. KAISER:  Your Honor, I will concede that on page

11   14 of our opening brief that we say that the Act promotes

12   significant government interests in at least four ways.  It

13   protects against animal exposure to infectious disease, and

14   protects against harm to animals caused by unqualified

15   workers, it protects against human exposure to zoonotic

16   disease, and it protects against harm to facility employees

17   caused by unqualified or inattentive workers.

18       I don't dispute that we did not directly discuss privacy

19   interests and private property interests there, though I would

20   say that -- that our brief and the legislative history is full

21   of discussions about privacy in private property.

22             THE COURT:  Well, let me add to what you said.  That

23   discussion, it is on page 14, is under a heading entitled the

24   Act is narrowly tailored to serve a significant governmental

25   interest.  And then the analysis that follows on the pages

1  from 14 through 19 address only those four specific offered

2  rationale.  You agree with that?

3        MR. KAISER:  Yes, Your Honor.

4        The Court:  And in one of the other briefs the

5  plaintiffs point out I think by way of criticism in their

6  argument that insofar as the State purports to be relying on

7  privacy rights or property rights in support of this

8  restriction, it's never articulated what that right is, and I

9  couldn't find it.  Is there an articulation of the privacy

10 right or property right that the State maintains is a

11 significant governmental interest that this Act is narrowly

12 tailored to serve?

13       MR. KAISER:  Well, I don't know if there's a

14 specific articulation in our briefs, Your Honor.  We on page

15 29, when we were talking about the equal protection challenge,

16 list as rationale bases for the law, but it's mentioned as an

17 important interest in protecting personal privacy in private

18 property, which cites to Otter, which recognizes the important

19 interest in protecting personal privacy in private property.

20       THE COURT:  That's right, thank you.  And I want to

21 make sure I'm being fair.  I think the State did argue those

22 interests in the context of the equal protection analysis.  Do

23 you maintain as you're here today that the State has given the

24 Court and the plaintiffs notice that it intends to assert as

25 part of the intermediate scrutiny test that property interests

1    or privacy interests are significant governmental interests?

2              MR. KAISER:   In our reply, Your Honor, on page six

3    and seven we mention that a comprehensive view of the Act's

4    history indicates a concern for disease, food safety and

5    privacy under our narrowly tailored analysis.   And, no, have

6    we fleshed that out in our briefs?   No.   But have we been

7    talking about privacy, private property?   Plaintiffs have

8    talked about -- have created a standard talking about

9    reasonable expectations of privacy which we've responded to.

10   So --

11             THE COURT:   This is the reason for my question.

12             MR. KAISER:   Okay.

13             THE COURT:   We have for sure talked about privacy

14   interests and property interests, and I guess I'm thinking

15   formulaicly.   I'm trying to figure out which bucket those

16   arguments were in.   My view was that the State was placing

17   those arguments in buckets -- I think you're right about

18   rational basis review under equal protection, and also under

19   the existence of the First Amendment right in the first

20   instance, but the State wasn't dropping those arguments in the

21   intermediate scrutiny bucket.   And if you think otherwise,

22   then I have a different question for you.

23             MR. KAISER:   We have not articulated those in the

24   intermediate scrutiny.

25             THE COURT:   Okay.

1          MR. KAISER:   I think the arguments that we

2     articulated in the threshold question and rational basis could

3     still apply because I believe the Court could find privacy and

4     private property important governmental interests just as

5     Judge Winmill did in Otter.

6          THE COURT:   I guess my response to that, and maybe

7     it's -- we've already spent more time on this now than it's

8     worth.   I just want to make sure I'm giving due weight to all

9     the arguments, but I don't know -- that doesn't strike me as

10    helpful to the Court's analysis.   I mean it seems like those

11    are just general principles that we could articulate in any

12    context without any tethering to the language of the statute,

13    the intent of the legislature or the like.

14         But that's -- that's subject matter that we'll take up

15    after the recess.   I think we have a lot to talk about still

16    in terms of legislative intent, purpose and the like.   Was

17    there -- but, Mr. Kaiser, I was pulling you all over the

18    place.   Was there something more you wanted to say about the

19    existence of a First Amendment right or the implication of any

20    First Amendment rights under section (b) or otherwise under

21    the statute?

22         MR. KAISER:   Well, Your Honor, I'm hopeful that I

23    covered everything that I planned to say, and I think I might

24    have been pulling you more places than you were pulling me.   I

25    think it's important to consider that if the plaintiffs'

1  argument prevails, that there's a right to lie to get access

2  to places that you're not otherwise able to go, then there's a

3  right to spy.  There's a constitutional right to spy.  And I

4  think that's a pretty important and pretty serious door that's

5  being opened.

6      And even if the Court says, well, we can apply some sort

7  of level of scrutiny to it, that subjects all sorts of laws to

8  First Amendment challenge that -- that never would have been

9  in the past and no court has said exists.  For example, GRAMA

10  prohibits a person who by false pretenses, bribery or theft,

11  gains access to or obtains a copy of a GRAMA protected record

12  to which the person is not legally entitled is guilty of a

13  Class B misdemeanor.

14      Well, we have, you know, false pretenses here.  And could

15  someone lie and say, yeah, I'm -- you know, I'm a governmental

16  official.  I need to look at these.  Someone who is the

17  subject of a criminal investigation could come in and say I'm

18  a cop and I need to look at these documents.  That would

19  subject that law to a First Amendment challenge.

20          THE COURT:  Do you draw any distinction in your

21  mind -- I thought -- I can't tell you how many hours I've

22  spent thinking about these issues and trying to understand

23  them.  Is there a distinction in your mind for example between

24  a law that criminalizes making a false statement to the NSA in

25  order to obtain employment with the NSA and a law that

1      prohibits or criminalizes making a misrepresentation to Taco

2      Bell to obtain employment with Taco Bell?

3              MR. KAISER:  It's a distinction of degree but not

4      of -- not of legal import.  I mean are we more concerned that

5      folks in the NSA are thoroughly vetted than we are the people

6      who work at Taco Bell?  Perhaps, but the legal principles

7      still apply.

8              THE COURT:  That's what I'm wondering.  But maybe --

9      let me -- help me understand why this is the wrong way to

10     think about this concept then.  I think -- I've been thinking

11     about it in terms of an initial threshold question about

12     whether that misrepresentation is a protected speech right in

13     the first instance.  Now, in one instance I'm making it to a

14     governmental entity and one to a private entity, and I don't

15     know that that makes a difference.

16             MR. KAISER:  I agree.

17             THE COURT:  If it is a protected right, then we're

18     talking about different rationale that might support the

19     criminalization of that statement, State secrets, and the

20     necessity of protecting State secrets on the one hand, or

21     maybe it's KFC and it's the Colonel's secret recipe.  But

22     that's trade secret law, and there are laws that deal with the

23     dissemination -- or collection and dissemination of trade

24     secrets.

25         I agree, you can't go into the company's files, corporate

1    espionage, separately actionable, tort remedies.  Are we
2    criminal -- is the State, any state, not just Utah, the
3    government, going to criminalize the misrepresentation in the
4    employment application?  Is it -- and if so, is it on the
5    basis of the justification -- which we'll talk about later
6    maybe under strict or intermediate scrutiny -- or is it that
7    there was just never any right -- that you didn't have a right
8    in the first instance so the government doesn't have to
9    justify it.  We can criminalize any misrepresentation in an
10   employment application.
11           MR. KAISER:  Well, so long as the misrepresentation
12   creates a material benefit for the speaker or causes harm, the
13   misrepresentation itself.  And I think you probably have to
14   look at employment application, employment application, but
15   your Taco Bell person could be a registered sex offender.
16           THE COURT:  But the State I think you would say can
17   make it a crime to make a misstatement on your resume.
18   Anybody in this state who makes a misrepresentation on a
19   resume and submits it to an employer with an employment
20   application is guilty of a misdemeanor.  That would be
21   constitutional.  Now, whether it would be good policy or not
22   is a different question.
23       But your point is that's constitutional because that
24   misrepresentation carries no protection because there's a harm
25   to the prospective employer and a potential gain to the person

1    who made the misstatement on the resume.  It's subject to

2    criminal regulation, not subject to any speech protection.

3              MR. KAISER:  That's right.

4              THE COURT:  That's the State's view?

5              MR. KAISER:  I think that's right.

6              THE COURT:  That's where I've understood us to land.

7    Okay.  Thank you, Mr. Kaiser.

8         Mr. Liebman, that was a long discussion.  Before we close

9    that chapter, I do want to give you a chance to respond if

10   anything else arose that you wanted to touch on briefly,

11   please.  And by briefly I don't mean quickly.  I will tell you

12   you were speaking quickly and smoke was starting to come from

13   Mr. Fenlon's transcription device.

14             MR. LIEBMAN:  I will be brief but not quick.

15             THE COURT:  Thank you.

16             MR. LIEBMAN:  There's two points that I want to

17   address here.  The first is this question of the extent to

18   which the First Amendment applies on private property.  And

19   it's simply not the case, as the State would have it, that

20   property rights extinguish First Amendment rights.

21             THE COURT:  You don't surrender them at the door.

22             MR. LIEBMAN:  You don't.  And if it were the case

23   that First Amendment rights vanished at the property boundary,

24   a lot of crucial First Amendment cases would have come out

25   differently.  First example is R.A.V. versus St. Paul.  This

1    is the case where someone burned a cross on their neighbor's

2    lawn.  And if it were the case that categorically there are no

3    First Amendment rights on private property, the Court would

4    have resolved that question in that way and affirmed the

5    conviction and been done with it.  But instead the Court

6    invalidated the statute, subjected it to a content-neutrality

7    analysis and held that a content-based restraint on speech,

8    even speech that's otherwise not even protected, fighting

9    words, is still unconstitutional.

10            THE COURT:  You can be prosecuted for trespass but

11   not for the speech.

12            MR. LIEBMAN:  That's right.  That's exactly right.

13   And, again, we're talking about people who are otherwise

14   lawfully present.  We're not talking about a right to, you

15   know, wave your press credentials to get onto somebody's

16   property.  We're talking about people who are otherwise

17   lawfully present.

18            THE COURT:  But Mr. Kaiser says that's a misnomer.

19   You're not lawfully present if I let you in the door believing

20   you were there to deliver Girl Scout cookies and in fact you

21   were there to plant a bug so that you could listen to what

22   happens in my bedroom.

23            MR. LIEBMAN:  Well, the cases are consistent that a

24   misrepresentation does not vitiate consent in a way that rises

25   to the level of trespass.  That's the Desnick case from the

1    Seventh Circuit and numerous other ones that we cite in our

2    brief.

3              THE COURT:   I didn't see that the Tenth Circuit has

4    spoken on that issue.  Do you agree?

5              MR. LIEBMAN:   I agree with that.  There's not a

6    Tenth Circuit case on that.  I think it's also important to

7    note that you have to distinguish between the right of the

8    private property owner to exclude certain speech on the one

9    hand and the right of the government on the other hand to

10   criminalize that speech.  We would certainly concede that a

11   factory farm has the right to prohibit filming, has the right

12   to fire anyone that it catches filming, has the right to kick

13   people out if they catch them filming.  But once the

14   government gets involved, there's a state action issue and the

15   First Amendment is implicated because the government is

16   criminalizing the speech.

17             THE COURT:   And you would say along those lines I

18   think that if you make a misrepresentation in your employment

19   application, we can terminate your employment?

20             MR. LIEBMAN:   Exactly.

21             THE COURT:   And if you did something else that

22   caused us harm here, we can sue you for that.  We have civil

23   remedies is what you'd say, and that's a different

24   consideration than government action directed to the same

25   misstatement?

 1          MR. LIEBMAN:  That's right.  And certainly the

 2   government enforcing the terms of a contract through the civil

 3   law is something that's drastically different from the

 4   government criminalizing speech through the criminal law.

 5          The second point -- well, let me make -- give a couple

 6   more examples of the application of free speech on private

 7   property to refute the idea that somehow those rights vanish

 8   once you cross private property.  For example in the

 9   defamation cases, it really doesn't matter where you utter the

10   ostensibly defamatory comment.  Even if it's done on private

11   property, you have the protections against liability that New

12   York Times versus Sullivan establishes.

13          If I utter a bad word against somebody at Taco Bell, it

14   doesn't mean that I don't still have a right to not be liable

15   unless someone can show that I said that statement with actual

16   malice.  And so the First Amendment doctrines pervade speech

17   regardless of where it takes place.

18          The Rideout case is another example.  In that case the

19   ballot selfies were taken at polling places.  Many polling

20   places are private property, such as a church or a private

21   school or someone's home, and they were posted on Facebook,

22   which is not public property, and nevertheless the Court found

23   a First Amendment right.

24          So it's simply not the case that the public/private

25   distinction is determinative.  The question is whether or not

1   the government has an interest in restraining speech and the

2   private property question really isn't determinative on that

3   point.

4        The second point I want to make is on the

5   misrepresentations issue in Alvarez and this question about

6   what constitutes a legally cognizable harm.  And I think the

7   State's construction of the legally cognizable harm is so

8   loose that it would make this exception swallow the rule.  If

9   we -- you know, people lie for all kinds of reasons.  They

10   perceive some benefit to doing so.  And if it were the case

11   that any conceivable benefit to the person telling the lie

12   were adequate, then the government could criminalize all kinds

13   of false speech.

14        Instead, what Alvarez demands is that there be a legally

15   cognizable harm and that it be material.  So we need something

16   specific, something tangible, and something that, you know, is

17   fraudulent or that deprives someone else of their property.

18        THE COURT:  Now I'm just talking out loud, and I'll

19   invite Mr. Kaiser to respond to this if he cares before we

20   recess.  But doesn't the State's reading of Alvarez say that

21   the only misrepresentations that are protected are those that

22   don't matter at all, and those that are most important to the

23   speaker aren't protected?  And does that turn the First

24   Amendment protection on its head?  I don't know.

25        MR. LIEBMAN:  I think that's exactly right.  That's

1    the exception that swallows the rule.  I mean --

2            THE COURT:   Is that what you just said and I made

3    it my idea?  Just like a judge to do that.  I'm sorry, go

4    ahead.

5            MR. LIEBMAN:  Right.  And I think Your Honor was

6    right in your questioning of Mr. Kaiser on this question of

7    whether -- you know, Mr. Alvarez gained something.   It was

8    credibility and respect from his constituents, at least until

9    a couple days later when he was out as having lied.   And there

10   was a harm to true recipients of the Medal of Honor who were

11   offended by the fact that he claimed to have received it.

12        And, you know, even in Alvarez there's some conceivable

13   benefit to the person who told the lie and some conceivable

14   harm to the people who heard the lie, nevertheless, that's not

15   sufficient.  It has to be material.  It has to be legally

16   cognizable.  And merely gaining access to a facility is not

17   legally cognizable.  It's the sort of psychic harm that the

18   court found inadequate in Alvarez.

19        You know, and we could think of all kinds of lies told to

20   gain access, for example, the false friend that comes to your

21   dinner party pretending, you know, that they like you.  If

22   that's punishable, then so too are the testers who go in under

23   the -- get access to the office, apartment, on the pretense of

24   being there to receive housing.  And so it's simply not the

25   case that lies told to gain access are the kind of legally

1    cognizable harm that Alvarez contemplates.

2         I'll leave it there.

3         THE COURT:  Mr. Kaiser, you were writing furiously

4    at one point in that discussion.  Was there a final point

5    before we take our recess?

6         MR. KAISER:  Oh, Your Honor, I'm not sure.  I would

7    say that -- that the material -- when we're talking about this

8    statute, and as we talk about overarching rules, they're

9    difficult to apply, and I think that the situation might

10   change sometimes.  But when we look at this statute, there is

11   material harm because we're talking about access to an animal

12   agricultural operation and not someone's dinner party.

13        THE COURT:  I think that goes to the argument we'll

14   have after the recess, the application of the statute.

15        MR. KAISER:  All right.  Then I'm finished.  We can

16   take our break.

17        THE COURT:  Let's take 10 minutes and come back and

18   do some more work.  Thank you, everyone.

19             (RECESS FROM 3:08 PM UNTIL 3:24 PM)

20        THE COURT:  All right.  Based on that exchange, I

21   think there's probably only about 14 hours of argument left.

