# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ANIMAL LEGAL DEFENSE FUND, PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, and AMY MEYER,<br><br>      Plaintiffs,<br><br>v.<br><br>GARY R. HERBERT, in his official capacity as Governor of Utah, and SEAN D. REYES, in his official capacity as Attorney General of Utah,<br><br>      Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br><br>Case No. 2:13-cv-00679-RJS<br><br><br>Judge Robert J. Shelby |

Utah recently joined the growing number of states to enact so-called "ag-gag" laws—laws that target undercover investigations at agricultural operations. Utah's version operates, in relevant part, by criminalizing both lying to get into an agricultural operation and filming once inside. Plaintiffs contend the law violates their First Amendment rights. For the reasons below, the court agrees.

## BACKGROUND

For as long as farmers have put food on American tables, the government has endeavored to support and protect the agricultural industry. In an address to Congress shortly after the Revolutionary War, George Washington, an ardent tobacco farmer, declared that "agriculture is of primary importance," and argued that the rapid growth of the young nation rendered "the

cultivation of the soil more and more an object of public patronage."[1]  Congress heeded the call, and federal legislation in the ensuing decades led to the development of millions of acres of farmland across the country.[2]

As agriculture expanded, so too did governmental investment in it.  Toward the end of the nineteenth century, President Lincoln established the Department of Agriculture—known then as "The People's Department"—and Congress began providing cash to states to conduct agricultural research.[3]  In the mid-twentieth century, following the Great Depression, President Roosevelt's administration went so far as to pay farmers to stop growing crops and to destroy existing crops and livestock in order to stabilize prices by artificially limiting supply.[4]  To this day, the federal government has continued to support the agricultural industry through measures like nonrecourse loans, subsidies, and price guarantees, as have the states, all of which have enacted right-to-farm laws.[5]  In short, governmental protection of the American agricultural industry is not new, and has taken a variety of forms over the last two hundred years.

What is new, however, is the recent spate of state laws that have assumed an altogether novel approach: restricting speech related to agricultural operations.  These so-called "ag-gag"

---

[1] *Eighth Annual Message of George Washington*, The Avalon Project, Yale Law School, http://avalon.law.yale.edu/18th_century/washs08.asp.

[2] Roger D. Billings, *The Homestead Act, Pacific Railroad Act and Morrill Act*, 39 N. Ky. L. Rev. 699, 700, 711, 729, 735 (2012) (discussing agricultural development in the wake of the Pacific Railroad Acts of 1862 and 1864, the Morrill Act, the Land Ordinance of 1785, and the Homestead Act of 1862, among others).

[3] *Message from Secretary Vilsack about the USDA 150th*, USDA, https://www.usda.gov/sites/default/files/documents/message-secretary-vilsack-usda-150th.pdf.

[4] Allen H. Olson, *Federal Farm Programs - Past, Present and Future - Will We Learn from Our Mistakes?*, 6 Great Plains Nat. Resources J. 1, 4 (2001) (discussing the Agricultural Adjustment Act of 1933).

[5] Rita-Marie Cain Reid & Amber L. Kingery, *Putting A Gag on Farm Whistleblowers: The Right to Lie and the Right to Remain Silent Confront State Agricultural Protectionism*, 11 J. Food L. & Pol'y 31, 34 (2015); Charlene C. Kwan, *Fixing the Farm Bill: Using the "Permanent Provisions" in Agricultural Law to Achieve WTO Compliance*, 36 B.C. Envtl. Aff. L. Rev. 571, 575–85 (2009).

laws have their genesis in the 1990s. Around that time, animal rights advocates had begun conducting undercover investigations to expose animal abuse at various facilities.[6] After these initial investigations became public, Kansas, Montana, and North Dakota all enacted ag-gag laws.[7] The laws criminalized entering an animal facility and filming without consent.[8]

Nobody was ever charged under these laws, and for nearly two decades no new ag-gag legislation was introduced. That changed, however, after a series of high profile undercover investigations were made public in the mid to late 2000s. To name just a few, in 2007, an undercover investigator at the Westland/Hallmark Meat Company in California filmed workers forcing sick cows, many unable to walk, into the "kill box" by repeatedly shocking them with electric prods, jabbing them in the eye, prodding them with a forklift, and spraying water up their noses.[9] A 2009 investigation at Hy-Line Hatchery in Iowa revealed hundreds of thousands of unwanted day-old male chicks being funneled by conveyor belt into a macerator to be ground up live.[10] That same year, undercover investigators at a Vermont slaughterhouse operated by Bushway Packing obtained similarly gruesome footage of days-old calves being kicked, dragged, and skinned alive.[11] A few years later, an undercover investigator at E6 Cattle Company in Texas

---

[6] *See* Lewis Bollard, *Ag-Gag: The Unconstitutionality of Laws Restricting Undercover Investigations on Farms*, 42 Envtl. L. Rep. News & Analysis 10960, 10962 (2012).

[7] Reid & Kingery, *supra* note 5, at 36.

[8] Kan. Stat. Ann. § 47-1827(c) (2012); Mont. Code Ann. § 81-30-103 (2011); N.D. Cent. Code Ann. §§ 12.1-21.1-01 (2011).

[9] Matthew L. Wald, *Meat Packer Admits Slaughter of Sick Cows*, N.Y. Times (Mar. 13, 2008), http://www.nytimes.com/2008/03/13/business/13meat.html.

[10] *Agriculture Industry Defends Itself Over Grisly Iowa Chick Video*, L.A. Times (Sept. 5, 2009, 11:50 AM), http://latimesblogs.latimes.com/unleashed/2009/09/agriculture-industry-defends-itself-over-grisly-iowa-chick-video.html.

[11] *Vermont Slaughterhouse Closed Amid Animal Cruelty Allegations*, L.A. Times (Nov. 3, 2009, 4:12 PM), http://latimesblogs.latimes.com/unleashed/2009/11/vermont-slaughterhouse-closed-amid-animal-cruelty-allegations.html.

filmed workers beating cows on the head with hammers and pickaxes and leaving them to die.[12]
And later that year, at Sparboe Farms in Iowa, undercover investigators documented hens with
gaping, untreated wounds laying eggs in cramped conditions among decaying corpses.[13]

The publication of these and other undercover videos had devastating consequences for
the agricultural facilities involved.  The videos led to boycotts of facilities by McDonald's,
Target, Sam's Club, and others.[14]  They led to bankruptcy and closure of facilities and criminal
charges against employees and owners.[15]  They led to statewide ballot initiatives banning certain
farming practices.[16]  And they led to the largest meat recall in United States history, a facility's
entire two years' worth of production.[17]

Over the next three years, sixteen states introduced ag-gag legislation.[18]  Iowa's was the
first to go into effect.  It was introduced in the wake of the Iowa Sparboe Farms video, in
addition to the publication of several other undercover investigations in Iowa.[19]  According to its

---

[12] Kevin Lewis, *Charges Filed in E6 Cattle Case*, Plainview Daily Herald (May 26, 2011, 11:30 AM), http://www.myplainview.com/news/article/Charges-filed-in-E6-Cattle-case-8414335.php.