22   We'll all be fine.  Kidding.  I'd like to pivot now to -- I

23   think if the Court finds that there is no First Amendment

24   right implicated, I think we're finished as a practical

25   matter.  If there are First Amendment rights implicated, I

guess an initial question I want to put to both of you -- it's
not addressed in the papers but it occurred to me -- and then
I think I'd like to talk now about what I think is the second
step in the Court's inquiry.  But if I split out subsection
(b) as a misrepresentation and analyze that separately and
differently than the recording prohibitions in A, C and D --
and I'm not by this question intending to signal anything.  I
haven't made any decisions about this.  But if I find for
example that one or the other of misrepresentation or
recording implicate a First Amendment interest but not both, I
think the Court's response to the summary judgment motions is
to strike -- if -- if that portion of the statute fails under
whatever scrutiny follows, we would strike a portion of the
statute but not the whole statute.  You both agree with that?

        Mr. Kaiser?

                MR. KAISER:  I do, Your Honor.  And severability is
a matter of state law, but the Utah Supreme Court has said so
long as -- I apologize.  So long as the interests that the
legislature sought to protect are still available under the
strict -- the new revised statute, then the statute should be
severed, and that would occur here.  We've got four different
types of harms that the legislature tried to stop.  If they're
not interrelated at all, you could absolutely sever them if
the Court believes that some parts of the statute are
constitutional and some aren't.

1        THE COURT:  Well, and is the same true in your view,

2    Mr. Kaiser, for example, that suppose we conclude that

3    subsection (b) misrepresentation implicates a First Amendment

4    right under Alvarez or otherwise but that there's not a First

5    Amendment interest implicated by recording, then we would

6    proceed into the substantive analysis only on the section that

7    remains?

8        MR. KAISER:  Yes, sir.

9        THE COURT:  And it would rise or fall independently?

10       MR. KAISER:  Yes.

11       THE COURT:  Do you see it differently, Mr. Liebman?

12       MR. LIEBMAN:  I do, or we would at least want the

13   opportunity to possibly brief that question.  I think

14   Mr. Kaiser states the standard correctly as to whether or not

15   the legislature would pass the revised version as it stands,

16   and I would want to look more closely at the legislative

17   history to determine that, you know, the majority of the

18   conversation was about recording rather than

19   misrepresentations, and it might be an open question that

20   could be briefed.

21       THE COURT:  So this is not a question that was

22   addressed in the briefing, but it's implicated by the motions

23   in my view.  I'll tell you that I -- I think it's -- it seems

24   to me that it's severable.  If either of you disagree with

25   that proposition, I'll invite you to submit a brief, please,

1    setting forth your position within 10 days of today.  What is

2    today, Tuesday?  So that would -- okay.  So that won't drop

3    you on a weekend.  All right.  Within 10 days of today then,

4    if you wish to be heard on that question, and I don't know

5    whether it will be implicated or not.

6        All right.  Let's turn to content-based and

7    viewpoint-based restrictions.  I think - I'm going to speak in

8    general terms now, but I think strict scrutiny will apply if

9    this statute is -- if we find that there's a First Amendment

10   interest, and it's -- the statute is content-based or

11   viewpoint-based in its infringement on that right.  Otherwise,

12   if neither of those are the case, then we'll apply

13   intermediate scrutiny.  I think that's the next step.  Do you

14   both agree with that statement as a general proposition?

15           MR. KAISER:  Yes, Your Honor.

16           MR. LIEBMAN:  Yes, Your Honor.

17           THE COURT:  All right.  So let's talk about

18   content-based and viewpoint-based, I think probably more

19   likely content-based.  As I understand the viewpoint-based

20   law, that's a pretty rigorous challenge for somebody.

21       Mr. Liebman, you got to start last time.  Why don't we

22   start Mr. Kaiser with the State this time, should we?

23       Is the -- is the statute content-based in its

24   application?

25           MR. KAISER:  No.

1          THE COURT:  And do we know that because we can read
2     it, the plain language in the first instance, and it says
3     nothing about the content of the communication or the
4     recording that's prohibited?
5          MR. KAISER:  That's right.
6          THE COURT:  And if that's true, do we just stop
7     there or do we then go on to consider whether there was
8     discriminatory intent by the legislature?
9          MR. KAISER:  We stop there.  And the authority for
10    that is the Tenth Circuit case, the Planned Parenthood of
11    Kansas and Mid-Missouri versus Moser.  And, you know, the U.S.
12    Supreme Court has talked about the -- whether a neutral law
13    can be content or viewpoint-based based upon the purpose of
14    the statute.  It mentioned that in Ward and it's been restated
15    again in Reed.  But the Court has never applied that.  It's
16    never said the plain language of a statute is content-neutral,
17    but we're going to look to someplace else to find some sort of
18    legislative purpose in the First Amendment arena and subject
19    the statute to a higher level of scrutiny.
20         THE COURT:  So what do we do -- I'm posing this now
21    as a hypothetical.  We'll talk in a moment I think about the
22    legislative history.  But let's just pretend, because it's not
23    the case, I don't think, necessarily, all of the legislative
24    history was fiercely and antagonistically directed toward
25    shutting down these animal rights, domestic terrorist groups,

1    and let's think of all kinds of inflammatory language we might

2    use.  Suppose that if we got to legislative history and looked

3    at it, all of us would blush with embarrassment about the

4    things that were said in open forums.  That doesn't matter in

5    your view if the face of the statute is neutral in

6    application?

7           MR. KAISER:  Right, because the standard is whether

8    the law is justified without reference to -- to the content of

9    the speech.

10          THE COURT:  And -- go ahead.  You weren't

11   finished.

12          MR. KAISER:  I probably was finished.  And the

13   justification here are -- not only is the statute facially

14   neutral, content-neutral, but the justifications that the

15   State has asserted are content-neutral.

16          THE COURT:  Those being the governmental interests

17   that we talked about earlier?

18          MR. KAISER:  That's right.

19          THE COURT:  The four governmental interests that we

20   would apply in whatever level of scrutiny we move to next.

21   And this is true also in your view, even if everyone in this

22   courtroom agreed that this statute would never be applied to

23   someone who violated the statute by going onto the property

24   for example and creating a puff piece about how spectacular

25   one of the poultry farms in Utah was that integrates

1    alternative sources of energy, it's got windmills and solar,

2    and the chickens listen to Beethoven, and there's little spas,

3    and they eat steak for dinner, and whatever -- I don't know if

4    chickens eat steak.  But the point is everybody understands

5    the statute would never be applied to somebody who did

6    something favorable to the agricultural industry that's at

7    issue, everybody understands it would only ever be applied to

8    people who promulgated films like those we've seen elsewhere?

9             MR. KAISER:  Yes.  And the Supreme Court has told us

10   so in the two -- two of the three abortion buffer zone cases.

11   There was an argument made that in one of the buffer zone

12   cases -- I think it was McConklin but I can't recall if it was

13   McConklin or Hill -- where the -- I think it -- maybe it was

14   in Hill, because you were -- the abortion opponents said,

15   well, wait a minute.  People within the buffer zone who are --

16   who are taking folks into the clinic for their health care

17   will certainly communicate with these folks, and it's going to

18   be applied inconsistently.  And the Supreme Court said, well,

19   maybe you'll have a claim later against -- against government

20   officials for applying the statute in an unconstitutional

21   manner, but that did not mean that the statute was

22   content-based or viewpoint-based.

23        And the other thing that we take from Hill too is that --

24   that the statute itself was defined -- apologize.  The statute

25   itself was defined with the -- oh, yes.  The law prohibited

getting within eight feet and communicating with the purpose

of protest, education or counseling.  That was -- those were

specific things that particularly focused on the content of

the message.  And the Supreme Court said that didn't make it

content-based.  And the statute simply empowers private

citizens entering health care facility within the ability --

with the ability to prevent a speaker who was within eight

feet and advancing from communicating a message they didn't

want to hear.  So the Court said that even though that was the

content that was prohibited, even that wasn't a content-based

restriction.

I imagine you're probably going to get to plaintiffs "of"

arguments here pretty soon, the preposition of, recording of

the agricultural operation.  I don't know if the Court is

interested in that.

THE COURT:  I'll be pressing Mr. Liebman about that.

I may part ways with the plaintiffs on their view about how

that -- I mean that clause is defined and it reads fairly

clearly to me.  Maybe he'll persuade me otherwise.  But I did

want to press you about something the State said in its reply

that I think -- maybe I'm just reading it too narrowly, but

this actually caused me some concern about whether I had this

wrong in my mind.

The State says in its reply on this point that

enforcement authorities need only determine whether the

1    recording was made on an agricultural operation to conclude

2    whether the recording violates the Act.  That's false.  I need

3    to know more than whether the recording was on the -- I need

4    to know about the facts and circumstances under which it was

5    made.  Was it made with the consent of the owner?  Was it made

6    by someone who is lawfully permitted to be there.

7         Early in -- elsewhere in your papers you say

8    whistleblowers can lawfully do this sort of thing, but then

9    you next say the recording's message is irrelevant.  And I

10   think that was really the point.  You don't have to view the

11   recording to know whether it falls within or without the

12   statute.  You just need to know the circumstances under which

13   it was made.  Is that right?

14             MR. KAISER:  That's right, Your Honor.

15             THE COURT:  And so is that evidence then that it's

16   content-neutral?

17             MR. KAISER:  That's right.  And beyond that the

18   Supreme Court in Hill said the mere fact that a law

19   enforcement officer would have to view the content -- view the

20   recording doesn't even make it -- make a regulation

21   content-based, because all the time law enforcement officers

22   review -- review evidence to determine whether conduct falls

23   within the proscribed statute.  And I believe this is in the

24   Hill case.

25        And, I'm sorry, I thought I had this.  Oh, here we go.

1    Whether a particular statement constitutes a threat,

2    blackmail, agreement to fix prices, etcetera, often depends

3    upon the precise content of the statement.  This court,

4    however, has never held that it is improper to look at a

5    statement's content in order to determine whether a rule of

6    law applies to a course of conduct.

7        So whether the -- whether the officer would have to

8    actually watch the video plus know about the other

9    circumstances that the Court has just pointed out, that still

10   doesn't make the -- the regulation content-based.

11           THE COURT:  And I suppose -- I only know about

12   Ms. Meyer, maybe I knew more when we were on the motion to

13   dismiss stage, but what I think I took from the papers here

14   was that law enforcement eventually reviewed what she recorded

15   but not for the purpose of determining the content but whether

16   the recording had been made on the public road or whether she

17   had crossed a fence.

18           MR. KAISER:  That's right.

19           THE COURT:  That's the sort of thing you're talking

20   about?

21           MR. KAISER:  That's right.

22           THE COURT:  Not bearing on the content but the

23   manner and circumstances in which the recording was made?

24           MR. KAISER:  That's right.

25           THE COURT:  If it -- if the Court concludes that the

1    statute is content-neutral, do we reach viewpoint?

2         MR. KAISER:  No.

3         THE COURT:  Let's talk about legislative intent for

4    a moment.  How in the world is a trial court supposed to

5    determine discriminatory intent and legislative intent?

6         MR. KAISER:  Your Honor, I'm glad that I'm not in

7    your chair because that's -- I don't know the answer, and

8    we've had 200 years of jurists trying to argue about how to do

9    that.  I think legislative intent is expressed through the

10   words of the statute, viewed from the purposes that the

11   statute is intended to protect.

12        THE COURT:  And how do we determine the purposes

13   that the statute was intended to protect?  That seems to me

14   it's the same question as the legislative intent.  And on this

15   point the State -- it's interesting.  I just use this as an

16   example.  So the plaintiffs point to things that some

17   representative said on the floor or in house discussion as

18   evidence of animus.  The State could easily point to

19   statements that other representatives made about other

20   motivations, states rights, property interests.  We could have

21   30 different statements by 30 different legislators on 30

22   different things.  There could be a vote.  The bill could

23   pass.  I have no idea why, do I, unless there's an express

24   articulation somewhere that there's a common shared or

25   majority interest or purpose?  Maybe the statute says this is

1    the purpose of the statute.  I see that sometimes, and that's

2    not here.

3              MR. KAISER:  No.

4              THE COURT:  I genuinely don't know how.  And there

5    is so much case law on this.  If you're the Supreme Court you

6    seem to just divine the legislative intent.  As a trial court

7    I don't know how to do it.

8              MR. KAISER:  I think it's nearly impossible, and

9    it's certainly impossible from statements of legislators.  I

10   think a statement of legislative intent in the bill is

11   helpful.  I think -- you know, oftentimes we're talking about

12   two different types of discernment of legislative intent.  The

13   first is what do the words mean, right?  If we were for

14   example looking at what false pretenses means, maybe we should

15   go back to committee hearings or what's going on in the world

16   or testimony or concerns that the legislature might have had

17   to determine what false pretenses means.

18        But to determine this part, what -- the purpose, why the

19   legislature passed the law, not what the law means, but why

20   they passed the law is impossible outside of a statement of

21   legislative intent.  And -- which is why the Tenth Circuit has

22   said let's not do it in First Amendment cases.  And most of

23   that review is limited to equal protection claims.

24             THE COURT:  So then what do I do with the State's

25   proffered justifications for the law when we get to scrutiny

1    in the next step?  There's four justifications offered here.

2    I'll tell you I've searched through -- we've searched through

3    the legislative history.  I don't know that the word

4    biosecurity appears anywhere --

5              MR. KAISER:  No, Your Honor.

6              THE COURT:  -- anywhere in the legislative history.

7    It's the first justification that's offered after the fact in

8    this litigation in support of the governmental purpose that's

9    served by the bill -- by the law rather.  I guess it's a

10   secondary question because we're focusing in the first

11   instance on legislative intent, but I don't know what to make

12   of that either.  Most courts seem just to credit what the

13   state says after the fact when we get here, but certainly on

14   rational basis review there's almost no independent screening

15   of that.  It appears like on intermediate scrutiny or strict

16   scrutiny I'm supposed to do something more.

17       And then we've seen this most recently in the election

18   cases in federal district courts this summer striking down

19   portions of some voting restrictions, where courts have

20   appeared to scrutinize a little bit whether there was --

21   whether the justifications for the limitations were really

22   those that the legislature had in mind.  There was the

23   abortion -- the Texas abortion clinic case last term in the

24   Supreme Court where the Supreme Court rejected I think the

25   explanations offered by the state after the fact.

1        What's a trial court to do with that?  When the State

2   comes forward with the four justifications here when we get to

3   the next step of this discussion, do I test them at all?  Do I

4   just accept that those were the real purposes motivating the

5   legislators?  And if so, how do we know that?  What evidence

6   do we have of that?  And what's the implication here where

7   the -- as I understand it the legislators who are identified

8   as witnesses who would have discoverable information quite

9   properly invoked legislative privilege, which they're entitled

10  to do.  And I think there's a risk about walking into federal

11  courts every time there's a challenge over a statute and

12  putting legislators on the stand and under oath to talk about

13  what -- this is our democracy.  I'm totally puzzled.

14        MR. KAISER:  Well, there are a few answers that I do

15  have for you, Your Honor.

16        THE COURT:  I thought you might.

17        MR. KAISER:  The first is, despite the puzzling

18  state of the law, the -- there is no First Amendment -- there

19  are no cases about the legislative intent in the First

20  Amendment arena that prohibit the government from providing

21  information after the fact of the -- of the passage of the

22  bill.

23        THE COURT:  How?  Through experts?  Through people

24  that weren't present at the time and don't have personal

25  knowledge about what motivated it or else some other way?

1              MR. KAISER:  In this case it's not about an

2     individual legislator's or the legislator as a whole --

3     legislature as a whole purposes, it's about the government

4     purposes, so the government can articulate those purposes.

5     And in fact in the First Circuit case that the plaintiffs just

6     cited to you, the ballot selfie case, there was very little

7     discussion about the legislative history, but the government

8     came in and brought additional evidence about -- about voter

9     fraud and supplemented the record, if you will, with that.

10    And there was no discussion that that was improper in an

11    intermediate scrutiny case in a First Amendment claim.