[13] *McDonald's Cuts Egg Supplier After Undercover Animal Cruelty Video*, L.A. Times (Nov. 18, 2011, 2:24 PM), http://latimesblogs.latimes.com/money_co/2011/11/mcdonalds-cuts-egg-supplier-after-undercover-animal-cruelty-video.html.

[14] Bollard, *supra* note 6, at 10960.

[15] *Id.* at 10963; Matthew Shea, *Punishing Animal Rights Activists for Animal Abuse: Rapid Reporting and the New Wave of Ag-Gag Laws*, 48 Colum. J.L. & Soc. Probs. 337, 338 (2015); *Vermont Slaughterhouse Closes Amid Animal Cruelty Allegations*, L.A. Times (Nov. 3, 2009), http://latimesblogs.latimes.com/unleashed/2009/11/vermont-slaughterhouse-closed-amid-animal-cruelty-allegations.html.

[16] Bollard, *supra* note 6, at 10963.

[17] David Brown, *UDSA Orders Largest Meat Recall in U.S. History*, Wash. Post (Feb. 18, 2008), http://www.washingtonpost.com/wp-dyn/content/article/2008/02/17/AR2008021701530.html.

[18] Jessalee Landfried, Note, *Bound & Gagged: Potential First Amendment Challenges to "Ag-Gag" Laws*, 23 Duke Envtl. L. & Pol'y F. 377, 378–79 (2013).

[19] *See Undercover Investigations*, Mercy for Animals, http://www.mercyforanimals.org/investigations (listing various undercover operations).

sponsors, the bill's purpose was "to crack down on activists who deliberately cast agricultural operations in a negative light and let cameras roll rather than reporting abuse immediately," and to stop "subversive acts" that could "bring down the industry," including acts committed by "extremist vegans."[20] The Iowa law prohibits obtaining access to an agricultural production facility under false pretenses and lying on a job application with the intent to commit an unauthorized act.[21]

Utah's bill came less than a month later. Representative John Mathis, the sponsor of the House bill, declared the bill was motivated by "a trend nationally of some propaganda groups . . . with a stated objective of undoing animal agriculture in the United States."[22] Another representative (a farmer by trade) stated that the bill was targeted at "a group of people that want to put us out of business," and noted that farmers "don't want some jack wagon coming in taking a picture of them."[23] Senator David Hinkins, the sponsor of the Senate bill, declared the bill was meant to address the "vegetarian people that [are] trying to kill the animal industry" by "hiding cameras and trying to . . . modify the films and stuff like that," explaining "[t]hat's what we're trying to prevent here."[24]

The bill ultimately enacted in Utah consists of four provisions: a lying provision, and three recording provisions.[25] The lying provision criminalizes "obtain[ing] access to an agricultural operation under false pretenses."[26] The three recording provisions criminalize:

---

[20] Bollard, *supra* note 6, at 10965.

[21] Iowa Code Ann. § 717A (2012).

[22] Dkt. 112-3 at 4.

[23] *Id.* at 23, 25.

[24] *Id.* at 39, 42.

[25] Utah Code § 76-6-112 (2012).

[26] *Id.* § (2)(b).

(1) bugging an agricultural operation; (2) filming an agricultural operation after applying for a position with the intent to film; and (3) filming an agricultural operation while trespassing.[27] Governor Herbert signed the bill into law on March 20, 2012.[28]

On February 8, 2013, Plaintiff Amy Meyer became the first person to be charged under the new law, and seemingly the only person in the country to ever be charged under an ag-gag law.[29] Meyer was arrested while filming what appeared to be a bulldozer moving a sick cow at a slaughterhouse in Draper City, Utah.[30] Meyer was on public property at the time—meaning her actions did not fall within the statute—but the State nonetheless brought charges. It later dismissed the case against Meyer without prejudice.[31]

---

[27] *Id.* § (2)(a), (c), (d). The full text is below:

(1) As used in this section, "agricultural operation" means private property used for the production of livestock, poultry, livestock products, or poultry products.
(2) A person is guilty of agricultural operation interference if the person:
    (a) without consent from the owner of the agricultural operation, or the owner's agent, knowingly or intentionally records an image of, or sound from, the agricultural operation by leaving a recording device on the agricultural operation;
    (b) obtains access to an agricultural operation under false pretenses;
    (c) (i) applies for employment at an agricultural operation with the intent to record an image of, or sound from, the agricultural operation;
    (ii) knows, at the time that the person accepts employment at the agricultural operation, that the owner of the agricultural operation prohibits the employee from recording an image of, or sound from, the agricultural operation; and
    (iii) while employed at, and while present on, the agricultural operation, records an image of, or sound from, the agricultural operation; or
    (d) without consent from the owner of the operation or the owner's agent, knowingly or intentionally records an image of, or sound from, an agricultural operation while the person is committing criminal trespass, as described in Section 76-6-206, on the agricultural operation.

[28] H.B. 187, 2012 Leg., Gen. Sess. (Utah 2012), available at http://le.utah.gov/~2012/bills/hbillenr/HB0187.pdf; Robert Gehrke, *Herbert Signs So-Called Ag-Gag Bill*, Salt Lake Trib. (Mar. 20, 2012, 7:25 PM), http://archive.sltrib.com/story.php?ref=/sltrib/politics/53758916-90/animal-bill-brown-farm.html.csp.

[29] Leighton Akio Woodhouse, *Charged with the Crime of Filming a Slaughterhouse*, The Nation (July 31, 2013), http://www.thenation.com/article/charged-crime-filming-slaughterhouse/.

[30] Dkt. 108 ¶ 5.

[31] *Id.* ¶ 7

6

Meyer, along with Animal Legal Defense Fund (ALDF) and People for the Ethical Treatment of Animals (PETA), subsequently filed this lawsuit against Gary Herbert in his capacity as Governor of Utah and Sean Reyes in his capacity as Attorney General of Utah (collectively, "the State"). Plaintiffs challenge the Act as an unconstitutional restriction on speech in violation of the First Amendment and as a violation of the Equal Protection Clause of the Fourteenth Amendment. Both sides have moved for summary judgment.[32]

## ANALYSIS

Plaintiffs argue the Act is unconstitutional because it violates their First and Fourteenth Amendment rights. The State contends some or all Plaintiffs lack standing to sue, and even if some have standing, the Act is constitutional. The court first addresses the State's standing arguments, and then turns to the merits.

### Standing

This is not the court's first time addressing Plaintiffs' standing to sue. The State initially moved to dismiss the case on this basis, and the court determined Plaintiffs had properly alleged standing.[33] Notwithstanding the State's present objections, the court concludes that Plaintiffs have now sufficiently substantiated those allegations through declarations and deposition testimony.