12         So the articulations of the government interests and the

13    information -- the difference between intermediate scrutiny

14    and rational basis is I can come up in a rational basis and

15    say, Your Honor, here are the 15 reasons that this -- that

16    this law makes sense, and I don't -- I don't need any evidence

17    that that's the case.  And we can sit here and you can say,

18    yes, that makes sense.  In cases like City of Cleburne -- now

19    we're really jumping forward -- we can say but your -- your

20    rationale doesn't fit the distinction.

21         In an intermediate scrutiny case the government must

22    present some evidence that shows the important government

23    interest and how the statute relates to that, and we've done

24    that in this case.  If the court were to require only

25    information that the legislature considered, that would be an

1    extremely high bar in many, many, many cases that we're

2    subject to anything more than rational basis scrutiny.

3         And, you know, our legislature is part-time.  Our

4    hearings are very short.  They have a lot to do in a very,

5    very limited period of time, and to make that exacting

6    requirement under the constitution would be a serious

7    federalism concern and just practically overly burdensome.

8              THE COURT:  And I don't know that it's helpful, but,

9    more importantly, I don't see that it's required.  These are

10   just questions.

11             MR. KAISER:  Okay.  All right.

12             THE COURT:  All right, discriminatory intent.

13   There's language in the record, and the plaintiffs point to

14   it, that is colorful, inflammatory perhaps, and there are

15   characterizations of animal rights groups and the like.  There

16   are legislators who at the time that they were considering

17   this bill expressed their personal feelings about these

18   organizations and the propriety of the work that they do.

19   What relevance does that have to determining discriminatory

20   intent or legislative intent?

21             MR. KAISER:  None.

22             THE COURT:  For the reasons we've touched on,

23   there's too many justifications to count --

24             MR. KAISER:  That's right.

25             THE COURT:  So a handful of legislators who have one

1  view, even if it was only that view, that's not sufficient to

2  establish discriminatory intent among the body?

3  MR. KAISER: That's right. And there's case law to

4  support that position. I think particularly the Hill versus

5  Colorado case, because there -- I believe it was Justice

6  Ginsburg that wrote that opinion. And she said, well, wait a

7  minute. Everybody knows that the reason that there was a ban

8  on handbilling in airports was because people didn't like what

9  the Hare Krishnas were doing. Everybody knows that the reason

10  that there was a ban on protesting outside a house in Frisby

11  versus Schultz was because antiabortion folks were protesting

12  and it was --  it was a problem. Everybody knows that the

13  reasons that there are buffer zones around women's healthcare

14  facilities or hospitals in the two cases was because of

15  harassment caused largely by antiabortion protesters. But the

16  mere fact that the legislation was targeted at a particular

17  conduct, particular group's conduct, doesn't mean that the

18  statute became content-based or viewpoint-based.

19  And so even if we say the reason that those particular

20  legislators enacted this law was because they didn't like the

21  conduct that undercover animal rights activists were engaging

22  in, that doesn't mean that the statute is content-based.

23  THE COURT: So let's pull the sheet back a little

24  bit. Some folks at least will argue, maybe Mr. Liebman will,

25  and if nobody in court argues, there will be people in public

1   at large who have an interest in this case who will say,

2   you're kidding me.   There were some exposés involving animal

3   cruelty that were published by animal rights groups, and the

4   next thing you know there's a wave of legislation in states

5   prohibiting this very conduct.   It happened in Idaho and it

6   happened in Utah, it happened in a handful of agricultural

7   states.   Everybody knew and understood what was happening.

8   This was an intent to stop people from making videos like this

9   in places like that and then circulating them in the public.

10          And everyone will say -- not everyone.   These people

11   would say, you just have to look at the circumstances in which

12   the legislation was passed in the states, and where it came

13   from, how similar it is, and the fact that it is uniquely

14   legislation like in Utah and Idaho and elsewhere, is uniquely

15   crafted to prevent the very thing that everybody understood

16   they were trying to prevent, and some of the legislators said

17   that expressly.   And so what's the legal response to that?

18   That it's irrelevant, is that the legal response?

19          MR. KAISER:   The legal response is that a law is

20   content-neutral when --

21                        (DRILLING SOUND)

22          THE COURT:   We periodically just drill things in the

23   courthouse.

24          MR. KAISER:   Good to know that the courthouse is

25   being --

1          THE COURT:  We haven't tased anybody in this

2     courtroom though for months.

3          MR. KAISER:  That's also good to know.

4          THE COURT:  Go ahead.

5          MR. KAISER:  The important -- the legal test is

6     whether the statute is justified without regard to the content

7     of the speech.  And we have four Supreme Court cases that

8     recognize that the driving force of a -- of a piece of

9     legislation doesn't mean that it's content-based because

10    it's --

11         THE COURT:  But what about discriminatory intent,

12    not content-based but discriminatory intent?

13         MR. KAISER:  The sort of extra part of Ward that the

14    Supreme Court has never -- has never applied?

15         THE COURT:  Right.  I don't know.

16         MR. KAISER:  Well, I mean the Supreme -- because we

17    have four Supreme Court cases that all targeted very

18    particularized conduct by very particularized groups, and the

19    Supreme Court has never held that part of the Ward test to

20    apply to any of those situations, despite the protestations of

21    a number of dissenters, that to me says the discriminatory

22    intent has to come from the statute itself.  And we've got

23    plenty of law that talks about that, right?

24         THE COURT:  The cases you'd rely primarily on are

25    those you've identified I think.

1          MR. KAISER:  That's right.  And of course there's a

2     little part that you were talking about, attacking this

3     particular conduct or these particular folks, and the Chief

4     Justice in McCullen noted that -- that states adopt laws to

5     address the problems that confront them.  The First Amendment

6     doesn't require states to regulate problems that don't exist.

7     When selecting among various options for combating a

8     particular problem, legislatures should be encouraged to

9     choose the one that restricts speech less not more.

10         And I know that in our last oral argument you asked about

11    why doesn't the State restrict surreptitious recording at

12    childcare facilities or at Google?  And the answer is because

13    the harms that have been presented to the legislature created

14    this statute, and the legislature shouldn't restrict more

15    speech when the harms aren't apparent to them.

16         THE COURT:  Well, and I think I understand from the

17    case law that the legislature need not regulate an entire

18    industry.  It's permissible for the legislature to say here is

19    the agricultural industry.  Here is an instance.  We'll

20    regulate that.  And later if we choose we can take it up in

21    fast food.

22         I don't think we're going to reach this discussion, the

23    related issue, today because I don't think we're going to get

24    into rational basis review under the equal protection

25    challenge.  I don't think it will be helpful for us to have

1    much discussion about that today.  But it did have me thinking

2    about this question, discriminatory intent and its cousin I

3    suppose, animus, in that context.

4         And there's no evidence of this, so we're just talking

5    out loud again.  But I think commentators and the public at

6    large that have an interest in this issue might say, well,

7    wait, the statute is not designed to punish animal rights

8    groups, even if that's what they -- legislators thought would

9    happen.  It was designed to provide some protection for

10   certain agricultural interests.  How does that argument unfold

11   in your view in that animus analysis?

12             MR. KAISER:  Well, we have a whole -- I have a whole

13   lot to say about animus, and --

14             THE COURT:  We don't need to say a lot about it.

15   But what do you think about that issue?  Because it's related

16   in my mind.  They're different.  I understand they're

17   different than discriminatory intent.  But even if this

18   legislature sought to give protection to the agricultural

19   industry in Utah and it knew that one consequence of that

20   would be to diminish access for groups that otherwise want it,

21   does that mean that it's animated by an intent to harm?

22             MR. KAISER:  No, no.  I wish I had a case law

23   citation, but there are always winners and always losers in

24   legislation, and whether someone gets a contract and someone

25   doesn't because of a fear of big oil versus a small town

1  operation or because one group wants to advance the country

2  one way and one group wants to advance the country the other

3  way, that doesn't equate to an intent to harm either under a

4  First Amendment or an animus analysis.

5      And, you know, the animus analysis really comes from

6  footnote four of Carolene Products.

7          THE COURT:  I really don't want to get too much into

8  animus.  It's not going to be helpful to our oral argument,

9  but thank you.  I've confronted this before.  This is no

10  mystery.  And I don't understand it exactly what the legal

11  framework is that I'm supposed to apply in that context and

12  I've tried.  But I'm not -- it will only arise in this case if

13  we get to the equal protection challenge I think, and even

14  then under the rational basis review I think, whether we

15  heighten it through some demonstration of animus.  Do you

16  think that's how it applies here?

17          MR. KAISER:  I think that's right, Your Honor.  And

18  despite the murkiness in the case law, what we know is what

19  the Supreme Court has decided, and the Supreme Court has

20  decided cases that says regardless of the effect on a

21  particular group, if the justifications for the law are

22  content-neutral, and if you can reference -- if you can decide

23  the law without looking at the expression prohibited in the

24  law, then it's content-neutral, and that's what we've got

25  here.

1        THE COURT:   Thank you.

2    Mr. Liebman, it is content-neutral on its face, is it

3 not?  You disagree?

4        MR. LIEBMAN:   I do disagree, Your Honor.  And I

5 think the fact that subsections (a), (c) and (d) all

6 criminalize the collection of images of an agricultural

7 operation makes it content-based on its face.

8    And let me -- the ballot selfie case -- not the Rideout

9 one, the other one that we mention.  This is the Indiana case.

10 In that case the Court found the statute content-based because

11 it prohibited taking an image of the ballot.  And the Court

12 italicized to post the ballot as evidence that that statute

13 was content-neutral.  And that's not a case that we cited in

14 our brief so I can give you the citation if you'd like.

15        THE COURT:   Would you, please.

16        MR. LIEBMAN:   Yes.   2015 Westlaw 12030168 at page

17 three.  And the same applies here.  There are things you can

18 take an image of at an agricultural operation that are not of

19 the agricultural operation.

20        THE COURT:   But is that true the way the clause

21 agricultural operation is defined in the statute?  Just on its

22 face I'm told, as used in the section, agricultural operation

23 means private property used for the production of livestock,

24 poultry, livestock products or poultry products.  And so when

25 we're told -- I mean the phrase of the agricultural operation

1    appears -- I counted them earlier.  Is it seven times in the

2    statute?  Doesn't that mean it's a location, not content?  And

3    then does that draw us to McCullen?

4         MR. LIEBMAN:  It doesn't, Your Honor.  I mean in

5    McCullen you can violate the statute merely by being present

6    within the buffer zone.  So that truly was about where you

7    were and not about what you were saying or even whether you

8    were saying anything.

9         THE COURT:  But isn't that true here also?  If

10   you've recorded an image in a geographic location of an

11   agricultural operation, irrespective of what's in that

12   recording, you've fallen within the statute, no?

13        MR. LIEBMAN:  No.  I mean imagine if you were

14   standing in the field of an agricultural operation and pointed

15   the camera at the sky to take a picture of the clouds.  That

16   would not be an image of the agricultural operation, but it

17   would be taken at the agricultural operation.  So you could

18   take photos at the agricultural operation that are not of the

19   agricultural operation.  And we also give the example if you

20   do a close-up of a birthday cake in the break room.

21        THE COURT:  Use the cloud example one more time.

22   What was the very last thing you said?  So then you've taken a

23   picture --

24        MR. LIEBMAN:  At the agricultural operation.

25        THE COURT:  But not of the agricultural operation?

1          MR. LIEBMAN:  That's right.

2          THE COURT:  Right.  And you did talk about the break

3    room example.  But the break room example falls within the

4    statute for sure, doesn't it?

5          MR. LIEBMAN:  I don't think so.  I mean it really

6    depends on what's within the viewfinder of the camera.  I mean

7    if it's zoomed in close enough on the cake, it's of the cake

8    and not of the agricultural operation.  And in fact this is

9    borne out in the legislative history at page 21 and 22 of the

10   transcript.  Representative Mathis, who is the sponsor,

11   actually says the statute doesn't apply to, quote, barns,

12   houses, fences, rock piles, things that we like to photograph,

13   end quote.  And this is where he's saying this isn't going to

14   apply to you people who just want to take a pretty picture of

15   the barn or the sunset.  It's targeted at the animal rights

16   activists that are taking pictures of the slaughtered cow.

17         THE COURT:  You agree with Mr. Kaiser though on this

18   point that under the law I don't reach that question if the

19   statute is plain on its face and it's content-neutral, or do

20   you disagree?

21         MR. LIEBMAN:  I certainly disagree.  And, you know,

22   the Supreme Court has reiterated that numerous times, and I'll

23   come to that in just a moment.  But I think this is a

24   different use of legislative history.  If there's some

25   ambiguity about what of means, then looking to legislative

1    history to clarify that term is different than looking at

2    legislative history to determine the underlying motive.

3        So this is a slightly different use of legislative

4    history to clarify what might be an ambiguity, if there's any

5    ambiguity about the term of.  But the plain meaning of of is

6    what something relates to, and a picture of something is that

7    which is within the frame of the photograph or the video and

8    that is by definition content-based.

9        And so one --

10           THE COURT:  On its face why doesn't the statute

11   apply to the home or the rock pile that's on the private

12   property of the agricultural operation the way its defined?

13           MR. LIEBMAN:  Well, I mean those are not the

14   operation of the facility, an agricultural operation as

15   Representative Mathis intended the term.  And, again, we're

16   talking about the sponsor of the legislation, the person

17   who --

18           THE COURT:  But what if all of his colleagues

19   disagreed?

20           MR. LIEBMAN:  Well, I mean --

21           THE COURT:  So is the intent of the -- is the

22   meaning of the statute drawn from the intent of a single

23   legislator, the sponsor, or shall we select someone else?

24           MR. LIEBMAN:  Well, no one else has opined on that

25   specific question in the legislative history about what kinds

of things are or are not covered.  And I would agree that you

don't have to get to that unless there's some ambiguity of of.

I think this is an easy case at the very threshold for the

same reason that the Indiana ballot selfie case was.  If it

says a picture of something, you've got to look at the picture

to figure out what it's of, and that's by definition

content-based on its face.  But if there's some ambiguity,

then looking to the legislative history and the person who

drafted it I think has a special authority to say what the

statute covers and what it doesn't.

THE COURT:  I'll candidly acknowledge I didn't, in

preparation for our hearing, find -- I didn't go searching for

that case.  I'll read it before we decide this issue, but --

and you make this argument in your -- I think it's in your

reply in support of your own motion, but in the -- I have the

statute in front of me.  Where in the statute do you find the

ambiguity?  For example, if we look under subsection (d) we're

told that it's a violation -- that if without the consent of

the property owner you knowingly or intentionally record an

image of or sound from an agricultural operation.  Do you

think that's ambiguous because of the of?

MR. LIEBMAN:  I think it's unambiguously

content-based.  If there's some dispute about whether of means

something other than what the picture is of, then perhaps

there is ambiguity there.  But in my mind it's clearly

1    content-based on its face and there's not a need to resort to

2    the legislative history but, nevertheless, if there's some

3    ambiguity of whether it's merely at the facility or of

4    particular operations of the facility, then it would help to

5    consult the legislative history.

6         THE COURT:  Is a photograph of an Australian sheep

7    dog on the -- on an open field that's private property used

8    for the production of livestock, is that within or without the

9    statute?  Is it content-based, the statute?

10        MR. LIEBMAN:  I think that would be covered by the

11   statute because that -- presumably a herding dog who is there

12   as part of the operations of the facility.  If you angle the

13   viewfinder of the camera sightly and just took a picture of

14   the sky, then you're no longer taking an image of the

15   facility, and that wouldn't violate it.

16        THE COURT:  And the skunk that wandered onto the

17   field, you take a picture, that's within or without of the

18   statute?

19        MR. LIEBMAN:  Well, to figure out what the picture

20   is of, whether it's of a skunk or a dog or a cow, the

21   authorities would have to look at the image itself.  And it

22   may be that this casts a very broad net.  There are certainly

23   a lot of things that this statute prohibits, but a broad reach

24   doesn't make it content-neutral.  It just means it's still

25   content-based but applicable to many different things that are

1    the agricultural operations.

2           THE COURT:  If it's not content-based, then the

3    Court looks to what, the evidence of discriminatory intent, or

4    do we go to viewpoint next?

5           MR. LIEBMAN:  Well, I mean viewpoint-based

6    discrimination is -- has been described by the Court as an

7    especially pernicious form of content-based discrimination.