The Constitution limits this court to deciding justiciable cases or controversies, a restriction courts have distilled into a three-part inquiry. To show standing to sue, a plaintiff must demonstrate (1) an injury, (2) caused by the conduct complained of, (3) that is redressible.[34]

---

[32] The court grants summary judgment if the movant shows there is "no genuine dispute as to any material fact" and the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

[33] Dkts. 24, 54, 59.

[34] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (citing U.S. Const. art. III, § 2).

This inquiry becomes somewhat complicated when the alleged injury, as here, is a chilling effect on speech based on a threat of future prosecution. On the one hand, "allegations of a subjective chill" or "of possible future injury do not satisfy the injury in fact requirement."[35] On the other, "a plaintiff need not expose himself to actual arrest or prosecution to be entitled to challenge a statute."[36]

To balance these competing interests—the constitutional requirement that an alleged injury be sufficiently concrete and the notion that a plaintiff need not take the final step of breaking the law before suing—the Tenth Circuit has developed a three-part test for a plaintiff alleging injury based on a chilling effect on speech. Such a plaintiff must demonstrate: (1) that in the past, the plaintiff engaged in the kind of speech implicated by the statute; (2) that the plaintiff has a desire, but no specific plans, to engage in the speech; and (3) that the plaintiff presently has no intention of engaging in the speech because of a credible threat the statute will be enforced.[37]

All three Plaintiffs meet this standard. Meyer has previously engaged in speech implicated by the statute. As discussed, on one occasion she was actually arrested and charged with violating the statute.[38] She wishes to continue engaging in speech related to animal activism, but currently has no plans to do so for fear she will be arrested again.[39] Similarly, members of ALDF and PETA have also engaged in undercover operations in which they lied to

---

[35] *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1087–88 (10th Cir. 2006) (internal quotation marks omitted).

[36] *Id.* (internal quotation marks omitted).

[37] *Id.* at 1089.

[38] Dkt. 108 ¶¶ 4, 7.

[39] *Id.* ¶¶ 9–10.

get into agricultural facilities and filmed once inside.[40]  They now wish to conduct operations at agricultural facilities in Utah.[41]  But they presently have no intention to do so because they fear Utah may prosecute them—and rightfully so, as the State already prosecuted Meyer for conduct even less clearly covered by the Act.[42]

The State does not meaningfully object to any of these contentions.  Rather, it argues only that "Plaintiffs have not shown they have any concrete plans to actually violate the law."[43]  But that is not what the law requires.  The Tenth Circuit has explicitly disclaimed any requirement that a plaintiff have actual plans to violate the challenged statute.  As discussed, to establish standing to sue based on a chilling effect on speech, a plaintiff must demonstrate only "a present desire, *though no specific plans*, to engage in such speech."[44]  Plaintiffs here have met that burden.

### The First Amendment

Turning to the merits, Plaintiffs argue the Act impermissibly restricts their free speech rights under the First Amendment.  The First Amendment limits the State's ability to enact laws that restrict speech.  Not all speech is protected by the First Amendment, but if a law restricts

---

[40] *See* Dkt. 107-1 at 5–12 (listing ALDF's undercover investigations where ALDF filmed); Dkt. 107-2 at 129:3–9 (acknowledging making misrepresentations to gain access); Dkt. 110 ¶¶ 7, 12, 13, 16 (representing that undercover investigators with PETA have entered agricultural facilities under false pretenses and filmed once inside).

[41] *See* Dkt. 109 ¶ 10 ("ALDF is particularly interested in conducting agricultural investigations in heavily agricultural states such as Utah . . . ."); Dkt. 110 ¶ 14 ("PETA is committed to conducting an investigation of another agricultural facility in Utah . . . .").

[42] Dkt. 109 ¶ 16; Dkt. 110 ¶ 15.

[43] Dkt. 116 at 2.

[44] *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1089 (10th Cir. 2006) (emphasis added).

speech that is protectable, the State must justify the law by articulating the problem it is meant to address and demonstrating that the law is properly tailored to address that problem.

Thus, the First Amendment analysis proceeds in three parts. The court first determines whether the Act's lying and recording provisions implicate protectable speech—that is, whether the First Amendment even applies. If so, the court next decides what level of scrutiny to apply to each provision, which in turn dictates what showing the State must make to justify them. Last, the court assesses whether the State has made that showing.

## A. Whether the First Amendment Applies

The first question is whether the lying[45] and recording criminalized by the Act are protectable speech under the First Amendment. The State contends the lying and recording criminalized by the Act can never be protected by the First Amendment, so the court need not engage in a First Amendment analysis. As to lying, it concedes that lies are "speech" for First Amendment purposes, but it argues that the lies implicated by the Act fall within a category the Supreme Court has deemed unprotectable. And recording, the State argues, is not speech to begin with, so it is similarly not protected by the First Amendment. Plaintiffs have the burden of demonstrating otherwise.[46]

### 1. The Lying Provision

Generally, when a law restricts speech, it is subject to some level of scrutiny. Since the early days of the Republic, however, there have been certain categories of speech that do not

---

[45] As discussed, the statute actually criminalizes gaining access under "false pretenses"; the parties use "lying" as shorthand, and the court follows that lead.

[46] *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984) ("Although it is common to place the burden upon the Government to justify impingements on First Amendment interests, it is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies.").

enjoy First Amendment protection.[47]  These categories consist of speech that has such little

value, and is so likely to cause harm, that the court need not conduct a case-by-case First

Amendment analysis because any regulation of the speech will clearly be upheld.[48]  They include

obscenity, defamation, child pornography, fraud, and true threats, among others.[49]

Recently, in *United States v. Alvarez*, the Supreme Court addressed whether false

statements belong on this list of unprotectable speech.  The Court ultimately concluded that lies

are not categorically unprotectable by the First Amendment, but lies that cause "legally

cognizable harm" do fall outside of First Amendment protection.[50]  Thus, the threshold question

here is whether all of the lies prohibited by the Act cause legally cognizable harm.  If so, the

lying provision is immune from First Amendment scrutiny.  But if any of the lies prohibited by

the Act do not cause legally cognizable harm, those lies are protectable under the First

Amendment and the lying provision of the Act criminalizing them is subject to scrutiny.

The parties do not dispute this is the applicable standard, but they vigorously dispute

whether the lies prohibited by the Act—"obtain[ing] access to an agricultural operation under

---

[47] *United States v. Stevens*, 559 U.S. 460, 468 (2010).

[48] *See R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 382–83 (1992); *see also Stevens*, 559 U.S. at 470 ("[W]ithin these categories of unprotected speech, the evil to be restricted so overwhelmingly outweighs the expressive interests, if any, at stake, that no process of case-by-case adjudication is required.").

[49] *See United States v. Alvarez*, 567 U.S. 709, 717 (2012).