8    And I think it sort of depends.  I mean we could -- we believe

9    the entirety of the statute is viewpoint-based based on the

10   legislative history and the desire to silence particular

11   speakers, but it's viewpoint-based on its face as to

12   subsection (c) because subsection (c) as an exemption for

13   speech that's approved of or consented to by the owner.  And

14   so the only kind of speech that's permitted under the statute

15   are ones that are approved of by the owner.

16       And the Court in Otter found a very similar provision to

17   be viewpoint-based on its face.  And so I think, you know, the

18   viewpoint-based analysis proceeds in the same way that the

19   content-based analysis proceeds, that is, it can be

20   viewpoint-based on its face or viewpoint-based as evidenced by

21   the legislative history.

22       And I can turn to that, although I do want to address the

23   facial content-based status of subsection (b) as well, not

24   just the provisions that prohibit taking an image of the

25   facility but also the false pretenses provision.

1          And certainly to determine whether someone has gained

2    access by false pretenses you would have to look at the

3    content of the employment application or the content of what

4    they told the interviewer at the job application and then lay

5    those statements alongside the truth to assess whether or not

6    there's some form of correspondence.  And so in that sense

7    that statute is also content-based on its face and certainly

8    courts following Alvarez have adopted the strict scrutiny

9    standard because prohibitions on false statements are by

10   definition content-based because they distinguish between

11   truth and falsity.  So subsection (b) on its own is also

12   content-based on its face, even if subsections (a), (c) and

13   (d) are not.

14         Let me also just take sort of a step backwards.  And I

15   think Your Honor said that if you make the determination that

16   these -- there's not a First Amendment right to record or to

17   lie that we don't proceed any further.  And I'm not sure that

18   that's exactly true under R.A.V. versus St. Paul.  In that

19   case the Court was dealing with fighting words, which are not

20   within the ambit of the First Amendment, but it still held

21   that a content-based limitation on fighting words was

22   unconstitutional.

23         So if we went this statute is content-based, even if

24   otherwise recording is not prohibited or otherwise

25   misrepresentations are not -- of this variety are not

1    protected, to limit otherwise unprotected speech in a

2    content-based way nevertheless is unconstitutional.  So I

3    think the content-based discussion has to come up regardless

4    of whether there's the threshold protection under the First

5    Amendment.

6         I can turn to the legislative purpose component of --

7              THE COURT:  I don't think I'm quite ready to leave

8    your content-based argument.  I think I sort of jumped in in

9    the middle of your content-based argument, and I want to make

10   sure I completely understand it.  Part of it is I think you're

11   distinguishing -- well, let me ask you I guess to describe in

12   your own words your -- we've read your papers, but help me

13   understand.

14        The fact that the statute might be directed to a specific

15   subject matter -- let's read the statute in the way that you

16   urge in your papers, the shot of the sky, that doesn't -- the

17   shot of the cake, not helpful.  But anything else on and

18   relating to the agricultural operation tells us nothing about

19   whether it has anything to do with how the animals are being

20   treated, how the operation is -- whether it's good or bad,

21   anything else, and you say content-based because it's subject

22   matter, yes?

23             MR. LIEBMAN:  Yes, that's right.

24             THE COURT:  It's not a photograph of a hamburger.

25   It's a photograph of a horse in a field on an operation.  How

1   does that in your view make it content-based under the law?

2        MR. LIEBMAN:  Well, the Supreme Court in McCullen

3   says the test for whether or not something is content-based is

4   whether the authorities have to look at the content of the

5   speech to determine whether or not a violation has taken

6   place.  And you didn't have to do that in McCullen.  Like I

7   said, you could stand within the buffer zone and not say

8   anything at all and still be in violation of the statute.  As

9   long as someone's lips were moving, they were violating the

10   statute.  Even if their lips weren't moving, they were

11   violating the statute.

12      And this statute is different.  It does require the

13   authorities to pull up, you know, someone's recording and go

14   frame by frame and analyze what the image is of to determine

15   whether or not a violation has taken place.

16      And certainly the Supreme Court has made clear that

17   prohibitions on speech of a subject matter are just as

18   content-based as prohibitions on positions.  So in Reed for

19   example, this is the case where there were -- the municipality

20   had a prohibition on signs, and the -- they took the position,

21   well, we're not discriminating against any particular

22   viewpoint.  And the Court said, well, it doesn't really

23   matter.  Viewpoint discrimination is not the only thing that's

24   impermissible under the First Amendment.  You can't take

25   certain topics and make them off limits.  And that's exactly

1    what this statute does.

2        And it may be the case that someone who takes a picture

3    of something that doesn't indict the agricultural industry,

4    you know, their viewpoint is not discriminated against, but

5    nevertheless by taking an entire class of topic, that is

6    agricultural operations and what happens on them and putting

7    it outside of the reach of the First Amendment makes this a

8    content-based statute.

9        THE COURT:  It doesn't really place it outside the

10   context of the First Amendment, does it?  It just implicates a

11   different -- a more stringent review?

12       MR. LIEBMAN:  That's right.  So it might not take it

13   outside of the First Amendment, but the question -- I think

14   the best way to put it is that the First Amendment doesn't

15   only prohibit viewpoint-based discrimination that silences

16   partisans on one side, it also says we can't take entire

17   classes of topics and regulate on that basis.

18       So for example a statute that says let's not talk about

19   the Israel/Palestine conflict would be content-based even if

20   it doesn't choose sides or a particular viewpoint within that

21   debate.

22       THE COURT:  And I think I understood your argument

23   with respect to subsection (b).  The fact that it's -- it only

24   goes to misrepresentations means it's specific to one kind of

25   speech, false speech as opposed to truthful speech, and so

1    that's content-based by definition also.

2              MR. LIEBMAN:   That's right.

3              THE COURT:   I think you were moving to legislative

4    intent and discriminatory intent.

5              MR. LIEBMAN:   That's right.   So the Supreme Court as

6    recently as Reed, which is two years ago, in a unanimous

7    decision has given its approval to this approach where we're

8    looking at a statute that might be content-neutral on its face

9    but nevertheless has the purpose and motive of silencing

10   speech.

11       And this -- the Supreme Court has acknowledged in at

12   least five cases, this is Sorrell, Turner, Ward, Playboy and

13   most recently Reed, which again was unanimous.   So the

14   Justices all agree that facially content-neutral statutes

15   might still be content-based if their legislative

16   justification and purpose is content-based or reflects a

17   disagreement with the message put forth by the speakers.

18             THE COURT:   And how -- I'll put to you the same

19   question I put to Mr. Kaiser.   And I'm not trying to be cute

20   about it.   I mean I just don't -- I genuinely don't understand

21   how a trial court is to go about determining that given all of

22   the information that is available in the legislative intent,

23   the different viewpoints of legislators, the justifications

24   offered post hoc by the State.   How does the Court sort -- I

25   know -- I've read the Supreme Court cases.   I see how they do

1    it.  I don't see how they're instructing me specifically to do

2    it, or am I just missing it?

3           MR. LIEBMAN:  Well, I think there are a couple of

4    cases that shed some light on what the Court can and should

5    consider.  The first is the Arlington Heights case where the

6    Court says that the legislative history may be highly

7    relevant.

8           THE COURT:  But how?

9           MR. LIEBMAN:  Well, I mean there's no requirement

10   that that motive be unanimous.  I mean if you search through

11   the legislative record and find statements as we have here

12   that are clearly about silencing part of the debate, that's

13   quite frankly enough.

14          THE COURT:  No.  But you're -- you're urging -- I'm

15   in a coequal branch of government, and the plaintiffs in this

16   case are urging me to strike down an action by another coequal

17   branch of government, the legislative branch.  They're the

18   folks that are elected by the citizens of this State to enact

19   policy, and there's a legislative and democratic process for

20   that.  If the citizenry is dissatisfied, if the citizens think

21   this is a stupid law because it restricts my ability to get

22   information about my food that I'm going to buy and eat and

23   feed to my children and I'm dissatisfied, I can reach out to

24   my legislators.

25          You're asking me as a judge to evaluate inconsistent

1    messages potentially from legislators as part of the

2    legislative process, which is complicated, legislators taking

3    into account numerous competing interests and policies, and

4    then through that process settling on something that garners

5    enough votes to pass.  What do I do?

6            MR. LIEBMAN:  We're not asking Your Honor to review

7    the record for stupidity, as you put it.

8            THE COURT:  No.  I mean but you want me to strike it

9    down as unconstitutional on the basis that the legislature

10   intended some specific thing.  And if they're competing

11   messages --

12           MR. LIEBMAN:  But that's the role of the judiciary

13   going back to Marbury versus Madison.  It's the role of the

14   courts to review legislative enactments and to suss out

15   impermissible motivations.  I mean the reason we have the

16   entire doctrine under the Equal Protection Clause and also

17   this sort of impermissible or discriminatory intent is to

18   protect against the tyranny of the majority.

19        When we have the government acting in illicit

20   content-based ways that discriminate on the basis of belief or

21   speech, then it very much is the role of the judiciary to step

22   in and protect the fundamental rights that are enshrined in

23   the First Amendment.  And certainly the Court can do that, as

24   the Supreme Court instructs in Arlington Heights, by looking

25   to contemporaneous statements of the decision-making body.

1          THE COURT:  So what do I do in the instance where

2    six legislators are talking in the floor debate about the

3    importance of state rights, three of them are talking about

4    the availability of insurance coverage, four of them are

5    talking about the safety of the workplace, three of them are

6    angry about animal rights activists, two others are talking

7    about the fourth grade class from whatever elementary school

8    is there observing that day.  What's the legislative intent?

9          MR. LIEBMAN:  Well --

10          THE COURT:  What's the purpose?

11          MR. LIEBMAN:  -- Arlington Heights says we're

12    looking for substantial motivations, and it's not precise

13    language but it's something more than what one angry

14    legislator said.  And let me just say that the example you're

15    giving is a much harder case than this one.  Here we don't

16    even have mixed motive.  Really the only motive that comes out

17    is animus against animal rights groups and a desire to stop

18    their videos from being used as national propaganda.  As you

19    said, you can search the legislative history in vein for any

20    reference to biosecurity, which is now the only real purpose

21    that the State is putting forth.

22          THE COURT:  Well, one of four.

23          MR. LIEBMAN:  Well, I think they all sort of

24    constellate around that same idea generally of worker safety,

25    animal safety.  But none of those interests come up in the

1    legislative history.  The exclusive focus is on animal rights

2    groups and what they use these investigations for.

3         And so here we're not even dealing with a mixed motive

4    case.  There's a predominant motive that comes out throughout.

5    And I don't want to sort of exhaustively go through those

6    quotations.  We go through them in our brief.  But it becomes

7    very clear that the sponsors of the legislation, both in the

8    House and in the Senate, are quite explicit, that the whole

9    purpose of the statute is to stop national propaganda groups

10   from recording embarrassing mistakes and using them to try to,

11   as they put it, end animal agriculture in this country.  And

12   that quite clearly shows a disagreement with the underlying

13   message that the speech conveys.  And the Supreme Court has

14   repeatedly said that that kind of motivation is impermissible

15   and turns an otherwise content-neutral statute into one that's

16   content-based.

17        Let me give another example of where the Supreme Court

18   has sort of instructed how to -- how to wade through this, and

19   that's the Church of the Lukumi case.  And that's a free

20   exercise clause but that's still within the First Amendment.

21   And the Court essentially in that case refers to the free

22   speech clause as a parallel provision.  And in both cases the

23   Court is trying to determine neutrality.  Is this a statute

24   that targets a particular content in the First Amendment in

25   the free speech context or is this a statute that targets a

1    particular religion in the free exercise case?

2         And there the Court says that legislative purpose may be

3    determined by both direct and circumstantial evidence, and

4    that such evidence includes, quote, among other things, the

5    historical background of the decision under challenge, the

6    specific series of events leading to the enactment, and the

7    legislative or administrative history, including

8    contemporaneous statements made by members of the

9    decision-making body, end quote.

10        And that I think certainly permits Your Honor to

11   consider, as you said, the fact that these -- this statute is

12   part and parcel of a national effort by the meat industry to

13   stop the outflow of undercover investigations that have

14   drastically transformed public debate on matters of

15   significant public concern.

16        And so given that framework for evaluating the

17   legislative purpose, it wouldn't be out of place for this

18   Court to look at the legislative history, to look at the

19   context and to suss out what the true motivation was here, and

20   that is to suppress and silence undercover videos and

21   undercover investigators that have criticism of the meat

22   industry.

23             THE COURT:   Is that the same thing as saying to

24   provide some level of protections for private owners in the

25   industry?   I mean you're illustrating and highlighting one

1    point.  What if the purpose that floats to the surface is not

2    to harm anybody specifically but to provide some protections

3    for some industry in the state?  Is that the same thing?

4            MR. LIEBMAN:  I think in the context of this

5    legislative history they're two sides of the same coin.  What

6    they're seeking to protect the farmers from is people who want

7    to publicize their embarrassing mistakes, as the state puts

8    it.  And so I think it's inextricably intertwined -- the

9    ostensible privacy protection is inextricably intertwined with

10   the desire to suppress speech.  And certainly looking at the

11   context in which the statute is defended by its sponsors and

12   others who come to speak in its defense, when they talk about

13   protecting the privacy and property rights of farmers, what

14   they're saying is, you know, these investigations are

15   embarrassing and we don't want them to see the light of day.

16       So there may be cases in which there truly is a mixed

17   motive, and in fact in the Church of the Lukumi case there was

18   testimony from city council members and members of the public

19   where the concern was about protecting animals who are used in

20   sacrifices.  Some of the statements were about just

21   antagonistic discriminatory statements against practitioners

22   of the Santeria religion.

23       So in that case you do still have a mixed motive where

24   some people are concerned about the animals, some people just

25   think animal sacrifice in the Santeria religion is immoral.

1    And nevertheless the Court says, well, even though there's

2    that mixed motive there, that a substantial motivation is this

3    discrimination against a religion because of its religious

4    beliefs.  That triggers strict scrutiny under the free

5    exercise clause.  And I don't see any reason that it would be

6    different under the free speech clause.  And certainly the

7    Supreme Court in all the cases we cite says that that's the

8    same analysis that should happen even for content-neutral

9    statutes or facially content-neutral statutes.

10       I think with regard to the content-based status of the

11   statute, that's -- those are all the points I wanted to make,

12   Your Honor.

13       THE COURT:  While it's on my mind, and I really

14   don't want to spend much time on it, but I think actually the

15   discussion we've just had maybe answers the same question I

16   put to Mr. Kaiser, that is about animus -- well, what do you

17   say about that, if we reach the equal protection analysis?

18       MR. LIEBMAN:  I think Moreno is very clear on that

19   point under the equal protection inquiry.  You know, in that

20   case there were one or two stray comments about hippy

21   communes, and that alone was enough to invalidate the law

22   under the animus doctrine.  Here we have a record that is much

23   more prevalent with animus than in that case.  And I think

24   Moreno and Windsor both make clear that the Court can -- and

25   Cleburne as well, all make clear that the Court can and in

1   fact does consult the legislative history to evaluate whether

2   or not animus is present, and in doing so don't require a ton

3   in terms of quantity of animus to strike down a statute or at

4   least subject it to heightened rational basis review.

5         THE COURT:   Is that something for a district court

6   judge to do or is that something for the Supreme Court to take

7   account of?  I mean that's an earnest question.  I know it's

8   outside the context of the case law, but I'm a trial court.

9   I'm going to look at a couple comments by a few state

10  legislators and decide it's evidence of state animus against

11  animal rights organizations, and on that basis I'm going to

12  invoke the authority of the federal judiciary to strike down

13  as unconstitutional an action by our elected representatives

14  in this state?  That's what you're urging, right?

15        MR. LIEBMAN:  I think so, Your Honor.  And again it

16  goes back to the role of the judiciary to check the tyranny of

17  the majority against unpopular political groups, and that's

18  exactly what happened in this case.

19        THE COURT:  And I understand that the appellate

20  rights of the parties are available on both sides, but is that

21  really -- I really struggle with whether that's an appropriate

22  exercise of authority for a district court judge.  I mean it's

23  in the cases.  I read it in the cases.  I don't know how to

24  apply it.  I see the Supreme Court can do it.  It raises a

25  serious question in my mind about the proper function of the

1    judiciary and at what level.  I'm not a policymaking body.