[50] *Id.* at 719.  No majority opinion emerged from *Alvarez*, but the plurality, concurrence, and dissent all agreed that lies are not categorically outside of First Amendment protection.  *Id.* (plurality opinion); *id.* at 734 (Breyer, J., concurring) (distinguishing statutes that "require[] . . . specific harm" or in which "tangible harm to others is especially likely to occur"); *id.* at 739 (Alito, J., dissenting) (advocating for the rule that "the right to free speech does not protect false factual statements that inflict real harm and serve no legitimate interest").  And at least a majority of the court agreed that the distinguishing factor is whether a lie causes harm; while the "legally cognizable harm" standard appears only in the plurality opinion, Justice Breyer in concurrence agreed that typically only lies that cause "specific" or "tangible harm" fall outside First Amendment Protection.  *Id.* at 734 (Breyer, J., concurring).  Indeed, the plurality and concurrence are largely in agreement as to which lies are subject to First Amendment protection; where they depart, as discussed below, is on what level of scrutiny to apply.

false pretenses"—cause legally cognizable harm. The State contends they do, and points to two types of harm it believes necessarily result from such lies: (1) danger to animals and employees, and (2) trespass over property persons otherwise could not access. Plaintiffs disagree, arguing that people who lie to gain access to an agricultural facility will cause neither of these harms.

### a. Danger to Animals and Employees

The State's first alleged harm—danger to animals and employees—likely qualifies as "legally cognizable harm" under *Alvarez*. But there is no evidence in the record that lying to gain access to an agricultural facility will necessarily harm animals or employees. It is certainly conceivable that some lies used to gain access to a facility might result in such harm—the job applicant, for example, who lies about being trained to use heavy equipment, or who represents that he has a safety certification he does not actually possess. But plenty of lies that fall within the purview of the Act would cause no harm at all to animals or workers—the applicant who says he has always dreamed of working at a slaughterhouse, that he doesn't mind commuting, that the hiring manager has a nice tie. Because the Act as written criminalizes lies that would cause no harm to animals or workers—i.e., lies that enjoy First Amendment protection—this rationale fails to place the lying provision outside of First Amendment scrutiny.

### b. Trespass Harm

The State's other argument is that access to private property in and of itself, when procured through misrepresentation, constitutes trespassing, and trespassing is a legally cognizable harm (meaning these misrepresentations would enjoy no First Amendment protection under *Alvarez*). Plaintiffs, for their part, contend that lying to gain access is not trespassing. Consent, they argue, is a defense to trespassing, and by definition anybody charged under the Act's lying provision would have obtained consent to enter (albeit through misrepresentation).

Thus, the initial question is whether misrepresentation negates consent—that is, whether a person who lies to obtain permission to access private property is a trespasser.

The answer, it seems, is not always. Neither the Utah appellate courts nor the Tenth Circuit have not spoken on the issue, but the Fourth and Seventh Circuits have. Both concluded that it depends on the type of harm (if any) the liar causes.[51] Specifically, if the person causes harm of the type the tort of trespass seeks to protect—interference with ownership or possession of the land—then her consent to enter becomes invalid, and from that point on she is not merely a liar, but a trespasser as well.[52] But if the liar does not interfere with ownership or possession of the land, her consent to access the property remains valid, notwithstanding that it was obtained nefariously through misrepresentation.[53] Thus, a competitor who enters a business to steal secrets while posing as a customer is a trespasser, as is the man who is invited into a home while posing as a repairman, but is in fact just a busybody looking to snoop around (because both have interfered with ownership or possession of the property).[54] But the liar who causes no trespass-type harm—the restaurant critic who conceals his identity,[55] the dinner guest who falsely claims to admire his host,[56] or the job applicant whose resume falsely represents an interest in volunteering,[57] to name a few—is not guilty of trespassing (because no interference has

---

[51] *See Desnick v. Am. Broad. Cos., Inc.*, 44 F.3d 1345, 1352 (7th Cir. 1995) (Lying to gain access constitutes trespass only when the access results in an "invasion . . . of any of the specific interests that the tort of trespass seeks to protect."); *see also Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 517 (4th Cir. 1999) (agreeing with "*Desnick*'s thoughtful analysis about when a consent to enter that is based on misrepresentation may be given effect").

[52] *Desnick*, 44 F.3d at 1352; *Food Lion*, 194 F.3d at 517.

[53] *Desnick*, 44 F.3d at 1352; *Food Lion*, 194 F.3d at 517.

[54] *See Desnick*, 44 F.3d at 1351–52.

[55] *See id.* at 1351.

[56] *See id.*

[57] *See Food Lion*, 194 F.3d at 518 (declining to "turn[] successful resume fraud into trespass").

occurred). In other words, under this reasoning, lying to gain entry, without more, does not itself constitute trespass.

Thus, merging the Fourth and Seventh Circuit's trespass conclusions (that a liar is not a trespasser unless and until she causes trespass-type harm) with *Alvarez*'s First Amendment conclusion (that a law criminalizing lies is immune from First Amendment scrutiny only if the lies cause legally cognizable harm), the following standard emerges: the Act here is immune from First Amendment scrutiny under the State's trespass theory only if those who gain access to an agricultural operation under false pretenses subsequently cause trespass-type harm, meaning interference with ownership or possession of the property. In those instances, they have negated their consent to enter, they are trespassers (and have therefore caused legally cognizable harm), and their lies, under *Alvarez*, receive no First Amendment protection. But if those who lie to gain access do not necessarily cause trespass-type harm (and thus, in turn, do not necessarily cause legally cognizable harm), their lies retain First Amendment protection under *Alvarez*, and the Act remains subject to scrutiny.

It is certainly possible that a lie used to gain access to an agricultural facility could cause trespass-type harm; a protestor, for example, might pose as a prospective customer, and then, after being let in the door, begin causing a scene or damaging property. But the Act also sweeps in many more trivial, harmless lies that have no discernable effect on whether a person is granted access, and, consequently, on whether a person causes any trespass-type harm. Indeed, given its broad language ("obtain[ing] access to an agricultural operation under false pretenses"), the Act on its face criminalizes, for example, an applicant's false statement during a job interview that he is a born-again Christian, that he is married with kids, that he is a fan of the local sports team. It criminalizes putting a local address on a resume when the applicant is actually applying from out

of town.  In short, the Act criminalizes a broad swath of lies that result in no harm at all, much less interference with ownership or possession of the facility—lies that are therefore entitled to First Amendment protection under *Alvarez*.

The State attempts to avoid this problem by arguing the court should more narrowly construe "false pretenses" in the Act to exclude these white lies that cause no real harm.[58]  The Act does not define "false pretenses," and in their original briefing, the parties simply equated "false pretenses" more or less directly with "lying."  After oral argument, the court ordered supplemental briefing on the definition of false pretenses as used in the Act,[59] at which point the State argued for the first time that the court should read a causation requirement into "false pretenses" to narrow its scope solely to lies that are material to a person's access.[60]  In other words, under the State's proposed interpretation, a lie falls within the Act only if a person gains access *because of* the lie—the applicant, for example, who lies about supporting the local sports team has not violated the Act unless the agricultural facility owner would not have given consent to enter had he known the applicant in fact preferred the crosstown rival.[61]

Setting aside the potential vagueness doctrine implications for reading this type of subjective requirement into a criminal statute, the State's proposed solution likely does not save the Act from First Amendment review.  At least under the approach adopted by the Fourth and Seventh Circuits, the fact that a lie was the reason the landowner granted consent to enter (and not merely an unrelated white lie) does not alter the harm calculation.  According to these courts,

---

[58] *See* Dkt. 202 at 3.