2    I'm just talking out loud now.  It's really something that

3    gives me pause.

4         MR. LIEBMAN:  I can sympathize with that.  I think,

5    you know, it's the role of the district court to apply as best

6    as possible the precedent that's come down from the higher

7    courts, and the higher courts through the animus quadrilogy

8    has said here is how you do it.  It might not be precise, but

9    you do your best to apply it, and if you get it wrong, then

10   there's the courts of appeals to fix it.  But I don't think

11   what we're asking for would demand policymaking at the trial

12   court level.

13        THE COURT:  That's an imprecise reference.  I mean I

14   guess I just view my role -- it is different than the -- but

15   you've stated it correctly.  My obligation is to apply the law

16   as best I can understand it from the courts above.  All right,

17   thank you.

18        Let's turn -- we have a little more work still to do, but

19   let's -- I don't know that I need much argument about strict

20   scrutiny beyond what you've said in your papers.  I think I'd

21   like to turn for a moment to intermediate scrutiny in the

22   event that the Court decides that that's the level of scrutiny

23   that applies to this statute.

24        Mr. Kaiser, I think -- I think -- let me state it more

25   generally and then invite you to illuminate the issue for me.

1    In somewhere around 600 pages of briefing I think the State
2    devotes a grand total of about four pages to arguing how this
3    statute is narrowly tailored to the significant governmental
4    interests that are identified.  There's about three and a half
5    pages in the State's memorandum in support of its motion for
6    summary judgment and one paragraph in its reply memorandum.
7    And to me this seems like sort of where the rubber meets the
8    road on intermediate scrutiny.
9         It is not clear to me from the briefing how the
10   restrictions in the statute relate at all to the four
11   governmental interests identified in the paper, let alone how
12   they're narrowly tailored to further and advance those
13   interests.
14        The statute on its face -- and I'm summarizing now, and I
15   understand the devil is often in the details in the careful
16   work that we do in this courtroom.  But the statute says don't
17   lie to get access to the property, don't record stuff
18   surreptitiously, don't record stuff while you're trespassing,
19   and don't record stuff without the permission of the
20   landowner.
21        And on the other hand what you're talking about is avian
22   flu, biosecurity outbreaks, health and safety of employees
23   when others are distracted in the workplace, and the like.  I
24   mean it seemed to me that this was a powerful statement and
25   simply put by the plaintiffs, and I want to bring it directly

1    to your attention and invite your response because I want to

2    ensure I'm giving full weight to the State's position.

3        When the plaintiff said -- this is on page 25 of docket

4    number 171.  I think this is the plaintiffs' opposition to the

5    State's motion for summary judgment.  They say the law

6    criminalizes even the most cautious and diligent undercover

7    employee and is thus overinclusive, and at the same time the

8    law does not criminalize careless violations of security or

9    food safety rules by non-investigators, thus rendering it

10   grossly underinclusive, as the law relates at least to the

11   four governmental interests identified.  That seemed correct

12   to me.  Why is it wrong?

13       MR. KAISER:  Well, we have to start with the

14   standard, which of course recognizes that the law doesn't need

15   to be perfectly tailored, and it doesn't even need to be --

16   it's certainly not the least restrictive and not perfectly

17   narrowly tailored.  And the harms that have been articulated

18   by our experts that we've -- that we've talked about are about

19   people who the owner doesn't know, are doing activities that

20   they don't know about, or have gotten there in a surreptitious

21   manner, and that's dangerous.

22       We have a number -- the statistics are mind-boggling

23   about the number of hens that had to be destroyed because of a

24   avian influenza and porcine diarrhea virus.  And the fact that

25   the federal government has suggested that for owners of birds

1   to be reimbursed if they -- if their flocks are destroyed,

2   they have to have a biosecurity measure.  Certainly subsection

3   (b) goes exactly to that.  Who are these people and where have

4   they been?

5            THE COURT:  No, no.  This is where I think you may

6   have lost me.  I mean I think that the governmental interests

7   that the state puts forward, many, maybe all of them, are

8   significant interests.  I don't -- I doubt if there's anyone

9   in this courtroom that disagrees that there's an important

10  governmental interest in protecting against animal exposure to

11  infectious disease by controlling human movements.  How is

12  that related in any way to the statute's prohibition on

13  gaining access through misrepresentation, unless that

14  misrepresentation is disguised to conceal an intent to harm

15  the food supply for example or something?

16           MR. KAISER:  Well, for example as the -- one of the

17  amici noted, there is -- in general biosecurity protocols

18  there's a three day quarantine period if a -- if a person has

19  had contact with other avian species.

20           THE COURT:  That question is not asked to anybody

21  that wants to access the facility though, is it, at least not

22  under the statute?  The statute isn't drawn to determining

23  whether anyone seeks access to a facility who has been

24  previously in contact with another facility or anything.

25  There's nothing about the misrepresentation that would

1    implicate paragraph B of the statute that is tethered in any

2    way to any of the safety risks that are identified in the

3    papers.  It could be as simple as a misrepresentation that I'm

4    legally -- I'm lawfully in the United States.

5              MR. KAISER:  It could be.

6              THE COURT:  It could be I'm an assistant scout

7    leader with the Boy Scout troop that's here for the tour.  It

8    could be -- it could be anything.

9              MR. KAISER:  It could be.

10             THE COURT:  How is that prong narrowly tailored --

11             MR. KAISER:  Well --

12             The Court:  -- to prevent the spread of disease

13   among the food source?

14             MR. KAISER:  It also could be I'm not a member of an

15   animal rights organization who has been on four farms in the

16   last 48 hours.  And when we're considering the purposes --

17   when we're considering the types of regulation here, the types

18   of misrepresentation, Ward says that narrow tailoring is

19   satisfied so long as the regulation promotes a substantial

20   government interest that would be achieved less effectively

21   absent the regulation.  Well, would it be more likely that

22   humans would be moving through farms or processing facilities

23   deceptively absent the regulation?  Absolutely.

24             THE COURT:  Let me ask you this.  Where is the

25   evidence that any member of an animal rights organization has

1   caused any of these foodborne illness outbreaks that are the

2   subject of the biosecurity concern?

3           MR. KAISER:  Well, to be honest, Your Honor, we

4   don't have that evidence.

5           THE COURT:  Right.

6           MR. KAISER:  And part of that is because it's been

7   very difficult to get farmers to stand up for this law because

8   of perceived threats of retaliation by plaintiffs or folks

9   like them.

10          THE COURT:  So the State's position is that if a

11  person makes a misrepresentation to a owner of a company, an

12  agricultural company, that person presents a biosecurity risk?

13          MR. KAISER:  That person may present a biosecurity

14  risk.

15          THE COURT:  Could the State take any further action

16  that's more narrowly designed to determine whether such a

17  person would present such a risk?

18          MR. KAISER:  Yes.

19          THE COURT:  All right.  It's not required, of

20  course, to have the least restrictive means --

21          MR. KAISER:  That's right.

22          The Court:  -- or the least intrusive means, but it

23  has to be narrowly tailored.  That has to mean something

24  beyond just that there's a hypothetical possibility, does it?

25  I mean subsection (b) may present a perfect illustration of

1    this in light of the case law.  It is a blanket statement

2    about criminalizing conduct.  Let's assume for purposes of

3    this discussion that it's First Amendment protected conduct.

4    Let's assume for purposes of this discussion that it's

5    content-based so we're applying the -- we're applying the

6    intermediate scrutiny in reviewing the statute.

7                MR. KAISER:  Content-neutral.

8                THE COURT:   Content-neutral.  I'm sorry,

9    content-neutral, so we're applying intermediate scrutiny.  The

10   risk is the spread of biohazards in the food source.   The

11   thing that's prohibited is a First Amendment statement that's

12   untrue.  That's the best the State could do?  You don't have

13   to do the best, but that's something that's restricted and

14   narrowly tailored to that risk that's presented in some

15   fashion?

16               MR. KAISER:  Well, the standards require that the

17   restriction be reasonably but not perfectly targeted to

18   address the harm intended to be regulated.  And remember the

19   harms here are the four that we've articulated in privacy and

20   private property, and these -- and what does the restriction

21   do?  The restriction keeps people off of land that is

22   biosecure, that has dangerous animals, that has dangerous

23   perhaps processing facilities.

24               THE COURT:   That's not true.  It keeps liars off the

25   land maybe.

1                    MR. KAISER:  Right.

2                    THE COURT:  That's all it does.

3                    MR. KAISER:  That's what it does.  But inherent in

4      those misrepresentations are that the landowner doesn't know

5      who those people are.  And that's what's important, because if

6      you say I'm a journalist, the landowner can say, oh, have you

7      done 15 interviews at other farms?  Oh, yeah.  Well, maybe we

8      shouldn't go into the barns but, you know, you can interview

9      me in my house.  If the person says -- is actually a

10     competitor and he says, no, I'm just looking for a job, we

11     don't know where that person has been and what exposures those

12     folks have had.  If the person says I'm a part of the Boy

13     Scout troop and in fact they're hired by an organization like

14     plaintiffs, the risk is higher.  And certainly that meets the

15     standard.  The regulation promotes a substantial government

16     interest that would be achieved less effectively absent the

17     regulation.

18          And I will concede that our record does not show that

19     plaintiffs' undercover operatives have created any of the

20     diseases that we risk, or that plaintiffs' undercover

21     operatives have caused an injury to another worker.  Though

22     there is certainly some evidence in the record of plaintiffs'

23     undercover operatives perhaps prolonging suffering of animals

24     by not reporting abuse in a timely manner.  And that's --

25     that's the evidence that we have for Your Honor and it's -- we

1    think it's sufficient.

2         THE COURT:  And subsection (b) is a good example,

3    the misrepresentation prong.  That protects against human

4    exposure to zoonotic disease and contamination?

5         MR. KAISER:  Yes.

6         THE COURT:  How?

7         MR. KAISER:  Well, for the reasons that I just

8    articulated.  Because the statement -- someone is making a

9    false statement to get access to an animal agricultural

10   operation is misrepresenting that person's identity and not

11   allowing the owner or the operator to know where that person

12   has been.

13        THE COURT:  So one of the principal arguments that

14   the State advances on the manner in which -- well, I guess

15   it's a -- let's see.  This is the argument about how the act

16   is narrowly tailored to the significant governmental

17   interests.  You complain that animal rights activists don't

18   appear to be offered training on biosecurity to their

19   investigators.  Those are the same investigators that are

20   seeking employment that then receive the same training from

21   the employer that all the other employees receive, no?

22        MR. KAISER:  That's right.

23        THE COURT:  So is it a -- so how is that harm not

24   mitigated?

25        MR. KAISER:  It's mitigated to some extent, Your

1    Honor, but the nature of the undercover investigator's

2    investigations is different from -- from a guy just seeking

3    employment.  The guy who is just seeking employment is coming

4    in and saying I want a job, and the owners, the farm owners or

5    the processing owners are going to say, well, this is an

6    aviary.  Have you been hunting in the past three days?  Well,

7    yeah.  Okay.  Well, come back on Thursday.  The undercover

8    investigators aren't going to say things like that.

9              THE COURT:  Why do you think that's the case?  I

10   mean --

11             MR. KAISER:  Because it would disclose their work as

12   undercover investigators.  Yeah, I've been at three farms in

13   the past 24 hours looking for a job.

14             THE COURT:  And the suggestion in the papers, in the

15   Government's -- or in the State's response that the undercover

16   investigators pose some threat to animal safety -- I'm not an

17   expert.  I understand that's not my role, but it's

18   counterintuitive to me that the animal rights activists who

19   seek to improve the well-being of animals would intentionally

20   expose animals to risks of -- biosecurity risks or others that

21   have wiped out tens of thousands or hundreds of thousands of

22   animals.

23             MR. KAISER:  Well, animals rights activists who want

24   to secure the rights of animals have released thousands of

25   mink knowing that mink that are in captivity can't live out in

1   the world, but yet they do it because of a political

2   statement.

3        And there's evidence in the record that PETA has delayed

4   production of animal rights -- of videos showing harm because

5   it's more effective for their speech.  And maybe in the

6   greater good that means we'll stop producing animals for food,

7   but those animals have more suffering in that short-term.

8             THE COURT:  Well, is it the State's interest to

9   promote the supervision of the conditions in which the animals

10  are kept on these farms and to make that information more

11  readily available to -- I mean part of the State's argument

12  here is that we're seeking to reduce harm to animals.  That's

13  what I understood you were to be arguing at least in part.  So

14  do we need more information about how the animals are kept and

15  how they're treated in the facilities --

16            MR. KAISER:  I don't --

17            THE COURT:  -- or less?

18            MR. KAISER:  I don't think we need more information.

19  The harm to animals is largely of their exposure to zoonotic

20  diseases.  It's also their exposure to folks who have divided

21  loyalties and, you know, might not be slaughtering that animal

22  properly to get a video, might not be reporting quickly

23  someone who is violating the law and committing an act of

24  animal abuse.

25            THE COURT:  Acts of animal abuse are covered

1   elsewhere in the statute, aren't they?

2           MR. KAISER:  In criminal law, yes.

3           THE COURT:   There's criminal prohibitions against

4   those things --

5           MR. KAISER:  Yes.

6           THE COURT:  -- if that's what we're concerned about.

7   Is the statute necessary or helpful to advance those causes?

8           MR. KAISER:  Is the statute necessary to advance

9   those causes?

10          THE COURT:  Or helpful?

11          MR. KAISER:  Well, I think it's helpful.

12          THE COURT:  It gives a second count in a criminal

13   information I guess for somebody who engages in animal abuse?

14          MR. KAISER:  Yes.

15          The Court:  The State makes the statement in support

16   of its second identified interest protecting against harm to

17   animals caused by unqualified or inattentive workers by

18   saying, and then you put this in quotes, a person entering an

19   animal agricultural facility to surreptitiously record, quote,

20   likely does not have the best interests of the individual

21   animal in mind, end quote.

22          MR. KAISER:  That's right.

23          THE COURT:  Is this what we're down to to support

24   the justification for the State's interest is what's -- what's

25   the intent of the person, the hypothetical person, who may be

1    present and if your expert is hypothesizing about whether such

2    a person would have the best interests of the animals in mind?

3    That's the State's justification for how the statute is

4    narrowly tailored to the significant interest?

5            MR. KAISER:  Yes, Your Honor, and we think it meets

6    the statute's or the test articulation, whether without the

7    statute the government's interest wouldn't be as well

8    served.

9            THE COURT:  I wondered whether the fourth interest,

10   the one about harm to facility employees caused by inattentive

11   workers -- this was just an example.  And I think this is what

12   the courts are cautioned not to do, so let me do it, but just

13   by way of illustration.  The concern I think that's

14   articulated by the State is if you've got someone who is

15   interest -- there who is interested in recording what's

16   happening, they may not be paying attention to what's

17   happening, and these are dangerous places where people could

18   get harmed.

19           MR. KAISER:  That's right.

20           THE COURT:  The statute doesn't purport to prevent

21   anybody from checking their e-mail or playing games on their

22   phone or texting or making phone calls or doing anything else

23   that employees might do that would distract, just recording.

24           MR. KAISER:  That's right.

25           THE COURT:  And it's irrelevant, right, because if

1    the one thing that the State identifies could help advance the

2    purpose of the statute, then that's enough.

3              MR. KAISER:  That's right, and particularly when

4    that's the understood harm that that statute seeks to -- seeks

5    to prevent.

6              THE COURT:   Right.  The understood harm drawn from

7    what experience?  We point to what evidence in the record that

8    animal rights activists have caused harm to coworkers through

9    inattentiveness because of recording?

10             MR. KAISER:  Well, I will also concede that there is

11   no evidence in the record that animal rights activists have

12   caused this harm.  Our experts who worked in the food safety

13   inspection service, worked for the FDA, have worked as

14   consulting for animal welfare on the industry side have

15   articulated this is a serious concern that they would have

16   based upon their experience in particularly processing

17   facilities.

18             THE COURT:  Two questions related to that I think.

19   Do you agree with -- am I correct -- I went searching for

20   evidence that the State supplied that there is any documented

21   incident of animal rights activists or anyone else causing any

22   of these harms that are identified by the State by recording

23   surreptitiously in any of these facilities?  I didn't see that

24   evidence.  There is none in this record; is that true?