[59] Dkt. 201.

[60] *See id.* ("[T]he false pretense must be a basis for the person 'obtaining' access.").

[61] *See id.* at 1 (A person is liable only for false representations "but for which the access to the agricultural operation would not have been provided.").

a liar does not become a trespasser merely because a property owner would have withheld consent to enter the property had he known the truth.  In *Desnick*, the Seventh Circuit concluded that undercover ABC investigators who represented themselves to an ophthalmic clinic as potential patients and then covertly filmed their visit did not commit trespass because they had consent to enter and caused no trespass-type harm; there was no sneaking into areas to which they were not granted access, no publication of intimate details of anyone's life, no theft of trade secrets, no disruption of office activities, etc.[62]  And it did not matter, according to the court, that the clinic "would not have agreed to the entry of the test patients into its offices had it known they wanted eye examinations only in order to gather material for a television expose of the Center and that they were going to make secret videotapes of the examinations."[63]  What mattered was they obtained consent to enter, and they subsequently caused no trespass-related harm to vitiate that consent.

Nor did the Fourth Circuit in *Food Lion* find it relevant that "consent [was] given *because of* the misrepresentations."[64]  There, ABC reporters falsified their resumes and obtained jobs at a Food Lion grocery store where they surreptitiously recorded various health violations.[65]  The Fourth Circuit noted it could find no authority for the proposition "that consent based on a resume misrepresentation turns a successful job applicant into a trespasser the moment she enters the employer's premises."[66]  The court concluded that the reporters' resume fraud did not amount to trespass because it did not interfere with "the ownership and peaceable possession of land,"

---

[62] *See Desnick*, 44 F.3d at 1352–53.

[63] *Id.* at 1351.

[64] *Food Lion, Inc.*, 194 F.3d at 518 (emphasis added).

[65] *Id.* at 510–11.

[66] *Id.* at 518.

regardless of the fact that the store owner would not have allowed the reporters on the property but for the fact that they concealed their identities.[67]  Thus, like the Seventh Circuit, the Fourth Circuit ultimately concluded that lying to gain entry, without more, does not render someone a trespasser.

At what point, then, does an invited guest become a trespasser as a result of making misrepresentations to a private property owner?  At least in this court's view, the issue is both complicated and mired in competing policy considerations.  Consider, for example, the owner of a landscaping company who bids on a project to provide landscaping services to an architectural firm, but misrepresents in his bid the experience of his company.  The owner falsely claims the company has completed fifty similar projects, when in fact it would be his first project as a landscaper, and provides fifty sample images of "previous projects," when in fact those images were merely lifted from the Internet.  The architectural firm hires the landscaper solely on the strength of his false experience and the quality of work in the fake images.  The landscaper nevertheless completes the project on time, for the price bid, and in a manner exceeding the expectations of the architectural firm.

What legally cognizable trespass harm has the firm suffered?  The Fourth and Seventh Circuits would conclude, none.  There is ample room for disagreement with that conclusion, and the Utah appellate courts or Tenth Circuit might well adopt a different analysis.  But absent guidance from these courts, the approach taken by the Fourth and Seven Circuits is persuasive to

---

[67] *Id.*  The *Food Lion* court ultimately upheld the reporters' trespass convictions, concluding that although their consent to enter was not vitiated by the lies on their resumes, they subsequently exceeded the scope of that consent by recording non-public areas of the store.  *Id.* at 519.  This part of the holding is not relevant to this case both because it was based on North Carolina state law, and, more importantly, because here the plain language of the Act punishes not only those who exceed their consent, but also those who lie to get in the door but then act entirely within the scope of their consent and are otherwise indistinguishable from any other employee.

this court. That is, something more than access by misrepresentation seems necessary to cause trespass-related harm. The mere knowledge (or lack of knowledge, as the case may be) that an invited guest was less than truthful, without more, may cause some harm, but it is difficult to see how that harm alone becomes legally cognizable.[68]

For these reasons, the court opts to follow the reasoning of the Fourth and Seventh Circuits that gaining access to a business by concealing an organizational affiliation, even if that concealment was the reason access was granted, does not alone cause a legally cognizable trespass harm. Applying that reasoning here, at least some lies criminalized by the Act enjoy First Amendment protection. As discussed above, the plain language of the Act criminalizes a host of trivial, harmless misrepresentations, and for that reason alone it is subject to First Amendment scrutiny. And under the reasoning of the Fourth and Seventh Circuits, the answer does not change even if the court were persuaded it could faithfully construe "false pretenses" in the Act to more narrowly criminalize only those lies that actually induce a property owner to grant access to an agricultural facility, as urged by the State. In other words, absent an additional showing of harm, under either interpretation, at least some of the lies criminalized by the Act retain First Amendment protection.

### c. Harm Related to Offers of Employment

The State's final argument is that even if access alone does not cause "legally cognizable harm" under *Alvarez*, obtaining a job under false pretenses does, so the Act's lying provision

---

[68] To be clear, this analysis is focused only on trespass-related harm with regard to access itself. The invited guest is obviously not immune from liability for other tortious conduct she may commit after being invited onto the property. For example, the property owner may still obtain relief through tort remedies (including trespass) if the guest later steals trade secrets, invades private spaces, destroys property, assaults employees, or the like.

(which presumably covers lying to get a job, among other types of access) is not subject to First Amendment scrutiny. For this proposition the State relies on the following line from *Alvarez*:

> Where false claims are made to effect a fraud or secure moneys or other valuable considerations, say offers of employment, it is well established that the Government may restrict speech without affronting the First Amendment.[69]

If the Act solely criminalized obtaining an offer of employment under false pretenses, this argument might carry some weight. Instead, however, the Act criminalizes "obtain[ing] access . . . under false pretenses," which sweeps in a host of lies unrelated to lying to gain employment, including, for example, lying about wanting to take a tour, lying about an interest in acquiring the facility, or lying about wanting to write an article about the facility for Modern Farmer. Because the Act criminalizes more than just lies to gain employment, *Alvarez*'s reference to "offers of employment" is not a basis to exempt the Act from First Amendment scrutiny. Indeed, this proposition is borne out by *Alvarez* itself. In that case, the statute at issue criminalized lying about receiving the Medal of Honor, which presumably includes lying about receiving the Medal of Honor in order to get a job open only to Medal recipients. But the fact that a subset of the lies criminalized were lies to gain employment did not bring the statute outside First Amendment protection. Rather, because it swept in First Amendment-protected lies (even if it also swept in unprotected lies), it was subject to scrutiny.

For the same reason, the false pretenses provision in the Act is subject to First Amendment scrutiny. It may be that some of the misrepresentations criminalized by the Act cause legally cognizable harm, but not all do. Thus, if the State wishes to criminalize these misrepresentations, the Act must survive First Amendment scrutiny.