25             MR. KAISER:  That's true, there's none in this

1  record.

2          THE COURT:  It's not a requirement, of course, but I

3  wanted to ensure I hadn't missed it.

4          MR. KAISER:  Yes.

5          THE COURT:  And I think the State's argument is

6  these are -- these are nevertheless things that our experts

7  hired to review the statute after the fact say could be

8  concerns that might arise and this statute would help

9  alleviate them.

10          MR. KAISER:  They are concerns that would arise.

11  And I should -- I should qualify that with the statement that

12  there is evidence in the record that for example sometimes

13  undercover animal rights activists delay their findings to

14  increase their public impact even if that means waiting for

15  particular animals to be harmed repeatedly during the process.

16      Now, that's not happened in Utah and there's no evidence

17  that these particular plaintiffs, any undercover agent of

18  these particular plaintiffs, has engaged in that, other than

19  some evidence that PETA has delayed reporting some of the --

20  their -- some of their undercover investigations to law

21  enforcement.

22          THE COURT:  I don't know.  Mr. Liebman might tell

23  me -- more likely he won't -- but ALDF or PETA might say

24  today, yeah, if this statute is invalidated and we can place

25  investigators there and they begin to acquire this

1    information, we absolutely will continue to acquire

2    information rather than immediately report because that's the

3    most instrumental way to make the case that we're trying to

4    make.

5        And the State's argument I think is, but if you allow any

6    of the harm to go unaddressed, that you're actually causing

7    further harm and that's what we intend to stop, except that we

8    don't want anyone there documenting it.  We want to make it

9    illegal for anyone to record it, but if anybody sees it,

10   they're required to report it.

11       MR. KAISER:  Not anyone.  The statute of course

12   related to recording is very, very narrow and targeted to

13   folks who intend to only record -- well, not only -- but

14   intend to record in opposition to the property owner's

15   prohibition and then do record.  That doesn't include

16   employees who say, oh, my goodness, I can't believe John just

17   did that.  I've got to report this, and no one will believe me

18   if I don't have a picture of it.  And so the statute is more

19   narrowly tailored than just a prohibition on recording, at

20   least for those -- for that specific harm.

21       THE COURT:  I have some questions about overbreadth

22   but I think they're best put probably to the plaintiffs.  Let

23   me ask you, Mr. Kaiser, before I invite you to switch out

24   spots at the podium, what have I missed with respect to the

25   narrow tailoring?  The State has made its arguments on pages

1  14 to 19 of its brief and then again in its reply.  Is there

2  more to add besides what we've talked about here?

3          MR. KAISER:  Your Honor, only that these -- this

4  sort of evidence can be considered by the Court and can be

5  balanced by the Court.  I have a really long quote from Clark

6  versus Community of Creative Non-violence.  That's the

7  sleeping in the park case.  And the plaintiffs there wanted to

8  get a homeless tent city right to protest, and the Court said,

9  well, that's not protected, but even if it is, it's not for --

10  up to us to decide how many hours they should be there, how

11  much camping there should be there.  That it's the -- it's the

12  Park Service's determination.  We do not believe that time,

13  place and manner designations assign to the judiciary the

14  authority to replace the Park Service as manager of the

15  nation's parks or endow the judiciary with the competence to

16  judge how much protection of park lands is wise and how that

17  level of conservation is to be attained.

18      And so while the Court can consider these and must

19  consider the requirements under Ward, and even iMatter,

20  whether the restriction reasonably targets the -- to address

21  the harm intended to be regulated and is satisfied if the

22  regulation promotes a substantial government interest that

23  would be achieved less effectively absent the regulation, it's

24  not strict scrutiny and it's not least restrictive means.

25          The Court:  The State's interests -- let me think.

1    I think sometime this morning I thought I finally had this

2    question well framed in my mind and now I've forgotten how I

3    stated it, but in short I've wondered whether the State's

4    preferred justifications prove too much.  If the question is

5    for example to prevent distracted workers, that's

6    justification for nearly any restraint that the State would

7    seek to place on employees in their workplace, including I

8    guess unprotected speech that employees might otherwise enjoy

9    in the workplace.  When wouldn't that be a justification then?

10   I mean it seems like then we'd be just rubber stamping any

11   restriction.

12            MR. KAISER:  Well, remember that we have to consider

13   this in the context of this law, in the context of these

14   particular facilities.  We're not just talking about employee

15   distractions back in my office.  We're talking about employee

16   distractions in either a farm where there are -- where there's

17   serious risk from the -- from injury, from animal injury, or

18   from a animal processing facility where there's -- it's one of

19   the most dangerous occupations in the country.

20        So, yes, in general would that -- would that interest be

21   suspect?  Perhaps.  I mean if we were talking about a

22   prohibition on recording in -- in your chambers, although we'd

23   have different justifications for a prohibition on recording

24   in your chambers, but we've got to consider it in the context

25   here of the facilities to be regulated.

1          THE COURT:  Thank you, Mr. Kaiser.

2      Mr. Liebman, I'd like to get to those issues.  Before I

3  do, can you help us understand better how the plaintiffs view

4  overbreadth relating to these other doctrinal issues?  Where

5  in the Court's analysis does that overbreadth analysis fit?

6          MR. LIEBMAN:  I think the simplest way to frame

7  it -- I don't think it's especially significant.  If the Court

8  finds essentially that the arguments that we've made about why

9  the statute is content-based and fails strict scrutiny,

10  overbreadth doesn't matter; if it's content-neutral and it

11  fails intermediate scrutiny, overbreadth doesn't matter.  It

12  really comes in if the Court is convinced that there might be

13  constitutional applications of the statute, there might be

14  some permissible restraints on misrepresentations or recording

15  but the statute bans too much.

16          The Court:  Too much, right.

17          MR. LIEBMAN:  So I don't think there's really a need

18  to go over a separate claim or cause of action.

19          The Court:  We get to that in your view after the

20  Court considers whether there's First Amendment rights

21  implicated, makes a determination about the level of scrutiny

22  to apply, goes through all of that, and then if there's

23  something remaining, then we would consider it through the

24  lens of overbreadth I guess before we get to the equal

25  protection analysis?

1      MR. LIEBMAN:  Yes.

2      THE COURT:  And I guess a related question that we

3  wanted to put to all of you today, I'm not sure I still can

4  see a meaningful application of the overbreadth analysis -- or

5  excuse me -- the equal protection analysis here.  I understand

6  Dean Chemerinsky is urging this and Judge Winmill went in this

7  direction.  There's a fundamental right potentially at issue

8  here, but it's a First Amendment right.  We have a doctrinal

9  way to evaluate that right.  What sense does it make -- I mean

10  if there is a protected First Amendment right, we'll be taking

11  it up in the context of the First Amendment analysis, and if

12  there's not, then I'm not sure I see how the equal protection

13  analysis is really going to be very helpful to us here.

14      MR. LIEBMAN:  I think you're right.  I don't think

15  it does independent work.  If the statute violates the First

16  Amendment, it also violates the Fourteenth Amendment under the

17  fundamental rights analysis.  But the inverse is true.  If we

18  don't win under the First Amendment, we don't win under the

19  fundamental rights analysis.

20      THE COURT:  Okay.  That was how I was conceiving of

21  it.  I wasn't sure if I misunderstood your position based on

22  your papers.

23      Let's talk about intermediate scrutiny, should we?

24      MR. LIEBMAN:  Yes.

25      THE COURT:  The State's -- the State's correct.  I

1   mean Mr. Kaiser pointed to the correct standard, right?  And I
2   sometimes say this in court.  My law clerks ordinarily become
3   very alarmed when they show up to work on their first day, and
4   I explain -- there's any number of reasons for that, but what
5   seems to catch them off guard is I tell them that they'll be
6   required to get two tattoos, one on each arm, one that says
7   standards and one that says burdens, because my work is
8   focused like a laser on those things.  That's what drives the
9   work of a trial court in my judgment.  What is the standard
10  that I'm required to apply, and who before me carries the
11  burden?  I think Mr. Kaiser has correctly identified the
12  intermediate scrutiny standard, has he?  No?
13          MR. LIEBMAN:  I don't think so, Your Honor.
14          THE COURT:  Okay.  How so?
15          MR. LIEBMAN:  Well, I think the way it's been
16  explained here sort of degrades it to something like rational
17  basis review where post hoc justifications are all that
18  matter, that conceivable, you know, bare assertions of harms
19  are adequate, and that's simply not the test.
20          THE COURT:  No.  It needs to be more than that,
21  right?  But neither need it be the least restrictive or least
22  intrusive means, but it need not be -- and it's not left to me
23  to determine whether there's a better way to do it.  The
24  question is does it -- now I've misplaced the specific
25  language, but I thought he was citing it correctly.  Does it

1    advance -- does it advance the governmental interest?  Does it

2    materially aid it?  Is that too general?

3             MR. LIEBMAN:  I think it's too general and too

4    generous.  I think the Court has in many ways narrowed that

5    assessment under Ward in the McCullen case, and this is at

6    page 2535 of McCullen where the Court says that under

7    intermediate scrutiny the restraint must not burden

8    substantially more speech than is necessary to further the

9    government's legitimate interests.  And also that the

10   government, even though it need not be the least restrictive

11   means, may not regulate expression in such a manner that a

12   substantial portion of the burden on speech does not serve to

13   advance its goals.

14        And here where we're talking about restraints on lies

15   regardless of what's lied about, where we're talking about

16   recording regardless of whether or not it's distracting, or

17   lies regardless of whether or not someone has been on a farm

18   in the last three days, and there's nothing in the record that

19   says that investigations are that fast and furious, in each of

20   those cases a substantial portion of the burden on speech does

21   not serve to advance the goals and the statute would fail

22   intermediate scrutiny.

23        So I think the articulation of the intermediate scrutiny

24   test in McCullen, which is the Supreme Court's most recent

25   analysis of it, is more demanding than the way the State has

1    framed it.

2         And certainly, you know, even in McCullen, a buffer zone

3    would in some ways advance the interest in preventing traffic

4    congestion or sidewalk congestion, but intermediate scrutiny

5    nevertheless demands more, that there be not the least

6    restrictive means, but that the burden not disproportionately

7    affect speech rights in ways that don't even advance the

8    government's interest, and that's exactly what we have here.

9         THE COURT:   Help us apply the second part.  You're

10   reading from paragraph numbered 18 from the McCullen decision.

11   The second part of that you recited where the government still

12   may not regulate expression in such a manner that a

13   substantial portion of the burden on speech does not serve to

14   advance its goals.  How does that relate in the context of

15   this regulation do you think?

16        MR. LIEBMAN:   Well, this prohibits

17   misrepresentations regardless of what is misrepresented.  And

18   the State has articulated these, you know, four just generally

19   call them safety rationales.  And I think it's important that

20   we can get to that in a moment that those aren't -- shouldn't

21   even be considered by the Court, but we can bracket that for a

22   moment.

23        But the regulation on misrepresentations, regardless of

24   what's lied about, burdens speech that doesn't even advance

25   the interests and safety.  So for example if we have a

1    misrepresentation that simply says, you know, I don't work for

2    an animal rights group, that doesn't implicate the stated

3    concern about someone who has been on another farm and might

4    be a disease vector.

5        In the same sense that recording, that done by a diligent

6    employee, and I think the portion of our brief that Your Honor

7    read to Mr. Kaiser is informative on that, that the most

8    diligent undercover investigator who wears the button-cam that

9    otherwise forgets it's there, does his job, is not distracted,

10   that the burden on that individual's speech doesn't advance

11   the government's interest in this constellation of safety

12   concerns.  That I think is the reason that this statute fails

13   intermediate scrutiny.

14       THE COURT:  Plaintiffs take the position in their

15   papers, and you just stated it, that we don't even reach these

16   proffered government objectives.  I think your -- as I recall,

17   the argument was where the State has invoked the legislative

18   privilege on the one hand, it can't then simultaneously

19   purport to offer justifications.  Is that the argument,

20   relying on the Nebraska District Court decision?

21       MR. LIEBMAN:  That's part of it.  And there's

22   another case, Awad versus Ziriax, a Tenth Circuit case from

23   2012.  It's an Oklahoma Sharia law case where the Court says

24   that it cannot and will not uphold a statute that abridges an

25   enumerated constitutional right on the basis of a factitious

1  governmental interest found nowhere but in the defendants'

2  litigating papers.

3  That's exactly what we have here is post hoc rationales

4  that the State has come up with to defend the statute after

5  the fact, and those shouldn't be considered.  The only

6  compelling or the only significant interest that actually

7  animates the discussion through the legislative history again

8  is the desire to suppress the speech of animal rights

9  advocates, which not only isn't significant, it's not even

10  legitimate.

11  And so I think the Court ought to focus only on the

12  actual motivation for the statute in assessing the purported

13  interests here.

14  THE COURT:  That's what I thought I understood you

15  to say in your papers, and that's what I hoped I hadn't read.

16  What do we do about that?  I touched on this.  I think

17  Mr. Kaiser was at the podium.  On the one hand this only --

18  this issue only arises in the context of government action

19  where we have a party come into court after the fact and

20  purport to offer an explanation for something, and then

21  ordinarily doesn't make anybody available who is related to

22  that decision to explain it, and instead turns to other

23  people.

24  We would never -- I don't want to speak too broadly.  We

25  ordinarily wouldn't allow a corporation to come in and say,

1   well, we took this act for this reason, but we're not going to

2   make anybody available to testify about it.  We would never

3   allow it.  We wouldn't allow anyone to testify about that.

4   But government is different, and government action and

5   legislation is different, right, for reasons that we've talked

6   about.

7       We don't want legislators sitting in courtrooms under

8   oath talking about the justifications or rationales for

9   legislation, do we?  Does a legislator sit for a deposition in

10   this -- how many legislators?  And do they testify about their

11   intention or do they speak -- is there a Rule 30(b)(6)

12   designee for the legislature who comes in to talk about the

13   intent and purpose for the legislature?

14         MR. LIEBMAN:  Well, I think Your Honor is right that

15   that's their choice and the legislative privilege shields them

16   from doing that.  But it can be, you know, in the case where

17   the legislature refuses to put forward its legitimate motives

18   after the fact, then we use what we have, and what we have is

19   the legislative history that's contemporaneous with the

20   decision-making body, which as we've discussed earlier,

21   Arlington Heights makes clear is a way to suss out what the

22   motive was for a statute.  And I think that applies just as

23   much when we're looking at what interest motivated the

24   legislature for the tailoring or the application of scrutiny

25   as it does for the reasons we discussed earlier.

1    THE COURT:  So a little old judge like me after the

2    fact reviews printed transcripts of floor statements and

3    committee hearings, and I divine what the legislative intent

4    was somehow by extracting from all of the varied statements by

5    the varied people what the legislative intent is and say to

6    the legislature because you didn't agree to sit for deposition

7    under oath, you can't respond, and that's it.  And then we

8    move forward and we determine whether what I've come up with

9    is sufficient or not.  We don't allow the State to come in and

10   make an offer or an explanation for a State purpose?

11   MR. LIEBMAN:  Not after the fact.  And that's

12   exactly the reason that we have the tiers of scrutiny is to

13   prevent the government from acting in one way that shows an

14   illicit discriminatory motive and then after the fact coming

15   in with post hoc rationalizations that obscure that fact.

16   THE COURT:  Am I right that there's not a Supreme

17   Court case where the Supreme Court has said the State offers

18   justifications A, B, C.  We decline to consider them because

19   the State legislators invoked their legislative privilege?

20   MR. LIEBMAN:  Not because of the legislative

21   privilege other than that case that we cite in the footnote

22   about the legislative privilege.  But there's certainly cases

23   where the Court is trying to determine the actual motive or

24   the purpose and the interest that motivated the passage of a

25   statute.  That's Lukumi.  That's Arlington Heights.  And, you

1    know, the idea that that might be imprecise is acknowledged in

2    those cases, but nevertheless it prevents post hoc

3    rationalizations that obscure more invidious forms of

4    discrimination.