---

[69] *United States v. Alvarez*, 567 U.S. 709, 723 (2012).

## 2. The Recording Provisions

The court next addresses whether the First Amendment applies to the Act's recording provisions. Unlike lying, which the State concedes is speech but argues is nonetheless unprotected in this case, the State argues the act of recording is not speech to begin with. According to the State, it may place any restriction on recording—including, presumably, banning it entirely—without having to justify the restriction under the First Amendment. Plaintiffs, by contrast, contend that recording is First Amendment speech, so the government must justify the Act's recording restrictions and demonstrate they are narrowly tailored.

There has been no definitive word from the Supreme Court or the Tenth Circuit on whether recording is speech for First Amendment purposes. But based on the Supreme Court's treatment of similar issues, it appears the answer likely is yes. Over a half-century ago, the Court declared that movies themselves are protected by the First Amendment, concluding that New York had to justify its decision to ban any movie the state deemed "sacrilegious."[70] More recently, the Court affirmed that laws restricting "visual [and] auditory depiction[s], such as photographs, videos, or sound recordings," are subject to First Amendment scrutiny, so the government was required to justify a statute that banned "crush videos" depicting the torture and killing of small animals.[71]

Thus, the Court has made clear that restrictions on recordings themselves are subject to scrutiny, and while it has not yet addressed whether such scrutiny extends to restrictions on the *making* of those recordings, it has recognized that "[l]aws enacted to control or suppress speech may operate at different points in the speech process"—for example, taxing ink and paper

---

[70] *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 502 (1952) ("[E]xpression by means of motion pictures is included within the free speech and press guaranty of the First and Fourteenth Amendments.").

[71] *United States v. Stevens*, 559 U.S. 460, 468, 482 (2010).

purchased to print newspapers.[72]  Taking these principles together—that recordings are speech and that pre-speech restrictions are treated similarly to restrictions on speech itself—it appears the Court likely would conclude that making a recording is an act that can enjoy First Amendment protection.

Several circuits have more directly confronted the question, and have reached the same conclusion.  The Seventh Circuit, for example, determined that "[t]he act of *making* an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording."[73]  Indeed, the undisputed right to *broadcast* a video recording would mean very little, the court explained, if the government could circumvent that right by regulating with impunity the *making* of the recording instead.[74]  Other circuits are in accord.  The Eleventh Circuit concluded there is "a First Amendment right, subject to reasonable time, manner, and place restrictions, to photograph or videotape police conduct."[75]  Similarly, the First Circuit concluded, with little discussion, that filming a town hall meeting is an "exercise of . . . First Amendment rights."[76]  And more recently, that circuit subjected laws restricting the taking of "ballot selfies" to First Amendment scrutiny.[77]

District courts that have addressed the issue have come down the same way.  A court in the Southern District of Iowa, in the context of a preliminary injunction, concluded that both

---

[72] *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 336 (2010); *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 592–93 (1983).

[73] *Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012).

[74] *Id.*

[75] *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000).

[76] *Iacobucci v. Boulter*, 193 F.3d 14, 25 (1st Cir. 1999).

[77] *Rideout v. Gardner*, 838 F.3d 65, 72 (1st. Cir. 2016), *cert. denied*, 137 S. Ct. 1435 (2017).

individuals and the media likely have a First Amendment right to "make and display videotapes of events."[78]  A court in the Eastern District of Pennsylvania concluded that the First Amendment protects the recording of police officers performing their duties.[79]  In the District of Rhode Island, a court found that an art teacher's filming of perceived health and safety violations at a high school constituted First Amendment speech.  And in the District of Massachusetts, a court concluded that the First Amendment "protected [a] right to record matters of public interest."[80]

In sum, it appears the consensus among courts is that the act of recording is protectable First Amendment speech.  And this court agrees.  Were the law otherwise, as the State contends, the State could criminalize, for example, creating music videos, or videos critical of the government, or any video at all, for that matter, with impunity.  In other words, the State could do indirectly what the Supreme Court has made clear it cannot do directly.  Because recordings themselves are protected by the First Amendment, so too must the making of those recordings be protected.  This is not to say the State cannot regulate the act of recording; it is merely to say that if it wishes to do so, the State must justify and narrowly tailor the restriction, as with any other constraint on protected speech.

### 3. The Private Property Distinction

The State's final argument is that even if the lying and recording criminalized by the Act are otherwise protectable speech, the First Amendment plays no role in this case because the Act applies only to speech on private property, and the First Amendment does not apply on private property.  According to the State, "private property rights extinguish . . . First Amendment

---

[78] *Lambert v. Polk Cty., Iowa*, 723 F. Supp. 128, 133 (S.D. Iowa 1989).

[79] *Robinson v. Fetterman*, 378 F. Supp. 2d 534, 541 (E.D. Pa. 2005).

[80] *Demarest v. Athol/Orange Cmty. Television, Inc.*, 188 F. Supp. 2d 82, 92–95 (D. Mass. 2002).

rights."[81]  And by that logic, speech on agricultural facilities enjoys no First Amendment protection.

This argument finds no support in the case law.  In its papers, and again at oral argument, the State relied on four Supreme Court cases: *Lloyd Corp v. Tanner* (the First Amendment does not compel the owner of a shopping center to allow people to protest on the property), *Hudgens v. NLRB* (the First Amendment does not compel a store owner to allow employees to protest on the property),  *Branzburg v. Hayes* (the First Amendment does not shield a reporter from revealing a confidential source to a grand jury), and *Pell v. Procunier* (the First Amendment does not compel a prison to allow journalists access to prisoners).[82]  But these cases are not on point. Indeed, the State's reliance on these cases (and its argument in general) confuses two related but distinct concepts: a landowner's ability to exclude from her property someone who wishes to speak, and the government's ability to jail the person for that speech.  The cases cited by the State deal with the first concept.  They stand for the proposition that the First Amendment is typically not a defense to generally-applicable tort laws.[83]  Specifically, as relevant here, they hold that the First Amendment does not provide a license to trespass on private property, and, as a corollary, nor does it provide a defense in a trespass suit.  In short, the cases cited by the State answer the question of whether a landowner can remove someone from her property or sue for trespass even when the person wishes to exercise First Amendment rights.  And generally, as the cases make clear, the answer is yes.

---

[81] Dkt. 199 at 24.

[82] *Id.* at 28 (State's counsel at Summary Judgment hearing citing *Lloyd Corp., Ltd. v. Tanner*, 407 U.S. 551 (1972), *Hudgens v. NLRB*, 424 U.S. 507 (1976), *Branzburg v. Hayes*, 408 U.S. 665 (1972), and *Pell v. Procunier*, 417 U.S. 817 (1974)).

[83] *See Branzburg*, 408 U.S. at 708–09; *Pell*, 417 U.S. at 834–35; *Hudgens*, 424 U.S. at 520–21; *Lloyd Corp.*, 407 U.S. at 570.