5         If the rule were otherwise, you know, the deliberative

6    body could say all sorts of horrible things and, you know, say

7    this is for this purpose, but don't worry, when we get hailed

8    into court, we'll come up with some other reasons.  And that I

9    think would truly defeat the purpose of the tiers of scrutiny

10   that really try to suss out the link between the actual

11   motivations of the statute and the extent to which the statute

12   is narrowly tailored to those ends.

13        THE COURT:  You told me you mentioned this is in a

14   footnote.  I'll just -- I thought I read every footnote.  I

15   don't remember.  Do you know what footnote you have in mind?

16        MR. LIEBMAN:  I don't.  Were you asking about the

17   legislative purpose?  And I think that's the District of

18   Nevada case about if they use it as a shield, they can't use

19   it as a sword.

20        The Court:  I was asking -- it's Nebraska.  Is it

21   Nebraska?  In any event, I was asking if there's a -- I don't

22   see a Supreme Court case where the Supreme Court has said,

23   well, we're not going to consider the proferred justifications

24   because the state legislature invoked the legislative

25   privilege.  Did I miss one?

1    MR. LIEBMAN:  Not that I know of, but I think that's

2  because that so rarely happens.  I mean the government in most

3  cases is pretty straightforward about what it's motivations

4  were.  And certainly the Awad versus Ziriax case, the Tenth

5  Circuit case, does say these sort of after-the-fact, you know,

6  ingenious interests that are found nowhere but in the

7  Defendant's litigating papers are not to be considered where

8  we're talking about the abridgement of constitutional rights.

9    And so that case I think, it's not the Supreme Court

10  but's it's this circuit making clear that those interests

11  shouldn't be considered.  But of course if Your Honor does

12  consider them, we would certainly argue that the statute is

13  not in any way narrowly tailored to those interests.

14    THE COURT:  You set out those arguments in your

15  papers.

16    MR. LIEBMAN:  Right.  Let me just make one more

17  point on that.  And I think the McCullen case is again pretty

18  instructive.  You know, a statute is not narrowly tailored

19  where there are preexisting generally applicable civil and

20  criminal laws that directly address the purported interests.

21  And the same applies here.  They could have a general --

22  generally applicable animal cruelty law that prohibits

23  treating animals cruelly.  They could have -- do have

24  generally applicable torts that address all of the interests

25  they just discussed.  There's rules against poisoning the food

1    system, and on and on.  And so --

2            THE COURT:  Trespass.

3            MR. LIEBMAN:  Trespass.  And of course the rights of

4    employers to fire any employee for any reason if they're

5    distracted or not, all of that are generally applicable,

6    content-neutral nonspeech restraining ways of directly

7    addressing the speech at issue.

8        And, you know, this idea that the public and workers and

9    the animals will somehow be better off if there's no

10   whistleblowing in this industry is, with all due respect to

11   the State, Orwellian.  I means these are investigations that

12   promote all of the interests that the State now purports to

13   defend.  Now, the statute is not only poorly tailored to those

14   interests, it's actually antithetical to those interests.

15       What it's perfectly tailored to is silencing animal

16   rights advocates by targeting the two methods that they use to

17   conduct these undercover investigations, which is gaining

18   access through false pretenses and recording videos.  And so,

19   you know, the sort of contortions to make this statute about

20   these interests, you know, when in fact the statute is

21   perfectly tailored to silencing critics of animal agriculture

22   I think really shows that the statute fails under intermediate

23   scrutiny.

24           THE COURT:   Thank you, Mr. Liebman.

25       Mr. Kaiser, I did want to ask you about -- I think you

1    had some additional comments, but I wanted to ask you about a

2    point that Mr. Liebman touched on and I forgot in your

3    argument.

4        The State says in its papers, if I understand it

5    correctly, the very same conduct that's prohibited by the

6    statute is okay if it's done by a whistleblower, but it's not

7    okay if it's done by somebody who, with the intent to go blow

8    the whistle, seeks out and obtains employment or goes on the

9    property.  What's the implication of that argument for the

10   intermediate scrutiny analysis?

11         MR. KAISER:  It's that the statute is not punishing

12   more speech than is necessary to effectuate the goals of the

13   legislature.  It's allowing legitimate reports of

14   whistleblowing.

15         THE COURT:  Well, are whistleblowers who are

16   recording in the workplace presenting the very same harm, the

17   risk of inattentiveness and physical injury, and injury to the

18   animals, harm to the animals, that you've just told me that

19   the statute is designed to prevent?

20         MR. KAISER:  No, because those folks didn't come

21   into the job with the intent to do these recordings.  They

22   responded to a situation that they saw, which gives them a

23   different perspective, a different experience and competency

24   that's different from someone whose only idea is to come in

25   and -- come in and record and get out.

1           The Court:  On what basis do we know that?

2           MR. KAISER:  I think it's logic and common sense.

3    If the Court -- do you have more questions?

4           THE COURT:  Just one more on that, and then I'd like

5    to hear any final comments you may have.  But from 10,000 feet

6    now, if we step back for a moment, what sense does it make

7    that in the State's view it is not only lawful but maybe

8    laudable to have whistleblowers as a matter of state policy

9    who observe wrongdoing in a workplace, including in an

10   agricultural facility, who engage in this conduct with the

11   intent and purpose to bring it to light, but that someone who

12   seeks to do the same thing but starts one step behind is

13   convicted of a misdemeanor?

14       When I say starts one step behind, the same intent formed

15   at a different point in time in the employment relationship,

16   but someone who goes to work in an agricultural facility to

17   support their family and two weeks in says, oh, my, I had no

18   idea.  This is awful.  I've got to alert somebody about it.

19   And somebody who two weeks earlier is making application

20   believing that the very same conduct is happening, maybe

21   having been told about it, who goes and seeks that employment

22   for the very same -- now the same purpose that the employee

23   has two weeks later to blow the whistle and bring it to light.

24   One is charged with a crime and the other is lauded under the

25   statute, the whistleblower statute.  What sense does that

make?

MR. KAISER:  Well, it makes sense, Your Honor, in the idea that the legislature did not want to -- animal safety is a concern of the legislature, and the legislature determined that -- that they didn't want to prohibit employees who had an ongoing relationship at the facility from reporting criminal activity.  But someone who is engaged -- who is coming in to spy, right, certainly some of those people might have heard that there's some -- there's some illegal activity, but there are also people who are coming in to record legal activity that they wouldn't otherwise have access to.

There are some people who are coming in to record business activity that they want for a competitor.  Maybe there's a journalist on one side of the issue or the other who is engaging in employment-based surreptitious recording.  And the legislature determined that those folks pose the risks not only to safety and security but also to privacy.

I mean if we want to talk about the issues and justifications that the legislature considered, the words private or privacy were used 45 times in the very short record of the debates in the committee hearings that we have.  And someone who is coming in to record for the purpose of recording is someone who is coming in for the purpose of invading that privacy and private space.  Someone who is recording based upon reactive, not proactive but reactive to a

1    situation that they encounter, is -- is blowing the whistle on

2    illegal activity, and that's a differentiation that the

3    legislature could -- can make.

4            THE COURT:  You came to the podium though with some

5    notes.  You wanted to make some comments in light of

6    Mr. Liebman's comments.

7            MR. KAISER:  I did.  I think that the citation

8    that -- the proposition that the legislators seeking immunity

9    and then having the whole state being precluded from asserting

10   justifications for a law is not based in any law I'm aware of.

11   I admit I'm not sure I'm familiar with the Tenth Circuit case

12   that they cited, but what was in their brief is this either

13   Nebraska or Nevada case.

14       And what happened in that case was that a legislator

15   asserted immunity and then wanted to file a brief about what

16   his view of the -- of the legislation was, the purpose of the

17   legislation.  And the Court said, no, no, no, you can't -- you

18   can't do that.

19       Well, that's very, very different from the State

20   asserting bases.  And if the plaintiffs want to call in a

21   legislator and ask about what the purpose of the law is,

22   that's the same after-the-fact rationalizations that they're

23   criticizing the State for doing now.

24       And the plaintiffs keep saying, Mr. Liebman keeps saying,

25   that the avowed purpose of this law was to silence animal

1     rights activists.  Well, you start reading the transcripts, to

2     the extent that the Court cares, and representatives

3     repeatedly say this is a privacy and safety -- well, this is a

4     privacy and private property issue, and more than once also

5     talk about food safety and animal safety.

6          Now, I'll admit that's -- those are sporadic references

7     in the record, but they're not absent.  And this wasn't a case

8     of the hypothetical that you were mentioning about three hours

9     ago of a legislator -- legislature talking only about hating

10    on a particular group.  There was certainly a lot of

11    discussion of privacy, private property, ability to control

12    property, the necessity to control animal operations, and the

13    concern about family farms that exist in the state, which are,

14    you know, 95 percent of animal agricultural operations in

15    Utah.

16              THE COURT:  We have the legislative history, and I'm

17    actually not -- I'm not convinced actually that we've read the

18    Senate -- there was a Senate committee hearing.  I think that

19    that transcript was submitted, and I don't think we got to

20    that.  But we've reviewed a lot of it and it speaks for

21    itself.

22         I do want to say this though in response to what you

23    said.  I want this to be clear today.  I'm invoking in this --

24    and we had a discussion earlier about this.  It's the Court's

25    standard practice in every case.  It's a matter of fairness

1    and application of the rules.  We're not going to expand today

2    the State justifications for the statute in terms of our legal

3    analysis.  The dispositive motion deadline was set for a

4    purpose.  The parties both filed cross-motions for summary

5    judgment and oppositions and set forth their positions in the

6    papers.  The word privacy appears once in the reply at the end

7    of a clause I think is my recollection in the section of the

8    brief relating to the -- whether the -- what's the

9    intermediate scrutiny analysis?

10        And the reason this is important -- I do this in every

11   case.  We don't come to oral argument and present a new issue

12   about which the other side didn't have notice in advance so it

13   could be adequately briefed.  I understand and appreciate what

14   you're saying about what's the motivating purpose behind the

15   law, and certainly I'll have that in mind as I review it, but

16   it won't be part of the Court's analysis as the -- under

17   intermediate scrutiny.  That's not been fairly and timely

18   presented by the State in my view.  But you wanted to make

19   other comments.

20        MR. KAISER:  Your Honor, just that the two cases

21   that the plaintiffs have been talking about for the last

22   couple of times back and forth to the podium.  Arlington

23   Heights, right, is a 1977 case that's about Fourteenth

24   Amendment equal protection challenges to housing

25   discrimination.  And to prevail in a housing discrimination

1    claim you have to prove intentional discrimination.  And the
2    Court looks -- was looking not to a legislative intentional
3    discrimination but actions of the administrative body and
4    municipal agents.  And that sort of intentional discrimination
5    is way easier to determine.  You can figure out what a mayor
6    did or a zoning board did much more than a legislator or a
7    body of legislators.

8        And the case about -- the free exercise case about
9    slaughtered animals is similarly distinguishable about
10   legislative intent because there we're talking about the First
11   Amendment equal protection challenge.  The Supreme Court has
12   used intentional discrimination there as well in a very
13   different way than in a First Amendment speech case.

14       And if you look at it, the Court starts with the statute
15   and parses the words of the statute to see, wait a minute, you
16   used things like sacrifice to determine -- to define these
17   animal cruelty regulations, and that raises the specter at
18   least for us that these were done in violation of religious
19   rights.

20       And, yes, the Court goes on and looks at other parts of
21   the legislative history, but I don't think either of those
22   cases stands for the proposition that a facially neutral
23   speech -- a facially neutral statute charged under the speech
24   clause, that you can ignore the facial neutrality and seek
25   some sort of respite among the waters of legislative history.

1                    THE COURT:  Thank you.

2                    MR. KAISER:  Next topic?

3                    The Court:  I think that's as far as I hoped to go

4      today.  I think we've touched on everything.  I was going to

5      ask for closing comments, but I actually have learned over

6      time that I benefit greatly from the thoughts of my very

7      skilled and bright law clerks.  So let's recess for a few

8      minutes.  I think we've probably heard what we need to hear.

9      This is the time though for you to make argument.  So either

10     of you may have some closing remarks -- not right now but when

11     we come back you may want to add something more.

12         I think we've covered what I want to cover.  Let's --

13     it's almost 5:30.  We've been going for about four hours with

14     a short break in between.  Let's take five minutes and come

15     back in and wrap up whatever is left.  Thank you.

16                    (RECESS FROM 5:26 PM UNTIL 5:36 PM)

17                    THE COURT:  I'd like to tell you all that I thought

18     of one more question, but in fairness it was my law clerk's

19     question, but it's a good one and we had discussed it before

20     and the State said something in argument today that implicates

21     this potentially.

22         I don't know what the difference is exactly in the

23     context of your motions, but I think this is an as applied

24     challenge, but it really reads like a facial challenge, and

25     all of your arguments really seem to be a facial challenge to

1    the statute and a response.  That's how I'm construing it.  Is

2    that the wrong way to perceive it?

3            MR. LIEBMAN:  I think it is a facial challenge.  I

4    conceive of as applied challenges when the statute is being

5    enforced in a particular proceeding.  So I would frame it as a

6    facial challenge that would invalidate the statute altogether.

7            THE COURT:  Now, there were the individualized

8    questions relating to standing, but once there was standing,

9    it seemed there was a facial challenge presented.  That's how

10   I viewed it.  The State said earlier I think that there was a

11   facial challenge.

12       You see it differently, Mr. Kaiser?

13           MR. KAISER:  Well, Your Honor, I think the

14   plaintiffs' pleadings were not clear on the issue, but to the

15   extent that they make a facial challenge, I'm prepared to

16   defend a facial challenge under the standard that there's no

17   set of circumstances under which the law could be applied

18   constitutionally.  And to the extent that they are making an

19   as applied challenge, I think we've got some facts that talk

20   about their particular intended applications under the

21   statute.  They make it a facial challenge, I -- we'll stay

22   with a facial challenge, Your Honor.

23           THE COURT:  Well, what do you think you responded to

24   in your papers, and what did you move on?

25           MR. KAISER:  Well, we responded to their complaint,

1    which alleged a content or viewpoint discrimination in one

2    count, and we responded to an overbreadth challenge, which

3    that is a facial challenge, that's clear, in the other count.

4    And then we responded to equal protection.

5        My understanding of their claim on a content-based or

6    viewpoint-based discrimination challenge is that it's a facial

7    challenge, but we included, to the extent that the plaintiffs

8    were bringing an as applied challenge, we included facts

9    particularized to the plaintiffs.  I'm hoping I didn't make

10   things more complicated than when you came out of the door.

11             THE COURT:  No.  I think I construed the portions of

12   the State's brief presenting those facts as relating more to

13   the standing challenge that the State reasserted, though some

14   of it related to a discussion.  I think you wove through the

15   merits of the arguments.

16       It seemed to me that the quality and character of the

17   briefing and the argument was about -- was a facial challenge

18   to the statute, and that's how I construed it.  That's how I

19   intend to rule on it I think.

20             MR. KAISER:  Yes, Your Honor.

21             THE COURT:  Right, okay.  What else did any of you

22   want to tell me?  This is your opportunity.  It's the only

23   opportunity you have to give us your positions.  I think I do

24   want to say -- I mean we'll hear anything that you want to

25   tell us.  I mean that.  We'll stay as late as we need to stay.

1        I do want to tell you your briefing was excellent and

2   your argument today has been extremely helpful.  You have both

3   been superb.  You're obviously well prepared, and you've been

4   focused and responsive to the Court's questions.  Your papers

5   were clear and organized.  It was -- you've made our work so

6   much easier than it sometimes is, especially with some

7   complicated legal issues, and we're grateful for that.

8        What else do we need to know?  Mr. Kaiser, anything more

9   from the State?

10       MR. KAISER:  Just a little bit, Your Honor.  First,

11  in the content neutrality intermediate scrutiny standard, we

12  didn't talk about alternative channels of communication.  I

13  guess the plaintiffs probably don't dispute that there are

14  substantial alternative channels of communication.

15       I think it's interesting in this case what that exactly

16  means, because the plaintiffs are talking about recording as

17  a -- as a speech right, so does there have to be alternative

18  means of news gathering?  If that's the case, they certainly

19  win.  There are lots of ways that the plaintiffs can get the

20  information.  They admit that.  Does there have to be

21  alternative means of communication, the actual dissemination

22  of the information?  Well, that's not even challenged under

23  the statute.