But that is not the question before the court.  The question here is whether the State (not a private landowner) can prosecute (not sue for damages) a person based on her speech on private property.  And at this point in the analysis, the question is the threshold one of whether it can do so without even justifying or tailoring the law.  The State cites no authority for this proposition.  Nor has the court found any, and seemingly for good reason: it is contrary to basic First Amendment principles.  If a person's First Amendment rights were extinguished the moment she stepped foot on private property, the State could, for example, criminalize any criticism of the Governor, or any discussion about the opposition party, or any talk of politics whatsoever, if done on private property.  This runs directly afoul of the First Amendment, which "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people," whether in the public square or in private coffee shops and cafes.[84]

In sum, the fact that speech occurs on a private agricultural facility does not render it outside First Amendment protection.  Nobody disputes that owners of an agricultural facility can immediately remove from the property any person speaking in ways the owners find objectionable.  But if the State wants to criminalize the same speech, it must justify the law under the First Amendment.

### B.  What Level of Scrutiny Applies

Having concluded that both the lying and recording provisions of the Act are subject to First Amendment scrutiny, the court turns to the question of what level of scrutiny is warranted.  Restrictions on speech are subject either to strict or intermediate scrutiny.[85]  Which level applies depends on whether the government criminalized the speech "because of disagreement with the

---

[84] *Roth v. United States*, 354 U.S. 476, 484 (1957).

[85] *Ward v. Rock Against Racism*, 491 U.S. 781, 791–92 (1989).

message it conveys"—what is known as a "content-based" law.[86]  A law is content based—and therefore subject to strict scrutiny—if determining whether someone violated the law requires looking at what was said.  But if assessing a violation does not require reviewing the message itself, the law is content neutral, and is subject to intermediate scrutiny.  With this framework in mind, the court will address the scrutiny that applies to the lying and recording provisions.

### 1. The Lying Provision

After *Alvarez*, it is not entirely clear what level of scrutiny is appropriate for laws that criminalize lying.  Though a majority of the *Alvarez* court agreed about whether and when lies are subject to First Amendment scrutiny, there was no consensus on what level of scrutiny to apply to laws criminalizing lies.  Justice Kennedy and a plurality of the Court found *Alvarez*'s prohibition on lying content based, and therefore applied strict scrutiny.[87]  By contrast, Justice Breyer, in a concurrence joined by Justice Kagan, would have applied what he termed "proportionality review," seemingly a variant of intermediate scrutiny.[88]

When a majority of a fragmented Court agrees on a result, but no majority consensus exists on the rationale for the result, the Court's holding is typically that of "those members who concurred in the judgment on the narrowest grounds."[89]  But "narrowness" is often difficult to determine, especially where, as here, the disagreement among Justices is one of kind—whether to apply strict or proportional scrutiny—not of breadth.  In these circumstances the Court has

---

[86] *Id.*

[87] *United States v. Alvarez*, 567 U.S. 709, 724 (2012).

[88] *Id.* at 730–31.

[89] *Marks v. United States*, 430 U.S. 188, 193 (1977).

historically deferred to interpretation by the lower courts.[90]  And in the wake of *Alvarez*, lower courts have generally applied strict scrutiny to laws implicating lies.[91]

This approach makes sense.  As discussed, the question is whether the law is content based, which requires determining whether "enforcement authorities [must] examine the content of the message that is conveyed to determine whether a violation has occurred."[92]  The provision at issue here criminalizes "obtain[ing] access to an agricultural operation under false pretenses."  Thus, whether someone violates the Act depends on what they say.  If, for example, enforcement authorities know only that an applicant represented to an agricultural facility that she attended a particular school, that alone is not sufficient to determine whether the Act was violated.  Rather, the authorities must take the next step of examining the content of the message: what school did she say she attended, and is that the school she actually attended?  The falsity of the speech cannot be determined without looking to the content of the message.  This means the provision is content based, and subject to strict scrutiny.

The State argues the lying provision is content neutral because it "prohibits all persons, regardless of the message they intend to disseminate, from lying to gain access to agricultural operations."[93]  But the test is not whether the Act prohibits some or all persons from lying.  And what message (if any) a person wishes to disseminate *after* accessing a facility is irrelevant.  The speech in question is the lie itself, and the only way to know whether a lie is a lie is to review what was said.  This is perhaps the quintessential example of a content-based restriction.

---

[90] *See* Justin Marceau, *Plurality Decisions: Upward-Flowing Precedent and Acoustic Separation*, 45 Conn. L. Rev. 933, 941–42, 974–88 (2013) (analyzing every Supreme Court case applying *Marks*).

[91] *See* Alan K. Chen & Justin Marceau, *High Value Lies, Ugly Truths, and the First Amendment*, 68 Vand. L. Rev. 1435, 1482 (2015) (collecting cases).

[92] *McCullen v. Coakley*, 134 S. Ct. 2518, 2531 (2014).

[93] Dkt. 116 at xxix.

## 2.  The Recording Provisions

The next question is whether the recording provisions of the Act are content based.  Each provision criminalizes "record[ing] an image of, or sound from, [an] agricultural operation."  And "agricultural operation" is defined as "private property used for the production of livestock, poultry, livestock products, or poultry products."[94]  So the question is whether criminalizing the recording of a particular location is a content-based restriction.

The State contends it is not.  According to the State, the Act does not restrict *what* is said, but rather *where* it is said.  In other words, the State's position is that the Act is not a content-based restriction but rather a permissible location-based restriction.

That might be so if the Act criminalized recording an image "*at* an agricultural operation."  But the Act criminalizes recording an image "*of* an agricultural operation."  The distinction is not trivial.  Indeed, the use of "of" rather than "at" means the Act does not bar all filming at an agricultural operation, so it is not location based.  For example, a person standing on agricultural operation property who films a passing flock of geese is certainly at an agricultural operation, but nobody watching the film would contend it was a recording "of an agricultural operation."  An employee who takes a photo of a sunset through the window of an agricultural operation is at the facility, but he has not snapped a shot "of an agricultural operation."  In short, if a person walks off an agricultural facility with a recording, the only way to know whether she is criminally liable under the Act is to view the recording.[95]  That makes the provision content based, and subject to strict scrutiny.

---

[94] Utah Code § 76-6-112(1) (2012).

[95] To that end, this case is unlike *McCullen*, where a restriction on standing within thirty-five feet of an abortion facility to turned "not on what [petitioners] say, but simply on where they say it," because merely standing within the buffer zone violated the act.  *McCullen*, 134 S. Ct. at 2531.

### C. Whether the Act Withstands Strict Scrutiny

Having concluded the Act is subject to strict scrutiny, the court must decide whether it withstands this review. The presumption is that it does not.[96] The State may rebut this presumption by demonstrating that "the restriction furthers a compelling interest" and that the restriction "is narrowly tailored to achieve that interest."[97]

On first blush, this inquiry appears to pit the First Amendment broadly against the privacy and property interests of landowners. Indeed, it might seem to involve a weighing of the value of undercover investigations against the wisdom and reasoning behind laws suppressing them. Ultimately, however, because of both the breadth of the Act and the narrow grounds on which the State defended it, these complex policy questions never really materialize in this case.