24       So I think that, you know, to the extent that the Court

25  gets to that element, I think it demonstrates that the statute

1    is in fact narrowly tailored because of the ample alternative

2    methods for expression.  And I know, you know, a couple of

3    years ago I came -- we came before the Court and tried to

4    argue that the alternative means of expression superseded a

5    narrow tailoring analysis and lost twice.  But I think there's

6    still some relevance for that -- for that portion, and

7    particularly recognizing that the narrowness in which the

8    statute was written.  It was written pretty broadly to begin

9    with.  And if there's some legislative history that's helpful,

10   it's that the statute was narrowed repeatedly to address

11   concerns about privacy and whistleblowing.

12        And the whistleblowing statute and whistleblowers, the

13   State isn't interested in hiding criminal activity, and this

14   statute is not interested in hiding criminal activity.  The

15   whistleblowing statutes and whistleblowers in general are

16   encouraged to report criminal activity.  But we're talking

17   about specific types of folks who are entering private

18   property and endangering the health and safety of -- or have

19   the potential at least to endanger the health and safety of

20   people on -- people and animals on animal agricultural

21   operations.

22        THE COURT:  On the alternative avenues for speaking,

23   do you take issue with the case law that the plaintiffs cite

24   in their papers about the multifactor test for example, that

25   the Court should take into account the expense and

1    availability and suitability of the substitutes?  I mean for

2    example the State says you can fly a plane overhead, and the

3    plaintiffs say, well, the cases tell you to look at the cost

4    and how effective that would be.  Judge, that's not a

5    substitute here.

6              MR. KAISER:  Well, you can fly a drone, which is a

7    little different than flying a plane.  But the --

8              THE COURT:  Or take handwritten notes or the like

9    and --

10             MR. KAISER:  Right.  And, no, the plaintiffs are not

11   entitled to their preferred method of communication, and

12   certainly they're not entitled to their preferred method of

13   news gathering.

14             THE COURT:  In light of subsection (b) of the

15   statute, is there an alternative avenue for speech?  The

16   plaintiffs and any representatives from their organization

17   cannot go to the facility even to take notes about what they

18   saw so they can write an exposé about it.  They can't do

19   anything to enter the facility lest they run afoul of

20   subsection (b).  So what avenues -- you talk about encourage

21   whistleblowers.  That's one thing I suppose, though their

22   experts talk about that.

23             MR. KAISER:  Well, Your Honor, I take issue with

24   your first premise.  I think there are oftentimes agricultural

25   operations that are open, that bring their doors open,

1   including some of the most contentious agricultural

2   operations, like Hudson Valley Foie Gras, which has an

3   essentially open door policy.

4       So I don't think that these plaintiffs are completely

5   foreclosed.  And certainly on a facial challenge reporters --

6   I mean maybe competitors are foreclosed, but reporters, people

7   interested in the operations of the farm, they're not

8   necessarily foreclosed.

9       What can these plaintiffs do assuming that a reasonable

10  farmer would never allow a PETA or an ALDF representative on

11  their farm?  They can do FOIA requests.  They can take

12  surveillance outside.  They can -- which is what plaintiff

13  Meyer did.  They can encourage whistleblowers.  They've done

14  that.  They can get information from the inside.  They've done

15  that.  They can use statistics.  They've done that.  So there

16  are certainly ample alternatives that are available to them.

17          THE COURT:  I guess my question was you don't take

18  issue with the case law that the plaintiffs cited about the

19  factors and considerations the Court should undertake in that

20  review?

21          MR. KAISER:  No, no, of course.

22          THE COURT:  Okay.

23          MR. KAISER:  And I also wanted to mention that the

24  only time that I've seen the plaintiffs talk about the tester

25  cases is referring to Desnick, which was not a First Amendment

1    case, right?  This was the Seventh Circuit case about

2    undercover investigations.  And the plaintiffs sued for tort

3    violations, and no First Amendment defense was raised.

4        And the Court, the Seventh Circuit there, said, well, in

5    this particular circumstance, because there's no reasonable

6    expectation of privacy under general privacy torts, there's --

7    there's no liability.  And it was Judge Posner who wrote the

8    opinion.  And he said, but, you know, if I were to pretend to

9    be a meter maid to go into your house, there would be

10   liability under a tort privacy theory.  And the Court

11   analogized to the tester cases, which were not First Amendment

12   cases, at least as much as I can recall and was able to look

13   at very, very quickly.

14            THE COURT:  It's a fair point.  I was trying to

15   think of the best analogies for illustrating some of the

16   points.  I don't have a specific tester case in mind that

17   stood for the proposition that it was a First Amendment right

18   that was at issue.

19            MR. KAISER:  And there's a difference between going

20   in and asking questions of a property owner to get an answer

21   to see if there is racial discrimination versus concealing

22   your identity to get access to a property.  There's a

23   difference there.

24            THE COURT:  Well, I'm not sure that it would be

25   helpful for us to get into -- to revisit that.  But the

1    question in my mind was, is there a First Amendment right that

2    exists, and do you surrender it at the door when you walk into

3    private property, as the State was suggesting?  I was just

4    wondering, but go ahead.

5            MR. KAISER:  And I would like to finish where we

6    started, as you probably would imagine, that this Act

7    prohibits conduct that's not -- that's not covered by the

8    First Amendment.  The Act protects 18,000 farmers, animal ag

9    producers and other Utah citizens from unwanted invasions of

10   their privacy and from dangerous intrusions.  It does so while

11   still allowing the plaintiffs to make all of the protestations

12   that they want.  They can do investigations.  They can do

13   investigations that are sanctioned by journalists -- by

14   journalism organizations.

15           And in fact there's an amicus brief in the Ninth Circuit

16   case, the Center for Medical Progress case, where 30

17   journalists agreed with what Dr. Sanders talked about, that

18   undercover investigation isn't the beginning.  It's the end of

19   an investigation.  The plaintiffs have all of those

20   journalistic tools and investigative tools at their disposal.

21           The plaintiffs have all of the speech tools at their

22   disposal to -- to suggest to Utahns to change their practices,

23   to stop eating meat, end the practice of factory farming,

24   whatever that is.  This statute does not affect those rights.

25           And the rights that the plaintiffs seek, the right to lie

1    to gain access to private property, the right to some sort of
2    heightened scrutiny because a couple of legislators have
3    mentioned their names, doesn't exist in binding federal case
4    law.  At most we've got ALDF versus Otter.
5        And so the plaintiffs are asking for new federal
6    constitutional rights that really, really infringe on the
7    rights of Utah citizens and the right of the State to control
8    private property.  As we talked about a little bit, there
9    could be pretty serious consequences.  That means there's a
10   First Amendment right to spy.  That means there's a First
11   Amendment right, at least a threshold right, to get access to
12   a competitor or to a group that you disagree with so that you
13   can try to undermine them.  That means there's a federal
14   constitutional right maybe to hack e-mails.  I think the
15   democratic party might disagree with that.
16       And so whether it's -- whether the target is a government
17   agency, a conservative group, a liberal group or private
18   property to seek that sort of constitutional protection is
19   pretty serious.
20       And we didn't really talk about my favorite case, Western
21   Watersheds, which illuminates those premises very, very well.
22   And, you know, when I first read the case I thought, oh, this
23   is really distinguishable because this is really, really
24   conduct, right?  This is trespassing onto private property,
25   getting data and reporting it.

1            But there are two reasons I think that Western Watersheds

2      is particularly important here.  The first is that the

3      plaintiffs made the same arguments regarding pre-speech

4      conduct, that that pre-speech conduct -- and one of the

5      plaintiffs in Western Watersheds is one of the plaintiffs

6      here, PETA -- that pre-speech conduct is protected under the

7      First Amendment.  And the Supreme Court has time and time

8      again said no, no, no.

9            The second reason that Western Watersheds is really

10     important is because the Court construed the Act not just to

11     be trespassing but actually to record, either handwritten or

12     record an image, because that's what the plaintiffs were doing

13     to get this information.  So in that sense, even though the

14     statute didn't mention recording, the Court construed it as

15     requiring that.

16           And the Court held there is -- that the Supreme Court has

17     never held that a trespasser, an uninvited guest, may exercise

18     general rights of free speech on property privately owned.

19     And --

20                 THE COURT:  That issue is not in dispute in this

21     case I don't believe.  It seems to me that the question that's

22     presented by the parties is what is an uninvited trespasser?

23     That's the question here.

24                 MR. KAISER:  There certainly is.  I think subsection

25     (b) allows --

1          The Court:  The plaintiffs won't argue that one of

2     their members can jump the fence in the middle of the night

3     and run onto the property and place a device and not be

4     subject to some constraint, I don't think.  I don't think

5     Mr. Liebman is going to stand up in a moment and tell me there

6     is such a First Amendment right.

7          MR. KAISER:  I think his -- I think his -- the

8     natural conclusion of these arguments, the natural result of

9     the constitutional rights he seeks gets there, even if the

10    plaintiffs don't want to do it.  But beyond that, someone who

11    lies to get access to private property is much more like a

12    trespasser and much less like an invited guest.

13         And I know in tort cases the courts have tried to draw a

14    line about reasonable expectations of privacy, but I don't

15    think that works in the First Amendment context.  The First

16    Amendment is about what sort of speech the government must

17    allow and where it must allow it, not about the where -- the

18    privacy expectations of citizens vis-a-vis the intrusion of

19    the government or the intrusion of a third party.

20         So I think Western Watersheds is important for those two

21    reasons.  And even though it's -- there's this -- you might

22    consider it dicta related to this case that someone is a

23    trespasser, an uninvited guest, I think the statute here

24    really incorporates those uninvited guests and unofficial

25    trespassers, and that the First Amendment doesn't apply to

1   either of these two particularized new rights that the

2   plaintiffs are seeking to provide.

3       For the reasons that we've talked about, the Act is not

4   content or viewpoint-based.  I would love to talk for four

5   hours about the Equal Protection Clause because I think it is

6   so so interesting.  And I apologize to the Court that we

7   spilled probably more ink than was necessary, but I think that

8   the Court has identified that the animus doctrine is just not

9   something that's appropriate to be applied in this case for

10  sure following the guidance of the Powers case from the Tenth

11  Circuit, and that the appropriate standard is a rational basis

12  and the State has articulated rational bases to support the

13  case under an equal protection challenge.

14      And with that I ask the Court grant our motion for

15  summary judgment, deny the plaintiffs' motion for summary

16  judgment and declare that the statute is constitutional.

17          The Court:  Thank you, Mr. Kaiser.

18          MR. LIEBMAN:  Let me start with the question of the

19  ample alternative channels.  I think it's certainly something

20  that we've contested.  And, you know, this idea that simply

21  because there are other means of communicating your message

22  ample alternative channels exist is simply not what the case

23  law says.  And again we return to McCullen, intermediate

24  scrutiny case.

25      And in that case the Court makes clear, again at page

1    2535 through 2536, that Ms. McCullen, even after the

2    amendments, was still able to approach and counsel, as she put

3    it, women who were considering abortions, and she had

4    persuaded about 80 women not to terminate their pregnancies

5    since the 2007 amendment, nevertheless, she said she reaches

6    fewer -- far fewer people, and that for the Court was

7    relevant.  So, you know, the mere fact that you can still do

8    some of your speech I think is not responsive to the question

9    of whether ample alternative channels are available.

10       And I think the Court in Rideout puts it quite succinctly

11   where it reiterates the maximum -- maxim that a photograph is

12   worth a thousand words.  And certainly in this case

13   photographs and videos of how animals are treated are not only

14   quantitatively different but qualitatively different from the

15   kinds of remaining information that we can seek.  A FOIA

16   document is not going to lead the federal government to hold

17   hearings on the failures of the USDA in the same way that the

18   Hallmark investigation did.  And if you read the expert report

19   of Mr. Thomas, it's quite gut wrenching, but it doesn't really

20   stand in for the video itself.

21       And so looking at this kind of uniquely persuasive form

22   of communication as, you know, ancillary to our protest

23   activities, our ability to communicate with the public, I

24   think is mistaken.  This is a core form of speech that is

25   persuasive in ways that other kinds of speech aren't.  It

1    isn't just our preferred method, it's one that's qualitatively

2    different.  And of course the record bears that out.  You

3    don't get congressional hearings.  You don't get a beef recall

4    of 150 million pounds based on FOIA documents or based on a

5    drone.  This only happens through undercover investigations.

6         I think there's the discussion of, you know, the kinds

7    of -- the Pandora's box that we would open up by recognizing

8    that some First Amendment rights remain on private property is

9    quite exaggerated.  What we're talking about here is recording

10   and speech on matters of significant public concern in -- on

11   property that already has a reduced expectation of privacy.

12   And we go into this in our brief about why commercial

13   properties have a reduced expectation of privacy.  That's a

14   Supreme Court decision in New York versus Berger, and that's

15   especially the case where they're heavily regulated.

16        And in fact under the Humane Methods of Slaughter Act,

17   slaughter houses have to be open 24/7 to government

18   regulators.  You even have to do the regulators' laundry.  So

19   the idea that this is analogous to a home or a boardroom or

20   all the other places that Mr. Kaiser discusses I think is not

21   the case.

22        You know, there's a narrow holding here, which is that

23   the First Amendment applies when we're talking about political

24   speech on matters of significant public concern on property

25   that already has a reduced expectation of privacy, and that's

1   the narrow framing of this issue.

2       I think when it comes to the Western Watersheds Project I

3   want to respond.  I think Mr. Kaiser's first instinct was

4   right, that this case is really, really distinguishable as he

5   put it.  This is a case where someone to -- had to be a

6   trespasser in the first place.  And the only portion of the

7   statute that has that similar standard is subsection (d).

8       And in Western Watersheds Project the Court doesn't even

9   address the R.A.V. versus St. Paul case, which says that even

10   where you're regulating speech that's otherwise not protected

11   by the First Amendment, you can't do it in a content-based

12   way.  So to the extent that this statute is content-based,

13   even subsection (d) would be unconstitutional for that reason.

14       And of course in that case the Court is looking at

15   whether or not someone is a trespasser or an uninvited guest.

16   And, again, the tort cases make clear that someone does not

17   become a trespasser simply through the act of resume fraud or

18   by virtue of conducting an uncover investigation.

19       I think it's also important to -- I think I'll just wrap

20   up by noting that, you know, this statute is really slamming

21   shut the only open window on how animals are treated on

22   factory farms.  And although there are other forms of gaining,

23   you know, some idea of what happens, videos and photos are

24   categorically different.  And of course if there's a

25   prohibition on gaining access by false pretenses, we can't

1    even take notes.

2         And so really the statute is leaving the consuming public

3    in the dark about how billions of animals are treated, and

4    that fails intermediate scrutiny at least, but it also fails

5    intermediate scrutiny -- I'm sorry -- strict scrutiny.  And as

6    we discussed earlier, because at least the misrepresentations

7    provision is content-based on its face, that statute, that

8    subsection has to be subjected to strict scrutiny and fails on

9    that basis.

10        And for those reasons we would ask Your Honor to grant

11   the plaintiffs' motion for summary judgment, deny the

12   defendants' motion and issue an injunction against enforcement

13   of the Ag Gag statute.

14             THE COURT:  All right, counsel.  Thank you for your

15   patience and all of your energy, your excellent argument.

16   We'll take the matter under advisement and we'll provide a

17   written ruling.  We'll be in recess.

18                  (HEARING CONCLUDED AT 6:01 PM)

19                           *  *  *

20

21

22

23

24

25

1

2

3

4

5                        Certificate of Reporter

6          I, Raymond P. Fenlon, Official Court Reporter for the

7    United States District Court, District of Utah, do hereby

8    certify that I reported in my official capacity, the

9    proceedings had upon the hearing in the case of

10   Animal Legal Defense Fund, et al. Vs.

11   Gary R. Herbert, et al., case No. 2:13-CV-679, in said

12   court, on the 25th day of October, 2016.

13         I further certify that the foregoing pages constitute

14   the official transcript of said proceedings as taken from my

15   machine shorthand notes.

16         In witness whereof, I have hereto subscribed my name

17   this 2nd day of November, 2016.

18

19

20

21                                    /s/ Raymond P. Fenlon

22

23

24

25