Instead, in its briefing, the State confined the court's analysis to four discrete government interests it contends support the Act, arguing: (1) the Act protects animals from diseases brought into the facility by workers; (2) it protects animals from injury resulting from unqualified or inattentive workers; (3) it protects workers from exposure to zoonotic diseases; and (4) it protects workers from injury resulting from unqualified or inattentive workers.[98] Though portions of the State's briefing refer loosely to privacy and property interests, these were not included in the State's enumerated list of four interests motivating the Act, and at oral argument the State explicitly disclaimed reliance on privacy or property interests for purposes of this analysis.[99] Thus, the court's inquiry and holding address only the arguments on which the State relied: that

---

[96] *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2226 (2015).

[97] *Id.* at 2231. Because Plaintiffs have mounted a facial challenge, if the court concludes the "statute fails the relevant constitutional test"—in this case, strict scrutiny—then "it can no longer be constitutionally applied to anyone." *Doe v. City of Albuquerque*, 667 F.3d 1111, 1127 (10th Cir. 2012).

[98] Dkt. 116 at 14; Dkt. 158 at 19.

[99] *See* Dkt. 199 at 50–54.

people who lie about their background to gain access to a facility, and who record while inside, risk spreading diseases to and injuring animals and workers, and that the Act is appropriately targeted at mitigating that risk.

As an initial matter, it is not clear that these were the actual reasons motivating the Act. Indeed, the legislative history surrounding the Act appears entirely devoid of any reference to an intention by the State to protect the safety of animals or workers. Rather, as discussed, it is rife with discussion of the need to address harm caused by "national propaganda groups," and by "the vegetarian people" who are "trying to kill the animal industry," "a group of people that want to put [agricultural facilities] out of business."[100]

But even assuming animal and employee safety were the State's actual reasons for enacting the Act, there is no indication that those interests are actually threatened by people who lie to get in the door or record once inside. At oral argument, the State conceded that the "record does not show that Plaintiffs' undercover operatives have created any of the diseases [employers] risk, or that Plaintiffs' undercover operatives have caused an injury to another worker."[101] In other words, the harm targeted by the Act is entirely speculative. And harm that is "mere[ly] speculat[ive] . . . does not constitute a compelling state interest."[102]

---

[100] Dkt. 112-3 at 4, 23, 39.

[101] Dkt. 199 at 114. The only basis the State provided to connect undercover investigators with harm to animals or employees is "some evidence in the record of Plaintiffs' undercover operatives perhaps prolonging suffering of animals by not reporting abuse in a timely manner." *Id.* The State has not argued that one of the compelling interests furthered by the Act is quickly addressing animal abuse by agricultural operations. But even if it had, the Act is not even remotely tailored to that end. Several states have addressed this exact concern by passing mandatory disclosure laws, requiring employees who record abuse to turn over the recording to authorities within a certain time period. *See, e.g.*, Mo. Rev. Stat. § 578.013 (2012). The court makes no determination about the constitutionality of such a provision, but notes only that it is seemingly both more narrowly tailored to and more effective at addressing delays in reporting animal abuse than are the provisions at issue here.

[102] *Awad v. Ziriax*, 670 F.3d 1111, 1129 (10th Cir. 2012) (citing *Consol. Edison Co. of N.Y., Inc. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 530, 543 (1980)).

Further, even if the State had demonstrated that protecting animals and employees from undercover investigators is a compelling interest, the State has not shown the Act is narrowly tailored to address this problem. To survive strict scrutiny, a law must be "actually necessary" to achieve the State's interests, and may not be over or underinclusive.[103] It is not at all clear from the record that the Act is actually necessary to address perceived threats to animals and employees from undercover investigators, especially given the slew of content-neutral alternatives discussed by the State's own expert.[104] Not only is the Act seemingly not necessary to remedy the State's alleged harms, it is an entirely overinclusive means to address them. It targets, for example, the employee who lies on her job application but otherwise performs her job admirably, and it criminalizes the most diligent well-trained undercover employees. And it is simultaneously underinclusive because it does nothing to address the exact same allegedly harmful conduct when undertaken by anyone other than an undercover investigator.

What the Act appears perfectly tailored toward is preventing undercover investigators from exposing abuses at agricultural facilities. The State has not argued this as a government interest motivating the Act. And had it done so, it is not clear whether that interest could be sufficiently compelling to withstand strict scrutiny. But that question is for another day. The court's analysis today addresses only the interests the State now relies on: health and safety of animals and employees. To that end, the State has provided no evidence that animal and employee safety were the actual reasons for enacting the Act, nor that animal and employee

---

[103] *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 799–804 (2011).

[104] *See, e.g.*, Dkt. 88-1 at 5–6, 12 (discussing various measures to protect against biosecurity threats, including "personal protective equipment or procedures required for anyone entering/exiting the premises," "lines of separation, protective outwear, donning and doffing practices," "information addressing employee movement practices," "limiting traffic (people and equipment) onto farms," "on-farm movement control of pigs, material, and people," "disinfection of vehicles, equipment, and appropriate disposal of dead pigs and slurry," and "training programs for the safety of . . . workers").

safety are endangered by those targeted by the Act, nor that the Act would actually do anything to remedy those dangers to the extent they exist. For these reasons, the Act fails strict scrutiny.[105]

## CONCLUSION

There can be no doubt that today, over 200 years after Washington implored Congress to safeguard the agricultural industry, the industry remains crucially important to the continued viability of the nation. Similarly important to the nation's continued viability, however, is the safeguarding of the fundamental rights Washington helped enshrine into the Constitution. Utah undoubtedly has an interest in addressing perceived threats to the state agricultural industry, and as history shows, it has a variety of constitutionally permissible tools at its disposal to do so. Suppressing broad swaths of protected speech without justification, however, is not one of them.

The court concludes that Utah Code § 76-6-112 is unconstitutional. Plaintiffs' Motion for Summary Judgment is granted.[106] The State's Motion for Summary Judgment is denied.[107] The clerk is directed to close the case.

SO ORDERED this 7th day of July, 2017.

BY THE COURT:

ROBERT J. SHELBY
United States District Judge

---

[105] Plaintiffs argue, in the alternative, that the Act is unconstitutional under the overbreadth doctrine. Because the court concludes the Act fails under strict scrutiny, it need not address overbreadth. *See Rideout v. Gardner*, 838 F.3d 65, 72 n.5 (1st Cir. 2016) (citing *United States v. Stevens*, 559 U.S. 460, 473 (2010)) ("Because the statute fails under intermediate scrutiny, we also need not reach the plaintiffs' argument that the statute fails under the overbreadth doctrine.). Similarly, the court declines to address Plaintiffs' alternative argument that the Act fails under the Equal Protection Clause.

[106] Dkt. 106.

[107] Dkt. 116.